UNITED STATES v. TOLEDO NEWSPAPER CO. et al.

(District Court, N. D. Ohio, W. D. January 23, 1915.)

*(Syllabus by the Court.)*

1. CONSTITUTIONAL LAW ⬤➡90—FREE SPEECH—RIGHT TO PUNISH.
   The constitutional guaranty of free speech and a free press is not infringed by summary process and conviction in contempt, because of publications respecting a pending cause and tending to obstruct the administration of justice therein.

   [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 172; Dec. Dig. ⬤➡90.]

2. CONTEMPT ⬤➡9—PUBLICATION OF AFFECTING PENDING CAUSE—EXEMPTION FROM PUNISHMENT—STATUTE.
   The act of March 2, 1831 (Rev. St. § 725; Judicial Code, § 268 [Comp. St. 1913, § 1245]), declaratory of the law of contempt, was not intended to, nor does it, exempt publishers and editors from attachment for contempt for publications improperly affecting a pending case.

   [Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 8, 15–18; Dec. Dig. ⬤➡9.]

**3.** CONTEMPT ⬤⇒6—NEWSPAPER PUBLICATION—PENDING CASE—OBSTRUCTION OF JUSTICE.

It is provided in section 268, Judicial Code, that this court may punish as contempt of its authority misbehavior so near its presence "as to obstruct the administration of justice." *Held*, that the criterion whether an alleged misbehavior is within this provision of the act is not the physical or topographical propinquity of the act to the court; but, having reference to all the pertinent circumstances attending its commission, it is the nature of the act as tending directly to affect the administration of justice.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 6, 9, 10, 13; Dec. Dig. ⬤⇒6.]

**4.** CONTEMPT ⬤⇒6—NEWSPAPER PUBLICATION—PENDING CASE—OBSTRUCTION OF JUSTICE.

Publications in a newspaper of general circulation in the city wherein the court sits, which publications are of a nature to embarrass the judge of the court in his consideration of a pending cause, or which tend to appeal to prejudice against the court or against a party to the cause respecting a pending case, may be misbehavior so near the presence of the court as to obstruct the administration of justice, wherefore they may subject the publisher or the editor, or both, to summary process in contempt under section 268, Judicial Code.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 6, 9, 10, 13; Dec. Dig. ⬤⇒6.]

**5.** CONTEMPT ⬤⇒9—NEWSPAPER PUBLICATION—PENDING CASE—OBSTRUCTION OF JUSTICE.

In order to produce a conviction, as contempt of court, for a newspaper publication affecting a pending cause, it is not necessary that the proof should show either that the publication ever came to the attention of the judge of the court, or that it had any influence on the consideration of the cause to which it refers. It is sufficient if, excluding any other reasonable interpretation of the language of the publication, after applying the ordinary rules for construing the English language and considering how it may be reasonably understood by ordinary readers, the state of public feeling on the subject-matter of the publication, and any other relevant matter which may reasonably aid in understanding the necessary effect of such publication respecting the pending cause, it is seen to tend to obstruct the administration of justice therein.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 8, 15–18; Dec. Dig. ⬤⇒9.]

**6.** CONTEMPT ⬤⇒60—NEWSPAPER PUBLICATION—EVIDENCE—OTHER PUBLICATIONS.

In considering whether a publication is a contempt of court, in that it tends to obstruct the administration of justice in a pending case, the court may consider other publications on the same subject by the same publisher.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 183–187; Dec. Dig. ⬤⇒60.]

**7.** CONTEMPT ⬤⇒9—NEWSPAPER PUBLICATION—DEFENSE.

It is no defense to a charge of contempt of court by publications respecting a pending case that the court was without jurisdiction to entertain such pending case.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 8, 15–18; Dec. Dig. ⬤⇒9.]

The Toledo Newspaper Company and another were charged with criminal contempt. Judgment against defendants.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

U. G. Denman, U. S. Atty., of Toledo, Ohio, and William L. Day, of Cleveland, Ohio, Special Counsel, for the government.    •

Lawrence Maxwell and Jay W. Curts, both of Cincinnati, Ohio, and Charles S. Northup, of Toledo, Ohio, for respondents.

KILLITS, District Judge.   The respondents, the Toledo Newspaper Company and Negley D. Cochran, respectively the publisher and editor in chief of a daily newspaper published in the city of Toledo, Ohio, known as the "Toledo News-Bee," are before the court to answer to charges of contempt for publications in that paper between the dates of March 24 and September 17, 1914, inclusive.

The information is in three counts, and is filed by the district attorney by order of the court.   The first count deals with publications between March 24 and September 12, 1914, affecting a cause pending in this court entitled Henry L. Doherty et al., Partners as Henry L. Doherty & Company, v. Toledo Railways & Light Co.

The second count offers publications of September 12 and 14, 1914, touching the proceedings in contempt in this court against one John Quinlivan; the rule to show cause against said Quinlivan in the contempt proceedings being entitled in the civil case whose title is given above.

The third count deals with a publication on September 17, 1914, relating to a proceeding in contempt in this court against Harry J. Howard, managing editor of the Toledo News-Bee.

The publications complained of, with the contexts of which they are a part, are set out in full in the information.   They are so numerous and many of them so long that to reproduce them in a statement of fact, even by reasonable editing in condensation, would be to very greatly tax the situation.   Besides, as not unusual in the style of journalism which the newspaper in question affects, they were so embellished with exaggerated headlines and other typographical display, operating as emphasis upon certain features, that their full effect cannot be exhibited in a practical attempt at reproduction in an opinion.   For the present purpose, it is sufficient to set forth a superficial view of their scope, although that will of necessity be extended.

The information charges that the publications involved in the first count were calculated and intended to produce two effects: First, an influence on the court's consideration of the pending traction case, by attempting an impression that a decision contrary to the wishes of the paper would not only be very unpopular in the community but likely to be met with active opposition; and, secondly, an encouragement to popular resistance to any order the court might make following such unpopular decision.

These purposes are alleged to have been effected by violent attacks on the parties to the case who were interested against the city, attacks calculated to influence public sentiment; by comment on the personality of the judge of the court and on proceedings in the case under him, tending to the impression that the court was liable to influence against the city out of proportion to the law and facts; by encouraging, through intensive comment and extravagant headings and other typo-

graphical embellishments, a plan for popular uprising against the traction company in spite of any order the court might make in the case; by misrepresenting, especially through prominent headlines, the action of the court through successive steps in the case; and by "featuring" attacks on the court from local organizations while the case was pending.

The proceedings concerning which publications are pleaded as offensive in the second and third counts were outgrowths of the traction case. It is alleged that these publications tended and were intended to embarrass the court in its consideration of the respective causes, by impugning the motives of the judge thereof and by attempting to belittle him in public estimation.

It is admitted that the paper in question containing these publications circulated to the extent of more than 50,000 copies daily in and about the city of Toledo, wherein sat the court in question and resided the judge thereof subject to comment in said publications. The order directing the district attorney to file the information and signed by the judge of the court recites the fact of his residence in the city of Toledo, and that, as a daily reader of the newspaper in question, the several publications had come to his personal attention.

Before entering into a more detailed description of the publications, it is proper to picture briefly the local situation and recent history of the city, as well as to outline the traction case referred to by title above, although the full force of the effect upon the paper's readers of the publication charged as offensive can be properly appreciated and gauged only by those who have seen the manner in which they were set forth and embellished from time to time with typographical exaggerations, and who, through residence in the city, are familiar with local conditions.

The testimony shows that Toledo has had a street railway franchise problem confronting it for more than ten years, and that agitation concerning it of the familiar extreme type had accompanied the attempt of every administration to deal with it, and that it had figured as the issue in five or six municipal electoral contests.

Franchises for some of the most important lines expired in 1910, and others, disintegrating the system, with March 27, 1914, although it was contended in the case, by both plaintiffs and the traction company, that they continued until October, 1915.

For years the News-Bee had violently opposed the local company which it had nicknamed the "Big Con." The paper's policy was threefold—opposition to a franchise renewal, insistence on a straight three-cent fare, and for municipal ownership.

In the spring of 1913 a New York partnership, H. L. Doherty & Co., took over the management of the system and began negotiations in behalf of the company for a renewed franchise, meeting persistent and vigorous opposition from the News-Bee.

In the municipal election of 1913, all of the candidates promised three-cent fare, but those opposed by the News-Bee defeated those favored by it by a very large majority. The election amounted to a defeat for the incumbent administration, which, after the election, and

within 40 days of its vacation of power to the incoming officiary, and four months before the franchises expired, passed an ordinance called the "Schreiber Ordinance," to require the company to operate its cars, after March 27, 1914, at the pleasure of the city, at the maximum fare of three cents with free transfers, and also to pay a rental of $250 per day for the use of the streets. Other terms were: An attempt to make mere continuance of operation after March 27th work a waiver of objections and an acceptance of the measure; and a direction to the city solicitor, in case of nonobservance by the company, to apply to an appropriate court for an alternative order of compliance or abandonment of the streets. No other provision was made for enforcement, nor did the ordinance specifically direct the company to cease its service even as an alternative to obeying the measure. The solicitor never applied for an order, as provided. The company very promptly signified that it would not follow the ordinance.

Monday evening, March 23, 1914, the city council defeated a motion to postpone the enforcement of the ordinance after the 27th for a reasonable time within which to determine the franchise question. The issue of the News-Bee of March 24 is the first pleaded in the information; the article in question occupying more than five columns under a heading extending across eight columns, the width of the paper, entitled: "Big Con Fights Three-Cent Fare in Federal Court." The article is preceded by a two-column wide condensation set up "boxed"—that is, with a rule line on all sides—entitled:

"Here's the street car tangle in tabloid; Thurstin (the city solicitor) promises to protect riders."

Preceding this a subhead in large type said:

"Thurstin Declares He Intends to Fight Until There's Nothing Left. Will Defend Any One Who Will Not Pay."

This statement is repeated in this form in one of the "tabloid" paragraphs in the "boxing":

"Solicitor Thurstin promises to protect those who are ejected from cars for refusing to pay more than three cents."

In the extended article, as a foundation for these headlines, is a two-line statement attributed to the solicitor that any car rider put off for refusing to pay more than three cents after Friday night will be "protected." In the same connection, the mayor is made to say that he will do all possible to assist the solicitor, " 'even,' he said with a smile, 'if I have to call out the reserves.' "

The article deals mostly with the proceedings before the council the night before. According to it:

"An audience of 400 interested men, women and children pack council chamber and hiss those councilmen who urge postponement of three-cent ordinance."

One of the older councilmen is reported to have urged moderation because of the intensity of public feeling, fearing "bloodshed very likely and everything else that goes with it" on Saturday, if the company refused to obey the ordinance until a court passed on it, and his

views are said to have provoked great disorder among the citizens present. The argument of another councilman for moderation was "met with jeers," and all through the debate "statements construed to lean toward the company were hooted." It was said that public interest in this meeting was so general that:

"The place was crowded to overflowing. No more could get in. Many had to stay out. * * * Men who had been in the franchise fight for a dozen years were there to see how these new councilmen would act in a crisis * * * Men from almost every walk of life were there."

The account of the meeting proceeds to remind the readers of "our memorable night ten years ago," and the intervening years of wrangling over the street car question now about to culminate in a victory for the people through the new ordinance to go into effect within the week.

In January, 1914, Doherty & Co. began an action in this court against the street railway company in the nature of a creditors' bill, asking that the equity of redemption in the company be conserved to the payment of a large judgment, and for the appointment of a receiver. Other allegations of the complaint incorporated the so-called "Schreiber Ordinance," alleging that to attempt to meet its terms would be to destroy the equity of redemption in the company because they were confiscatory. It is averred that the officers of the city of Toledo are advising that this ordinance will be in force after March 27, and are suggesting to the public that thereafter citizens should refuse to pay any fare in excess of three cents and should demand the right to ride at such a rate, and that, on the refusal of the agents of the company to accept such fare, the rate should be insisted upon to the extent of violence.

It is alleged that the company holds other franchises besides those assumed to expire with March 27, whose provisions will be seriously impaired by the city's attempt to enforce the ordinance in question.

A feature of the prayer was that, if the situation did not change before March 27, the city of Toledo might be made a party to the case and the ordinance tested.

During the first three months of 1914, negotiations for a new franchise were in progress between Doherty & Co as managers of the traction company and the city, and no proceedings were had in the case beyond the filing of papers until the forenoon of March 24, when, the action of the council the night before in refusing to extend the time from March 27 for the operation of the ordinance making action necessary from the standpoint of the company, supplemental pleadings were filed, setting up the developments to that time, and the motion to make the city a party, that an inquiry into the validity of the ordinance might be had, was pressed.

The judge of the court (Judge Killits) was then on duty in Cleveland, within the district. The proposed order to bring the city in and the application therefor were read to him over the telephone by the clerk and received the court's approval, with the direction that the

order be sent to Cleveland for signature. It was so sent immediately, was signed on the 24th, and received back in Toledo on the morning mail of the 25th, and was entered as an order at chambers as of the 24th. Arrangement was made between the parties to meet the court at Cleveland at chambers at noon on Thursday, the 26th, to present the motion for a temporary injunction.

The article of the News-Bee of the 24th, which told of the proceedings in council on the previous evening, started with an account of the filing of the papers that morning in this court, its initial sentence, after the customary "tabloid" statement, being:

"With Henry L. Doherty directing operations, the Big Con got busy early on Tuesday in its efforts to evade the provisions of the Schreiber three-cent fare ordinance."

Early in the article it speaks of the interview over the telephone with the judge, and the account of the council meeting the night before follows at length after the statement ascribed to the city solicitor with reference to the case. For a cartoon the traction company was represented to be "In the Last Ditch," and managing editor Howard, testifying for respondents, said that the "last ditch" was intended to mean this court.

Owing to the illness of the judge on the 26th, the hearing was passed until Saturday morning, March 28, at Toledo, when it was then had, and, for reasons pertaining to the record as it then was, on the 30th the motions were overruled, but the main case was not otherwise affected.

In the meantime, however, the traction company had filed a cross-bill and had joined with the plaintiff in a demand for a restraining order affecting the ordinance. This cross-bill repeats the charges that the city officials were publicly advising the people that individual citizens should take the enforcement of the ordinance into their own hands, and that any efforts by them individually in that behalf would be protected by the peace officers of the city.

The issue is also raised whether in fact the principal franchises to be affected by the Schreiber ordinance expired with the 27th of March; it being pleaded that they did not in fact expire until October, 1915.

March 25, being the day before that set for the hearing, the paper's front page contained a cartoon entitled "A Desperate Case," representing the "Big Con" as a very corpulent person in bed very ill, his attorneys and Mr. Doherty around him in great anxiety and very much caricatured; one of them explaining that, "We'd Better Call in Doc. Killits." The news article was headed, in big type extending across five columns, "Car Riders May Ignore Order Barring Low Fare," and, continuing over two columns in which measure in the body was set, a subhead, "Plan Made to Test Schreiber Ordinance Immediately After Muny Ownership Meeting." Another subheading in the form of a "tabloid" paragraph was:

"Mass meeting of Municipal Ownership League at Memorial Hall, to be held Friday Night. Plan laid that Memorial Hall crowd shall remain in session until midnight, then swarm on cars and refuse to pay more than three cents."

The article, set in type across two columns, in detailing this plan begins:

"It has been planned, *restraining order or no restraining order by the federal court*, to test the strength of the three-cent-fare-all-day ordinance immediately following the closing of the meeting of the Municipal Ownership League in Memorial Hall on Friday night, unless, before that time, other counsel prevails. The Schreiber ordinance will become effective at midnight on Friday, or 12:01 a. m. on Saturday. That's the night the Municipal Ownership League is to hold its first meeting. It is planned to hold the crowd until midnight. Then the crowd is expected to offer three-cent fares on all the lines radiating from Memorial Hall, and refuse to pay more."

Full details of the proposition follow, with the information that the project is in charge of one of the city's councilmen at large, who, when asked, "What if in the meantime the federal court issues a restraining order preventing the city from enforcing the ordinance?" said:

"There comes a time in the history of men and nations when things go too far, I, for one, am willing to obey any reasonable injunction, but I will obey no injunction that takes away from the people of this city their rights."

Following, was this:

"It is intimated that at the meeting of the Central Labor Union of Thursday night resolution will be approved calling on all labor union men to attend the mass meeting on Friday night. These men *may furnish the sinew to see to it that three-cent fares are accepted by the conductors* after the new ordinance becomes effective."

The editorial page of this issue contained, in type larger than that of ordinary reading matter, a two-column wide denunciation of the "Doherty outfit," who need "very badly in their business * * * a franchise that will make the millions of water in their bonds and stock as good as money in the bank." It is entitled, "Municipal Ownership the Only Way to Street Railway Peace," and the plaintiffs in the Doherty Case are described as "arrogant franchise manipulators" who now begin "to smile sweetly at the people." They are said to complain that the company cannot operate for three cents because it "has to have a fare that will enable them to pay $800,000 a year interest on watered bonds and then pay dividends on stock that is all water— every penny of it"; and that they seek a franchise which "carries with it the right to levy a street railway tax on the people of Toledo— not all of the people of Toledo, but merely those who don't own automobiles and have to use the street cars." Having thus treated of the plaintiffs in the action, the writer thus introduces the court before which they are suitors:

"And now the railway crowd has taken the franchise into the United States court. That means, practically, that the rights of the people of Toledo will be placed in the hands of a two-legged human being who happens to be a federal judge.

"Just what kind of a judge this particular judge may be, and just what kind of a two-legged human being he is, we don't know. But the fact that he is a judge, and a federal judge at that, doesn't make him any more or less of a man than he was before he went on the bench.

"So the people's rights here will depend largely upon how his mind works, and whether he thinks in straight lines or around corners. Anyhow, whether he is a great big man or a little bit of a man, he will have a whole lot to.

220 F.—30

say in finally determining the argument between the people of Toledo and the bond and stock gamblers and speculators."

The excuse for this editorial is to demand that the city employ, to assist the solicitor, attorneys "to impress the court" who equal in ability "the high priced legal talent that is for sale to the highest bidder" and employed by the "Big Con," and thus prevent, if possible, the latter from getting a "strangle hold" on the people in the courts.

In a written argument filed by counsel for respondents, this production is dismissed from consideration as "merely an intensely emphatic assertion" of the judge's human limitations.

Author-Respondent Cochran, disclaiming any intention to reflect on the judge's integrity, testified that he wrote it in language which the common people would understand, and in such a way as "to get the punch in" and to make the people take an interest in the case; that, although Judge Killits had held court in Toledo for nearly four years, he did not know whether or not he was a judge who would try cases exactly on the law, or be specially impressed by the professional standing of counsel for either party.

As part of the same editorial page appeared this:

"Holding court over the telephone is a new one, but, it seems to be a very satisfactory method of doing business."

March 26, being the day of the hearing, the paper carried a heading in type nearly an inch high and extending across the whole front page, *"Killits Upsets Low-Fare Order,"* repeating the heading on another page to which the subsequent article was carried. For subheads, it said:

"Holds Schreiber Ordinance Should be Suspended Until Hearing as to its Fairness. Instructs Marshal to have Deputies Ready to Enforce Ruling."

In the body of the article it is made very clear that the impression conveyed by these headline statements *is wholly false,* for it is said, what was a fact, *that there was no* hearing in Cleveland; that the judge—

"was ill in bed with a temperature of 102. He postponed the hearing until he could return to Toledo on Saturday. Judge Killits sent a five-page typewritten communication, through Clerk Wilson of the local United States court, for the information of the people of Toledo."

The statement was published in full and was nothing more than a setting out of the respective rights of the city and the traction company when a franchise expires, and an appeal to the judge's fellow citizens to maintain order until the court could hear the question, expressing confidence that, notwithstanding what had been predicted of the meeting for Friday night, the good sense of the city would preserve order. Not a word can be found in it which even hints any conclusion as to the merits or demerits of the issue presented by the motions. The only possible foundation for the assertion of the heading was contained in a separate statement on page 5 of the issue, in which this was said of the court:

"In a brief statement from the bench here to-day, Judge Killits said *no formal order had been issued in regard to the Toledo car situation, but that*

*one might be issued on Friday night if the situation warranted.* The judge assumed the bench only for a few moments. He said: 'As a citizen of Toledo, I ask that both the representatives of the city and of the company approach these problems in the proper way. It is plain to me that there is a chance to settle these questions with honor to both sides. No reasonable man wants to be other than fair to the company and the company must be fair to the city. No formal order has been issued, but if conditions warrant it to-morrow night one will be issued.' "

The same issue of the 26th contained this:

"Preparations are going on for an enormous mass meeting at Memorial Hall on Friday evening to deal with the street car situation. Leaders have been planning to hold the crowd until midnight and ask that they tender only a three-cent fare when they board the cars after that hour."

It is also reported that the Central Labor Union would advise labor union men to attend the meeting in force.

Besides, four editorials were published in this issue, one to the effect that "the people will have a sort of referendum vote as to whether they will pay three cents or five cents for a ride on the street cars"; another poking fun in a familiar way at persons prominently connected with the pending case, respecting the proposed meeting in Memorial Hall Friday night; another giving assurance that the police will not "use their clubs on car riders who refuse to pay more than three cents car fare after Friday," because Sam Jones, some time mayor of Toledo, once said that *"the law is only what the people will back up."* The last was under the heading, "In the Balance," and was:

"The case of the rights of 200,000 common people versus the rights of some wealthy investors and speculators will now be placed in the balance by a judge of the United States court. Let substantial and not technical justice be done."

On Friday, March 27, the day before the ordinance was to be effective, it was announced that all parties urged that no violence be indulged that evening, but that the meeting for Memorial Hall that night would be held. The fact that the court hearing would not be until Saturday forenoon was announced. By way of cartoon, a double one was offered, labeled, "As we lose Kapp we get Lapp." One panel represented the marshal of this court (Lapp) proceeding in great haste towards Toledo, bearing a hand bag marked "Order from Judge Killits," although in fact there was no order; while the other depicted the public safety director of the city (Kapp), who was the head of the city's police department, in equal haste on his way to Philadelphia. Editorially, under the caption, "The Big Con's Attitude the Same Old Defiance of the People," set in large type, in double-column space, it was said, among other things:

"It is now a trespasser on many streets of Toledo, and will be on practically all of them by to-morrow morning. It has now rushed into the federal court to try to take from the hands of the people of Toledo the right to control their own streets, and to make terms under which the Big Con may use those streets."

That there was a lively possibility of much disorder on the expiration of the franchises there can be no question. The News-Bee's news article of the 27th spoke of "the anxiety about trouble Friday night" as

part of the situation; and "featured," with large headlines, that a sentiment that the city should not be disgraced by disorder was arising causing much protest against tendencies in that direction already noted in its columns. . The fact that cots were being placed in the federal building to facilitate night service of United States marshals, if necessary, was the text of another article, with the announcement that officers in addition to these stationed in Toledo were to arrive from Cleveland to assist in preserving order. The paper had the enterprise to print the portraits of two of the local deputies in this connection. . To avoid a chance for disorder the street car company notified conductors to carry persons free after Friday night who refused to pay more than three cents. In two days the free riders numbered more than 62,000.

Saturday's issue (March 28) published a news article in five columns on the situation, under a main headline across five columns: "Thousands Riding Free; Killits Hears Big Con Plea"—in which the order of the company is printed that persons be carried free rather than that conductors have any controversy over the tender of three-cent fare pending the court proceedings, and it was stated that the court was hearing the motions against the ordinance. For a cartoon in connection with the news article and relating to the attempt of the mayor to' insist on a three-cent ride during the night, that officer is represented as saying "I'll pay no more than three cents," with Mr. Doherty advising the conductor that the mayor should be regarded as his guest. The title of the cartoon was: "Doherty—The Man Who Put Con in Conductor."

Monday evening the motions for a temporary injunction restraining the enforcement of the ordinance were denied, because the measure itself provided that it should be enforced through an order out of the state court for which the city solicitor was directed to and, it appeared, was about to apply. It was obvious that the reason advanced in this court for a temporary injunction, namely, that the ordinance was unreasonable, was available to the company to resist the solicitor's application for an order out of the state court to enforce it, and that, until the state court had found it enforceable because reasonable, the company could stand its ground against it and in such attitude was entitled to protection. The ordinance was neither self-enforceable nor operative without order of some court.

Although the court had specifically held that the city could summarily stop the use of the streets for traction purposes by the company, the same issue (March 31) of respondents' paper which carried the decision bore this editorial utterance:

"To the layman it appears *peculiar that the city cannot stop the company's cars* because the public is entitled to the service or requires it, but the company can stop the cars at once on expiration of its franchise rights, regardless of the needs of the people. Reminds us, somehow, of the elder Vanderbilt."

By answer respondents say that, if this may be construed as a misrepresentation of the court, "the error was unintentional."

· Early in August, the main case being still on the docket of the court, the plaintiffs and the defendant traction company filed supplemental pleadings setting up the failure of the city solicitor to proceed, as it was

asserted he had agreed to do, to seek an order for the enforcement of the ordinance according to its provisions; that because of threatened disorder the company was carrying passengers free who insisted upon three-cent rides; that its losses in this behalf aggregated a thousand dollars a day; that its protests to the city were met with specific orders to the police of the city to require the company to carry passengers for three cents, with a policeman on each car for that purpose, if necessary; and that the city was threatening to compel the company to maintain a street car service under the ordinance and to restrain, by the use of the police force of the city, the removal of its cars from the streets.

Motions were renewed under these circumstances, supporting by affidavits the prayer of the pleadings in the case that an injunction be granted restraining the city from compelling the company to maintain service in the city under the Schreiber ordinance and from preventing the company from removing its cars from the streets and discontinuing its service. An affidavit filed before the hearing of these motions, and never denied, set forth the fact that to the date of the hearing the company had been compelled to carry free under these circumstances 8,-000,000 passengers.

August 14, hearing on these motions was taken up. Testimony was then produced tending to show that the ordinance was confiscatory; that the company in fact, with the routing of lines then obtaining, could not carry passengers for three cents and pay bare operating expenses. On this showing, the city was directed to support the ordinance by testimony, and, at the city's request, the hearing was passed to September 8, that the city might be prepared. This was plainly, as shown by the record and the court's statement, the familiar situation of the sustention of the burden of proof by the side having the affirmative and the requirement upon the negative (here the city) to then produce its defense, yet the News-Bee treated it, in an article headed: "Test of Schreiber Ordinance in U. S. Court Sept. 8. Killits Puts Burden on the City"—as though the court were requiring the city to prove primarily its legislation to be valid. The impression so occasioned seems to have been the inspiration later of an inflammatory attack on the court by a local organization, out of which grew the attachment for contempt of John Quinlivan.

From August 14 to September 5 the court was allowed to escape the paper's attention. On the last-named date, this editorial paragraph appeared:

"If Judge Killits should be held in Canada while Henry L. Doherty is marooned in Wall street, what would we ever do? Still Peter Parker is always willing to give us good advice."

The Peter Parker referred to is admitted to be a citizen who had once been subject to much criticism, whereupon he left the city. Returning some time afterward, he had been a frequent writer of letters to the News-Bee on public questions.

September 6, the Socialist "local" of Toledo adopted resolutions relative to the pending case. On the 9th, while the court was hearing the case, the News-Bee published a portion of the resolutions in the following article:

"Socialists Call Big Con Trespasser.

"Toledo local of the Socialist party has adopted a resolution which refers to the street railway company as a trespasser in the streets, and claims no judge has legal authority to compel a city to insure a corporation profit. The resolution concludes:

" 'We contend that the present Schreiber ordinance is prior to, and above any judge or court made law. And we contend that no judge, federal or otherwise, has the right to unmake laws made by a duly elected legislative body. We contend further that the people of Toledo have by their votes sustained the Schreiber ordinance.' "

September 8 and 9, the motions were finally heard. On the last day the city, through the solicitor, admitted that the ordinance was unreasonable and impossible to be followed by the company without loss. The court then took the issues under advisement, stating distinctly that no decision would be handed down for two or three days, when we should have considered the objections to jurisdiction advanced by the city. It was also stated that, if the court should decide to restrain the operation of the ordinance, the enforcement of the order of injunction would be suspended for a short time to allow public feeling to cool.

Although it was plain that yet the court had taken no final action, that it was still considering its jurisdiction to act at all, the issue of the News-Bee of the 10th, containing an account of court proceedings on the 9th, was headed with the false statement in large type on the front page: "Low Fares Banned by U. S. Judge." The evening of this issue, at the regular meeting of the Central Labor Union, made up of accredited delegates from the numerous labor organizations of the city, a resolution was read by John Quinlivan, business agent of the union, denouncing the court for placing "the burden of proof of the Schreiber ordinance on the city," and recommending that preliminary steps be taken by the union for the judge's impeachment should he render a decision in the case adverse to the city. The issue of the News-Bee, September 11, contained an account of this meeting and the discussion of the proposed impeachment, under the heading: "Judge Killits is Criticized in Central Labor Union Meeting."

An attachment was issued September 11 for John Quinlivan; whereupon, in the first edition of the News-Bee of Saturday, the 12th, on the streets before the court's decision in the pending case, in the guise of printing the news of the proceeding against the labor organizer, the offensive and threatening language attributed to him was extracted from the body of the article and placed in different and more prominent setting, embellished with a rule border known as "boxing," as a distinctive feature of the front page, after this fashion:

"Killits Accuses John Quinlivan of Contempt.

"Basis of Charges Against Union Leader.

"These are the remarks alleged to have been made by John Quinlivan, and on which Judge Killits bases his contempt charges:

" 'The street car situation of Toledo is in the hands of a friend of the Rail-Light.

" 'Judge Killits has demonstrated from the first that he was at all times favorable to the Rail-Light.

" 'Any fair-minded citizen will see that when Killits placed the burden of proof of the Schreiber ordinance on the city that the city was going to be

the goat. The Central Labor Union should adopt stinging resolutions and let our federal friend know what we think of him.

" 'The burden of proof should have been placed on the Rail-Light. Killits and the press are preparing to hand the people a lemon. They are unfair to the people.

" 'Impeach Killits.' "

These publications conclude the foundation for the first count.

Under the second count, the information sets up that in issue of September 12, under the heading, "Quinlivan is Ready to Defend Killits Contempt Charges," the paper published an account of Quinlivan's attachment, in which it is said that "Judge Killits stated on Saturday that he would hear the case himself"; and that, on the 14th, again in a news article dealing with the same case, the statement was repeated in this form, "Killits has announced that he will hear the case"; and that, on another page of the issue of September 14, a communication, under the head, "In the Editor's Mail," was published, reading:

"The Quinlivan Case.

"To the Editor:

"Regardless of whether Judge Killits has or has not the right to sit in judgment in the Quinlivan case, it seems to me that the ethics of the affair would lead him to either appoint some other judge to hear the evidence, or better still, have some other authority make the selection. It stands to reason that such tactics on the part of the judiciary will not have a tendency to instill in us more confidence.          [Signed]  Paul G. Dennie."

It was testified by Managing Editor Howard that this letter was written in his office by Dennie and edited and revised by him (Howard). And in the same issue, casting its utterances in prominent black-face type set across two columns, at the head of the editorial page, the paper said:

"Would it be contempt to remark that it is a peculiar situation where the officer who makes the charge, also considers the evidence, renders the verdict and imposes the sentence."

As the offering under the third count, it appears that a rule in contempt was issued out of this court for Harry J. Howard, managing editor of the News-Bee, directing him to show cause why he should not be punished for contempt for certain publications, including those set up in the second count and dealing with Quinlivan's case, and that said proceeding against Howard was pending when, with relation thereto, respondents published, as a feature of the first page of the paper for September 17, in larger type than that used ordinarily for reading matter, and across two columns this, with reference to the charge against Howard:

"The News-Bee and Judge Killits.

"As we see it the public interest in the contempt proceedings instituted by Judge J. M. Killits against the News-Bee and Managing Editor Howard, depends not so much on what the judge sees fit to do or not do, as it does upon how his action may affect the policy of the News-Bee.

"It has been the policy of this paper in the past to discuss frankly and fearlessly all questions of public policy and interest. And without regard to whether our statement of the truth, as we see it, pleases or displeases this, that or the other citizen—even though that citizen happens to be what is commonly known as a judge.

"We have no desire to influence the conduct of any judge in interpreting the law in any particular case. And we have no intention of permitting any judge of any court to influence our judgment in defending the public interest.

"We don't want to censor judicial decisions, and will not permit judicial censorship of the News-Bee's editorial policy.

"We have notions of our own about contempt of court. One of them is that nobody but the judge himself can inspire public contempt of the court over which he happens to preside.

"The people of this country, because of patriotic education from early youth, start out with respect for our federal courts. When that respect changes to contempt, it can be only because of the conduct of a judge or judges.

"We have said before that after all, Judge Killits is no more than a two-legged man like any of the rest of us. We repeat it for the sake of emphasis. No judge judges by divine right even though he holds his job for life.

"No judge is infallible or omnipotent. No physical or mental change takes place when he is lifted from the practice of law and placed upon the bench, that transforms him from a human being into a god.

"And what kind of a judge he turns out to be depends almost altogether on the kind of a man he was beforehand.

"We shall not discuss now the merits of this particular case. We do not discuss cases while they are pending, with any purpose of interfering with the administration of justice.

"We prefer to give every judge free rein to make either a Solomon or monkey of himself, if either be possible.

"But once the case is decided, we shall say and publish whatever we think best for the public good, whether it pleases or displeases any judge—even if that judge happens to be John M. Killits."

The News-Bee is published daily in several editions. On the 17th of September the foregoing article appeared in the so-called noon edition. About 1 o'clock of the 17th an order to show cause in contempt was filed against the Toledo Newspaper Company, Cochran, and Howard, based on the several publications, including the foregoing, appearing in the early edition of that day. Mr. Cochran testified that he was aware of the filing of this order and its scope as soon as it was filed, being at the courthouse at the time. Four subsequent editions of the News-Bee were published on the 17th, including its regular or home edition, each bearing the above editorial across two columns in the center of the front page, while in an adjoining column was, in each edition after the noon edition, an account of the fact that respondents were directed to show cause why they should not be punished for contempt for publishing, among other things, the identical writing. This order was superseded by the present information.

[1-4] The inquiry is direct, of course, whether the offenses charged to respondents are within the scope of section 268, Judicial Code (section 725, R. S.; Act of March 2, 1831), which reads, so far as it applies here at all, as follows:

"The said courts shall have power * * * to punish * * * contempts of their authority: Provided, that such power * * * shall not be construed to extend to any cases except the misbehavior of any person in their presence, *or so near thereto as to obstruct the administration of justice*," etc.

The language respecting the proviso has been slightly changed from the original act, but it is plain that the revision has not made necessary

a different construction. It is settled that the statute is a limitation, through definition, upon the powers of inferior federal courts to punish contempts by summary process. Ex parte Robinson, 19 Wall. 505, 510, 22 L. Ed. 205, and cases citing it.

It is contended by respondents, upon authorities soon to be considered, that the statute was intended by Congress to, and does in fact, completely exempt newspapers from responsibility in contempt under all circumstances. This claim, and its support, are deemed worthy of fullest consideration.

But one federal case is known to us to be reported and decided prior to the act of 1831, but under the act of 1789, directly dealing with an alleged newspaper contempt; the act of 1789 providing power in the courts "to punish by fine or imprisonment at the discretion of such courts all contempts of authority in any cause or hearing before the same." We refer to the case of Hollingsworth v. Duane, Wall. Sr. 77, Fed. Cas. No. 6,616, in which the court, two judges sitting, held that:

"Any publication, pending a suit, reflecting upon the court, the jury, the parties, the officers of the court, the counsel, etc., with reference to the suit, or tending to influence the decision of the controversy, is a contempt of the court, and punishable by attachment."

Decisions to the same effect in state jurisdictions were not rare, and that this was a proposition undebatable at common law we believe will not be disputed, whatever may have been the uncertainty of the common law respecting mere libels on judges or attacks on the courts not connected with pending causes; and the act of 1879 undoubtedly was designed to clothe federal courts with common-law powers in this respect, although the Supreme Court, in United States v. Hudson et al., 7 Cranch, 32, 3 L. Ed. 259, said:

"To fine for contempt, imprison for contumacy, enforce the observance of order, etc., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others; and so far our courts, no doubt, possess powers not immediately derived from statute;"

—thus seeming to suggest that statutory authority was not necessary. Many subsequent decisions of the Supreme Court approving the Hudson Case, although holding that the act of 1831 acted as a limitation upon the exercise of the power, so decidedly affirm its inherency in a court of general jurisdiction as essential to the tribunal's very existence as to render it very doubtful if that court would support an act taking away the power altogether from one of this jurisdiction. Ex parte Robinson, supra; Ex parte Terry, 128 U. S. 289, 302, 9 Sup. Ct. 77, 32 L. Ed. 405; Interstate Commerce Commission v. Brimson, 154 U. S. 447, 489; 155 U. S. 3, 14 Sup. Ct. 1125, 15 Sup. Ct. 19, 38 L. Ed. 1047, 39 L. Ed. 49; Ex parte Savin, 131 U. S. 267, 275, 9 Sup. Ct. 699, 33 L. Ed. 150; Eilenbecker v. District Court, 134 U. S. 31, 36, 10 Sup. Ct. 424, 33 L. Ed. 801; In re Debs, 158 U. S. 564, 594, 15 Sup. Ct. 900, 39 L. Ed. 1092; Bessette v. Conkey, 194 U. S. 324, 327, 24 Sup. Ct. 665, 48 L. Ed. 997.

The case at bar demands a construction of just so much of the statute quoted. If respondents are responsible, it is because we must conclude

that, upon the whole case, the acts charged against them have the quality of misbehavior so near the presence of the court "as to obstruct the administration of justice."

At the outset we are relieved of the consideration of the constitutional guaranties of a free press, by the decision in Patterson v. Colorado, 205 U. S. 454, 462, 27 Sup. Ct. 556, 558 (51 L. Ed. 879, 10 Ann. Cas. 689), in which the court, speaking in a case of newspaper contempt, said of the guaranties in the first and fourteenth amendments:

"In the first place, the main purpose of such constitutional provisions is 'to prevent all such *previous* restraints upon publications as had been practiced by other governments,' and they do not prevent the *subsequent* punishment of such as may be deemed contrary to the public welfare."

The court holds that the rule which made criminal libel punishable despite the guaranty of a free press "applies yet more clearly to contempts." No case has been more generally cited with approval on this subject than Respublica v. Oswald, 1 Dall. 319, 1 L. Ed. 155 (1788), a case of interference by publication with judicial proceedings in a pending cause, in which, considering the constitutional guaranty, the court said that "it is impossible that any good government should afford protection and immunity" to those who abuse the privilege of a free press. The current of authority since to the same effect is unbroken.

The main proposition asserted by respondents, if valid, produces a startlingly absurd result. According to it, they are immune from responsibility for an attack upon an Ohio federal court under the construction, for which they insist, of section 268, Judicial Code, which conduct, if perpetrated upon an Ohio state court under precisely similar circumstances, would involve them in attachment for contempt under a state act of almost precisely the same tenor as that of the federal act, and passed by the Ohio Legislature in imitation of the latter (Ohio Act of 1834; section 5639, R. S.; section 12136, General Code of Ohio). The decision of Myers v. State, 46 Ohio St. 473, 22 N. E. 43, 15 Am. St. Rep. 638, to be discussed later, settles responsibility of newspaper editors and publishers under such circumstances in Ohio procedure, and, following Patterson v. Colorado, supra, which cites Myers v. State with approval, a conviction in the state court under the Ohio statute would be upheld by the Supreme Court of the United States.

It cannot be that statutes of substantially the same scope and language in two jurisdictions of the same geographical application should so vary in meaning and intent that one should have virility, with respect to a powerful public influence, to vindicate the highest public interest, while the other, in an application to the same kind of circumstances, should be impotent to sustain in any degree the same function.

Chancellor Kent, on an occasion hereinafter referred to, said that such a construction of the act offered by respondents was unreasonable. Nevertheless it is supported by direct authority. In re Poulson, Fed. Cas. No. 11,350, a Circuit Court case in 1835, in Pennsylvania, the judge sitting therein entertaining the same view of the law in United States v. Holmes, Fed. Cas. No. 15,383. In some measure, also, it is the view of the court in Re May (D. C.) 1 Fed. 737, 743; Morse v. Montana Ore Co. (C. C.) 105 Fed. 337; and Cuyler v. A. & N. C. R.

(In re Daniels) 131 Fed. 95, a decision by the District Court in the Eastern District of North Carolina.

We are confident that it may be made entirely clear, if we may be allowed time and space necessary, to show that this claim for the act's purpose is untenable; that Congress never intended to, and did not, immunize newspapers from responsibility in contempt for interference by improper comment on pending cases; and that a myth in this respect has grown up, having its origin wholly in the views of the court in the Poulson Case, supra, Baldwin, Justice, that being the first reported decision after the act of 1831. In understanding Justice Baldwin's views, it may be well to consider that he was a Pennsylvanian, from a state whose Legislature in 1809 had passed an act declaring that no newspaper comment, however invidious, concerning a pending case, should be construed into a contempt punishable by summary process. He says, in fact, in his opinion, without the slightest record to justify the assumption, that he believes Congress to have been influenced in the passage of the act of 1831 by the Pennsylvania statute. He laments:

"The court is disarmed in relation to the press; it can neither protect itself, or its suitors; libels may be published * * * without stint; the merits of a cause depending for trial or judgment may be discussed at pleasure; anything may be said to jurors through the press, the most willful misrepresentations made of judicial proceedings, and any improper mode of influencing the decisions of causes by out of door influence practiced with impunity. * * *

"The press is free, if not set to work in the presence of the court, or so near as to interrupt its business. The law does not prohibit any endeavor made to influence or intimidate a juror or witness, if corruption, force, or threats are avoided. Papers may be put into their pockets, conversation held with them, newspapers put into their hands, or statements made in relation to any matter in issue while they are actually impaneled. The court may regret and censure the practice, and perhaps admonish the party who thus tampers with a juror or witness, but can neither punish the offense nor prevent its repetition. The law has tied their hands. The judges must be passive. It is not for them to be the first to set the example of disobedience to the law, or attempt to evade plain enactments. * * *

"For the protection of parties, for their security of a fair and impartial trial and decision of their case on the evidence and law which apply to it, to defend them against the efforts of the press or of individuals to excite a prejudice in the minds of a jury, to induce them to find a verdict on out of door statements, or other means of perverting their judgments—no legal check is interposed."

There is much more of the same language in the Poulson Case, which finds its echo in a subsequent opinion of the same judge, being the second decision under this statute—United States v. Holmes, supra.

If this were the law, then indeed would an inferior court of the United States be largely shorn of "one of the attributes, one of the powers necessarily incident to a court of justice"—the power "of vindicating its dignity, of enforcing its orders, of protecting itself from insult." Eilenbecker v. District Court, 134 U. S. 31, 36, 10 Sup. Ct. 424, 33 L. Ed. 801.

That this court is not so impotent we are prepared to insist, notwithstanding the authorities cited, all of which clearly are influenced by these views of Justice Baldwin, which, on the record we shall hereafter produce, are surely erroneous. We digress, however, to note that one

of the two reasons given by Justice Baldwin in confirmation of his faith has disappeared with the decision in Savin, Petitioner, 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150. The second section of the act of 1831, now section 5399, Rev. Stat., made it a crime to "corruptly or by threat, or force, obstruct or impede, or endeavor to obstruct or impede, the due administration of justice," etc. Justice Baldwin said: '

"This provision is in further confirmation of the view taken of the first section. It is a clear indication, of the meaning of the law, that the misbehavior which may still be punished in a summary manner does not refer to those acts which subject a party to an indictment. To construe it otherwise would be to authorize accumulative punishment for the same offense. * * * The first (section) 'alludes to that kind of misbehavior which is calculated to disturb the order of the court.' * * * 'The obstruction of the administration of justice,' in the first section, refers to that kind of behavior which actually disturbs the court in the exercise of its function while sitting"— while, he proceeds to say, all other invidious acts, if reached at all, are under the second, or criminal, section.

But the Supreme Court, in the Savin Case, held that the federal courts, under this act, may punish summarily as contempt, under the first section, misbehavior which is also punishable by indictment under the second section of section 5399, R. S.

In the May Case, supra, the point decided was that a juror was in contempt for misbehavior near to the presence of the court when he visited a codefendant, under an indictment in which separate trials were had, at the latter's home, and there talked on the merits of the case on trial. The court said (1 Fed. 737, 742):

"The act does not define how near the court the misbehavior must be, nor the character of such misbehavior, and I think it may fairly be construed to extend to any misbehavior by a juror, in his capacity as such, wherever committed, since such misbehavior necessarily tends to obstruct the administration of justice."

There was clearly no occasion for the court to say (page 743 of 1 Fed.):

"The act was passed for the purpose of preventing the courts from interfering with newspaper comments upon trials."

In the Morse Case, supra, the decision was that a party aggrieved by improper newspaper comment pending his case was not precluded from urging its prejudicial influence on the verdict as a ground for new trial by a failure to ask for an attachment in contempt. As a nonessential part of the opinion's argument, the court expressed a doubt whether contempt would lie in the circumstances then before it.

The views, therefore, of Judges Brown and Knowles respecting this matter are pure dicta. The Daniels Case (C. C.) 131 Fed. 95, upon which respondents so strongly rely, will be considered later.

We would not venture to disagree with the construction of a statute by a justice of the Supreme Court, although sitting as a nisi prius judge, extended in an opinion so nearly contemporaneous with the passage of the act, unless fortified with very considerable support. Justice Baldwin's views are, as we shall see, plainly the control of whatever subsequent authority respondents are able to offer. They are so confident, comprehensive, and positive as to seem to have been uttered

ex cathedra. However, he bases them upon contemporary history, the record of which is as available to us for examination as in his time. This is not a situation where there has been a continuous and consistent construction for a long period; for, when we consider the authorities offered by respondents, all controlled by the Poulson Case, we find that all but one of them are pure dicta, and the other nearly if not quite so (In re Daniels, discussed infra); and when the principal reason relied on by Justice Baldwin for his holding, namely, that the criterion of "nearness" to the court's presence which resolves a misbehavior into a contempt is a physical or topographical propinquity to a sitting court, is considered, we find him supported only by what is seen to be but a dictum of Justice Field, in Re Robinson, supra, to be later considered, while it is controverted by very important series of decisions by *all the federal courts* down to the present time.

The Poulson Case is respectable because of the time of its decision and the eminent quality of the judicial mind which considered it. As to the first, if we may judge of the paucity of reported cases, the federal judiciary has not suffered many attacks of the character before this court, which might call its soundness into question. Of the second element of importance, it may be said that the infallibility of an inferior court decision is to be tested by the premises and the soundness of its reasoning.

Again, this decision does not gain strength because it is of a statute couched in ambiguous language (Houghton v. Payne, 194 U. S. 88, 99, 24 Sup. Ct. 590, 48 L. Ed. 888); for no ordinary construction of section 268, or of the original act, produces a hint that any category of behavior involving obstruction of justice is immune. It cannot be claimed, of course, that any right acquired by virtue of the construction in the Poulson Case will be divested if it is disregarded. Where no rights intervene, especially when the language is unambiguous, a question of construction of a federal statute is not judicially settled until the Supreme Court has spoken. Wilson v. City Bank, 17 Wall. 473, 21 L. Ed. 723; Andrews v. Hovey, 124 U. S. 694, 716, 8 Sup. Ct. 676, 31 L. Ed. 557.

The opportunity to go into the legislative history of an act whose scope is a subject of controversy is clear. We do not ignore that, generally, the statements of views of members of Congress, in debate, are not proper sources of the meaning of a statute (United States v. Freight Association, 166 U. S. 290, 318, 17 Sup. Ct. 540, 41 L. Ed. 1007); but the character of the debate, whether sentiment was divided or unanimous, the environment of a bill, its legislative vicissitudes, and pertinent contemporary history, may be considered (Johnson v. Southern Pacific Co., 196 U. S. 1, 20, 25 Sup. Ct. 158, 49 L. Ed. 363; Lincoln v. United States, 202 U. S. 484, 498, 26 Sup. Ct. 728, 50 L. Ed. 1117; Standard Oil Co. v. United States, 221 U. S. 1, 50, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734). In Johnson's Case the court went to the Congressional Record to ascertain "the mind of Congress" to assist it in construing the automatic coupler act, and, in the Lincoln Case, the division of sentiment over the

act of July 1, 1902, attempting to ratify executive dealing with the Philippines, was considered in interpreting that statute.

Especially might this court go to the legislative history of the act when it is asked to follow a construction violating, as that of Justice Baldwin seems to, several accepted canons of interpretation. A statute under construction should be harmonized with prior acts and decisions, if reasonably possible. Blair v. Chicago, 201 U. S. 400, 459, 469, 26 Sup. Ct. 427, 50 L. Ed. 801; Lincoln v. United States, supra. The interpretation should be reasonable, and should be that which comports with the public welfare or public policy, as the Supreme Court applied the rule to railroads in construing the Sherman Act. United States v. Freight Association, supra, 166 U. S. at pages 320 et seq., 17 Sup. Ct. 540, 41 L. Ed. 1007.

In Harris v. Runnels, 12 How. 79, 86 (13 L. Ed. 901), the court said:

"It is a rule, if effects and consequences shall result from an interpretation of a statute contrary and in opposition to the policy which it discloses, * * * such an interpretation must be rejected."

Justice Baldwin would read into the statute an exception from its operation which is against public policy, and, in doing so, antagonizes the principle that a purpose in derogation of the common law must be, at least, visible.

In Maxwell v. Dow, 176 U. S. 581, 602, 20 Sup. Ct. 448, 456 (44 L. Ed. 597), the Supreme Court said that it is less material, in case of a constitutional amendment, to consult the legislative history of a measure, than when an ordinary bill or resolution is to be interpreted, but, even then:

"The safe way is to read its language in connection with the known condition of affairs out of which the occasion for its adoption may have arisen, and then to construe it, if there be therein any doubtful expressions, in a way so far as is reasonably possible, to forward the known purpose or object for which the amendment was adopted. This rule could not, of course, be so used as to limit the force and effect of an amendment in a manner which the plain and unambiguous language used therein would not justify or permit."

Wherefore, we submit, we may refer to the impeachment of Judge Peck, closing with his acquittal January 31, 1831, as the inspiration of the act in question. The act's genesis in that trial is historically conceded, and it is clearly discernible from the records of both the trial and the act's passage that, not only is an interpretation to wholly exempt newspapers from the measure's operation not sustained in any degree by utterances on the floor of either house of Congress, but is inconsistent with the whole current of debate. The charge against Judge Peck was based on the fact that, having in December, 1825, handed down orally an opinion *determining finally* a case then before him and reducing his judgment to a decree specifying the precise points upon which the court reached its determination, three months thereafter he published a written opinion, in which he confessedly traveled, not only outside of his oral delivery, but beyond the record of the concluded case, and that, because counsel in the case in print criticized the reasoning of the judge in this published opinion upon matters, as the judge himself confessed, not before him in the original hearing, he attached

the latter as in contempt of course, and imprisoned him, and disbarred him from practice for 18 months. For the facts now presented, an examination has been had of the Congressional Globe for the 21st Congress, of the journals of both Houses, of Gales and Seaton's Register of Debates, and of Benton's Abridgment.

The day after the House received the report of the failure of the impeachment (February 1, 1831), Mr. Draper, of Virginia, submitted the following resolution, which was agreed to without a division:

> "Resolved, that the committee on the judiciary be directed to inquire into the expediency of defining by statute all offenses which may be punished as contempts of the courts of the United States."

What Mr. Draper had to say in explaining the purpose of this resolution is all the reported discussion had in either House on the subject after the Peck trial; wherefore we quote briefly: Saying that it was not his intention to discuss a question which had recently been much agitated elsewhere, he continued:

> "I wish to know whether if I myself choose to go into the public newspapers to defend any vote I give here it be not competent for any man who thinks proper to do so to enter the same forum upon equal ground to show that my opinion is wrong."

And, following with an argument that it would not be contempt of the House if it were sought to criticize him under such circumstances, and that no other department of government should have protection denied to the legislative, he proceeded:

> "Whenever an individual in office *lays aside his official capacity,* and endeavors by argument and reason to convince others that anything which he has done officially had been done properly, he has a right to be met by whomsoever, differing in opinion from him in any forum which he himself may select. * * * It may be said, sir, in opposition to the object of this resolution, that there will be difficulty in defining contempts of court. Though this may be true, we shall find no difficulty in defining what are not contempts. We can embrace, in any legal provision on this subject, many cases which are not contempts. We might say, for example, *that it would not be a contempt of 'court to express an opinion upon any decision finally made in court,* etc. We might declare that it should *not be a contempt of court in any one to say that a judge is not immaculate.* But the law ought to be so clear that every individual may be able to look to the statute book, and know whether, in any thing that he may do, he acts within the law or not." (The italics are ours.)

The proceedings of record thereafter were as follows: February 10, a bill (No. 620) "declaratory of the law concerning contempts of court," was orally reported from the judiciary committee by Mr. Buchanan, and, read twice, referred to committee of the whole House; February 28 read third time, and passed without debate, division, or roll call; March 1st passage of bill by the House referred to the Senate, and referred to the Committee on Judiciary; March 2 orally reported for passage with amendment by Mr. Webster, considered, read three times, and passed, without debate, division, or roll call; March 2, House concurred in Senate amendment, with an additional amendment, in which the Senate concurred, and the bill was passed. Nowhere is there recorded a statement of the nature of amendments, nor hint that anything more than formal attention was given to a subject which had been

thoroughly discussed in the Peck Case. The Globe does not contain a line on the subject after the introduction of Draper's resolution.

Going now, as we may (The Delaware, 161 U. S. 459, 472, 16 Sup. Ct. 516, 40 L. Ed. 771), to the debate in Peck's Case, if further light on the attitude of Congress out of which the act grew is demanded, we find that, when the resolution for impeachment was up for initial consideration in the House, Ellsworth, for the committee, directed attention to the fact that Judge Peck had "neither jurisdiction nor provocation; *he had finished the case, adjourned the court, and descended from his judicial station* to that of an essayist of a newspaper." "Shall it be declared," said he, "to the American people that, *after a judge has given his opinion and dismissed the case,* he may arrest a citizen, drag him before his tribunal," and prosecute him for contempt?

When the matter was on for adoption of the report, Buchanan, making the principal argument, went into great detail to explain that the case was entirely concluded when the alleged contempt was perpetrated. He urged that, notwithstanding that the language of Blackstone and Lord Hardwicke "is sufficiently general to embrace other cases," the authorities either from England or America did not include any case in which the courts had attempted to summarily punish libels upon their proceedings *"except in causes actually depending."* Continuing, he said:

"I shall not affirm that no case exists in which the courts of the United States ought to possess the power of punishing summarily for constructive contempts. If, *whilst a cause is depending,* particularly a case to be determined by a jury, *an inflammatory publication should be made in the newspaper, touching the question to be decided, calculated to enlist public feeling in favor of the one party or prejudice it against the other,* the court may possibly, under such circumstances, inflict justice upon the author." (Italics, here and elsewhere in this opinion, ours.)

In this connection he called attention to the law (passed in 1809) of Pennsylvania denying even this power to the state courts. A year later, closing the prosecution, he expressed a personal view that courts ought not have the right to punish summarily even libels respecting pending cases, however not urging the proposition as applicable against Judge Peck, but emphasizing again the fact that in the case before the Senate judicial functions had entirely ceased before Judge Peck attempted anything under criticism.

Other prosecutors whose addresses are preserved were McDuffie and Storrs. McDuffie, with great particularity, urged that the case had been concluded, that *"there was an end to the judicial functions of the judge as to that case,"* when he attempted to resent a published criticism of an "extrajudicial opinion." He asserted that no man of any sense would contend "that the judges of the United States had any power, any right to punish any libel, however flagitious, on any act of the court, *after it had been done,* as a contempt."

Storrs maintained the position:

"That no free citizen could be punished by the summary process of attachment for *a libel or contempt against any court in a cause not pending* in that court, * * * and that the conduct of Judge Peck tended to break down all the securities and guards which the law had raised for the protection of the liberties of the American people."

There is *no intimation in any discussion* of intent to exempt newspapers from summary process in contempt *under all circumstances.*

It is worthy of note that two men of great influence, occupying opposite sides in the Peck controversy, handled this measure on its passage. Mr. Buchanan was chairman of the House judiciary committee. It would seem that, if he were asking Congress to follow Pennsylvania's example in completely immunizing the press, he would have produced a measure with little or no ambiguity in that respect. The record shows Daniel Webster to have been actively interested in Peck's trial. He voted with the majority of the Senate for acquittal. It seems very clear that, as chairman of the Senate committee in charge of the bill, he would not have recommended a measure to be interpreted as going away beyond the position of Peck's prosecutors, nor would others of the majority have allowed it to pass unchallenged.

Men notable in our history, in both houses, and who were from states whose courts then held, and still have, full common-law powers respecting contempts, interested themselves by vote and speech in favor of Judge Peck. It is unreasonable to claim that they would have been even silent, if this act was intended to put the press out of reach of its provisions, much less to have abetted such a proposition.

We must not forget that Congress, in entitling the measure "An act declaratory of the law concerning contempts," recognized a law already existing. The act does not confer new powers, nor does it limit powers theretofore actually enjoyed by the federal judiciary. It does not repeal the act of 1789. We loosely say that it limits the power, but the limitation inheres only in the definition which it provides. In declaring what the law is, Congress is but saying what it theretofore had actually been, and that any attempt to exercise the power theretofore had been unlawful, except in cases within some classification made by the act. Coming when it did, it must be taken as an expression of the view of Congress that facts analogous to those in the Peck Case do not constitute contempt as the law was and should be. There is nothing to suggest that the intention was to include in the limitation a range of misbehaviors relating to an entirely different state of facts, and infinitely more mischievous in their effect to obstruct the administration of justice.

We must assume that, in refusing the suggestion of Draper that it be categorically set out what situations shall not be within the summary power of the court, Congress intended the act to be construed in particular cases to meet particular conditions. Surely, if a great and influential agency for public direction and education, capable, in licentious hands, of directing courts to follow popular passion, were intended to be rendered absolutely immune by this act, the situation demanded that the Legislature should, and we have every reason to insist that it would, have made such intention plain, at least by general language unmistakable in meaning. That it did not, under circumstances, excludes the thought that such was its intention.

The court, in the Poulson opinion, makes against its own conclusions in saying (page 1207 of 19 Fed. Cas.):

220 F.—31

"On the trial (of Judge Peck) the law of contempt was elaborately examined by the learned managers of the House of Representatives and the counsel for the judge. It was not controverted that all courts had power to attach any person who should make a publication concerning a cause *during its pendency,* and all admitted its illegality when done while the cause was actually on trial. *It had too often been exercised to entertain the slightest doubt that the courts had power, both by the common law and the express terms of the Judiciary Act,* § 17 (1 Stat. 83), *as declared by the Supreme Court, to protect their suitors by the process of attachment.* With this distinct knowledge and recognition of the existing law, it cannot be doubted that the whole subject was within the view of the Legislature; nor that they acted most advisedly on the law of contempt." (Italics ours.)

If we follow the decision, then, we are forced to say that Congress, in declaring what the law is and had been, in intention and in effect worked a revolution of the law, condemned an application that theretofore had been undebatable, and, in compassing this intentional upending of principles which not only federal courts were applying to the satisfaction of everybody, but which no state Legislature at that time had attempted to change except Pennsylvania, language was used requiring strenuous effort at construction in order to get even a glimmer of such a purpose. We submit that upon the whole view it is more probable that Justice Baldwin's opinion was influenced by the Pennsylvania law, than that Congress was moved by it to work an awkward and obscure imitation.

Finally, to close this part of our opinion, we quote ·from a court whose state early adopted the federal act to be applied to its own courts. Saying (State v. Galloway, 5 Cold. [45 Tenn.] 326, 330 [98 Am. Dec. 404]) that the local statute was similar to the federal act, Poulson's Case is thus criticized:

"It is altogether probable that the *breadth of expression* employed by Judge Baldwin, to declare the immunity of the press, may require limitation, in case the matter published be of a character, and vicinity to the court, so as fairly to bring it within the class prescribed by the Code, which consists in 'the willful misbehavior of a person so near to a court as to obstruct the administration of justice.' See Poulson's Case, cited and commented upon in 1 Kent's Commentaries, 301."

The comment in Kent's (second edition) was in a footnote by Chancellor Kent himself, who characterized the law as interpreted by Justice Baldwin, to be *unreasonable* "in leaving the suitor unprotected at the moment when he stands most in need." Evidently the Tennessee court agrees with the chancellor.

Judge Jones, in Ex parte McLeod (D. C.) 120 Fed. 130, 137, 138, 139, put the matter very clearly in discussing the act of 1831. He says, with reference to the particular phase now before this court:

"It is questionable, to say the least of it, whether Congress intended to take away from the courts the existing common-law power to punish, as for a contempt, improper efforts, in the guise of published statements or comments, pending the trial of a particular case, to secure judgment therein, in obedience to the dictates of passion or prejudice, or to thrust other ulterior considerations before the tribunal, against which justice and the law seeks to guard judge and jury in the trial and decision of causes. * * *

"As we have seen, the chief purpose of the statute 'declaratory of the law of contempts of court,' approved March 2, 1831, which is now codified in section 725 of the Revised Statutes (U. S. Comp. St. 1901, p. 583), was to pre-

vent the punishment, as for contempt, of what were really only the exercise of free speech and liberty of the press in criticizing judicial officers and acts, and chronicling the doings of the courts. * * *

"We cannot, in the absence of words forcing that conclusion, impute any design to Congress, in dealing with an evil exercise of the power, to destroy also the existing right to exert this power for good, in upholding the purity and independence of the courts. The words do not demand such a construction, and to give them effect would deny powers very essential to courts in 'the administration of justice.' "

It is urged that the statute should be construed literally because of its penal character. It should be construed narrowly as defining the limits of a summary power, but the construction should consist with the important function which that summary power serves; it should be given its reasonable intendment. United States v. Antikamnia Co., 231 U. S. 654, 658, 34 Sup. Ct. 222, 58 L. Ed. 419. The fact that it deals with a power inhering in courts independent of the Legislature, one essential to the execution of their duties and the maintenance of their proper authority, is an important factor of construction. The interpretation should not be so narrowed as to emasculate the very function it declares. United States v. Shipp, 203 U. S. 563, 575, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265. The proper construction, it seems to us, is to leave a power reasonably consistent with a freedom in the courts to consider and determine causes uninfluenced by any agencies except the law and the facts properly brought to their attention.

We are cited to the case of Ex parte Robinson, 19 Wall. 505, 22 L. Ed. 205, and to that part of Judge Fields' opinion which, paraphrasing the statute, says:

"As thus seen, the power of these courts in the punishment of contempts can only be exercised *to insure order and decorum in their presence*, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes." (Italics ours).

In this case Robinson sought to be relieved from an order disbarring him for an alleged contempt. It will be seen that the order did not result from a finding upon a rule on him to answer to a charge of tampering with a grand jury witness, which was the first charge, but was occasioned by an alleged indignity offered the court directly in its presence. Page 507 of 19 Wall. (22 L. Ed. 205).

The court below did not pass upon the rule at all, nor does Judge Field say anything more (19 Wall. page 511, 22 L. Ed. 205) about the alleged offense of Robinson respecting the witness than that the grand jury's report does not make a case. The case therefore does not turn upon an interpretation of the statute in this particular before us. The peremptory writ to restore him to the bar was awarded: First, because disbarment cannot be made a punishment for mere contempt; and, second, because the power to disbar can be exercised only after notice has been given and opportunity for defense. When this case is examined and the situation disclosed, it will be seen that there was no occasion for Justice Field to say, "As thus seen, the power of these courts in the punishments of contempts can only be exercised *to insure order*

*and decorum in their presence,"* etc., if he meant by that ·that only that misbehavior which operated to a physical interruption, disturbance, or delay in the performance of judicial duty as a court was actually sitting, was within the first classification of the act. ·If this case is to·be given the effect claimed for it, we are justified in insisting that. the action of the Supreme Court in refusing review to McCaully (In re McCaully, 198 U. S. 582, 586, 25 Sup. Ct. 805, 49 L. Ed. 1172), to be discussed hereafter, is equivalent to an overruling of Judge Field's ·holding. Ex parte Robinson has been cited by the Supreme Court in possibly a dozen cases, and at times quoted from, touching its relation to the law of contempts, but in none has the Supreme Court adopted the narrow construction of this first classification of the act given in this excerpt from Justice Field's opinion.

In Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552, in which mandamus was refused to restore to the bar Wall, who had been disbarred for participation in a lynching, Justice Field, in a dissenting opinion, quotes his Robinson decision to the point that the proceeding should have followed the analogy of the law of contempt, and that therefore Wall could not have been disbarred before indictment and conviction for an act which did not take place in the actual presence of a *sitting court; but his reasoning was not followed by any associate.*

In Sharon v. Hill (C. C.) 24 Fed. 726, Justice Field himself seems to have gotten away from his earlier notion that an interruption of a court's "order and decorum" was essential to contempt proceedings, for, sitting with Judge Sawyer, in that case, he orally delivered an opinion upon one phase, saying, "Mr. Justice Sawyer will explain for the benefit of counsel the statutes of Congress," and then heard Judge Sawyer say that the action of Mrs. Hill in threatening a witness with a revolver when, an examination was in progress *before a commissioner* was *a contempt·of the* Circuit Court within this first classification.

And the Supreme Court itself has taken issue with Justice Field's dictum in the Robinson Case in Savin, Petitioner, supra, for there it is held that an effort to corrupt a witness outside of· the courtroom, although in the corridors of the court, under circumstances which had no relationship to a physical interruption of the court proceedings, was within this clause of the act. And a study of its attitude toward the facts in Cuddy, Petitioner, in the same volume (131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154), suggests that the court in that case, had it been necessary, would have gone as far as did Judge Brown in Re May, supra, to hold that an attempt to corrupt a juror remote · from the place of the court's sitting and at an hour out of court would also be within the section.

In McCaully v. U. S., 25 App. D. C. 404, an attachment against the respondent under that part of section 268 under consideration here, for attempting to corrupt a juror at his place of business one-half mile from the courthouse and two days before the trial of the case in which the juror was to sit, was sustained; the court saying that:

"The question is not one of geography or topography, or propinquity or remoteness, but of direct influence upon the administration of justice. * * * Bribery of a juror or the intimidation of a witness pollutes the foundations of justice at their source, and reach at once to the very seat and shrine of

the administration of justice, whatever be the place where the formal act is done.   Under such circumstances, the court is wherever the juror or the witness is, and there is no question of locality in the case." ·

The jurisdiction of the court in that case, under the statute, was the sharply contested question, and motions for leave to file petition for writs of habeas corpus and certiorari were *denied by the Supreme Court.*   198 U. S. 582, 586, 25 Sup. Ct. 805, 49 L. Ed. 1172.

We feel that these considerations dispose of In re Robinson, so far as the dictum of Justice Field is attempted to be applied here.

We now come to the case which respondents deem very important, Cuyler v. Atlantic & N. C. R. R. Co. (In re Daniels [C. C.]) 131 Fed. 95, although the facts there are not comparable to the situation here, and we would not say that, upon its facts, it was not correctly decided. The respondent was charged with having criticized severely, *after the fact,* the appointment of a receiver by the District Court of his state. So far as the opinion seems  to be in any way inconsistent with the conclusion we reach here, it is found to be based upon Justice Field's attempt to limit the operation of the statute in Ex parte Robinson, supra, and upon the Poulson Case.   The citations from Kent and Rapalje made by Judge Pritchard depend for their authority upon the Poulson Case alone.

The note from Kent's Commentaries is but partly quoted.   It is wholly based on Justice Baldwin's decision, and we have elsewhere further considered the note and Chancellor Kent's view of the Baldwin interpretation.   Likewise Rapalje supports his text statement, that the act deprived federal courts "of the common-law power to protect," by the process of attachment, "their suitors, witnesses, officers, and themselves, against libels of the press," concerning a pending trial, *by no other authority whatever* than Poulson's Case.   See Rapalje, Contempt, p. 72.   If therefore we are justified in not following In re Poulson and the dictum of Justice Field in Re Robinson, we may disregard In re Daniels as an authority for the proposition that newspapers are immune under all circumstances.

But the Daniels Case cannot be construed as denying the application of the statute to facts such as appear in the case at bar.   Indeed, Judge Pritchard says (131 Fed. 99):

"There may be instances where the publication of editorials or other matter in newspapers would bring the author within the limitations of the statute.   For instance, if a newspaper editor should publish an article concerning a trial which was being considered by a jury, and should send a copy of the paper containing such article to the jury, or a member thereof, during the progress of the trial, for the purpose of influencing them in their deliberations, it would present a question whether such conduct would not be misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice."

It is criticism of the judge of a court because of his official conduct, aspersion personal to him and unaffecting a pending matter, and not tending to obstruct the performance of official duty in hand, affecting the administration of justice in general only and indirectly in that court as a mere libel of the judge, which Judge Pritchard very properly decides is not covered by the statute.   Such is the plain meaning of the

language of the opinion (131 Fed. page 98), it was so construed by the author of the first paragraph of the syllabus to the report (131 Fed. page 95), and such construction, only, harmonizes with that portion of the opinion we have quoted above.

In the case before us, no interpretation of section 268, Judicial Code, is insisted upon against respondents which is essentially different from that allowed by Judge Pritchard in the foregoing quotation. The immediate possible effect on the administration of justice in a pending case is no clearer in a circumstance such as he imagines, than that obtaining in the circumstances in the instant case. A concession that a publication out of court *may be* the occasion of summary process under the first clause of the *proviso* of the section is all that is contended for against the present respondent, so far as the law is concerned.

We are confident that the foregoing considerations, to which, perhaps, we have given too much time, justify us in denominating as mythical and legendary the view that Congress intended *complete immunity* to the press from summary process under all circumstances.

An eminent judge of this circuit, whose industry and clarity of thought and expression always illuminated a subject under his full consideration (Hammond, J., in U. S. v. Anonymous, 21 Fed. 761, 768), expressed the correct view, we think, of the act of 1831, respecting its effect on the press, in saying:

"It is generally understood that the object of that statute * * * was to enlarge the liberty of criticisms by the press and others by *curtailing* the power to punish adverse comments upon the courts, their officers and proceedings, *as contempts which tend to impair respect for the tribunal*, and *thereby* obstruct the administration of justice."

That is to say, the power is *curtailed,* not wholly destroyed, so that criticisms which tend to reflect generally upon the court, either by libeling the occupant of the bench, or by criticizing proceedings and processes, but which have no tendency to affect a cause under consideration, are not reached by the statute, although they may, in a general way, obstruct the administration of justice, particularly through fostering a disrespect for the tribunal. Examination of cases arising under statutory limitations no broader than those of the federal act, and in which respondents were discharged, show that it was precisely this criterion which relieved them. State v. Edwards, 15 S. D. 383, 89 N. W. 1011; In re MacKnight, 11 Mont. 126, 27 Pac. 336, 28 Am. St. Rep. 451; Dunham v. State, 6 Iowa, 245; Storey v. People, 79 Ill. 45, 22 Am. Rep. 158; and other cases. This is undoubtedly the only sound conclusion to be reached after a study of the act, and vindicates alike the liberty of the press and the right of a court to consider any cause before it "free from outside coercion or interference" specially directed to such pending cause.

The only view to be taken of this act consistent with its history, its relation to the accepted law of the time, and with the inherency in every court of a power of protecting its suitors and itself, is that taken by the Supreme Court of Virginia in Carter v. Commonwealth, 96 Va. 791, 32 S. E. 780, 45 L. R. A. 310:

"That although the United States statute of 1831 carefully enumerates the subjects for which courts may punish summarily for contempt, that enumeration is so comprehensive as to afford complete protection to the courts in the performance of their duties."

And so Judge Hammond says, in the case cited (21 Fed. 761):

"The courts will find that the Legislature has not taken away any valuable power, when these statutes are properly understood. * * * The mere place of the occurrence may not be an absolute test of that question, and it may depend on the character of the particular conduct in other respects beside the place where it happens. * * * Whenever the conduct * * * ceases to be general in its effect, and invades the domain of the court to be specific in its injury, by intimidating, or attempting to intimidate, with threat or otherwise, the court or its officers * * * while in the discharge of their duties as such, if it be constructive because of the place where it happens, because of the direct injury it does in obstructing the workings of the organization, for the administration of justice in that particular case, the power to punish it has not yet been taken away by any statute, however broad its terms may apparently be."

Following United States v. Anonymous, federal authorities are consistent in applying the principle that the criterion whether a given act is "so near the presence of the court as to obstruct the administration of justice" is not in the physical propinquity of the occurrence to the court, but abides in the degree of approximation the act attains in affecting an immediate duty before the court; that there may be invidious acts or misbehaviors occurring remote from the physical presence of a sitting court, in place or time or both, yet so direct in their tendency to affect the administration of the court's duties in a pending cause as to be an obstruction thereof, and, consequently, within the statute. It is the quality of obstruction to the administration of justice that measures the propinquity of the act to the court. This was Judge Brown's idea of the law in Re May, supra; and it must have caused the Supreme Court to refuse a review of McCaully v. United States, supra. Sharon v. Hill, supra; United States v. Patterson (C. C.) 26 Fed. 509; In re Brule (D. C.) 71 Fed. 943; Ex parte McLeod (D. C.) 120 Fed. 130; United States v. Carroll (D. C.) 147 Fed. 947; United States v. Zavelo (C. C.) 177 Fed. 536; Kirk v. United States, 112 C. C. A. 531, 192 Fed. 273; In re Steiner (D. C.) 195 Fed. 299, 303; United States v. Huff (D. C.) 206 Fed. 700.

As the Supreme Court, in the Savin Case, supra, destroyed one of the two reasons given by the court for the Poulson decision, so the authorities just cited, as the facts of the respective cases are examined, unanimously take issue with Justice Baldwin's other and more important reason, and justify the conclusion we have given in the preceding paragraph. Of these the opinions of Judge Gilbert, for the Eighth Circuit Court of Appeals (Kirk's Case), and of Judges Jones and Grubb (the McLeod and Huff Cases), cover the ground so completely relative to the proper interpretation to be placed on the provision that the misbehavior must be *"so near"* to the court's presence *"as to obstruct* the administration of justice" that it were supererogation to say more.

We call attention to Judge Gilbert's language (192 Fed. page 277, 112 C. C. A. page 535) as expressing precisely the view we hold of the

statute's exact purpose respecting newspaper comment, that it was and is "to limit the power of federal courts to punish as for contempt criticisms of judicial decisions or judicial officers." We hold respondents here for a criticism neither of a judicial decision nor of a judicial officer, but for publications affecting prejudicially proceedings in a pending case. The distinction is plain between an ex post facto comment on a decision, or a mere libel of a judge, on the one hand, and, on the other, an effort by publication to affect the consideration of a case pending its decision, or to excite prejudice against an anticipated decision. We agree entirely with Judge Grubb's theory that no legitimate distinction may be drawn, to limit the application of the statute, between that kind of obstruction to the administration of justice, respecting a pending cause, which involves the relation of jurors, witnesses, and examiners to the court, on the one hand, and matters affecting the judge of the court in his relation to the case, on the other.

In the Huff Case the sitting judge received at his house a letter calculated to affect his official action respecting a pending case. If this case is correctly decided, and Judge Grubb's reasoning is convincing, then newspaper criticism tending to affect the relation of judge and parties to a pending cause must be equally within the statute, for there can be no controlling distinction, to apply the statute in one case and to avoid it in the other, between a written attack on the judge reaching him in the privacy of his home and one spread broadcast, by the thousands of duplications, under the eyes of his fellow citizens as well as under his, in his home city wherein his court is held.

The modern law of contempt by publication is precisely that for which we are contending here as applicable to this court and as not abrogated by the statute. Bishop's New Criminal Law, §§ 259, 260, 261; Bailey, Habeas Corpus, c. 7; Oswald, Contempt, pp. 91, 92, 97; Rapalje, Contempt, § 56; 9 Cyc. 20. No state, except Pennsylvania and Kentucky, in all the years since Peck's trial, has attempted by legislation to put the press in a class by itself as privileged to interfere with the administratioin of justice in a pending case. No case is reported, except those criticized above, in which newspaper comment tending to embarrass the court with reference to a pending cause, and not being a mere libel on the judge, is not held to be punishable summarily as a contempt. Century Digest, Decennial Digest, American Digest, Title, "Contempt."

We will discuss but a few of the more important cases for the light they afford. The authorities they cite need not be repeated in this opinion. It is obvious that cases which decline to admit the province of a Legislature to limit a court's power by definition of what shall be considered to be an attachable contempt, such as the important case of State v. Frew, 24 W. Va. 416, 49 Am. Rep. 257, are not valuable as authority, so we consider some of those only which apply statutory provisions.

Oregon and Washington by statute make "disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to impair its authority, or to interrupt the due course of a trial or other judicial proceeding" attachable. In each state it is held that publica-

tions tending to embarrass the court in the consideration of a case before it are within the operation of this language. State v. Kaiser, 20 Or. 50, 23 Pac. 964, 8 L. R. A. 584 (in which the respondent was relieved only because it was adjudged that he did not publish of a pending cause); State v. Tugwell, 19 Wash. 238, 52 Pac. 1056. 43 L. R. A. 717.

In Iowa the statute provides for summary punishment of "contemptuous or insolent behavior toward such court while engaged in the discharge of a judicial duty which may tend to impair the respect due to its authority." Under this provision the summary punishment of an editor was sustained for publishing an article ridiculing one of the parties and denouncing the witnesses in a pending trial. Field v. Thornell, 106 Iowa, 7, 75 N. W. 685, 68 Am. St. Rep. 281. The court said:

"The language of the statute does not require us to adopt a construction which will cripple the administration of justice, and deprive parties and the state of the hearing of causes unmolested by extrinsic influences, whether within or without the actual presence of the court. * * * The question arises, then, whether the court may, by contempt proceedings, protect witnesses from denunciation and intimidation by the public press, and the jurors from the influence created thereby. * * * We have discovered no authority denying the power of the court to punish as contempt an act which tends to impede, embarrass, or obstruct it in the discharge of its duties."

In Nebraska contempt may consist of "any willful attempt to obstruct the proceedings, or hinder the due administration of justice in any suit, proceeding or process pending before the courts." It is settled in that state that "a publication regarding a cause, during its pendency in court, which tends to corrupt or embarrass the administration of justice, and to produce a prejudice in the minds of the public with respect to the merits of a cause," is punishable within the statutory description. Percival v. State, 45 Neb. 741, 64 N. W. 221, 50 Am. St. Rep. 568; Rosewater v. State, 47 Neb. 630, 66 N. W. 640; State v. Bee Publishing Co., 60 Neb. 282, 83 N. W. 204, 50 L. R. A. 195, 83 Am. St. Rep. 531.

In North Carolina it is provided (section 648, N. C. Statute) that direct contempts shall consist "in disorderly, contemptuous or insolent behavior committed during the sitting of any court of justice, in the immediate view and presence of the court and directly tending to interrupt its proceedings, or to impair the respect due to its authority." The Supreme Court of the state (Ex parte Schenck, 65 N. C. 368) held that this statute did not restrict the constitutional power of the courts, and, in an elaborate and recent opinion (Ex parte McCown, 139 N. C. 95, 122, 51 S. E. 957, 2 L. R. A. [N. S.] 603) held that an assault upon the judge of the court, at the latter's boarding place and during the evening recess of the court, was within the statute; this altercation having reference to a case as to which judicial function had not ceased.

We have already referred to the view of the Supreme Court of Tennessee as to the applicability of the statute of that state to a case like this at bar. Georgia also has a statute in imitation of the federal act. In Baker v. State, 82 Ga. 776, 9 S. E. 743, 4 L. R. A. 128, 14 Am. St. Rep. 192, a suitor, whose case was not yet on trial, who in the courtroom, in the presence of several of the venire for the term, five or seven minutes before court was to convene for the morning, persisted

in·discussing his case with the judge, was found to be in contempt within the statute. In Wynn v. City & Suburban Ry., 91 Ga. 344, 17 S. E. 649, it was held in face of the contempt statute, that it was not error for the trial court to say in its charge to the jury in a personal injury case that it proposed to attach for contempt the publisher of a newspaper improperly commenting on the pending case.

We have noted that Ohio has a contempt statute on the lines of the federal act. ·In Steube v. State, 3 Ohio Cir. Ct. R. 383, 2 O. C. D. 216, the meaning of the words "misbehavior in the presence of the court, or so near thereto," etc., in the statute (section 5639, R. S.; section 12136, General Code Ohio; Act of 1834) was under specific interpretation. In a case where a stranger to a case on trial had, at recess and at a place five blocks away from the courthouse, assaulted an attorney in the pending case because of his connection therewith, the court held the statute applicable, holding:

"Whatever acts are calculated to impede, embarrass, or obstruct the court in the administration of justice, are considered as done in the presence of the court."

The McCown, Baker, and Steube Cases are cited to support the departure of the federal courts from the narrow interpretation of the federal act found in Poulson's and Robinson's Cases, and have no other importance, not being newspaper cases; but Ohio does furnish a case closely parallel to the instant proceeding. In Hale v. State, 55 Ohio St. 210, 45 N. E. 199, 36 L. R. A. 254, 60 Am. St. Rep. 691, it was held that the act of 1834, now section 12136, G. C. Ohio, could not be regarded as limiting powers inherent in the court of common pleas, as that was a court created by the Constitution; but in Myers v. State, 46 Ohio St. 473, 22 N. E. 43, 15 Am. St. Rep. 638, the court did not consider the statute in any other way than as controlling the common pleas court, and expressly found the publication involved to be within it. The statute (then section 5639, R. S., now section 12136, G. C.) provided summary punishment of "a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice." Myers had been jointly indicted with another for certain election forgeries, and had been given a separate trial. Pending the trial of his codefendant in the city of Columbus, Myers caused to be published an article in the Cincinnati Inquirer attacking the trial court with reference to the case. The Supreme Court said (46 Ohio St. page 490, 22 N. E. 44, 15 Am. St. Rep. 638):

"The publication came within section 5639, Rev. Stats. * * * It is true that the article was not written, nor was it circulated by the respondent, in the presence of the court. Indeed, it was written in the city of Cincinnati, though dated at Columbus. But the publication was in the courtroom, as well as elsewhere. It was intended to have effect, and did have effect, in the courthouse at Columbus, and the writer was just as much responsible for that effect as though he had in the courtroom itself, and while the trial was progressing, circulated and read aloud the article, or uttered the libeling words verbally."

It was a fact shown in that case that the paper in question circulated generally in the city of Columbus. The court reasoned that it is because the publication evinced an intention "to insult and intimidate

the judge, degrade the court, destroy its power and influence, and thus bring it into contempt; to influence the people against it; to lead them to believe that the trial then being conducted was a farce"; and because it had a tendency, "when read by the judge, to produce irritation, and, to a greater or less extent, render him less capable of exercising a clear and impartial judgment"—that it "tended directly to obstruct the administration of justice in reference to the case on trial," becoming therefore a contempt of court. The court further said:

"The statute clearly authorizes, as did the common law, courts to punish summarily, as contempt, acts calculated to obstruct their business."

This case is not only important as construing a statute in terms quite like that controlling this court, but as settling the law of the local jurisdiction within which respondents' offensive publications were had. It is plain that, had respondents been convicted of criminal contempt of a state court under circumstances such as those before us, they could get no relief from federal authority. Patterson v. Colorado, supra.

Three cases from very respectable state courts may be selected to support, if support is needed, the argument of the Supreme Court of Ohio that offensive publication tend directly to obstruct justice. In People v. Wilson, 64 Ill. 195, 211, 16 Am. Rep. 528, the dictum in Stuart v. People, 3 Scam. (Ill.) 405, under a statute giving a court power "to punish contempts offered by any person to it while sitting," was approved and the holding followed that:

"In this power would necessarily be included all acts calculated to impede, embarrass, or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court."

This case is not reversed by Storey v. People, 79 Ill. 45, 22 Am. Rep. 158, for the latter was decided not only under different state legislation, but dealt with a publication relating to a past court transaction.

In Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280, it is held that, in a publication which "amounts to a contempt of court because it interferes with the due administration of justice in a cause before the court, the contempt is analogous to a contempt in the presence of the court."

In State v. Howell, 80 Conn. 668, 69 Atl. 1057, 125 Am. St. Rep. 141, 13 Ann. Cas. 501, the court, in holding that proof is not necessary that the offensive article was read by jurors, said:

"A sentiment favorable or unfavorable to one of the parties to the case may be made to so pervade the community as to reach the courtroom and the triers and interfere with the fair and impartial performance by the latter of their duties."

Finally, on this subject, State v. Myers was cited with approval by the Supreme Court of the United States in Patterson v. Colorado, supra, to the point made in that opinion (205 U. S. 463, 27 Sup. Ct. 558, 51 L. Ed. 879, 10 Ann. Cas. 689), that:

"What is true with reference to a jury is true also with reference to a court. Cases like the present are more likely to arise, no doubt, when there

is a jury and the publication may affect their judgment. Judges generally, perhaps, are less apprehensive that publications impugning their own reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an interference, it may punish it as in the instance put. When a case is finished, courts are subject to the same criticism as other people; but the propriety and necessity of preventing interference with the course of justice by premature statement, argument, or intimidation hardly can be denied."

Of the cases above considered, Tugwell's, Rosewater's (Omaha Bee), Myers', and Patterson's were each instances where the misbehavior was alleged to have been with an intent to embarrass and influence the court in the performance of its duty. We are unable to find applicable to the language of the federal statute (section 268, Judicial Code) any reasonable construction which will relieve respondents in this case for the consequences in contempt for improper comment on a pending cause which involved the parties in the several proceedings reviewed.

It is nothing that no federal court in a reported case has ever hitherto so applied the statute. The language of this measure does not exclude its application to newspapers, and one court of appeals in a dictum has suggested that it may be so applied, as we have seen, in Re Daniels (C. C.) 131 Fed. 95, 99. We may employ the language of the Supreme Court of Nebraska (State v. Bee Publishing Co., supra) in partial explanation of the absence of reported federal cases, that:

"Courts have not often called publishers to account for constructive contempts, because it has rarely happened that a public journal, wielding any considerable influence, has deliberately employed outlaw methods in attempting to control judicial action."

Or that of the Supreme Court of Iowa (Field v. Thornell, supra), that it seldom occurs "that an honorable journalist so far forgets his self-respect as to trespass upon the rights of the judiciary or seek to control or improperly influence its conclusions."

On this subject, the Supreme Court of Colorado noted (People v. Stapleton, 18 Colo. 568, 33 Pac. 167, 23 L. R. A. 787), with respect to newspaper contempts, that:

"It is a matter of common observation that the courts of this country are reluctant to exercise the extraordinary power vested in them."

We hope that it will occur to those who may take an interest in the instant case that the fact that an endurance of the News-Bee's uncommon treatment of the case pending in this court was sustained for nearly six months, before action was taken to call it into question, is some evidence of a reluctance, on the part of this court, to exercise its extraordinary power in contempt.

It needs no argument that this case has all the incidents of a criminal proceeding, and that defendants can be held only after competent evidence with the unequivocal deductions from the facts proven thereby disclose their guilt beyond a reasonable doubt.

The defenses interposed are: (1) A want of jurisdiction to entertain any of the causes or proceedings concerning which the several alleged publications were uttered. (2) that these publications were all

within respondents' privilege as fair and proper comments and accounts of matters of public interest. (3) That none of the publications tended to embarrass the court in any way or to obstruct the administration of justice. (4) A disclaimer of intention to produce any such result.

Want of jurisdiction is asserted to have existed to hear the Doherty Case for any purpose because of the claim that the city was not a proper party thereto, wherefore the issue respecting the ordinance could not be heard and determined by this court. This is that line of defense peculiar to the first count.

In the matter of the second and third counts, it is claimed that the court had no jurisdiction over the Quinlivan proceedings because the latter was sought to be held under an order bearing the title of the traction case, wherefore no jurisdiction was had to attach either the present respondents or Howard for contempt with reference to the Quinlivan Case nor respondents for comment on Howard's Case. It is also offered in evidence, but not pleaded, that no affidavit had been filed to support the court's order citing Howard for contempt.

We do not understand the practice to be settled that the judge of a court needs an affidavit to precede a citation for contempt the facts supporting which are matters of his own personal cognizance. Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552.

Respecting the point that the Quinlivan order was in the original equity case by title, counsel seem to misread the case of Gompers v. Buck Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. The proceedings under the Quinlivan order are not brought into the record by respondents, and, of course, it will not be presumed that there were therein any of the fatal weaknesses found by the Supreme Court in the Gompers Case; for we do not understand the court to find the issue of the rule under the title of the equity case to have been a matter so serious as to destroy of itself jurisdiction. Under the authority of In re Kaplan Bros. (Third Circuit Court of Appeals) 213 Fed. 753, 130 C. C. A. 267, which discusses in this particular the Gompers Case, jurisdiction of Quinlivan was not lacking for this reason.

On this defense we are referred then finally to the status of the traction case, and it seems to be respondents' theory that, if jurisdiction of that case were absent, it was entirely safe for any one to indulge a line of conduct respecting it and proceedings attempted in it which might be unsafe as in contempt if jurisdiction were present. No extensive argument is now necessary upon the question that this court had jurisdiction of the traction case. There is nothing in its record to indicate collusion to cast a fraudulent jurisdiction. The plaintiffs were citizens of another state. Their right to insist on the preservation of their debtors' equity of redemption against confiscatory assaults cannot be doubted. That the enforcement of the ordinance would be to waste the traction company was a triable issue, and that such was a fact the city admitted after a contest. Plaintiffs, as well as the company, had a right to contend that the franchise did not expire at the time when the city sought to apply its day by day ordinance, and that therefore to enforce the ordinance would be to impair a contract. That the city could not

compel the company to continue its service, whether the latter wished to or not, is a justiciable proposition; likewise, the further insistence that the city could not prevent the company from removing its cars from the streets after the expiration of its franchise. That, even after expiration of a franchise, rights remained in a traction company to use the streets in a reasonable way, subject to reasonable conditions imposed by the city, until the city should summarily direct such use to cease, was decided by the case of City of Detroit v. Detroit United Railway, 172 Mich. 136, 137 N. W 645, and in that particular this case is in no wise affected by the decision of the Supreme Court of the United States, affirming the Supreme Court of Michigan, reported 229 U. S. 39, 33 Sup. Ct. 697, 57 L. Ed. 1056.

One incident affecting jurisdiction counsel overlook: The ordinance did not provide specifically that, as an alternative to the rates of fare, the company should abandon the streets. Had it done so, there would have been no justiciable question, for the measure would have been self-enforceable, and, however confiscatory and impracticable the rate, within the power of the council to pass, for, with the power to order the company off altogether, the council might couple with the exercise of that power the alternative of an unreasonable condition for continuing service. There was in the case, then, not the question of what the rate should be, which is a legislative and therefore a nonjusticiable question, but what the condition of use should not be, which is a proper subject for judicial inquiry.

These considerations are sufficient to confer jurisdiction. Cleveland v. Cleveland City Ry. Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; Blair v. Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801; Siler v. Louisville & Nashville Railroad, 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753; Louisville Trust Co. v Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Carroll v. C. & O. Coal Agency Co., 124 Fed. 305, 61 C. C. A. 49; Pennsylvania Co. v. L. E., B. G. & N. Ry. Co. (C. C.) 146 Fed. 446.

It is entirely clear, however, that this issue cannot be collaterally raised. Jurisdiction is a judicial question present in every litigated case. Sometimes it is too plain for contention. Where there is doubt, it is to be decided by the exercise of exactly the same judicial functions operative in case of any other legal proposition. It is preposterous that, when it is an actively controverted issue, a newspaper has more liberty with the court on a chance that jurisdiction may finally be found wanting, than it would enjoy if some other legal inquiry were the subject of consideration.

Comment reflecting on a court respecting a case before it is contempt of a different character from that involved in disobedience to an order of court. As to the latter, of course, want of jurisdiction to make the order is a complete defense to attachment for disobedience. In re Sawyer, 124 U S. 200, 8 Sup. Ct. 482, 31 L. Ed. 402. On this subject the Supreme Court of Colorado says, in Cooper v. People, 13 Colo. 337, 378, 22 Pac. 790, 802, 6 L. R. A. 430, 443 (a newspaper contempt case):

"But were we to concede that the jurisdiction of the district judge in the premises was doubtful, the position of respondents would not be materially different; for, if substantial doubt on this subject exists, pending the solution of this doubt, in good faith, and in a proper manner, the orders and proceedings of the court or judge are entitled to the same consideration as when no such objection is made. As we have said in another case, days of patient and careful investigation are sometimes necessarily consumed before the want of jurisdiction becomes apparent; and an admission that during this investigation witnesses may decline to testify, interlocutory orders may be disobeyed, and the proceedings may be treated with public contumely, would operate to deprive the court of power to determine the very point of jurisdiction itself."

The record of the Doherty Case shows that the judge gave the question of jurisdiction careful investigation, holding it for consideration until long after the facts had suggested the court's duty if it were present. We need say no more on this defense. The last word was said by the Supreme Court in United States v. Shipp, 203 U. S. 563, 573, 27 Sup. Ct. 165, 166 (51 L. Ed. 319, 8 Ann. Cas. 265). There it was objected, on grounds similar to those urged here, that respondents could not be held in contempt of the Supreme Court for permitting the lynching of a prisoner whose petition for writ of habeas corpus had been denied by the local federal Circuit Court and who was prosecuting an appeal to the Supreme Court. The court said:

"But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law. It and it alone necessarily had jurisdiction to decide whether the case was properly before it. On that question, at least, it was its duty to permit argument and to take the time required for such consideration as it might need. * * * Until its judgment declining jurisdiction should be announced, it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition, just as the state court was bound to refrain from further proceedings until the same time."

The argument that the publications in question do not tend to obstruct justice proceeds wholly on consideration of each as an isolated act. Much, of course, of the matter pleaded in the information, is entirely beyond criticism, and we conceive that the pleader is not insisting otherwise. Other matters are, at least, disagreeable, and with this quality are of some importance only as light-giving parts of the res gestæ. Others are, at least, technical breaches of the paper's privilege which, if but isolated lapses from proper comment, a court should not hastily take under consideration; but, as parts of a series on the same subject and in the same line of offensive criticism, they severally gain in force. Others still are individually so strong that each carries its own power for mischief.

The rule is that, when there is no ambiguity in the language, intent to effect what the language tends to effect is presumed against a sworn disclaimer of such intention. Ex parte Nelson, 251 Mo. 63, 157 S. W. 794; In re Chadwick, 109 Mich. 588, 67 N. W. 1071; Fishback v. State, 131 Ind. 304, 30 N. E. 1088. Of course, the question of ambiguity is to be decided by considering the context and, to some extent, the res gestæ. Henry v. Ellis, 49 Iowa, 205. Respondents should be held for what appears in their paper of any issue pertinent to the

subject under inquiry, and a full understanding of what is said in one place may be attempted by referring to what was elsewhere in the issue said on the same subject, and, if that subject is one discussed by the paper over a period of time, what is said in one issue may have an interpretative effect respecting matters appearing in other issues. A proceeding for newspaper contempt partakes of the incidents of any other action for defamation, and other publications on the same subject before and after the date of that declared on may be offered for interpretation, at least, on the matter of quo animo, as in libel. Post Publishing Co. v. Hallam, 59 Fed. 530, 8 C. C. A. 201 (Sixth Circuit Court of Appeals); Van Derveer v. Sutphin, 5 Ohio St. 293; Larrabee v. Tribune Co., 36 Minn. 141, 30 N. W. 462; Commonwealth v. Damon, 136 Mass. 441; Enos v. Enos, 135 N. Y. 609, 32 N. E. 123; Thibault v. Sessions, 101 Mich. 279, 59 N. W. 624; Cushing v. Hederman, 117 Iowa, 637, 91 N. W. 940, 94 Am. St. Rep. 320; Bee Publishing Co. v. Shields, 68 Neb. 750, 94 N. W. 1029, 99 N. W. 822.

In a disbarment case in which the question of libel was involved, the Circuit Court of Appeals for the Sixth Circuit (Thatcher v. United States, 212 Fed. 801, 810, 129 C. C. A. 255) says of the claim that the publication was proper:

"The argument that it is not libelous, or is not untruthful depends upon the mistaken view that it cannot be condemned if skilled dialecticians can point out how each sentence or half sentence, standing alone, is not necessarily inconsistent with the facts. It is impossible to consider such a publication from that standpoint. It was drafted by Mr. Thatcher and his associates, skilled in the nice use of language and in the leaving of pegs whereon they might hang technical justifications; it was prepared and published to be read by and to influence a class of the community not skilled in these things, and which would take it to mean what it seemed to mean; and it must be read against its composers with the same meaning which they intended its readers should draw. * * * It cannot be considered as if it had been put before an audience of lawyers who would not be misled by its absurdities, or as if composed by laymen who could be excused by their ignorance."

Tested by this appropriate rule, no ambiguity attends some of the publications separately considered, and none of those upon which the court makes a finding herein have that infirmity, when treated as respective parts of a series on the same subject, and when the light from circumstances known and commented on by respondents' paper is given them. The background against which they all stand, and which develops their force and capacity for mischief, is the excited state of public feeling pictured in the News-Bee's account of the council meeting of March 23, and the intense public interest in the traction case of which respondent Cochran testified.

The traction case stood then, March 24, under a handicap involved in asking consideration of a question upon which a large part of the community in which the court sat had arrived, assisted by respondents, at so definite and insistent a judgment that any suggestion, even official, of moderation of temper, and any argument seeming to favor the plaintiffs, met with public objurgation.

That this situation, without more, offered some embarrassment to the court is quite obvious and could not have escaped as shrewd an observer and as experienced a newspaper man as respondent Cochran,

and it is not easy to follow with sympathy his disclaimer that the subsequent publications of his paper, some of which he wrote, had no purpose to add to that embarrassment.

They were surely capable of the mischief attributed to them in the information. It is not material that a definitely formed intention to that end was ever held by respondents, if the utterances were recklessly made or in pursuit of a journalistic policy seen to be against public policy when persistently followed. However, so far as any interpretation of them respecting intent is necessary beyond their language—and we think none is—aid is had from the two chief witnesses for the defense, respondent Cochran and Managing Editor Howard. The former said that the paper's policy was to print all the news under an "implied contract" with its patrons to that end, that he himself wrote, not for lawyers and dialecticians, but for a "lot of human beings and to make them understand"; that he "wanted to get the punch in there so it would get to them and make them think" and to "keep up the public interest"; that if he had not been writing down to the people, but for lawyers, his "language might have been more ladylike." He complacently admits that he uses a vernacular which conveys special meanings to the particular class he aspires to lead. Mr. Cochran and, through him, the corporation respondent which gives him responsibility to speak for it, cannot complain if here the rule in Thatcher v. United States is applied, and that their language, profuse use of staring type, and other peculiarities of expression, not forgetting that, with reference to the traction case, perversions, distortions, and prevarications respecting court proceedings are not neglected, are considered in an effort to see what "punch" got to their readers, what thoughts the latter were sought to think, what meanings they were intended by respondents to draw. Mr. Howard testified frankly in line with Mr. Cochran, and further said that the paper endeavored to emphasize, by repetition and otherwise, the salient features of the day's happenings; and that is his explanation for the triple repetition of the stated purpose of the city solicitor to exceed his official duty in protecting those individuals who should stand upon their assumed rights to ride for three-cent fare, although the question had been relegated for judicial determination. He admitted that some of the publications were intended to comment upon proceedings had in the pending case, notably the editorial on holding court over the telephone, which, he said, was the paper's comment on a circumstance which the paper considered to be a vital crisis in the case. It doubtless had not occurred to Mr. Howard that the only possible effect of the court authorizing by telephone the entrance on the 24th of March of an order of whose tenor the judge was well informed, and which he actually signed on that day and caused to be returned as signed to be filed at the beginning of business on the subsequent day, was to give the city of Toledo a day's extra notice of the fact that it was to meet the attack of the plaintiffs. No possible prejudice ensued, and, if the time were critical for the city, the court, in the action which was so unfavorably commented upon by respondents, gave it an additional time in which to prepare.

220 F.—32

Reluctantly, however, Mr. Cochran was finally forced to admit that in times of great public excitement, affecting a case pending before a court, a paper is not privileged to print as matter of news a matter which may be seen reasonably to add to that excitement. The justification, however, through a right to print the news, does not exonerate respondents from responsibility here for any of the editorial comments complained of; for no one of them can be considered to be "news." Assuming, considering the intensity of the situation manifest Tuesday morning, March 24, that it was proper as a matter of news, and, in the same article which carried the statement that the court was asked to pass on the fare question, to announce that the city solicitor would protect any one who chose to exercise his private judgment in the matter—an action which would be manifestly beyond the solicitor's official authority—why, if to state a matter of news were the only motive, should this absurdity be mentioned four times and be made the subject of two headlines, and why, in that connection, was it necessary to publish the fact of the mayor's indorsement?

Again, if it were desirable as a matter of news to state that a mass meeting was proposed for Friday with an anarchistic afterpiece, the most ordinary consideration of the delicate position in which the intensity of public feeling placed the court would, it seems, have forbidden the incendiary extravagances of headlines, repetitions, and sensational treatment which marked, to the point of advertising with the paper's approval, the announcement of the project to hold a mass meeting Friday night in Memorial Hall "restraining order or no restraining order by the federal court, to test the strength of the three-cent fare all day ordinance." And, if a public duty were felt to demand, in the same issue which so elaborately advertised this proposed test of the ordinance en masse, that the city increase its professional representation in the court lest the "franchise manipulators" get a "strangle hold" on the people by unduly impressing the court with their "high-priced legal talent," there was no reasonable or respectable call to carry the argument into an unmistakable reflection on the court.

Of course, editorial utterances of a newspaper are voluntary—no consideration for a timely presentation of current events constrains the manner of expression of editorial opinion. Hence it may be observed that, if respondents were not committing their paper to the public disorder feared for Friday night, it was with amazingly bad judgment that they chose to say, editorially, on the 26th, that the police would not use their clubs on recalcitrant car riders that night, indorsing in that connection apparently the alleged opinion of Sam Jones that "the law, was only what the people will back up."

The manner, too, in which news matter is treated in the writing, is, of course, purely a question of editorial policy. So it is submitted that, if the News-Bee were intending to respect the tribunal to which the question was referred, it was a most unfortunate use of terms to say of the members of the Central Labor Union in attendance at the Memorial Hall meeting:

"These men may furnish the sinew to see to it that three-cent fares are accepted by the conductors."

This statement was not a matter of news. It was merely an expression of opinion by the writer as to the source from which physical force to accomplish the purposes in question might be derived. It was doubtless a case of "getting in the punch."

It is seen, then, that to a situation already highly inflamed the issues of the 24th, 25th, and 26th of March of respondents' paper do nothing less than offer additional fuel: (1) Through an assurance, March 24, made so often and so plainly as not to be overlooked, that he who contributed to the disorder feared for Friday night would be protected by the city's law officer. (2) By advice, on the 25th, to those of its readers who were disposed, by the announcement of official protection given in the previous issue, to take the law into their own hands, that they will have mob support as the result of a meeting in Memorial Hall called for specific action, "restraining order or no restraining order" from a court whose judge is so temperamentally and mentally uncertain that its decrees, if unpleasant, are entitled to questionable respect. (3) By, on the 26th, bracing timorous readers, who hesitate to join the crowd, with the admonition that they may not fear restraint from peace officers of the city, nor be deterred by lingering respect for law and authority, because, forsooth, the time has come when law is just what public passion, aroused by such publications as these,. deems for the time being should be respected.

No innuendo is needed to suggest the tendency of these publications. They are unambiguous toward an unmistakable addition to the burden of both suitors and court taken on when the motions were filed. The language is not susceptible of two interpretations—it tends in no direction save that charged in the information.

Respondents cannot escape responsibility for the evident tendency of their publications by proof of the truth of their statements. Globe Newspaper Co. v. Commonwealth, 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761. Newspapers have more than the truth to think about; they must consider the effect of stating the truth.

Besides the satirical and reflective comment over "holding court over the telephone," admitted by Editor Howard to voice the paper's disapproval of the court, there is another case in which there is an acknowledgment that an intention existed to reflect on the court. After the case for the plaintiffs had been heard, August 14, with testimony that the ordinance was confiscatory, the court, on application of the city, considerately gave it more than three weeks to make its proof in support of the ordinance, adjourning the hearing until September 8th.

On September 5 respondents uttered the satirical editorial note coupling Judge Killits with plaintiff Doherty and classifying the two with one Peter Parker, a former butt of the News-Bee's satire. Counsel for respondents, in the written argument in support of their demurrer, justify this publication in these words:

"We do not believe that this expression of confidence that the people themselves were able to handle the street railway situation without the assistance of the courts was in any way unwarranted."

The spirit of this comment is the keynote of the explanation and interpretation for every publication in question, for it is entirely the spirit of the testimony in this case given by respondent Cochran. It has the same flavor of suggestion that the court, in deigning to permit the traction suit to enter its dockets, was trenching upon the prerogatives of respondents to settle the controversy. We are able to understand now the extravagances of expression, the lurid typographical exaggerations, the misrepresentation of the court in headline after headline, and in text and editorial, the consistently unfriendly attitude against the court. For more than ten years, as they say, respondents have fought the Big Con, and it should not now be that the latter should enjoy the resource of the courts unmolested—respondents, as the self-appointed guardians of the people, had reached a verdict on the traction question which should not be disturbed by the judiciary.

It must be conceded that the headlines of the issues of March 26, August 14, and September 10 convey information at variance with that of the news articles which, respectively, follow. It is urged, by way of defense, that each headline should be considered in connection with the enlarged article. March 26, the line, "Killits Upsets Low Fares," set in type exactly the size and style of the capital letters of the title to the paper, extending clear across eight columns of the paper, is the feature of the front page. The body of the article makes it plain that the statement is entirely false, as nothing is there told, nor did anything in fact happen, which tends intelligently to make that headline a truthful statement. The same may be said of the headlining of the other two issues referred to.

But we are told that whatever uncertainty or error abides in this extravagant headlining is corrected by the truthful news account underneath. It is a naive defense that the veracity of an extended news account should be accepted as an antidote to the prevarication in the headlines in large type, from which the paper's reader gets his first impression of the facts reported and, doubtless, in many instances, his abiding interpretation of the full account which follows. Granting the right to "get the punch" in the writing and to emphasize the "salient features" of the case, respondents are still held to a responsibility to state the truth when they comment on the court's proceeding in a pending case.

Of course, if these false headline statements were but isolated offenses, or if they could be referred to mere blundering in "make-up," the court's duty to pass them in silence would be obvious; but they accord too clearly with the entire policy of the paper, they take their places too plainly in the file of consistently invidious comments on the court respecting the pending case, not to be considered as reflecting respondents' attitude toward the court and the cause. They join the more detailed and elaborate offensive publications to connote an intention to control the issue in the traction case, or, at least, in case the court's decision does not meet the wishes of respondents, to render it of doubtful value to the prevailing party.

Undoubtedly, one of them, that which said, August 14, "Killits Puts Burden on the City," inspired Quinlivan's attack on the court.

His discussion before the Central Labor Union, September 10, on the proposition to suggest impeachment of Judge Killits in case he decided the traction issue against the city, was based on the impression he held that the court had "placed the burden of proof of the Schreiber ordinance on the city." Nowhere else than from the misstatement of fact of the News-Bee could he have obtained such a notion, and this circumstance meets the claim that respondents' publication did not tend to embarrass the court. It is also worthy of note that this labor union meeting was held on the evening of the issue of the News-Bee containing the headline statement, in letters over half an inch high, "Low Fares Banned by U. S. Judge," over an article which told that the court had not yet reached a decision. It was in fact that day announced from the bench, but not published by respondents, although respondents had a transcript of the statements of the court and have introduced that transcript in evidence in this hearing, that the question of jurisdiction to issue an injunction was not yet decided; the city having admitted the fact that the ordinance was confiscatory and consequently void.

We may here note the curious fact that the Socialist thought, as shown in the resolutions which Mr. Howard testifies he edited for publication on September 9, ran in the same verbal channels with that of Editor Cochran. March 27, the latter wrote editorially that the Big Con "is now a trespasser on many of the streets of Toledo"; while, September 6, the Toledo Socialist Local, according to Mr. Cochran's paper, "adopted a resolution which refers to the street railway company as a trespasser in the streets." This may be a mere coincidence; but, as in case of Quinlivan's attack upon the court, it seems more likely to have been inspired by Mr. Cochran's production.

Newspaper criticism of a party to a pending cause respecting the same has always been considered as misbehavior tending to obstruct the administration of justice, even when unaccompanied by the slightest reflection on the court itself, except in those infrequent jurisdictions wherein the press has been completely immunized. That principle operated solely in some of the cases we have cited, such as Globe Newspaper Co. v. Commonwealth, State v. Howell, and Henry v. Ellis. They proceed on the principle that a court has a paramount duty to protect suitors from anything which will interfere with a fair consideration of their rights. It was this, doubtless, which prompted Chancellor Kent to say that, "in leaving a suitor unprotected at the moment when he stands most in need," Justice Baldwin's interpretation of the federal act of 1831 was unreasonable. The court, in Cooper v. People, 13 Colo. 366, 22 Pac. 799 (6 L. R. A. 429), supra, says:

"Parties have a constitutional right to have their causes tried fairly in court, by an impartial tribunal, uninfluenced by newspaper dictation or public clamor."

It follows that any newspaper comment which tends to make the position of a litigant difficult before the court hampers the efforts of the court to adjudicate the issue fairly and dispassionately. In this light, the News-Bee's editorials of March 25, entitled "Municipal Ownership, the Only Way to Street Railway Peace," and of March

27, "Big Con's Attitude is the Same Old Defiance of the People," and the cartoons, "At the Last Ditch," and "A Desperate Case," because each tends unmistakably to deride or denounce plaintiffs in the pending case, with reference thereto, and therefore tends to further inflame public hostility to them, are of themselves instances of behavior which could have no other direction than to render more difficult of performance the duty of this court toward those who rightfully had appealed to its consideration.

It is unnecessary to argue at length that the editorial referring to Quinlivan's case, of September 14—"would it be contempt to remark that it is a peculiar situation where the officer who makes the charge also considers the evidence, renders the verdict and imposes the sentence"—was meant to be contemptuous. Its language, form of expression, the typographical prominence—across two columns, in heavy, black-faced type—leave no room for doubt. The repetition, in the news columns of that date, of the statement made on the previous issue-day, that "Killits has announced that he will hear the case himself"—an announcement which, if true, was not important enough for immediate repetition—obviously was to lay a foundation for this editorial and for the Dennie letter, which was also plainly in contempt. Mr. Howard, in receiving the Dennie letter, recognized by editing it that it was offensive, for he testifies that he said to Dennie, after he (Howard) had edited it, "If you will stand for it in this form, I will use it." These publications tended, without ambiguity, to weaken whatever effect a punishment of Quinlivan after conviction might properly have by way of vindicating the court's right to an unhampered consideration of the issues submitted to it in the traction case.

The so-called "declaration of independence," the two-column, front page editorial of September 17, republished in several issues after a rule had been entered on respondents for uttering it, and which is the basis for the third count of the information, is likewise too plainly an offensive—purposely so—attack on the court respecting a pending case to be within any privilege possible to an orderly imagination. The justification offered in written argument is too grotesque to be regarded as serious. It is, in substance, that, having been accused of an offense, a right inhered in respondents to try the question out first in their paper with sundry reflections on the quality of the tribunal which assumed to entertain the charge. Of course, this defense begs the whole question. It would be just as good if the News-Bee had been sued for libel or its editor indicted by some grand jury. In either of these cases, by the same reasoning, the paper, in advance of the trial, would have the right to berate the other party, lampoon the grand jury, discuss the evidence and abuse the judge of the court. And, as respondents have no greater right to use their newspaper in their own behalf when under charges than in behalf of any other citizen, if their argument is good the paper and its publishers and editors are immune from punishment for any interference with a pending proceeding which they please to offer. If we have come to this pass, the courts may as well take permanent vacations and allow all litigable questions to be settled in editorial sanctums. Mr. Cochran said of this editorial that it was

"primarily intended to make the people of Toledo understand that, no matter what happened to me, no matter what any court might do, that it was not going to change the policy of the News-Bee;" that it was written to let his readers know that it was not intended "to let any judge edit the News-Bee or lay down its editorial policy," that is to say, that the News-Bee will hold its chosen course in defiance of any court; as between the court's right to undisturbed consideration of issues before it and Mr. Cochran's "editorial policy," the latter has precedence under all circumstances. This is insolent egotism becoming rabid.

Instead of criticizing the publications, September 9, of the Socialist resolutions, condemning court interference with the Schreiber ordinance, and, September 11, of the proceedings of the Central Labor Union discussing impeachment if the city should lose the traction case, counsel suggest that respondents should be complimented, because that action operated to relieve these organizations of something which they should "get out of their systems," and that, by publication, at the end, "they could see what nonsense and foolishness it was." By precisely the same reasoning, everything respondents themselves said of the court and the suitors before it, however invidious or offensive, could be excused, because that behavior would be but a process of eructation—a relief from some disturbance of respondents' systems. This defense is more ingenious than impressive. If these utterances were not so clearly in line with respondents' own original attacks on the court respecting the case, they might be overlooked, perhaps, on the ground suggested. It has already been noticed that both the Socialists and the labor agitator received inspiration for their outbursts from respondents. There is some responsibility on those who administered the poison which disturbed these systems. As it is, the same editorial precaution which suggested editing the Socialist criticism had better have been exercised to their exclusion altogether if respondents would not bear responsibility for them as reflecting the paper's own views. One who gives currency to defamatory matter is himself liable (25 Cyc. 574; Olmsted v. Brown, 12 Barb. [N. Y.] 657), and newspapers cannot escape on the theory that they are entitled to print the news (25 Cyc. 405), although this court, in matters of contempt, at least, would not incline to apply this principle very rigidly, if the publications were free from the appearance that they served the paper's "editorial policy" of defamation. In this connection, it should be observed that what is considered reprehensible in the publication of the account of the Quinlivan matter, in the early edition of the News-Bee of September 12, appearing before the entry of the court's order in the traction case, is not the fact itself that the paper saw fit to print the news and the substance of the charges against Quinlivan, but that, in line with its policy to emphasize and give prominence to what it considers the impressive things in the items of news, respondents extracted from the news article the threatening and contemptuous language of Quinlivan and presented it with special typographical emphasis.

In our findings hereafter stated we omit some publications which counsel for the government insist are predicates for a charge of contempt. We pass them over principally to give respondents the benefit of every doubt. Unless a publication plainly tends to affect the admin-

istration of a pending case, our conception of section 268 requires that it be not considered a misbehavior, no matter how aggravating or unfair it may be. An extreme instance is the editorial of March 31. The motion for a temporary injunction was denied on March 30, with a written opinion, of which the News-Bee was furnished a copy and from which, in its issue of March 31, it published extracts; yet respondents unmistakably perverted the court's position in their editorial comment. That the court's position and the paper's comment thereon may be more clearly considered together, we set out here in parallel a paragraph from the opinion and the editorial:

| Opinion. | Editorial. |
|---|---|
| "That the company may run its cars from day to day without the city's consent and charge fare because its service is a public necessity, * * * but the city may at any time summarily deprive the company of the use of the streets except to salvage its property and the company may stop its cars at any time." | "To the layman it appears peculiar that the city cannot stop the company's cars because the public is entitled to the service or requires it, but the company can stop the cars at once on expiration of its franchise rights regardless of the needs of the people. Reminds us somehow of the elder Vanderbilt." |

The subject in the opinion was but briefly considered, epitomizing the features of the court's unofficial statement in which, in more detail, it was declared:

"That the company can only operate after the expiration of its franchises at the city's sufferance, and its right to do so ends abruptly when the city acts through a new franchise or by imposing reasonable terms for a continued day by day use or other by means at the city's command."

This statement was published in full in the News-Bee March 26.

It follows, from these facts, that an only possible explanation for the editorial reflection on the court abides either in a willful oversight of the respondents' own files and documents coupled with an intention to belittle the tribunal, or in the employment of a willful perversion of the truth in a persistent intention to degrade the court. For it there can be no legitimate excuse. Strictly speaking, however, this unjustifiable comment cannot be said to tend to obstruct the administration of justice because it deals with a completed act of the court; wherefore it is within the favor of the decision in 131 Fed. (the Daniels Case), which case, in our judgment, at the most decides no more than this. In the case before us, however, the publication has an important function as an illuminant of the respondents' attitude towards the court respecting the traction case generally to exhibit the animus inspiring prior and subsequent publications which the court finds to be contemptuous. Respondents recognize the difficulty of excusing or even explaining this editorial. They deny any intention to reflect on the court, but its cynical tone, aside from its reference to the elder Vanderbilt's well-advertised views of the public, belies the disclaimer. They acknowledge they had reference to the court's opinion, but insist that they intended to refer at the same time to the claims put forth by the traction company. They say that, to the extent that it "does not correctly state the decision of the court, the error was unintentional." Unfortunately for their defense, the sneer at the court is based entirely on the misrepresentation,

and its tenor harmonizes altogether with that of every other comment made respecting the case.

We agree entirely with the view of the court in Stuart v. People, 3 Scam. (Ill.) 395, which counsel for respondents are assiduous to call to our attention, to the effect that:

"An honest, independent, and intelligent court will win its way to public confidence, in spite of newspaper paragraphs, however pointed may be their wit or satire, and its dignity will suffer less by passing them by unnoticed, than by arraigning the perpetrators, trying them in a summary way, and punishing them by the judgment of the offended party."

This was said in a case where there was a specific finding of fact that the sole alleged offensive publication had no tendency to obstruct the administration of justice. We would, and in this case did, go further and say that a court ought not to be swift to notice newspaper quips or careless or even untruthful reporting of its proceedings, even if superficially they reflect upon it respecting a pending case. Much better should it overlook such matters and trust to the good sense of the community it serves to secure for it the respect to which it may be entitled. On this principle we might have left unconsidered some other publications for which respondents are now held, had they not been plainly respective parts of a series of offenses.

But a court may carry forbearance so far and depend so long upon the good sense of the public to protect it from the embarrassment of repeated and persistent attacks as to become contemptible for weakness. Especially would this point be reached when, as here, the attempt to undermine the court is made by appeal after appeal to the selfish interests of the public in the outcome of the case, in which the public is repeatedly told that it is the only party whose rights are entitled to a particle of respect. In this matter the record shows that the court endured the News-Bee's attacks upon suitors before it and upon the court itself, and carried all the embarrassment inevitable from these publications, for nearly six months before moving to vindicate its independence. If longer patience than that would have been a greater virtue, it surely would have been at the same time a weakness of public service.

The right to freely comment on judicial conduct is not involved in this case. Such a right is unquestioned; just as plain as the corollary that the courts have a right—the people have a right—to expect newspapers to fairly criticize the courts, to argue their criticisms from truthful, not false, premises. Under these fair and honorable circumstances, it is true, as Judge Taft said to the American Bar Association, of which counsel are at pains to remind us, that "the opportunity freely and publicly to criticize judicial action" is of vast importance, for one reason that:

"It is the only practicable and available instrument in the hands of a free people to keep * * * judges alive to the demands of those they serve."

One is unable to find, however, in this right, any excuse for hampering the administration of justice by unfair comment on the court and by stirring up hostile sentiment toward the court and suitors therein respecting a pending case.

There is another supreme public interest which the right to freely criticize judicial action is to serve, not to destroy, of which the court, in Cooper v. People, 13 Colo. 377, 22 Pac. 802 (31 L. R. A. 429), supra, speaks:

"Every citizen has a profound personal interest in the enforcement of the fundamental right to have justice administered by the courts, under the protection and forms of law, free from outside coercion or interference. It is doubtful if anything else can be mentioned of greater importance than this right to society and the state; and it is not too much to say that the responsibility of the journalist for its enforcement is, because of the vantage ground he occupies, second only to that of the judge."

The right to criticize judicial action, of which Judge Taft speaks, is the right to remind courts of their function to determine issues before them free from any external influences of any character, not a right by unjustifiable criticism and comment and palpable appeals to public passion to impose external influences upon the tribunal.

Without affecting the present case, we may adhere, also, to the views announced before a recent meeting of the American Bar Association, which counsel for respondents very carefully call to our attention, wherein the distinguished speaker said:

"May I not ask you gentlemen whether the time is not now ripe for the judges themselves to take greater pains to explain to the public the situation they now occupy; in some way * * * to let the public understand what is going on in the courts, the great purpose of the courts, the great objects to be attained?"

The suggestion is acceptable, truly, but to follow it courts must have an honest medium of communication with the people. Judges may write opinions and file them; thereafter they must trust to the press. That newspaper, however, which maltreats a court, as did the News-Bee of March 31, in founding upon a palpable misrepresentation of this court's traction opinion of March 30 a sneering reflection on the court's fairness, and whose headline custom yields so many false impressions as this record shows, is not a very promising medium for a judge's explanation to the people of the position the court occupies respecting a matter of public interest. In spite of appearances, we are certain that the sardonic humor in counsel's reminder of this address was unintentional.

We are unable to accept at its face value the claim in testimony, offered possibly in mitigation, that the offenses complained of were committed in a zealous, self-effacing effort to serve the people. There are not wanting in the atmosphere of this case grounds for suspecting that the boasted interest in the people was commercial, not unselfish and patriotic; that the "implied contract" to give the people all the news was violated in the publication of manifest untruths and unmistakable reflections on the court and parties before it, not in excessive zeal for the public welfare, but willfully to foster local prejudices, so that the resultant distrust of authority might be coined into dividends; that these equivocations and, at times, downright prevarications, were played as salient features, and cast in extravagant headlines and special boxings, to stimulate an interest which would increase circulation, give excuse for extra editions, and catch more pennies.

According to Mr. Cochran's testimony, four municipal elections were carried by candidates supported by the News-Bee and in line with its traction policies, and yet the power to settle the franchise question was never exercised; the issue was always on hand to be the subject for lurid rhetoric and violent invective. It is open to question whether, at least since 1910, with the state law protecting the people through a referendum, the News-Bee's city hall could not have brought the question to an answer. The city had the exhaustive report of its chosen expert, and the votes in council as shown by the passage of the Schreiber ordinance. It does not strain the imagination to see, in the "Big Con," the perennially unsettled traction question, and the vogue for three-cent fare, assets for respondent's business, whose value might greatly diminish, if not entirely vanish, if allowed to be coolly and dispassionately considered in a local court in plain view of an *undisturbed* community. The intelligence of those connected with the paper is too obvious to permit confidence that they entertain a genuine feeling that any interest the people had in the solution of the question justified editorial conduct which had no other direction than to make it less and less easy for the people to see clearly just what their fair and reasonable interest was. They would not say, of course, that, no matter how cordially the "Big Con" was disliked or whatever the cause of the dislike, the honest people of Toledo desired anything else than fair treatment of it and from it. No one of an honest mind can reasonably deny that each publication in question directly tended to impassion those who relied on the News-Bee for impressions of men and events, and that thus such readers became measurably disqualified from judging what was fairly due either the city or the company, or whether the public's agents were faithful to their obligations.

Obviously, also, much of the testimony is shrewdly directed to a probable future claim that the court in this case aims to curtail the freedom of the press. Mr. Cochran's comments on the purpose of his "declaration of independence" leave no doubt here. Emphatically, a free press is an indispensable asset to liberty; but a licentious, unscrupulous press is a liability. Thomas Jefferson, while yet President, wrote to John Norvell that:

"It is a melancholy truth that a suppression of the press could not more completely deprive the nation of its benefits than is done by its abandoned prostitution to falsehood."

An unreliable newspaper is no friend of the people. Jefferson said of such that a man who never looks in one "is better informed than he who reads them, inasmuch as he who knows nothing is nearer the truth than he whose mind is filled with falsehood and errors."

The principle this court is applying here is not one which curtails in the slightest the liberty of respondents to publish anything they please, but it is the salutary doctrine, always recognized and indispensable to good order, that they must respond for a baleful use of that freedom. Robertson v. Baldwin, 165 U. S. 275, 281, 17 Sup. Ct. 326, 41 L. Ed. 715. Nor is there in this case any assertion of a special power in the court over the press. A newspaper is merely a private affair, the activity of persons as amenable to the laws as individuals in other voca-

tions, and the editors of newspapers—mere human beings, too—have no greater privileges than the writers of private letters or the circulators of common gossip. The power of a court over a newspaper is the same in quality, no greater and no less, as that affecting any other enterprise. A court is but a public agency—the people themselves in organization for a special purpose—to which newspapers are responsible when in the wrong, as any other human activity. The court, in People v. Stapleton, supra, say:

"Thoughtful citizens know very well that there is far more danger to our institutions, and far more danger to the rights of the people, and especially to the rights of litigants, to be apprehended from the power of the press over the courts, than from the power of the courts over the press."

The lynching of Johnson at Chattanooga, March 19, 1906, was preceded within four hours by an inflammatory article in a local newspaper under a "scarehead." As a result, officers of that city were before the Supreme Court and the whole community was in disgrace. United States v. Shipp, 214 U. S. 386, 29 Sup. Ct. 637, 53 L. Ed. 1041. Recently, Leo Frank's was a case also where apparently public hysteria, stimulated by hyperbolic newspaper discussion of the charge against him, supplanted due process of law and made the court holding his life in the balance a contemptible thing, a failure as the administrator of justice.

That Toledo should be disgraced, as other cities have been, by street car riots, on Saturday, March 27, was rendered impossible by the action of the traction company in allowing free rides. Whether rioting would otherwise have occurred is pure speculation. Members of the city council predicted it as early as the 23d, and the News-Bee itself says there was "much anxiety" on the subject. It is entirely obvious that its own behavior on March 24, 25, and 26 gave reasonable occasion for anxiety, because it offered the greatest encouragement to those who were disposed to defy law and order to exercise their proclivity when the franchises expired.

As no sophistry avails with intelligent persons to argue out of these publications their tendency to arouse distrust and dislike of the court, so, equally, no sophistical declamation should be allowed to becloud the issue of this case. It is not to muzzle the press, to "edit the News-Bee," to create a "fear" of this court, or its judge, to prevent which Mr. Cochran says, in his testimony, was the purpose of his "declaration of independence," but to define and to insist on the right of this court to transact the business intrusted to it without molestation or the embarrassment of improper influences, whether newspaper suggestion, criticism, intimidation, or what. It is to assert "the right of every litigant to have his case heard free from baneful external influences sought to be executed from selfish or other improper motives."

This court is dealing here with "palpable acts of journalistic lawlessness, calculated to weaken the independence of the court and destroy confidence in its judgment. To justify them is to deny the supremacy of the law, and assert the doctrine of newspaper absolutism. To admit that publishers may promote their interests in pending litigation by resorting to methods not available to others is to strike down our much-

vaunted principle of 'equality before the law,' and to declare that journalists, who chose to become malefactors, are a privileged class and entitled as such to go unwhipped of justice. But the law recognizes no such distinction. It accords to publishers, says Chancellor Walworth, 'no rights but such as are common to all. They have just the same rights as the rest of the community have, and no more.' King v. Root, 4 Wend. (N. Y.) 113 [21 Am. Dec. 102]." State v. Bee Pub. Co., supra.

[5-7] It is urged that it is neither averred nor proven that any of the publications involved ever came to the attention of the judge of the court. In our judgment, this is nothing. The question is not, did the misbehavior embarrass the court or obstruct justice in either of the directions alleged, but whether they were calculated—tended—to such results. It is not what respondents actually accomplished, but what they intended and tried to do, for which they should be held. Attempts to commit crimes are themselves crimes. Besides, the order for an information, offered and received in evidence without objection, recites that each of the publications were seen by the judge as a daily reader of the News-Bee. In cases of this kind it is competent for the court to take judicial notice of pertinent facts which come within the cognizance of the judge's senses. Myers v. State, 46 Ohio St. 473, 492, 22 N. E. 43, 15 Am. St. Rep. 638.

Yet the record shows some obstruction of justice referable to respondents' conduct. In fear of the results of the encouragement to anarchy, of defiance to constituted authority, for Friday night, March 27, which the News-Bee had given in its issues for the three previous days, the traction company allowed free riding, to its great and unjustifiable loss, as clearly appeared when the city admitted the confiscatory character of the ordinance in whose behalf the News-Bee advertised the meeting in Memorial Hall, "restraining order or no restraining order." The situation, to which respondents' behavior undoubtedly contributed, impelled the court's special endeavors to allay public feeling and, to accommodate the public temper, caused it to delay the operation of a just order for three days. The proposition for unlawful action Friday night, which the News-Bee exploited March 25, brought additional work to the administrative officers of the court, of which the paper itself speaks.

After the events, it is safe speculation to say that all of these fears were needless, but at the time, as the paper admits, anxiety existed; whether foolish or not is beside the question. However that feeling may be characterized, respondents' behavior was a prominent factor in its creation. We need not go beyond the articles from the News-Bee admitted in evidence in this case to learn that the court had its attention turned to some of these things to its annoyance when the issues in the case were under its consideration.

Counsel for respondents ask the court to consider it a virtue in respondents that, Friday, March 27, their paper printed a news article, under the heading, "All Urge Peace in the Car Contest." This article has as one of its opening paragraphs this:

"With a crisis in Toledo's 12-year fight for three-cent fare only a few hours away and the people aroused as they seldom have been through the long years of struggling against the Big Con, all parties to the controversy—company, city and federal court—pleaded on Friday for no rioting or trouble after midnight, when the three-cent all day ordinance becomes effective."

This sentence has four propositions, only one of which makes for peace: There is a crisis after "long years of struggling"; the people are thoroughly aroused; although the court has to hear the question, the ordinance is effective nevertheless at midnight; all parties—three, two of whom have been the object of the News-Bee's attacks—plead for good order, save the News-Bee and those whom it essays to lead.

The paper merely states a matter of news, its "editorial policy" for the last three days is not changed. On the contrary, its cartoonist pictures the head of the city's safety department hastening out of town, thus giving point to the editorial assurance of the day before that the police will not "use their clubs on car riders who refuse to pay more than three-cent car fare after Friday," and Mr. Cochran breaks out in more two-column wide, large type, editorial "punching," advising his followers that the Big Con is a "trespasser" which has "rushed into the federal court" to wrest control of the streets from the people; that its attitude is "the same old defiance of the people"; that its past conduct gives no assurance that it will live up to its promises; and that it operates for "the financial gain of foreign bondholders and stockholders."

Under these circumstances, the amount of credit due respondents for merely printing the news that others than the News-Bee "pleaded on Friday for no rioting or trouble" is not very large. The article is noticeable for proof that "the anxiety about trouble," of which the paper elsewhere speaks, had become somewhat general since Monday night, when councilmen first gave it voice. Mr. Cochran himself seems to have been affected, for he says in testimony:

"I asked the boys—I asked them: 'There is danger of any trouble here?' They said: 'Absolutely none, unless it may be a little scrap on the rear end of a street car.'"

Because of this showing, analysis is difficult of the state of mind which, in answer to his counsel's question as to ground for fearing violence, prompted him to answer: "I don't know where it came from, but it must have been in Judge Killits' imagination."

It is not a task on imagination to see the possibility of numerous scraps on back platforms, with "the people aroused as they seldom have been through the long years of struggling," if the full Memorial Hall project, so extensively advertised and apparently indorsed by the News-Bee, had been carried out, and some hundreds of men, with Mr. Cochran's denunciations of "stock gamblers and speculators, trespassers, arrogant franchise manipulators," seeking a "strangle hold" in the courts on the people, and the impassioned oratory of 15 speakers, stirring their souls, had rushed the cars that night. An experienced newspaper man like Mr. Cochran knows something of the psychology of a mob, and knows, of course, that one "little scrap" would be an insignificant, casual, individual matter; but a score or more at the

same time, and as the sequence of inflammatory appeals, and thus becoming action in concert, would amount to a riot. The publications in the News-Bee unquestionably tended to the production of just such a concert of action. From such a situation to destruction of property, and even loss of life, is but a step, as historical experience shows.

The Quinlivan incident also was thrust upon the court in direct sequence to respondents' misrepresentation, and, as we have hitherto suggested, the identity of language between the Socialist resolution, edited and published in the News-Bee on September 9th, and its own characterization of the "Big Con" as a suitor in this court, suggests that the Socialist insult to the court was inspired by respondents' conduct.

We take this occasion to reiterate former expressions of gratitude to counsel that they have apparently assisted this cause to proceed altogether as one affecting the court as an agency of the people, and not at all as a matter of private concern to the individual who, as a part of the court, happens to occupy the bench for the time being. It is power emanating from the Constitution and laws, and, consequently, derived from the people, which this court exercises; therefore, an insult to it, an attempt to belittle or degrade it or to thwart the exercise of its functions, is an affront to the people themselves and in no way a personal matter between the alleged offender and the judge. Our conception of section 268 of the Judicial Code agrees thoroughly with that of counsel for respondents, to this extent, at least: Those who would degrade this case to the level of a mere personal controversy between the respondents and the judge of this court do so either through sheer ignorance or through a pitiable incapacity to understand how public service may be impersonally rendered, without which there can be no faithful performance of official functions, or because of willful perversion of facts plain to an honest and open mind. As far as possible, to emphasize the impersonality of this proceeding we have, to counsel's knowledge, proceeded with utmost deliberation and accommodation to every convenience of respondents, and if in any place there is the slightest failure in respect to any interest of the respondents, it has not been due to any lack of scrupulous endeavor that nothing should be left undone to make a record complete as to any right they should have.

While, of course, after Mr. Cochran's testimony of his years of continued active interest in the News-Bee as its editor in chief, and his admission that for four years his paper had industriously chronicled the proceedings of this court, we may not accept as reliable his claim that in writing his editorial of March 26 he was merely indulging in reasonable speculation respecting the quality of the court as a factor yet unknown to him, he might, as far as we know, have truthfully said that nothing had theretofore transpired which had established an unfriendly relation between the latter and the News-Bee.

In this connection, it may be observed that all of the publications of the first count were uttered before the court had indicated any view which by the wildest imagination could be considered to be at odds with the News-Bee respecting the Schreiber ordinance or as to

anything else connected with the traction case. The court was never called upon to decide the controversy that the measure was confiscatory, for that fact was admitted by the city, and its admission was not resolved into a court finding until after respondents had uttered all of their publications from March 24 to September 12, inclusive. We are bound therefore to consider that the offenses embraced in the first count were not inspired by any feeling against the judge of the court, but were wholly the fruits of a policy obsessing respondents, which would brook no interference with their self-appointed task to settle the traction question on terms entirely their own.

This court, however, has no right to allow an endeavor to be impersonal to enfeeble its judgment of the character of respondents' offenses, and, if therefore we seem to have indulged in strictures of characterization, it is because the crime of respondents is so clear, the tendency of their acts so demoralizing to a state of society which, needing some organization for the settlement of its controversies, needs therewith confidence in its judicial tribunals, that there is no alternative but unequivocal condemnation.

Again, we are not helped to any soft words by any act of respondents since attention was called to their offenses. Mr. Cochran somewhat flippantly says, speaking of both tirades whose authorship he owns, that they were not occasions when he felt that his thoughts should be couched in "very nice, ladylike language," and the air of his entire testimony is that of one whose attitude toward the court and the question of its right to try the traction case free from the News-Bee's interference is still precisely that which formed the "editorial policy" responsible for any of the publications we have to consider. It is very plain that he justifies every outrage of his paper, is still under the obsession of an unweakened confidence in his editorial impeccability, and, with difficulty, entertains a compassionate disdain for any one failing to accord to him, as his privilege, the right to speak the final word upon all questions, even to advising the people what a court should or should not do and to what extent they should respect or obey its decrees. There is nothing apologetic in his manner or disposition. If he disclaims any intention to reflect on the court, it is not born of any thought that he may have overstepped, but seems to be the product of pity for the mind that sees in his acts anything to be criticized. We may also regard the witness Cochran as reflecting the present attitude toward the court of the corporation which still intrusts to him the responsibility of speaking for it, wherefore it would be idle for the court to employ mellow terms in discussing respondents' offenses.

We have made separate findings of fact adjudging respondents guilty on all three counts and for the publications of March 24, 25, 26, 27, and August 14, September 5, 9, 10, 11, 12, 14, and 17, and we come now to the difficult task of fixing an appropriate penalty. Congress has not seen fit to fix a maximum; but, in the alternative of fine or imprisonment, punishment is left to the sound discretion of the court. The case before us is unique. The books do not afford another where the court, respecting a pending case, was subjected to a con-

tinual and prolonged bombardment as here. Many reported newspaper cases are extant but the offenses were for single publications, or, at most, three or four; here there are a score and more. In no other case was the court a target for months. Also, but one other case is reported (State v. Bee Pub. Co., supra) where, as here, a newspaper began on the court before the latter had taken any action at all, and in that Bee Case there were not joined, as here, to attacks on the court, efforts to stir up popular opposition to the court's findings, nor was there misrepresentation of court proceedings. The rule is for the offense to follow some action by the court. For instance, in Myers' Case an indictment had been found; in Patterson's, Tugwell's, and Rosewater's, respectively, the publications were inspired by partisan resentment at holdings by the court; but here the court had been absolutely voiceless in the subject-matter of the contempt when the News-Bee proceeded editorially to belittle its judge and gave inspiration to those who would defy it. Even after the first expression from the court had been in favor of the issue for which the News-Bee contended, its decision was misstated and the prevarication made the premise for a most deliberate and offensive slur. The incidents of the first count especially precede and disclose an intention to anticipate court action. In the language of another court, the publications "were directed solely to actions to be taken and conclusions arrived at in the future, and it was undertaken by this reprehensible method to prejudice the mind of the public and extort a particular decision in a case then pending for determination." It is notable that the publications under the second and third counts are substantially challenges to the court. The publications which we condemn are separately contempts, some of them aggravated, and in series they intensify the offensiveness of each other, until, in the aggregate and cumulating their tendency, they call for punishment for which no adequate precedent exists. In connection with the cold-blooded, uninvited character of respondents' course, a deliberate employment "of outlaw methods in attempting to control judicial action," we ought not lose sight of the fact that respondents are still recalcitrant, putting before the court a defense which affronts intelligence; for, where it is not puerile, as where jurisdiction to hear the traction case is denied, it is definitely unreasonable, in that it asks for a construction of respondents' language which contravenes all rules of interpretation and invites the court to concede to the press rights which would make it more than a "Fourth Estate" and would give it power to indirectly control one of the three approved departments of our government.

If there were no other publications for the court to consider than those of the midweek of March, an offense sufficiently serious to warrant a large fine would be present. March 24: The traction company is trying to "evade" its obligations by taking its case into the federal court, but the city solicitor will "protect" any individual who takes the law in his own hands nevertheless. March 25: The judge of the court is an uncertain quantity, liable to be unduly impressed by the "high-priced legal talent" sold to the "Big Con," and therefore to furnish the latter with a "strangle hold" on the people; but it is planned that the people shall board the cars in large numbers on Friday night after listening to 15 speakers in Memorial Hall, and by aid of "sinew"

furnished by union labor compel the conductors to accept three-cent fares, "restraining order or no restraining order by the federal court." March 26: While the judge of this court is holding "in the balance the case of the rights of 200,000 common people versus the rights of some wealthy investors and speculators," preparations are going forward for the mass meeting in Memorial Hall to be assisted by union labor, and the police will not "use their clubs on car riders who refuse to pay more than three-cent car fare" that night, because the law is "only what the people will back up." This is preaching, advocating, anarchy. No sophistry of argument, no ingenious theory that the people of this city were interested in the case in the manner of "stockholders of a large corporation" entitled to receive reports of their business, suffice to gloss over the seriousness of this sort of thing, and it would be no less anarchistic if jurisdiction in this court to hear the traction case were palpably, unequivocally absent. These are not merely the result of reportorial inefficiency and enthusiasm, for the editor in chief, himself, gave them some personal attention.

For these reasons, a sound discretion calls for the imposition of a substantial fine upon the respondent corporation, and thus in some measure cause to be returned to the public part of the profits made from a circulation stimulated by appeals to selfish individual interests and by encouraging distrust of the faithfulness of public agencies.

The respondent Cochran is also specifically found guilty of criminal contempt, as charged in the information; but, after all, we must consider him as an employé of the real offender, merely an instrument—willing, it is true—of its unlawful conduct, not a principal. In one of his screeds he had something to say of lawyers who sell themselves to the highest bidder. We doubt whether he who sells a facile pen to a corporation that the latter, from the prostitution of his ability, may prosper through exciting prejudices against the country's institutions, is qualified to cavil on this subject. If he were a principal instead of a mere employé, or were this a second offense, the court's duty to send him to a jail or workhouse might well be exercised; but here, we think, justice will be secured by making the Toledo Newspaper Company bear the substantial responsibility for the acts of those whom it hires, and by imposing on the servant, Cochran, in this, his first offense toward this court, at least, a fine in a nominal amount, that he may have a final judgment from which to prosecute review.

The Supreme Court, in Re Chiles, 22 Wall. (86 U. S.) 157, 169 (22 L. Ed. 819), has held, under the statute upon contempts which we apply, that, in cases where the end sought is to vindicate the court's authority, the court must judge for itself the nature and the extent of the punishment with reference to the gravity of the offense. A corporation can be punished only by a fine. The gravity of the offense is certain; there can be no graver public crime than to attempt, in the manner here, to extort from a court a particular decision, or to work to poison the minds of citizens against the only organization which society has yet been able to devise for the settlement of its controversies. The assumed failures of courts to do "substantial and not technical justice" are not to be prevented by attempting to make them subservient to gusts of popular passion, or, through falsely reporting their proceedings, dis-

torting the facts before them for determination and lampooning unpopular suitors, by encouraging a mob spirit toward them.

The discretion which abides in a court to determine what amount of fine will be proper punishment in a given case involves an effort in ascertaining what sum will actually work a penalty under all the circumstances, including the financial condition of the offender; for it is obvious that a small amount might be a greater burden on one offender than many times that sum to another. The consideration here is to vindicate the court's independence by the imposition of a fine that will mark the importance of the issue as well as to punish. If we could feel that respondents were satisfied of the court's right to exact respect from them in the premises, and hence that they were finding in the court's condemnation alone some measure of punishment, the disposition would be to make that fact compensate for a large part of an otherwise proper fine. But this case closes with a feeling that they are as obdurate as ever, have learned nothing since their last publication, and may refrain in future from repeating their offenses only because of probable consequences, and not through a sense of justice to the court.

It is a matter of common knowledge in this community that the respondent corporation is exceedingly prosperous, which fact is also indicated by its statements under the act of August 24, 1912. The financial condition of one under conviction may be looked into, that the court may be advised of what would be a punitive fine, and be enabled to exercise an intelligent discretion. Under the decisions in Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652, and Wilson v. United States, 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558, we may require the corporation to produce its books in an inquiry. We hesitate, however, to exercise this inquisitorial power here, and prefer to act definitely in the light the court already has. It is, accordingly, adjudged that the respondent the Toledo Newspaper Company pay a fine of $7,500 and the costs of this proceeding. A writ of execution is awarded, but the same is stayed until March 15, 1915. On or before that time the respondent corporation may apply to the court for a modification of this sentence, on the ground that it is excessive considering the present financial condition of the corporation and the rate per cent. of its profits on its investment during the months of March to September, inclusive, of 1914. After an inquiry in this behalf, had on such application, a modification of sentence will be made as the facts then exhibited justify. The respondent Cochran is fined $200, and he is ordered to stand committed to the jail of Lucas county, Ohio, until this fine is paid. Execution of the order of commitment is suspended until April 15, 1915, to enable him to perfect a record for a review of the judgment against him, at which time, if proceedings in error have been begun, a further suspension pending review will be granted. Execution of judgment against respondent corporation will also be granted pending proceedings for review, whether the sentence is modified on its application or not.

NOTE.—Since both the opinion and order in this case were written, we have noted a press report of a decision by the judge of a state court affirming the constitutionality of section 11343—2, General Code of

Ohio (Act of April 26, 1911, p. 95), providing that the publication of "a fair and impartial" report of certain court proceedings and documents filed therein shall be privileged under certain circumstances. Whether that act does or does not control this court in a case of this character, we have given it application in this case, as will be noted where the opinion deals with the publication by the respondents, September 12, 1914, of the charges against Quinlivan.

On the presentation of a motion for a new trial, respondents in this case withdrew their complaint as a ground for new trial that the fine against the respondent the Toledo Newspaper Company was excessive.

---

### CROWN ORCHARD CO., Inc., v. DENNIS et al.

(District Court, D. South Carolina. January 21, 1915.)

No. 124.

**1. COURTS ☞262—UNITED STATES COURTS—JURISDICTION—STATE LAWS.**

The federal courts are compelled to observe the distinction between actions at law and suits in equity, and, when sitting in equity, can take jurisdiction under the express provisions of Rev. St. § 723, only where there is no plain, adequate, and complete remedy at law, and this jurisdiction cannot be enlarged or extended by state statutes or procedure.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 797, 798; Dec. Dig. ☞262.]

**2. COURTS ☞367—UNITED STATES COURTS—STATE LAWS AS RULES OF DECISIONS.**

In construing a deed to standing timber in South Carolina, if the courts of South Carolina have adopted a rule of construction applicable to such deed, it must be followed by the federal courts, subject to certain limitations.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. ☞367.]

**3. LOGS AND LOGGING ☞3—SALES OF STANDING TIMBER—REMOVAL.**

A deed to all standing timber on certain land in South Carolina of a specified size reserved to the grantor the right to use timber for ordinary plantation purposes, but provided that this should not include the right to clear the land, and provided that the grantee should have eight years in which to cut and remove the timber, and that, if it was not cut and removed within that time, it should have such additional time as might be desired for cutting and removing it, and in such case should pay interest on the original purchase price year by year in advance. The grantor was to pay all taxes on the land and timber. It was the mutual understanding that the cutting was to commence within eight years, and that, if the timber was not all cut off within that time, the grantee should have such additional time as was necessary to cut off the remaining timber, and that the grantor wanted to clear the land and open it to cultivation. *Held;* that the deed did not give the grantee an indefinite time to remove the timber, but only the time fixed, with a reasonable extension thereof to complete the cutting and removal; and hence it was not entitled, in a suit, to enjoin the removal of the timber by one of the grantor's heirs claiming under a deed from the other heirs to a decree extending the period for removing the timber 25 years, especially in view of the burden which this would place on the owners of the land, the lack of mutuality in the contract which gave the grantee the option of paying interest and obtaining an extension or stopping payment and leaving the owner without remedy, the uncertainty in the terms of the contract, and the impracticability of enforcing the contract by reason of the inability to distinguish at the expiration of 25 years between timber covered by the contract and timber not so covered.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6-12; Dec. Dig. ☞3.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. LOGS AND LOGGING ☞3—SALES OF STANDING TIMBER—EQUITABLE RELIEF.**

Where the cutting and removal of the timber was not commenced within the eight years, the court would not grant a reasonable time thereafter to cut and remove it, but would leave the grantee to its remedy of law, especially where it appeared that the owners of the land were solvent.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. ☞3.]

**5. LOGS AND LOGGING ☞3—SALES OF STANDING TIMBER—CONSTRUCTION OF CONTRACT.**

In construing deeds to standing timber, the intention of the parties should be ascertained and enforced as in the construction and enforcement of other contracts.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. ☞3.]

**6. LOGS AND LOGGING ☞3—SALES OF STANDING TIMBER—CONSTRUCTION OF CONTRACT.**

A grant of standing timber, while executed in respect to the grant, is executory with respect to the cutting and removal of the timber.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. ☞3.]

**7. SPECIFIC PERFORMANCE ☞120—EVIDENCE—PAROL EVIDENCE.**

While, in the absence of fraud or mistake, parol evidence is not competent to contradict or alter a written contract, when specific performance is sought the court may hear evidence, in order that it may be in possession of every fact and circumstance attending the negotiation and execution of the written agreement, to enable it to so mold its decree, that justice and right may be awarded.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 384–386; Dec. Dig. ☞120.]

In Equity. Bill by the Crown Orchard Company, Incorporated, against William H. Dennis and others, for an injunction, etc. Bill dismissed.

The bill, answer, and proofs make the following case:

The complainant is a corporation created and organized February 19, 1912, under the laws of the state of Virginia, with a maximum capital stock of $15,000. Its principal office is at Crozet, Albemarle county, Va. "The purposes for which it is formed are to acquire, hold, lease, manage, operate, develop, cultivate and control real estate, improved and unimproved, and the appurtenances thereto; to grow orchards of all kinds, nursery stock, general farm products, live stock and poultry; to acquire and operate plants for the manufacture of cider, vinegar, canned goods and all by-products of fruit, vegetables and farm products; to build and operate warehouses, storage houses and cellars of all kinds; to construct, maintain and rent any other buildings, either on lands owned by the company, or on the property of others for the betterment of its property, or any part thereof; to buy and sell timber and lumber of all kinds; to manufacture barrels, crates, boxes or any other articles that may be necessary or convenient in the conduct of the foregoing business; to sell nursery stock, orchard, mill, farm and manufactured products; to act as agent for others for the sale of any or all of the above goods and property and to buy and sell any and all articles of personal property and merchandise, and to transact all business and to do all other things incidental thereto, which may be necessary and convenient in the judgment of the board of directors for the purpose of the company." It is also given power to borrow money, issue its bonds therefor, and execute mortgages and deeds of trust to secure the same. Certificate of Incorporation, Plaintiff's Exhibit 5. The defendants are residents and citizens of the Eastern District

of the state of South Carolina. The amount in controversy, exclusive of interest and cost, exceeds the sum of $3,000.

On May 5, 1903, E. J. Dennis, the ancestor and predecessor in title of defendants, being seised in fee of a tract of land, lying and being situate in Berkley county, S. C., known as "Fair Springs," upon which he then resided, containing 660 acres, together with his wife, A. H. Jennings, executed a deed to Freeman S. Farr, trustee, in which he conveyed to said Farr, trustee, his heirs, executors, administrators, and assigns, in consideration of the sum of $1,500, "all the timber of every kind and description, both standing and fallen, of ten inches stump diameter and upwards, twelve inches from the ground at the time of cutting," on said tract of land, reserving the timber "on five acres immediately around dwelling house." He also reserved "the right to use any timber from the said tract for ordinary plantation purposes connected with the said land; this reservation, however, not to include the right to clear the said land or any of it." By said deed was granted to Farr, trustee, "a permanent right of way 62 feet wide upon and across the tract or tracts of land described as aforesaid and all contiguous land, to be selected and located by the said party of the second part, his heirs, executors, administrators, or assigns, whenever and wherever so desired, to be used for a permanent railroad, or tramway, or for any permanent branch railroad or tramway, together with the following exclusive rights and privileges to be exercised at any and all times during the continuance of this contract, at the pleasure of the said party of the second part, his heirs, executors, administrators, and assigns, namely, to enter freely upon said above-described tract or tracts of land," etc. The purposes for which these easements are granted are to locate and establish rights of way over said land and contiguous lands, for ingress and egress at any and all times for men, teams, and vehicles; to cut and make roads over said lands; to build, construct, maintain, and operate railroads, tramways, cart and wagon ways, across said lands, on such routes as may be selected by said second party; to establish and maintain stables and other fixtures or buildings on said land; and to do any and all things that may be necessary or convenient for the cutting, handling, hauling, and removing of the timber, as aforesaid, from the aforesaid tract or tracts of land, and for the transportation of any other timber and articles, of every kind and description, that the second party may desire to transport over the said roads, or any of them. The right and power is also given to cut such small timber from the land as the party of the second part may, in his judgment, deem necessary to build and operate the railroads, tramways, buildings, fixtures, and structures during the continuance of the contract, or with the right to remove all such railroads, tramways, etc. Following the habendum clause in the deed is a covenant of warranty.

"Second. That the said parties of the second part, his heirs, executors, administrators and assigns, shall have, and the same is hereby granted to them, the period of eight (8) years, beginning from the date hereof, in which to cut and remove said timber from the said land, and that in case the said timber is not cut and removed from said land before the expiration of said period, then that the said second party, his heirs, executors, administrators or assigns, shall have such additional time as may be desired for cutting and removing said timber, but in the last-mentioned event the said second party, his heirs, executors, administrators, or assigns, shall, during the extended period, pay interest on the original purchase price above mentioned, year by year, in advance, at the rate of six per cent. per annum." The owner of the land further covenants that he will pay all taxes now due, or that may become due, on said land and timber, and upon his failure to do so the party of the second part may do so and have a lien on the land therefor. "All covenants, stipulations and agreements herein assumed, or undertaken by either party to this contract, shall be binding upon their respective heirs, executors, administrators or assigns, and all benefits and advantages herein provided for, either of the said parties, shall accrue to their respective heirs, executors, administrators or assigns, as the case may be." The deed is signed by the grantors and grantee, and duly proven and registered.

On September 23, 1904, the said Freeman S. Farr, trustee, conveyed and assigned the timber conveyed in said deed, together with the timber on 58 other tracts, to the Oneida Timber Company, a corporation created by and organized under the laws of South Carolina. He also transferred all such rights of way, etc., and "rights to time for removing such timber, or any of it, and rights to extend such time," to said timber company. It is recited in said deed that said Freeman S. Farr held said timber as trustee and conveyed the same to said company by way of executing the trust.

On June 30, 1910, the Oneida Timber Company conveyed said timber, together with a large number of other tracts of standing timber, to the Midland Timber Company, a South Carolina corporation. While the language of this deed is not so explicit in the description of the right to the time granted and extension thereof transferred, it may be taken as sufficient for the purpose of vesting in the grantee all of the rights in that respect, owned by, or vested in, the grantor.

E. J. Dennis died intestate prior to the 29th day of April, 1911, leaving his wife, the defendant A. H. Dennis, to whom, together with his children, the other defendants, the land, upon which the timber conveyed was standing, descended. No portion of said timber having been cut or removed on or prior to said 29th of April, 1911, the Midland Timber Company, by R. L. Montague, its general manager, delivered to defendants "E. J. Dennis and his two sisters and mother (A. H. Dennis) and brother" a paper writing (Defendants' Exhibit 1), in which the execution of the said deed to Freeman S. Farr, trustee, is recited, and that by sundry mesne conveyances all of the timber rights, rights of way, privileges, and easements had been conveyed to said Midland Company and reciting further that: "Whereas the said Midland Timber Company desires to exercise its rights under the said deed to extend the time in which to cut and remove the said timber, and to use and enjoy the aforesaid timber rights, ways, privileges and easements according to the terms of said deed of conveyance for a period of twenty-five years. That said Midland Timber Company notified the said parties, owners of said land, "that, it desires twenty-five years additional time, after the 5th day of May, A. D. 1911, within which to cut and remove said timber and to use and enjoy the said timber rights, ways, privileges and easements, during which extended period, or so much of the same as may be used for such purposes, it hereby agrees and binds itself, its successors and assigns, to pay interest at the rate of six per cent. annum, year by year, in advance, on the original purchase price of fifteen hundred dollars, as provided in and by the said deed, and in pursuance thereof it hereby tenders and offers to pay to the said A. H. Dennis individually and * * * heirs at law of the said E. J. Dennis, Sr., deceased, the sum of ninety dollars (said sum being six per cent. on the original purchase price of fifteen hundred dollars) for the first year of said period of twenty-five years; that is to say, from the 5th day of May, 1911, to the 5th day of May, 1912. It is, however, expressly understood that this notice of the intention and purpose of the said Midland Timber Company to extend the time within which to cut and remove the said timber and use and enjoy the said timber rights, ways, privileges and easements, as aforesaid, is not intended, nor shall it be taken, to limit, in any manner whatever, the grant in fee simple of the permanent and exclusive right of way as is set out in the aforementioned deed of conveyance executed by E. J. Dennis, Sr., and A. H. Dennis to Freeman S. Farr, trustee." The defendants refused to accept said tender, claiming that the period for cutting and removing said timber expired on May 5, 1911. There is evidence tending to show, but contradicted by defendants, that on May 5, 1911, the Midland Timber Company, by its general manager, tendered to defendants the interest on the sum of $1,500, which was refused. Defendants do not deny that they claimed, and have at all times claimed, that the time for cutting and removing the timber expired May 5, 1911. No further tender was made by the Midland Timber Company. On June 28, 1913, the Midland Timber Company executed to complainant, the Crown Orchard Company, a deed reciting a present consideration of "fifty-eight thousand six hundred and forty-two and $^{50}/_{100}$ dollars to it, in hand paid, at and before the sealing and delivery of these presents, by

the Crown Orchard Company, Inc.," conveying to complainant the timber, timber rights, etc., on seven tracts of land, aggregating 7,000 or 8,000 acres, including the land upon which the timber in controversy, conveyed by Dennis to Farr, trustee, is situate. No part of the recited consideration was paid; there was an agreement by which the Crown Orchard Company was "to pay for the timber as cut." The timber on the Dennis land was estimated, by complainant's witness, on September 2, 1909, to be of the value of $4,850.

The bill was filed herein January 28, 1914, and at that time complainant paid to the clerk of this court, in legal tender, $270, and on May 5, 1914, $90, which is held by him in the registry subject to the order of the court. Complainant owns no land in South Carolina, and no other timber than that conveyed in the deed above mentioned. It owns several hundred acres of Orchard land in Albemarle county, Va. Complainant's president was told, before taking the deed, that defendants "refused the tender of the extension money." Neither the Midland Timber Company nor complainants have ever operated a mill nor engaged in cutting timber—never made any effort to cut defendants' timber. The evidence shows that the Atlantic Coast Line Railroad Company runs within a quarter of a mile of the Dennis land. About 300 or 400 acres of the Dennis land is capable of being cleared and cultivated. The timber "is easy to get out—could be cut in one year—with small mill."

On December 24, 1913, the defendants, other than W. H. Dennis, executed a deed to said W. H. Dennis, conveying the standing timber of the "Fair Springs" tract for a recited consideration of $2,000, giving to him the period of four years within which to cut and remove same. Defendant W. H. Dennis entered upon said land, and placed a small mill thereon, and began cutting the timber, and was so engaged when enjoined by an order of the court in this cause. The testimony in regard to other matters is more or less conflicting.

Montague & Montague, of Richmond, Va., L. D. Lide, of Marion, S. C., and Octavus Cohen and Smythe & Visanska, all of Charleston, S. C., for complainant.

W. P. Pollock, of Cheraw, S. C., and B. A. Hagood, of Charleston, S. C., for defendants.

CONNOR, District Judge (after stating the facts as above). The case was argued both orally and upon very full briefs by counsel for both parties; in view of the far-reaching effect of the final result upon valuable property rights, and the conflict found in decided cases and judicial opinion, I have given the several phases of the case very careful consideration. The historical development of judicial thought regarding sales of standing and growing timber, wherein an immediate removal was not contemplated by the parties, is interesting, but not at all times uniform. The decisions of the courts, expressing such judicial opinion, have been more or less modified to meet modern conditions surrounding such sales, the development of the milling business, and seeking to give effect to the intention of the parties.

[1] In the investigation of decided cases, care must be had to ascertain whether they are actions at law or suits in equity. It will also be observed that in many cases found in modern reports the courts have, under the Code Procedure, administered both legal and equitable remedies in the same action, whereas this court is compelled to observe the distinctions prescribed by the federal Constitution and statutes respecting actions at law and suits in equity. This court, sitting in equity, can take jurisdiction only when there is no plain, adequate, and complete remedy at law. Rev. St. § 723; 4 Fed. Stat. Ann. 530. The ju-

risdiction of this court cannot be enlarged or extended by state statutes or procedure.   Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358.   The relevancy of these principles will appear as we proceed with the development of the case.   Plaintiff rests its right to relief in equity upon certain propositions clearly stated and forcibly argued.

[2]  1. In construing the terms of the deed and its several parts, the construction of deeds containing the same, or essentially the same, terms, by the court of South Carolina, must be followed by this court. This proposition is correct, subject to certain limitations, where it is shown that the courts of South Carolina have adopted a rule of construction applicable to the deed upon which plaintiff relies.

[3, 4]  2. In South Carolina it is held that a conveyance of standing timber, without condition, vests the absolute title to the timber in the grantee, and the courts will not read into such deeds an intention on the part of the parties that the timber is to be cut and removed in a reasonable time, but the grantee has, in such cases, an indefinite time to cut and remove the timber.   "This," it is insisted, "is settled in South Carolina."

To sustain this proposition, plaintiff relies upon the decision in Knotts v. Hydrick, 12 Rich. (S. C.) 314, and Wilson Lumber Co. v. Alderman, 80 S. C. 106, 61 S. E. 217, 128 Am. St. Rep. 865.   It therefore becomes necessary to examine these cases.   Knotts v. Hydrick was an action at law.   Wilson Lumber Co. v. Alderman was a civil action in the nature of a suit in equity, seeking an injunction, by the grantee of the timber, against the owner of the land, restraining him, or his subsequent grantee, from cutting the timber.   The decision was rested clearly and solely upon the authority of Knotts v. Hydrick.   Conceding to these decisions their full authoritative value, defendants insist that they do not apply to or control the decision of the instant case, because, in the deed from Dennis to Farr, trustee, a time is fixed within which the timber is to be cut and removed, and that the distinction between cases in which such limitation is found and those in which there is no such limitation is recognized by the Supreme Court of South Carolina.

In Flagler v. A. C. Lumber Corporation, 89 S. C. 328, 71 S. E. 849, the Hydrick and Wilson Lumber Co. Cases were relied upon by the defendant.   In that case the timber "12 inches stump diameter, and upwards, 12 inches from the ground at the time of the cutting, now standing and being upon the land described," was conveyed.   The deed contained a clause giving to the grantee a time limit of ten years from the time the grantee began cutting and removing the timber, with an extension clause "from year to year" by paying 6 per cent. interest each year on the purchase price.   The learned judge, writing for the court, said:

"It will be noted that neither in the case of Knotts v. Hydrick nor Wilson Lumber Co. v. Alderman was there an attempt made in the deeds to limit the right of the owner of the timber to any given period of removal, * * * and all this court held was that, in the absence of such limitation upon the right of removal, such right of removal continued to exist in the owner of the timber.   In other words, the deeds under construction failed to show, by anything on their face, any intention on the part of the parties thereto of limiting the right to remove."

In the Flagler Case the court found, upon the face of the deed, that the parties had made "an attempt to limit the time in which removal can be made." It is further said:

"It is enough to say that the words used in the contract were absent in Knotts v. Hydrick and Wilson Lumber Co. v. Alderman; nor were any provisions of similar import found in either of those cases; and we are therefore of opinion that they do not control the case now under consideration."

The judge proceeds to discuss the question as to the construction of the deed then before the court as open, and "to examine the authorities as to what the law is." He begins an examination of the contract for—

"what light it gives as to the intention of the parties, for in the last analysis their intent is the controlling factor in the construction of the deed, provided the instrument furnishes the evidence of the intent; and here it is to be borne in mind that, whilst the deed in the words used is at first such words as ordinarily convey a fee-simple title, the deed is signed by both the grantor and grantee, and the reason for this lies in the fact that the parties intended to bind each other to certain obligations; upon the grantor, the passing of title to the grantee, and upon the grantee, not only the right to remove, but, in a qualified sense, the duty also of so doing. A time limit * * * was evidently in contemplation."

After discussing the contention of the defendant, he says:

"So it would follow that there would be nothing to prevent the grantee from indefinitely holding the land in its original condition; * * * and in the meantime the land would remain incumbered and unfit for cultivation. And during this long period the grantee was to pay taxes, not only on the land, but on the timber as well. Was this contemplated by the parties? We think not. Some lesser period of time must have been in the minds of the grantor and grantee. What this lesser period was the agreement fails to show. What rule does the law supply in such a case?"

After discussing a number of decided cases from other jurisdictions, the conclusion is reached:

"That both by the inherent reason of the thing, as well as by authority, the true rule is that wherever it is apparent in a contract that the parties had in view some time for the commencement of the removal of the timber, which intent was not embodied in the terms of the contract, that the law will presume and will enforce that such commencement of the removal of the timber shall be within a reasonable time from the date of the contract."

This decision points out clearly the distinction between the terms of the deed in that case and in Hydrick and Wilson Lumber Company Cases, and states that these cases are not controlling authorities in cases where the terms of the deed or contract indicate an intention to place a time limit on the right of removal—that in such cases a reasonable time will be given for removal.

The principle or rule of construction announced in the Flagler Case is uniformly approved and applied in every other case which has come before the Supreme Court of South Carolina, with the single exception of Timber Co. v. Prettyman, 97 S. C. 247, 82 S. E. 484. This case will be examined and its authoritative value considered later on.

In McClary v. Atlantic Coast Lumber Co., 90 S. C. 153, 72 S. E. 145, the extension clause in the deed is in the identical terms found in the

Dennis deed. It is expressly held, upon the authority of the Flagler Case, that:

"Such deed, though a valid conveyance of the fee, passed a qualified or determinable fee only; the grantee or his assigns being required to commence the removal of the timber within a reasonable time, as viewed by the parties when the contract was signed." Atlantic C. L. Lumber Corp. v. Litchfield, 90 S. C. 363, 73 S. E. 182; McSwain v. Atlantic Coast Lumber Corp., 96 S. C. 155, 80 S. E. 87.

The decisions of the South Carolina Court are, as I understand them, in harmony with those of a large majority of other courts. The authorities are collected and discussed in Young v. Camp. Mfg. Co., 110 Va. 678, 66 S. E. 843. Among the cases cited by the learned president, writing for the court, may be noted, as of special application, MacRae v. Stillwell, 111 Ga. 65, 36 S. E. 604, 55 L. R. A. 513; Adkins v. Huff, 58 W. Va. 645, 52 S. E. 773, 3 L. R. A. (N. S.) 649, 6 Ann. Cas. 246; Hill v. Hill, 113 Mass. 103, 18 Am. Rep. 455. The conclusion reached by the court is clearly thus stated by Judge Keith:

"Looking to the whole deed—and all of its provisions must be considered in order to arrive at its proper construction—we are of opinion that it was not the intention of the parties to give an absolute and unconditional title to the timber, but only such as was cut and removed within the time limited by the deed, and such extensions thereof as the grantee was entitled to demand upon a fair construction of the deed, or as might be agreed upon between the parties."

The language of the deed under consideration in that case was very similar and in essential respects identical with that found in the deed from Dennis to Farr, trustee. Judge Keith calls attention to the "incidental rights" which passed under the deed creating burdens, easements, and privileges which he says "impose such burdens upon the land of the grantors as greatly to diminish, if not indeed to destroy, its value." The learned counsel for complainant vigorously attacks the soundness of this decision, insisting that it violates the principles of the common law, and that the learned court "fell into error" by treating the deed as a transfer of personal property, following the decisions of courts which hold that standing timber is personalty. The well-considered discussion of the authorities and the principles involved create, in my mind, the conviction that the learned judge, with his uniform care and thoroughness of investigation and consideration, did not fall into the error suggested. There is nothing in his language to indicate that he overlooked the almost uniform holding of the courts that standing and growing trees were real estate. It is true, as said by the learned counsel, that from the time of Lord Coke, in Liford's Case, 11 Coke, 46, courts have held that a conveyance or reservation of standing trees, with no limitation as to the time within which they should be removed, conveyed or reserved the trees and an interest in the soil sufficient for their growth, etc. 1 Washb. Rev. Prop. 16. Such was the holding in Knotts v. Hydrick, supra; Robinson v. Gee, 26 N. C. 186; Baxter v. Mattox, 106 Ga. 347, 32 S. E. 94; and many other cases cited in the well-prepared briefs of counsel.

It is manifest that, while judges so held, they recognized the fact that practical difficulties were presented in working out a practical remedy

for enforcing the right. This is illustrated by the process of reasoning resorted to by the court in Robinson v. Gee, supra. A reservation in fee simple was made of "all the sawmill, pine timber on the land standing and being, or which may hereafter stand or be on the said land," or any part thereof, with full and absolute privilege of egress and regress in and upon the said land at all times, for the purpose of cutting or taking away the said reserved timber. The court said that:

"When any of the trees and saplings by full growth became timber, fit to be used at the sawmill, then there would be a cesser of estate in those trees, by the owner of the land, and a use in the timber trees would spring up and vest in him, whoever he was, who could deduce his title under the said reservation, with a perpetual license to enter and cut and carry away the timber."

This was an action at law. It is quite impossible to reconcile many of the decisions found in the adjudged cases and much of the reasoning on which they are based.

[5] It can, however, be safely said that, in the construction of timber deeds, the courts have adhered to the elementary principle that the intention of the parties should be ascertained and enforced, as in the construction and enforcement of other contracts. It is equally well settled that, where an indication of intention to limit the time within which the timber was to be cut and removed was found, and the period for cutting and removing was uncertain, the court would infer that both parties intended that it should be done in a reasonable time, and in this I understand the South Carolina court is in harmony with the uniform current of judicial opinion. Complainant insists that, conceding this to be true, a time limit is fixed by the terms of the deed in this record (that is, "as long as may be desired"), and that this language has been held by the Supreme Court of South Carolina to give to the grantee of the timber the right to fix the time, which right the court cannot control. To sustain this contention, it relies upon the recently decided case of Midland Timber Co. v. Prettyman, 97 S. C. 247, 81 S. E. 484. The learned counsel stresses the language of the court: "When the parties speak for themselves, the court cannot imply." Defendants urge upon the attention of the court the peculiar facts in, and history of, this case, insisting that it does not constitute a rule of property binding upon this court in the disposition of this case. The record, which has been filed by counsel, discloses the following facts: The Atlantic Coast Lumber Company took from Mrs. Heape, the owner of a tract of land, a deed for the timber, the terms of which, in respect to the description of the timber, was the same as in the deed from Dennis to Farr, trustee. The period fixed for cutting and removing the timber was ten years, with an extension clause in the identical language found in the Dennis deed. The Midland Timber Company acquired the title and rights of the Atlantic Coast Lumber Company. At the expiration of the ten years, no timber having been cut or removed, the timber company made a tender of the interest on the purchase price, giving notice that ten years' additional time to cut and remove the timber was desired. This was refused. Repeated tenders were made, with like refusals on the part of the owner of the land. The Midland Timber Company entered into a contract to sell, and Prettyman to buy, the timber and rights claimed

under the deed from Mrs. Heape. The timber company tendered a deed to Prettyman, demanding the purchase price, the payment of which was refused, upon the ground that it was not entitled to the extension of time demanded or to any extension. The Midland Timber Company and Prettyman submitted the question to the court, in an action without controversy, upon an agreed state of facts. The circuit court held that the title of the timber company was valid and adjudged that Prettyman execute the contract by taking the deed and paying the purchase money. From this judgment Prettyman appealed. The Supreme Court, without deciding the question presented upon the record, remanded the case with instruction to make Pearson, the then owner of the land, a party to the record. This being done, the controversy was submitted to Judge Spain, who rendered a decree for the plaintiff, and this, upon appeal, was affirmed; the Chief Justice, for a majority of the court, adopting Judge Spain's opinion without discussion, Justices Hydrick and Fraser concurring. Mr. Justice Watts dissented. Judge Spain's decree does not mention, or in any manner refer to, the rights of Pearson, the owner of the land; he simply directs that Prettyman pay the purchase money and accept the title. While Judge Spain was of the opinion that the language of the deed was unambiguous and left no room for an implication that the parties intended to limit the time "desired" to "a reasonable time," yet he is equally explicit in finding that the time demanded was reasonable; hence the decree may be sustained upon that finding, although it would not seem that he so intended. It is probable that as Pearson, the owner of the land, was party to the record, noted exceptions to the decree, and joined in the appeal, he would be bound by the decree, although it makes no reference to his rights. With all possible deference, I am unable to interpret the decision as a departure from the principle announced in the Flagler and other cases, enforcing the reasonable time rule when the deed indicates such to have been the intention of the parties, although the language of Judge Spain, adopted by the court, is capable of such construction. Conceding pro hac vice that the decision in Prettyman's Case is the last declaration of the law of that case, by the Supreme Court of South Carolina, and giving to it its full authoritative value, I am of the opinion that it is not controlling authority in this court upon the pleadings and proofs before me. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359. It will be observed that Judge Spain says that the extension clause, in the deed before him, identical with that in the Dennis deed, upon the authority of Alderman v. Wilson, 71 S. C. 64, 50 S. E. 643, "conferred a privilege or option, and did not affect the rights which had already been granted."

The deed before the court in Young v. Camp, supra, was, in respect to the extension clause, in the identical language as in the deed in this record. Judge Keith says, in respect to the effect of this language:

"There seems to be a little diversity among the cases, most of them holding to the effect that the purchaser has no title to any timber which is not cut [and removed] at the expiration of the time specified therefor, although a very few hold that the title to the timber in such case is still in the purchaser, but that the right to enter for the purpose of cutting and removing it is lost thereby"

The court of West Virginia, in Adkins v. Huff, supra, after discussing the several lines of thought on this question, says:

"By the great weight of authority, it is determined that no right or title exists in the grantee after the expiration of the time specified in the deed or contract."

The court, in the Camp Case, supra, held that, upon a fair construction of all the parts of the deed, the defendant was entitled to a reasonable time, after the expiration of the fixed period, to cut and remove.

[6] It is uniformly held that, while the grant of the trees, coming within the description, vested a present interest in that respect, the contract is executed; but, in respect to the period fixed for removal and the extension of such time, the contract is executory. Bunch v. Lumber Co., 134 N. C. 116, 46 S. E. 24. This is, of necessity, the correct interpretation of the contract, giving to it a twofold character. In respect to the grant of the timber, nothing further remains to be done by either party; in respect to the cutting and removal within the time fixed, if free from ambiguity, the license is irrevocable; in respect to the extension of the time, when the grantee is to pay an additional amount, as in this and many other cases, interest on the original purchase money, it is executory—an option on the part of the grantee to pay the interest and a promise on the part of the grantor, upon his doing so, to extend the time. When the terms of the contract in regard to the time of extension are uncertain, the court will infer that the parties intended that the timber shall be cut and removed in a reasonable time; and this is a mixed question of law and fact, usually to be decided by the jury, in the light of competent and relevant testimony.

We are thus brought to the consideration of the facts disclosed in the record. Complainant prays that the court enjoin defendant W. H. Dennis, who is the only one of the defendants interfering with or cutting and removing the timber. It is not alleged, nor is there any suggestion, that the other defendants have cut or removed any timber, or threaten to do so. As to them, neither the allegations nor proof show any equity for injunctive relief. The only decree which can be asked against them is that they specifically perform the executory contract of their predecessor in title. If complainant is entitled to this decree, it follows that defendant W. H. Dennis, who justifies under the deed from his codefendants, should be enjoined from continuing to cut and remove the timber. While there is no specific prayer for specific performance as against the defendants, under the general principles of equity pleading and practice, the prayer for general relief entitles the complainant to such relief as, upon the proofs, it shows itself entitled. The witnesses were examined before me orally, and the merits of the controversy fully disclosed.

[7] While it is elementary that, in the absence of allegations of fraud or mistake, parol evidence is not competent for the purpose of contradicting or altering a contract, reduced to writing, it has been well settled, since the decision by Sir William Grant, M. R., in Woolam v. Hearn, 7 Ves. 211, 2 L. C. Eq. 410, that:

"When equity is called upon to exercise its peculiar jurisdiction by decreeing specific performance, the party to be charged is let in to show that, under the circumstances, the plaintiff is not entitled to have the agreement specifically performed." Bispham, Eq. 381.

This is not upon the theory that, in such cases, the court reforms the written agreement or corrects the mistake, although it is within its power, and is sometimes done, and specific performance of the agreement, as reformed or corrected, decreed. The true ground upon which the parol testimony is admitted, on the part of the defendant, is that specific performance not being a matter of absolute right but of sound judicial discretion, the chancellor should be in possession of every fact and circumstance attending the negotiation and execution of the written agreement, to enable him to so mold his decree that justice and right be awarded.

"When the terms of a written contract have been ambiguous, so that, adopting one construction, they may reasonably be supposed to have an effect which the defendant did not contemplate, the court has, upon that ground only, refused to enforce the agreement." Note to Woolam v. Hearn, supra.

The well-settled principles by which courts of equity are governed, in enforcing specific performance of executory contracts, is recognized and enforced by the courts of South Carolina. The recent decisions upon this question are cited by Mr. Justice Watts in his dissenting opinion in Timber Co. v. Prettyman, supra. Marthinson v. McCutchen, 84 S. C. 256, 66 S. E. 120. See, also, Rexford v. Southern Woodland Co. (D. C.) 208 Fed. 295, where the South Carolina cases are cited; Bispham's Eq. 371 et seq.

The uncontradicted evidence in this record shows that, at the time of making the contract and signing the deed, Gen. Dennis and Mr. Boatwright, who represented Mr. Farr, after examining the property, "discussed the matter fully as to how long they should have to get this timber off of the land; and it was clearly understood that they should have eight years, and, if all of the timber was not cut off the property before the expiration of eight years, that they should have such additional time as was necessary to get off the remaining timber." They were to commence cutting within eight years. That was the mutual understanding. Most of the land on which the timber is standing is pine land "very fine pine land." The parties, at the time of making the contract, "discussed the question of opening up the land to cultivation. Gen. Dennis said that he wanted to clear the land. He was a farmer as well as a lawyer. * * * It was understood that he wanted to open up the land." Gen. Dennis, with his family, resided upon the land, about one-third of which was cleared. It appears from the record that he had five children. Their ages are not stated; but it appears that they have all reached their majority. The age of Gen. Dennis is not stated, nor are we informed as to the date of his death, except that it was prior to April 29, 1911. In ascertaining the intention of the parties, in respect to the time within which the timber was to be cut, it is necessary to, so far as possible, put ourselves in their position, with reference to the subject-matter of the contract, and their

relation to it. From this viewpoint, it is proper to note the terms of the deed and contract with respect to the effect their enforcement would probably have upon the uses to which the land, upon which the timber is standing, would be put, and the condition of the family, in its relation to the land and the owner. These are all relevant facts. It is manifest that neither of the parties understood that the land was being sold, or permanently so incumbered as to practically destroy its value for the purpose of dwelling upon or cultivating it. It is impossible to underestimate the effect upon the value of the land for sale, or any other purpose, by the extensive, burdensome, and almost unlimited easements upon and rights to its use by the grantees of the timber. In the unlimited discretion of the grantee, or his representatives and assigns, the right to use the land was subject to be practically destroyed. If, as the complainant contends, these burdens are without limitation as to time, the owner cannot himself, nor can his grantee, nor his heir at law, clear an acre of the land, nor could it, at his death, with any degree of safety, be divided among his children, or made of value to them as dwelling places or for purposes of cultivation. He and his children became little more than tenants at sufferance, with their rights, both in respect to time and extent of the use thereof, subject to the uncontrolled and uncontrollable "desire" of the grantee and his representatives or assigns. When we look to the status of the parties, it is proper to consider that of both the grantor and grantee. It is evident, from recitals in the deeds in evidence, that Farr was buying up large quantities of timber in the section of the state in which this timber was situate, for the purpose, either by himself or through a corporation, in which he was, or expected to be, interested, of manufacturing it into lumber. There were very large mills at Georgetown, S. C. It is clear that he was not purchasing for indefinite holding as an investment. This timber, together with timber purchased at approximately the same time and in the same and adjoining counties, was, within a few months, conveyed by Farr, trustee, to the Oneida Timber Company. Is it not an almost irresistible conclusion in the light of the existing conditions, that both parties contemplated that the timber would be cut and removed within the time fixed and, if necessary, a reasonable extension thereof, to complete the cutting and removal? This conclusion is strengthened, if not removed from the domain of doubt, by the uncontradicted testimony of the only living witness to the negotiation and execution of the contract, at least the only one introduced. From this viewpoint, the language of Judge Keith is both appropriate and convincing. He says:

"We cannot think that the grantors ever intended to confer any such right upon the grantee; and that it would be unreasonable to hold that it was intended to confer upon the Camp Manufacturing Company a right to cut and remove within a wholly indefinite period the timber which it had purchased." Young v. Camp, supra.

It is uniformly held that, when specific performance of an executory contract is enforced, "the agreement must be mutual. Its terms must be certain and its enforcement must be practicable." Bispham, Eq. 377. Measured by either test, the complainant is confronted with difficulties.

The grantee and his assigns come under no obligation to pay the interest "year by year." They may at any time, at their election, stop the payment and leave the owner of the timber without remedy; if the timber becomes of less value, or is destroyed by fire, or, for any other cause, the complainant does not deem it to its interest to continue the payment of the interest, it is under no legal obligation to do so.

In Marble Co. v. Ripley, 10 Wall. 339, 359 (19 L. Ed. 955), Mr. Justice Strong says:

"It is a general principle that when, fro.. . .nal incapacity, the nature of the contract, or any other cause, . . . . t is incapable of being enforced against one party, that party . . .lly incapable of enforcing it specifically against the other." Solo... . Sewerage Co., 142 N. C. 439, 55 S. E. 300, 6 L. R. A. (N. S.) 391.

The complainant is a Virgi.. corporation, with but small capital stock; has no property in South Carolina; is not engaged in cutting timber; has no facilitie. f .. doing so. Defendants are required to pay all taxes both on the l.. . .d timber.

"What is meant by . . .aality is that the contract must be of such a nature that performance .. both sides can be judicially secured." 26 Am. & Eng. Enc. 32.

Taking complainant's expression of its "desire" for time to cut and remove the timber as 25 years, would it be reasonable, just, or equitable to incumber the title of defendants, the heirs of their ancestor, and, in all probability, their heirs, with the burden fixed upon the land by the decree which complainants seek?

The contract must be certain in its terms. The language of the Dennis lease is .. .certain. It is suggested that an unlimited time is given or, at .. . a time of which complainant is the sole judge. It is next suggested that the time is "year by year"; that is, that, by the payment and acceptance of the interest "year by year," the extension is granted for the current year. It is, however, in this case said that the agreement is to extend for a reasonable time, the extent of which is to be fixed by the grantee, at the expiration of the first period of eight years. Adopting this view, complainant, at that time, gave notice that it "desired" 25 years, carefully reserving, however, the right to the easements in fee/simple, etc.

Without pausing to discuss the reasonableness of either of these views, it is sufficient to say that there lurks, in the terms of the contract, painful uncertainty. Assuming, however, that these difficulties are passed, the enforcement by the court must be practicable. The timber conveyed is described as "all the timber of every kind and description, both standing and fallen, ten (10) inches stump diameter, and upwards, twelve inches from the ground, at the time of cutting." The deed bears date May 5, 1903. By what practicable method, at the expiration of 25 years, is the timber standing on the land at the date of the deed to be distinguished and separated from that which has germinated since that date is not suggested. What timber the owners of the land may, during all of these years, cut and remove, because not included in the description, not on the land at the date of the deed, must of necessity be equally uncertain. It is expressly provided that he is not to

"clear" any of the land. The length of time required for trees, of the various kinds found upon such lands, to grow to the size suitable for cutting into merchantable lumber, is dependent upon various conditions—the fertility of the soil, moisture, drainage, seasons, and others equally uncertain.

Without undertaking to speculate in regard to these uncertain elements, it is manifest that to decree specific performance of the contract, as interpreted and asked by complainant, would be to introduce elements of uncertainty which would insulate and isolate the entire tract of land from any valuable or useful purpose during a quarter of a century, without a single compensating advantage to its owners. Marble Co. v. Ripley, supra, in which, for other reasons, the court refused specific performance because it was impracticable—the time during which performance was to run; change in parties; the fact that the court would be called upon to determine elements of uncertainty. In such cases the parties are left to their remedy for breach of the contract by an action at law for damages.

There is, however, another view of this record which is entitled to consideration. The time fixed for cutting and removing the timber expired May 5, 1911. On April 29, 1911, the Midland Timber Company, then owner of the timber and timber rights, served written notice on the defendants, demanding an extension of 25 years, with a tender of the interest, which was refused, and on May 5, 1911, another tender was made and again refused; defendants insisting that the time for cutting expired on that day. No further tender was made or action taken by the timber company until June 28, 1913, when it executed a deed to complainant undertaking to convey the timber and easements. This deed recited, in explicit terms, the payment of a large sum of money as the consideration upon which it was made. In truth nothing was paid, nor did complainant come under any obligation to cut any portion of the timber at any time. It simply promised to pay for the timber "as cut." No tender was made or action taken by complainant until January 28, 1914, when this bill was filed and $270 paid into the clerk's office for the benefit of defendants. It is of interest to note the purposes for which complainant was chartered and organized, as set out in its charter. It is very doubtful whether, upon a fair construction of its charter, the contract with the Midland Timber Company, and the contract which it proposes to make under the decree, sought in this case, is not ultra vires. It is quite manifest that no such contract was in the contemplation of the incorporators at the time of taking the charter. The real motive prompting its action is frankly stated by Mr. Montague, to secure a standing in this court.

It is suggested that the decision of the case of Midland Timber Co. v. Prettyman, supra, was not anticipated. Without pausing to discuss or decide the objection urged by defendants that the transaction is a fraud upon the jurisdiction of this court, it is manifest from the admitted facts that the complainant does not come into the court with any very meritorious claim upon its consideration or demand for the exercise of its extraordinary power to grant either injunctive relief or specific performance. It voluntarily comes into a contract after, as it al-

leges, defendants had breached its terms, with full knowledge of this fact. It claims under a deed containing a recital not true in fact. It assumes no obligation either to the timber company or defendants, permits a year to pass without notifying defendants of its assumed relations to them, and then files its bill invoking the equitable power of the court. The timber which it claims to own, and for which it has not paid a dollar, was worth, September 3, 1909, $4,850. The complainant fails to produce the contract with the Midland Company, although requested to do so. It will also be noted that the defendant the Midland Timber Company "owns 186,000 acres of timber land and is still very actively in business." The stockholders and officers of the two companies appear to be, to a large extent, the same persons. In McCable v. Matthews, 155 U. S. 550, 15 Sup. Ct. 190, 39 L. Ed. 256, Mr. Justice Brewer says:

"A decree for the specific performance of a contract for the sale of real estate does not go as a matter of course, but is granted or withheld according as equity and justice seem to demand, in view of all the circumstances of the case."

Among the reasons assigned for refusing a decree was that it was "a purely speculative contract on the part of plaintiff." Bispham, Eq. 376.

Without further pursuing the discussion, I am clearly of the opinion that in no aspect of the case is the complainant entitled to a decree extending the period for 25 years, during which it may, as its own election, cut and remove the timber from defendant's land, with all of the incidental burdens upon it. Counsel say that, if they are mistaken in their interpretation of the contract in that respect, complainant is entitled to a reasonable time, and ask the court to fix such time. It is true that, in several of the cases cited, the court fixed a time within which, after the decision, the grantee was given to cut and remove the timber. In the Camp Case, supra, one year was given. The court, in some instances, remanded the case for the judge to fix a reasonable time. In these cases it was manifest that the grantees intended to cut the timber; there was no speculative element in them. For the reasons stated, and the further reason that complainant has an adequate remedy at law, by an action for damages, for the alleged breach of the contract, and refusal to extend the time, I do not think any further time should be fixed by this court. The measure of damages, if plaintiff can make out its case, in an action at law, is clear. Defendants are the owners of the tract of land of 660 acres, upon which the timber, in 1909, was worth $4,850; hence, so far as this record shows, a judgment would be enforceable against them. It is shown, without contradiction, that Mrs. Dennis is solvent. I have not deemed it necessary to discuss or decide the controversy in regard to the tender alleged to have been made by the Midland Timber Company. I am of the opinion that, upon the pleadings and evidence, complainant is not entitled to a decree enforcing specific performance. The prayer for a permanent injunction must be denied.

A decree dismissing the bill at complainant's cost may be drawn.

In re DEUTSCHE BROS.

(District Court, S. D. New York.   February 5, 1915.)

1. BANKS AND BANKING ⬳15 — INSOLVENCY — APPLICATION OF ASSETS — "BENEFIT."

Under Laws N. Y. 1910, c. 348, § 25, as amended by Laws 1911, c. 393, requiring parties engaging in the business of receiving deposits or money for transmission to present to the comptroller a surety bond conditioned upon the faithful holding and transmission of all money, and in the event of the insolvency or bankruptcy of the party, upon the payment of the full amount of such bond to the assignee, receiver, or trustee for the benefit of the persons making deposits or delivering money for transmission, where the amount of the bond of bankrupt private bankers had been paid to their trustee in bankruptcy, the trustee could be authorized to use a part of such fund to save valuable equities in real property of the bankrupt, which otherwise might be lost because of the failure to pay interest, the relative rights of the special class of creditors and the general creditors being properly preserved, as the statute makes no provision for the distribution of the fund by the trustee, and the word "benefit," as used in the statute, is of broad meaning and wide signification.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 12–17;  Dec. Dig. ⬳15.

For other definitions, see Words and Phrases, First and Second Series, Benefit.]

2. BANKRUPTCY ⬳138—BANKS—ASSETS—BOND—"TRUSTEE."

Under Laws N. Y. 1910, c. 348, § 25, as amended by Laws 1911, c. 393, requiring a bond from private bankers conditioned for payment in the event of insolvency or bankruptcy to the assignee, receiver, or trustee, in case of bankruptcy the trustee in bankruptcy is the "trustee" intended.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193–204, 206–209;  Dec. Dig. ⬳138.

For other definitions, see Words and Phrases, First and Second Series, Trustee.]

3. BANKRUPTCY ⬳138 — BANKS — ASSETS — BOND — COMPOSITION — FUNDS AVAILABLE.

Under Laws N. Y. 1910, c. 348, § 25, as amended by Laws 1911, c. 393, the amount of the surety bond of bankrupt private bankers, which had been paid to the trustee in bankruptcy, could not be used by the bankrupts in carrying out a plan of composition accepted by a majority of the creditors, under which they were to reopen their business, turning over their net profits to a corporation to be organized under the supervision of the superintendent of banks, and which was to execute notes to the creditors, as the bankrupts never had title to such fund, and the trustee in bankruptcy did not acquire title through them.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193–204, 206–209;  Dec. Dig. ⬳138.]

In Bankruptcy.   In the matter of Deutsche Bros., bankrupts.   On certificate of the referee, bringing up the question of his power to grant an application by the trustee.   Matter referred back to the referee for a conclusion on the merits.

Samuel Hoffman, of New York City, for creditors.
Samuel Strasbourger, of New York City, for bankrupt.

MAYER, District Judge.   The bankrupts were engaged in the borough of Manhattan, city of New York, in the business of private bank-

ing, which was conducted pursuant to a license issued to them by the comptroller of the state of New York under the provisions of article 3a of the General Business Law and acts amendatory thereof and supplemental thereto.

Before the issuance of the license to the bankrupts, they, as principals, and the Ætna Accident & Liability Company, executed and delivered to the comptroller of the state of New York their bond in the sum of $100,000 in accordance with the provisions of the act referred to, the salient parts of which will be set forth hereinafter. In due course, Mr. Richards, the superintendent of banks of the state of New York, became trustee in bankruptcy, and thereafter the Ætna Company paid to the trustee the penal amount of the bond, to wit, $100,000.

Heretofore an order was made by the referee requiring the trustee to segregate, and hold in trust for the benefit of persons depositing moneys with the bankrupts, either for the purpose of transmission to others or for the purpose of safe-keeping, the said $100,000, and further requiring the distribution of the sum in special dividends to the persons thereto entitled, and this same order likewise provided for such a dividend of 20 per cent. This dividend of 20 per cent. will use up approximately $60,000, leaving still in the hands of the trustee, out of this $100,000, approximately the sum of $40,000. Exclusive of the money realized from the bond, the assets of the estate in cash do not exceed the sum of $3,000; but there are other assets of the estate, consisting of various parcels of improved real property in the city of New York and within the Southern district. The trustee has had appraisals made, and from these appraisals and his knowledge of the real estate he is convinced that, if the real property can be held for a reasonable time, it, and each parcel thereof, will pay an income, and that such income will be sufficient to pay the fixed charges in the way of interest and taxes. Meanwhile, however, the property is in danger of being lost because of failure of interest, and, in at least one instance, because of an overdue second mortgage, and the consequent result of foreclosure proceedings which are now pending.

The $3,000 in the hands of the trustee will be wholly insufficient to save the real property. Unfortunately, almost all of the creditors of the bankrupts are persons of humble means, who confided their money to these private bankers, either for transmission or safe-keeping. The outstanding liabilities under this head aggregate in the neighborhood of $225,000, while the liabilities to creditors other than this class, such as merchandise creditors, aggregate not to exceed $10,000. The trustee (and he has the co-operation of all concerned) is exceedingly anxious that a plan be worked out whereby, if possible, to save what he believes are valuable equities, to the end that ultimately a much more substantial result will be obtained for the transmission and safe-keeping deposit creditors than if the equities in the real estate should be wiped out and the $40,000 (approximately) remaining out of the money paid over by the Ætna Company should be distributed as dividends to the persons who may be entitled thereto.

At an adjourned first meeting held on November 27, 1914, the bankrupts presented an offer of composition, and a majority in number and

amount of the claims proved accepted the offer of the bankrupts, and such acceptances are on file with the referee. On December 19, 1914, the bankrupts petitioned the referee for an order directing the trustee to deposit the sum of $85,000 out of the funds then in his possession, subject to the order of this court, for the purpose of carrying out the composition. The referee ruled that the $100,000 then in the possession of the trustee, obtained by him from the surety company, could not be used for any purpose other than a direct payment to the persons for whose benefit, under the statute, the money was available.

The plan of composition contemplated the payment of 25 per cent. in cash, and if there were sufficient funds a larger initial payment, in the opinion of the board of directors of a corporation to be formed. The remaining 75 per cent. (or whatever the balance was after making the initial payment) was to be paid in income notes executed by the proposed corporation, which were to be indorsed by the bankrupts, and which were to be payable on or before three years from the date thereof, pro rata, out of the proceeds resulting from the sale of the assets conveyed to the corporation, such pro rata payment to be made semiannually, beginning six months after the date thereof out of such proceeds.

Immediately upon the confirmation of the composition a corporation was to be organized under the Stock Corporation Law of the state of New York, whose affairs were to be managed by a properly selected board of directors. The capital stock was to be transferred to and vested in three trustees, to be appointed by the superintendent of banks, who should hold the same as trustees for the benefit of all creditors, and who should vote the stock for the persons designated as directors of the corporation.

Such steps as were necessary were to be taken to vest in the corporation all the property of the bankrupt estate. The board of directors were to be vested with the full management and charge of the property, and were to liquidate the same as rapidly as possible, paying semiannually to holders of the income notes pro rata such dividend out of the proceeds as they might determine to be advisable. The bankrupts agreed, immediately upon the composition being effected, to reopen the business of selling steamship tickets, money exchange, and money transmission heretofore carried on by them under rules and limitations fixed by the superintendent of banks, and to continue during the term of the adjustment notes to manage and operate the business, and to pay over to the directors of the corporation the net profits of the business, they to receive reasonable compensation for their services, to be fixed by the board of directors. Certain other provisions were incorporated in the offer of composition, which need not now be set forth in detail.

The certificate of the referee brings up the question as to whether there is power to acquiesce in or direct the trustee to use the balance of the $40,000, or any part thereof, for the purpose of paying taxes, interest installments on mortgages, and the second mortgage to which reference has been made. The attorneys for the bankrupts at the same time bring up the question as to whether the referee should be

directed by the court to order the trustee to deposit part of the $100,000 subject to the order of the court, for the purpose of carrying out the composition in the event of it being confirmed by the court.

In other words, the situation is this: If, out of the $100,000 realized, from the Ætna Company bond, $85,000 can be utilized for the purposes of the composition, then the composition, if deemed advisable, can go through. (In order to avoid confusion, it may be stated that the $85,000 would be made up of the $60,000 which constituted the 20 per cent. dividend declared for the purpose of relieving the creditors and an additional $15,000.) As part of that situation, and also as an independent proposition, the question is whether any part of $100,000 can be used to save the properties which the trustee believes have substantial equities.

The matter should be dealt with promptly, and therefore, while the question of the composition is not before me on any certificate of review, I have concluded, in order to avoid delay, to state my opinion in reference thereto. I will therefore consider (1) the certificate of review before me, and (2) the power, as matter of law, of the court to direct the trustee to turn over a part of the fund of $100,000 as, in effect, assets which can be considered as part of the offer of composition.

[1] It is provided, among other things, by section 25 of chapter 348 of the Laws of 1910, as amended by chapter 393 of the Laws of 1911, effective June 21, 1911, as follows:

"Except as provided in section 29d, no individual or partnership shall hereafter engage directly or indirectly in the business of receiving deposits of money for safe-keeping or for the purpose of transmission to another or for any other purpose in cities of the first class without having first obtained from the comptroller a license to engage in such business. Before receiving such license the applicant therefor shall file with the comptroller a written statement in the form to be prescribed by the comptroller and verified by the individual or members of the firm making the application, showing the amount of the assets and liabilities of the applicant, designating the place where the applicant proposes to engage in business, that the applicant has been, or if the applicant shall constitute a partnership, that a majority of the members thereof having a controlling interest in the business of such partnership have been continuously for a period of five years immediately preceding the date of such application resident in the United States. Such applicant shall at the same time deposit with the comptroller five thousand dollars if the applicant is engaged only in the business of receiving money for transmission to another and otherwise ten thousand dollars in money or in securities which shall consist of bonds of the United States, of this state or of any municipality thereof, or other bonds approved by the comptroller, and if a deposit of securities shall be so made in lieu of money, the comptroller shall thereafter require the applicant to maintain such deposit at all times at a value which shall equal the sum that the applicant is required by this section to deposit. In addition thereto there shall be presented to the comptroller a bond to the people of the state of New York executed by the applicant and by a surety company approved by the comptroller, conditioned upon the faithful holding of all moneys that may be deposited with the applicant, in accordance with the terms of the deposit and the repayment of such moneys so deposited and upon the faithful transmission of any money which shall be delivered to such applicant for transmission to another, *and in the event of the insolvency or bankruptcy of the applicant, upon the payment of the full amount of such bond to the assignee, receiver or trustee of the applicant, as the case may require, for the benefit of the persons making such deposits and of such persons as shall deliver money to the applicant for transmission to another.*"

In the Matter of Moritz Rosett and Max Rosett, Individually, etc., Bankrupts, Joseph M. Conklin, as Trustee, etc., Petitioner, 204 Fed. 431, 122 C. C. A. 617, the Circuit Court of Appeals for the Second Circuit (April 14, 1913) had this statute under consideration. The question in that case was whether the fund was distributable among all the creditors who did banking business with the bankrupts, or only among such creditors as did banking business with them in the city of New York, and the court held that only those who did banking business with them within the state of New York were entitled to the benefits of the fund. No other case involving the construction of the part of the statute here under consideration has been called to my attention.

The question, therefore, is a new one, and must be resolved in accordance with familiar rules of construction. What the New York Legislature was endeavoring to accomplish was the protection to some extent of the persons making deposits with or delivering money for transmission to these private banks. It undoubtedly realized that the depositors and transmitters are people of small means, and many, and perhaps most, of them of recent foreign origin, who cannot speak English, and who need a great measure of protection. That is precisely the situation in the case at bar, and therefore one of much concern, because of the desire to safeguard the rights of these unfortunate people so far as the law will permit.

[2] In the provision above quoted the Legislature contemplated insolvency or bankruptcy of the banker and used words which were technically correct. Having in mind "the event of the insolvency or bankruptcy" of the banker, it was provided that the payment of the full amount of the bond should be made to the "assignee, receiver or trustee of the applicant, as the case may require." Clearly "trustee" means a trustee in bankruptcy, selected as the statute provides. It will be noted that there is no provision for the distribution of the fund by the trustee. There is nothing in the statute which in so many words commands in kind the distribution of the particular fund, the payment of which by the surety company is required under the bond after insolvency or bankruptcy.

The payment is "for the benefit of the persons" making deposits, and of such persons as shall deliver money to the banker for transmission to another. The word "benefit" is one of broad meaning, and under this statute, in my opinion, of wide signification. The duties of assignees, receivers, and trustees are defined by statute and regulated by rules of court, and these officials are subject to the supervision of the courts, and must account in and to the courts.

In seeking the meaning of a statute, an illustration sometimes is helpful. Let it be supposed that a bankrupt private banker had pledged with some financial institution securities concededly worth $200,000, that the amount of the loan for which such securities were pledged was $100,000, and that by the payment of the loan the trustee, for the benefit of the estate, would receive $200,000 in securities or money, and thereby be able to pay the class to be benefited 100 cents on the

dollar. It is hard to believe that a remedial statute of this character was intended to prevent the appropriate officer in bankruptcy from saving for people needing protection assets which otherwise would be lost.

I think that what is meant by "for the benefit of the persons making deposits and of such persons as shall deliver money to the banker for transmission to another" is benefit of a class of persons, namely, depositors and transmitters, and that this class under the decision in the Rosett Case is confined to those transacting the business in question with the bonded private banker within the state of New York.

I am of the opinion that the Legislature never intended that an assignee, receiver, or trustee should be prevented from using the fund in such manner as would increase the estate, or from applying the fund in such directions as would save assets, where the saving of the assets would be for the benefit of the very class of people for whose protection the statute was enacted. To hold otherwise would be to give the statute a narrow construction, which would impair the useful purpose for which it was designed.

I conclude, therefore, that the referee had power to grant the application of the trustee for leave to apply part of the fund under consideration for the purposes set forth by the trustee in his application. Apparently the referee has considered only the question of law involved, and therefore the matter will be referred back for a conclusion on the merits.

For the guidance of counsel I may say that they should present to the referee a full statement showing the precise condition of each of the properties, which statement should comprehend, among other things, the amount of taxes, interest, income, and cost of maintenance. I may further observe that, if the referee is of opinion that the facts warrant the use of the fund for the purposes desired, there need be no difficulty in preserving the rights of the special class. If this money saves equities in real estate, a lien will be created in favor of the statutory class for whom the trustee will be acting. It will not be troublesome to work out and preserve the relations in this regard between the general creditors and this special class of creditors.

[3] In respect of the proposed composition and the use of part of the $100,000 fund to that end, it must be remembered that the bankrupts never had title to the fund. By the provisions of the statute, the title to this fund becomes vested in the trustee in bankruptcy, and nowhere are the bankrupts in the chain of title, and in no manner can they be said to be the channel through which the title flows. The fact that the bankrupts deposited certain securities with the surety company in order to obtain the bond does not in any manner change the situation. The obligation of the bond is to pay the trustee for the benefit of a certain class described in the statute, and while in the case at bar a majority of the creditors in number and amount have approved the proposed plan of composition, yet the court cannot create title where there never was any.

The result is that the bankrupts cannot use these funds directly or indirectly as a contribution to the assets which would make up the estate intended to be administered in the carrying out of the plan of com-

position, and the referee was right when he refused to sign the order directing the trustee to deposit part of the fund for the purpose of carrying out the composition.

The application of the trustee is returned to the referee for his report on the merits.

———

UNITED STATES ex rel. NG HEN et al. v. SISSON, Chinese Inspector.

(District Court, S. D. New York. July 20, 1914.)

1. ALIENS ⊙⊐53—DEPORTATION—COUNTRY TO WHICH ALIENS SHOULD BE DEPORTED.

Under Immigration Act Feb. 20, 1907, c. 1134, § 35, 34 Stat. 908 (Comp. St. 1913, § 4284), providing that the deportation of aliens illegally within the United States shall be to the trans-Atlantic and trans-Pacific ports, from which such aliens embarked for the United States, or, if such embarkation was for foreign contiguous territory, to the foreign port at which such aliens embarked for such territory, whether an acquired domicile in Canada or Mexico will prevent deportation of an alien entering the United States therefrom to the European or Asiatic port of original embarkation, nothing short of an actual domicile will do so, and it is for the alien to show such domicile.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⊙⊐53.]

2. ALIENS ⊙⊐32—DEPORTATION—SUFFICIENCY OF EVIDENCE.

In a habeas corpus proceeding by a Chinese person ordered deported, evidence *held* to justify a finding that such person, who entered the United States from Canada, came originally from China.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⊙⊐32.]

3. ALIENS ⊙⊐32—DEPORTATION—PORT TO WHICH ALIENS SHOULD BE DEPORTED.

Under Immigration Act, § 35, where there is no evidence of the particular port in China from which a Chinese person embarked for the United States, such person may be deported to the port nearest the place where he was born and has his family.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⊙⊐32.]

4. ALIENS ⊙⊐54—DEPORTATION—PORT TO WHICH ALIENS SHOULD BE DEPORTED.

The detention of an alien under a warrant of deportation is illegal, unless the warrant provides for deportation to the port required by law.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⊙⊐54.]

5. ALIENS ⊙⊐54—DEPORTATION—HABEAS CORPUS—BAIL.

Where a writ of habeas corpus by an alien ordered deported is sustained, and the prisoner discharged, the court may provide for bail to insure his appearance if the ruling be reversed; but where the writ is dismissed, the prisoner's right to bail depends entirely upon the rules regulating his custody where he already is, as a writ of habeas corpus does not put the relator into the custody of the court, or disturb the custody of the person then detaining the relator, and the court has no power to enlarge the relator while the inquiry proceeds or after the writ has been dismissed.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⊙⊐54.]

⊙⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Habeas corpus by the United States, on relation of Ng Hen and others, against Harry R. Sisson, Chinese Inspector in charge for the District of New York and New Jersey. Writ dismissed, and relators remanded.

John N. Boyle, of New York City, for relators.
H. Snowden Marshall, U. S. Atty., and Harold A. Content, Asst. U. S. Atty., both of New York City, for respondent.

LEARNED HAND, District Judge. These cases stand separately, as the record in each is different. The first case in order is Ng Hen, who upon his first hearing was most frank and candid. He was born in China, of a Chinese mother who had never been out of China.

He embarked from Hong Kong with the intention of coming to the United States as soon as possible. There can be no doubt that he is within section 35 and must be deported.

[1] The next case is Ng Yee Chung, who admits that he was born in China and has a family there. The testimony of Ng Hen justifies the conclusion that Ng Yee Chung's statement is false in which he says that he had at no time left the United States after landing in San Francisco five years ago, and further justifies the conclusion that he was one of the three whom Ng Hen and Ng Kai met in the barn in Canada just before crossing the St. Lawrence. There is, however, no evidence to show when he entered Canada, nor from where. He may have embarked for the United States direct, and gone to Canada, and then decided to come back, or he may have embarked from China for Canada, and then come into the United States for the first time. In the first case he is directly within the decision in Lewis v. Frick, 233 U. S. 291, 34 Sup. Ct. 488, 58 L. Ed. 967. In the second case the point is raised whether, to bring the case within section 35 it must not appear that when the alien embarked for foreign contiguous territory he expected to enter the United States.

Literally there is no such requirement. The question is whether the words must be so understood by intendment. I do not think it necessary to decide whether an alien, shown to have been actually domiciled in Canada or Mexico, and found illegally in the United States, comes within section 35. Ng Yee Chung, being an alien, his domicile of origin will endure till a new one has been shown to arise. I am willing to go so far in construing section 35 as to hold that at least nothing short of a domicile in Canada or Mexico will prevent deportation to the European or Asiatic port of original embarkation, and that this is for the alien to show. Whether an acquired domicile will change the result is not presented.

Wong Suey's case is like Ng Hen, except that his testimony somewhat conflicts with Ng Hen's. His admission that he meant from the outset to come to the United States brings him unconditionally within section 35.

[2] Ng Kai's case is quite different from the others, and without the use of Ng Hen's testimony presents the same state of facts as was before the Circuit Court of Appeals in United States ex rel. Moore v.

Sisson, 206 Fed. 450, 124 C. C. A. 356. The whole of Ng Kai's story was a silly fabrication, to believe which would rightly enough earn its author's contempt. The fact that it is all obviously false does not supply any evidence. All that can be gathered from Ng Kai's story is that he is a Chinaman who is telling a false story about how he came here. While we may make some inferences from his motive, they hardly justify a specific conclusion as to where he was born and where he came from. Ng Hen, however, says that Ng Kai came with him from Regina and entered with him. This justifies the deportation, just as in the case of Ng Yee Chung, but does not determine that China was the country whence he came. But Ng Hen also says that Ng Kai came before he (Ng Hen) came from Hong Kong, and this, in the absence of contradiction and in the light of Ng Kai's own perjury, is enough to justify a finding that he came from China. Hence his case is like Ng Yee Chung.

Hop Yet's case is like Ng Kai's, in that he certainly enough made up a false tale; but in it he admitted that he had been born and married in China. Ng Hen's story justifies the conclusion that he was one of the five who crossed the river, and the rule I have accepted in Ng Yee Chung's case justifies his deportation to China.

[3] Therefore the writ will be dismissed as to all five relators. A question is raised, in that the warrant of deportation mentions no port; the statute requiring that the deportation should be to the port of embarkation. In the case of Ng Hen, Wong Suey, and Ng Kai this port is Hong Kong, and the warrant should so read. In the case of Ng Yee Chung and Hop Yet we have no evidence of the port of embarkation. The problem is a practical one, and had best be solved by deporting them to whatever port is nearest to the place where each was born and has his family. The warrant will therefore be amended to conform to these directions, if the relators so wish it, and, when amended, the writ will be dismissed, and the relators remanded.

[4] It may well be questioned whether this court has the power to change the warrant as I have directed. The point was especially reserved in Lewis v. Frick, supra, whether habeas corpus searched more than the legality of the relator's detention and included the purposes of the executive officers. If, however, as was decided in United States ex rel. Moore v. Sisson, supra, the detention is illegal, unless the plan, of which it is a part, will in the end land the relator where the law requires him to go, it is as illegal if it seeks to convey him to Tien Tsin or Shanghai or Port Arthur, if he should go to Hong Kong, as though it sought to send him to any port in China, when he should go to Canada. It therefore appears to me that, under the rule in United States ex rel. Moore v. Sisson, supra, this court must hold the detention illegal, unless it be upon a warrant in which the terminus ad quem is that required by law.

[5] A question has also been raised of bail pending an appeal. This matter has been the subject of a confusion which it seems to me the subject does not justify. A writ of habeas corpus does not put the relator into the custody of this court. It does not assume to disturb the custody of the person then detaining the relator. It requires his

production and examines the legality of the custody. This court has no proper power to enlarge the relator while the inquiry proceeds, and less power to do so after the writ has been dismissed. If the writ be sustained, and the prisoner discharged, then the court might provide for bail to insure his appearance if the ruling were reversed, but only in that case. Till the writ be sustained, the question of bail depends entirely upon the rules regulating the relator's custody where he already is.

UNITED STATES ex rel. HOM CHUNG et al. v. SISSON, Chinese Inspector.

(District Court, S. D. New York. February 2, 1915.)

1. ALIENS ⨪32—DEPORTATION—COUNTRY TO WHICH ALIENS SHOULD BE DEPORTED.

Under Immigration Act Feb. 20, 1907, c. 1134, § 35, 34 Stat. 908 (Comp. St. 1913, § 4284), nothing short of a domicile in Canada or Mexico will prevent the deportation of an alien entering the United States therefrom to the European or Asiatic port of original embarkation, and it is for the alien to show such domicile.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⨪32.]

2. ALIENS ⨪32—DEPORTATION—COUNTRY TO WHICH ALIENS SHOULD BE DEPORTED.

Chinese persons, ordered deported to China, must show from what country, other than China, they came to the United States, if they wish to be deported to some other country.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⨪32.]

3. ALIENS ⨪32—DEPORTATION—PORT TO WHICH ALIENS SHOULD BE DEPORTED.

The port to which a Chinese person should be deported is a practical matter for the immigration authorities to determine, and if the port to which such a person is ordered deported is not the one from which he sailed, he must show what that port was.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⨪32.]

Habeas corpus to inquire into detention of certain Chinese persons.

Robert M. Moore, of New York City, for relators.

H. Snowden Marshall, U. S. Atty., and Harold A. Content, Asst. U. S. Atty., both of New York City, for respondent.

LACOMBE, Circuit Judge. The evidence indicates that these three, with others, surreptitiously entered the United States from Canada. They were found in Jersey City, locked in a box car of the Erie Railroad. They claimed to have been born in the United States, but failed to prove their averments, and were ordered deported. The only question is whether the government can send them to China, or only to Canada.

[1] I concur with Judge Hand's ruling in the case of Ng Hen, 220 Fed. 538. He says:

"I am willing to go so far in construing section 35 as to hold that at least nothing short of a domicile in Canada or Mexico will prevent deportation to the European or Asiatic port of original embarkation, and that this is for the alien to show. Whether an acquired domicile will change the result is not presented."

[2] It is understood that Canada refuses to receive Chinese persons. A construction of the act which would make it impossible for the United States to send them to China or any other place, unless it could show the particular port from which they sailed, does not commend itself to me. If they wish to be sent to some place other than China, it is for them to show from what country, other than China, they came.

Hom Ech testified that neither his father nor mother ever told him where he was born, and he does not know whether his mother was ever out of China. Hom Chung testified that when he was about 19 years old he was living in a village in China; that he came from China about 2 years ago; that his blood mother was never out of China. Hom Jung testified that he went home to China with his father and mother when he was 2 or 3 years old; that he remained there 16 or 17 years; and that he left China a little over 4 years ago.

[3] As to the question to what port they shall be sent, that is a practical matter for the immigration authorities to determine. If it is contended by any of the relators that the port is not the one from which he sailed, it will be for him to show what that port was. The intent of the statute is too clear to allow it to be defeated by relators leaving uncertain what it is in their power to make certain.

Writs dismissed.

---

### In re MARRINER.

(District Court, D. Maine. February 11, 1915.)

No. 10380.

BANKRUPTCY ☜184—LIENS—FAILURE TO RECORD.

Under Bankr. Act July 1, 1898, c. 541, § 67a, 30 Stat. 564 (Comp. St. 1913, § 9651), providing that claims, which for want of record or for other reasons would not·have been valid liens as against the claims of creditors of the bankrupt, shall not be liens against his estate, and Rev. St. Me. c. 93, § 1, providing that no mortgage of personal property is valid against any other person than the parties thereto, unless possession is delivered to and retained by the mortgagee, or the mortgage is recorded, where, though a mortgage was not recorded for two years, it was not withheld from record for the purpose of giving the mortgagor a fictitious credit, or pursuant to any agreement or collusion between the mortgagor and mortgagee, and was not recorded, after being so withheld, in contemplation of bankruptcy, or with any corrupt purpose, or with knowledge that the mortgagor was in a bankrupt condition, the mortgage was valid as against creditors who extended credit to·the mortgagor prior to the recording of the mortgage, as under the Maine statute a mortgage made in good faith is valid against all parties who, previous to the date of its

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

record, have not acquired a lien by attachment, levy, or some similar proceeding.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. ☞184.]

In Bankruptcy. In the matter of Willis E. Marriner, bankrupt. On petition by Clement F. Robinson, trustee, for review of an order allowing the mortgage claim of Elwin A. Soule. Order affirmed.

Arthur L. Robinson, of Portland, Me., for trustee.

J. Bennett Pike, of Bridgton, Me., and Arthur Chapman, of Portland, Me., for claimant.

HALE, District Judge. The matter now before the court is the petition of the trustee, Clement F. Robinson, for a review of the findings of the referee, allowing the mortgage claim of Elwin A. Soule. The chattel mortgage in question is dated February 21, 1913; it covers the bankrupt stock, and fixtures, tools, and appliances, in petitioner's store at Bridgton. The mortgage was not recorded until February, 1914. The indorsement on the back states that it was received on February 13, 1914, for record in the town clerk's office.

It is contended by the trustee in bankruptcy that the mortgage is invalid on two grounds: First, because it was a preference; second, because it was negligently withheld from record, thereby deceiving other mercantile creditors, who sold goods in the belief that the purchaser's stock was not incumbered by any mortgage to Soule, so that the mortgagee is estopped from claiming any priority over other creditors under it.

In considering the question relating to a preference, the referee has carefully considered the testimony, and has concluded that at the time of recording the mortgage Soule did not have reasonable cause to believe that a preference was being effected thereby. The referee, therefore, decided that no preference had been made. In reviewing his finding upon this point, I am satisfied that he is correct.

The second contention presents a rather unusual question. The trustee insists that the lien of this mortgage should not be allowed, by reason of the provisions of section 67a of the Bankruptcy Act, to wit:

"Claims which for want of record or for other reasons would not have been valid liens as against the claims of the creditors of the bankrupt shall not be liens against his estate."

The Revised Statutes of Maine (chapter 93, § 1) provide:

"No mortgage of personal property is valid against any other person than the parties thereto, unless possession of such property is delivered to, and retained by the mortgagee, or the mortgage is recorded by the clerk of the city, town or plantation organized for any purpose, in which the mortgagor resides, when the mortgage is given."

In this case there is no contention that the mortgage was kept off record for any corrupt or colorable purpose. It is not contended that there was any collusion or agreement between the mortgagor and the mortgagee whereby the mortgage was withheld from record for the

purpose of giving the mortgagor a fictitious credit, as in Blennerhasset v. Sherman, 105 U. S. 100, 26 L. Ed. 1080, where the Supreme Court has held such agreement sufficient to render a deed void at common law. The Perkins Case (D. C.) 155 Fed. 237; The Shaw Case (D. C.) 146 Fed. 273; Butterfield v. Woodman (D. C.) 216 Fed. 208, 214.

It is not contended in the case at bar that when the mortgage was recorded, such record was made with any knowledge on the part of the mortgagee that the mortgagor was in a bankrupt condition, or that such record was made in contemplation of bankruptcy, or with any corrupt purpose.

The trustee contends that the mortgagee has withheld his mortgage from record for two years, during which time the mortgagor has been obtaining credit from various mercantile houses, who have sold him goods in the belief that the stock in trade was unencumbered by a mortgage; that the mortgagee is now estopped to come in and claim a lien ahead of other mercantile creditors, who have been extending credit in the meantime in ignorance of the mortgage; that, even aside from any question of estoppel, it is contrary to this statute to give any validity to an unrecorded mortgage. The trustee relies upon Sawyer v. Pennell, 19 Me. 167; Sheldon v. Connor, 48 Me. 584; Shaw v. Wilshire, 65 Me. 485; Garland v. Plummer, 72 Me. 401.

The trustee also cites cases which have arisen under statutes of other states, somewhat similar to the Maine statute, regarding the recording of chattel mortgages. I have studied with interest the very suggestive argument of the learned counsel for the trustee. I cannot, however, sustain his contention. The referee is correct in finding that there is no case in which our Maine statute has been so construed as to give creditors a right, after a mortgage is recorded, to set it aside as against claims arising while the mortgage was unrecorded. Under the Maine statute a mortgage, made in good faith, is valid against all parties who, previous to the date of its record, have not acquired a lien by attachment, levy, or some such proceeding. The decisions of other states on similar statutes are not altogether decisive of the question. I think it must be held that a mortgage is good only between the parties so long as it is unrecorded; but, when recorded, it takes effect as against third parties. Sawyer v. Turpin, 91 U. S. 114, 23 L. Ed. 235; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956.

In view of the fact that the petitioner has had the use of the bankruptcy court in protecting and disposing of the mortgaged property, and in view of the fact that a portion of the expense thereof is justly chargeable to the sum found to be due the petitioner by virtue of his mortgage, the referee has ordered that, out of the amount found due the petitioner, the sum of $75 be deducted as representing that portion of the expense of protecting, preserving, and disposing of the mortgaged property, which would be justly chargeable to the mortgagee. His finding is affirmed, namely, that the sum of $1,000 and interest thereon since February 21, 1913, less the sum of $75, be ordered to be paid to Elwin A. Soule, in settlement of his claim by virtue of the mortgage.

A decree may be presented in pursuance of this order.

## DIGGS v. UNITED STATES.†

### CAMINETTI v. SAME.

(Circuit Court of Appeals, Ninth Circuit.   March 18, 1915.   Concurring Opinion April 8, 1915.)

Nos. 2404, 2405.

1. CRIMINAL LAW ⊜⊐721, 857—WITNESSES ⊜⊐305—PRIVILEGE FROM SELF-INCRIMINATION—WAIVER—COMMENTS ON FAILURE TO TESTIFY.

Under Const. Amend. 5, providing that no person shall be compelled in any criminal case to be a witness against himself, and Act March 16, 1878, c. 37, 20 Stat. 30 (Comp. St. 1913, § 1465), providing that a person charged with an offense shall at his own request, but not otherwise, be a competent witness, and that his failure to make such a request shall not create a presumption against him, where a person charged with crime testifies in his own behalf, the waiver is complete, and he is no longer under the protection of the amendment, and his failure to testify concerning certain matters may properly be commented on and considered by the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1672, 2054, 2055; Dec. Dig. ⊜⊐721, 857; Witnesses, Cent. Dig. §§ 1053–1057; Dec. Dig. ⊜⊐305.]

2. CRIMINAL LAW ⊜⊐780—INSTRUCTIONS—TESTIMONY OF ACCOMPLICE.

While it is the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, it is not reversible error to refuse an instruction to this effect.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1859–1863; Dec. Dig. ⊜⊐780.]

3. CRIMINAL LAW ⊜⊐510—TESTIMONY OF ACCOMPLICES—CORROBORATION.

In the federal courts, corroboration of the testimony of an accomplice is not necessary to support a conviction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1124–1126; Dec. Dig. ⊜⊐510.]

4. CRIMINAL LAW ⊜⊐507—TESTIMONY OF "ACCOMPLICES"—CORROBORATION.

Women transported from one state to another for an immoral purpose are not "accomplices" to the offense of transporting them and furnishing tickets for their transportation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1082–1096; Dec. Dig. ⊜⊐507.

For other definitions, see Words and Phrases, First and Second Series, Accomplice.]

5. WITNESSES ⊜⊐268—CROSS-EXAMINATION OF ACCUSED—SCOPE.

Where, on a trial for transporting women from one state to another for an immoral purpose, though accused testified to nothing that occurred on the trip to such other state, he repeatedly referred in his testimony as to matters previously occurring to such trip to R., it was not improper to allow him to be asked on cross-examination what he meant by the R. trip, and whether he was accompanied on such trip by the women in question and another man charged with a similar offense.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 959; Dec. Dig. ⊜⊐268.]

6. WITNESSES ⊜⊐268—CROSS-EXAMINATION OF ACCUSED—SCOPE.

Where, on such trial, one of the women on cross-examination testified to intimate relations with accused, a question asked him on cross-examination as to whether he suggested to his counsel the questions asked her, to which he replied that he suggested that to his counsel a long time before he came into the courtroom, and might have made the suggestion during her cross-examination, and the statement of counsel for the gov-

---

⊜⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

220 F.—35     † Rehearing denied May 10, 1915.

ernment that the defense, prompted by the defendant, put such questions, were not improper.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 959; Dec. Dig. ☜268.]

**7.** CRIMINAL LAW ☜723—ARGUMENT OF COUNSEL.

On a trial for transporting women from one state to another for immoral purposes, the prosecuting attorney in his argument stated that the eyes of the people of the United States were on the jury, and that 60,-000,000 or 90,000,000 people were awaiting the verdict, respecting which statement the court, when objection was made, stated that this was merely a form of speech and that counsel should confine himself to the evidence. Counsel further remarked that, if there was any man who had sunk to the·uttermost depths of depravity, it was the man in form alone who seduced a girl and then exposed her shame to the world, and that if he had one redeeming trait of character, having blasted the life of a virgin, he would go to the penitentiary before going before a jury and admitting that he seduced her, and recounting the times when he had illicit intercourse with her, and that a decent man would die first, to which objection was made on the ground that accused had made no such admissions. Counsel further remarked that the government demanded that the laws enacted for the protection of young and decent women be rigidly enforced, and that an acquittal would be a blot upon the name of the state. The court told the jury to be guided solely by the evidence, and not by the statements or declarations of counsel, and accused requested no further instruction on this point. *Held,* that there was nothing so offensive or inflammatory in the remarks as to require a reversal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1663, 1674, 1676; Dec. Dig. ☜723.]

**8.** PROSTITUTION ☜1—TRANSPORTATION OF WOMEN FOR IMMORAL·PURPOSES—ELEMENTS OF OFFENSES.

The immorality denounced by the White Slave Traffic Act (Act June 25, 1910, c. 395, 36 Stat. 825 [Comp. St. 1913, § 8813]), prescribing the punishment for knowingly transporting any woman or girl in·interstate commerce for the purpose of prostitution or debauchery, or for any other immoral purpose, is not limited to commercialized vice, and the act applies to transportation for the purpose of making the girl the concubine or mistress of the person transporting her.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. §§ 1, 2; Dec. Dig. ☜1.

Violations of White Slave Act, see. note to Savage v. United States, 130 C. C. A. 2.]

**9.** CRIMINAL LAW ☜814—INSTRUCTIONS—CONFORMITY TO EVIDENCE.

On a trial for transporting a woman from one state to another for an immoral purpose, an instruction that, in considering her testimony and the weight to be given thereto, the jury might consider her motive in testifying, whether she had been or appeared to be acting under the influence of any person, and whether any promise of immunity had been offered to her, and any hope she might have for leniency in any criminal action brought against her, was properly refused, where there was no evidence tending to show any promise of immunity, or that she was acting under the influence of any one.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1821, 1833, 1839, 1860, 1865, 1883, 1890, 1924, 1979–1985, 1987; Dec. Dig. ☜814.]

**10.** PROSTITUTION ☜4 — TRANSPORTATION FOR IMMORAL PURPOSE — SUFFICIENCY OF EVIDENCE.

Evidence *held* to support a conviction of C. for transporting two women from one state to another for an immoral purpose, though D., charged with a similar offense, purchased the tickets for the transportation.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 4; Dec. Dig. ☜4.]

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. PROSTITUTION ⬅⬆5—TRANSPORTATION OF WOMEN FOR IMMORAL PURPOSES —INSTRUCTIONS.

Where, on a trial for transporting and procuring tickets for the transportation of women from one state to another for an immoral purpose, to wit, that they should be and become the concubines and mistresses of accused and another person charged with the same offense, the court read the indictment and statute to the jury, explained the meaning of the terms of the statute, defined "concubine," "mistress," and the term "debauchery," as used in the statute, and charged that if the women were taken to another state as testified by them, and while there accused and his companion cohabited with them as the testimony tended to show, the jury might find that they were taken there with the immoral purpose and intent charged, the jury could not have understood, as claimed, that accused and his companion were guilty if they merely seduced the girls.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 5; Dec. Dig. ⬅⬆5.]

Ross, Circuit Judge, dissenting.

In Error to the District Court of the United States for the First Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Maury I. Diggs and F. Drew Caminetti were separately convicted of offenses, and they bring error. Affirmed.

Robert T. Devlin and Marshall B. Woodworth, both of San Francisco, Cal. (S. Luke Howe, of Sacramento, Cal., and Nathan C. Coghlan, of San Francisco, Cal., of counsel), for plaintiffs in error.

J. A. Cooper, of San Francisco, Cal. (Anthony Caminetti, Jr., of San Francisco, Cal., of counsel), for plaintiff in error Caminetti.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge. The two cases named above, although separately tried, arose out of a single transaction, in which each of the plaintiffs in error was involved. For the reason that the points presented to this court are similar in the two cases, they will be disposed of in a single opinion of this court.

The indictment against Diggs contained six counts. He was convicted on the first four counts, and there was no verdict on the last two. The first count charged him with transporting Marsha Warrington from Sacramento, Cal., to Reno, Nev., for the purpose of debauchery, and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become his concubine and mistress. The second count charged him with transporting Lola Norris from Sacramento to Reno, that she might become the mistress and concubine of Caminetti. The third count charged him with procuring a ticket for Marsha Warrington from Sacramento to Reno, with the intent that she should become his concubine and mistress. The fourth count charged him with buying a ticket for Lola Norris, with the intent that she should give herself up to debauchery, and for an immoral purpose, to wit, that she could be and become the concubine and mistress of Caminetti. The fifth and sixth counts charged him with persuading,

inducing, and enticing Marsha Warrington and Lola Norris to go to Reno for the immoral purposes set forth in the other counts.

The indictment against Caminetti contained four counts. The indictment was similar to that against Diggs, excepting the two counts relating to the purchase of tickets were omitted from Caminetti's indictment. He was convicted on the first two counts and acquitted on the last two.

[1] Error is assigned to the following instruction to the jury:

"After testifying to the relations between himself and Caminetti and these girls down to the Sunday night on which the evidence of the government tends to show the trip to Reno was taken, he stops short and has given none of the details or incidents of that trip, nor any direct statement of the intent or purpose with which that trip was taken, contenting himself by merely referring to it as having been taken, and by testifying to his state of mind for some days previous to the taking of that trip. Now this was the defendant's privilege, and, being a defendant, he could not be required to say more if he did not desire to do so; nor could he be cross-examined as to matters not covered by his direct testimony. But in passing upon the evidence in the case for the purpose of finding the facts you have a right to take this omission of the defendant into consideration. A defendant is not required under the law to take the witness stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact, nor is the prosecution permitted in that case to comment unfavorably upon the defendant's silence; but where a defendant elects to go upon the witness stand and testify, he then subjects himself to the same rule as that applying to any other witness, and if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence, since it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so."

This assignment presents the question whether the waiver of the privilege of silence by a defendant in a criminal case in becoming a witness in his own behalf is a complete waiver, so as to place him in the position of any other witness in the case, or is only a partial waiver; that is to say, a waiver so far as the defendant sees fit to testify, leaving him, as to other matters, still under the protection of the fifth amendment. The statute of March 16, 1878 (U. S. Comp. Stats. of 1913, § 1465), provides that a person charged with an offense "shall at his own request but not otherwise be a competent witness. And his failure to make such a request shall not create any presumption against him." Upon a careful and cautious consideration of the question we reach the conclusion that the statute should be held to mean that the waiver is complete, and that when it has been made the defendant is no longer under the protection of the amendment.

The only cause we have found for hesitation in reaching that conclusion is the fact that the Circuit Court of Appeals for the Eighth Circuit, a court for which we entertain the highest respect, in a similar case (Balliet v. United States, 129 Fed. 689, 64 C. C. A. 201), held such an instruction reversible error. It is to be said, however, that while the opinion in that case contains no discussion of or reference to any adjudicated case of the state courts we think it is not improbable

that the conclusion reached was influenced by the then settled rule of the Supreme Court of the state of Missouri. But in 1913 the Supreme Court of Missouri in State v. Larkin, 250 Mo. 218, 157 S. W. 600, 46 L. R. A. (N. S.) 13, overruled its prior decisions. In that case the court said:

"We have carefully examined the statutes and holdings upon, this question of more than 30 states, and we find that it has been held universally that, if the defendant is not sworn as a witness in his own behalf, any comment by the prosecuting attorney on his failure so to testify constitutes reversible error, in the absence of a peremptory and proper rebuke by the trial court. But, on the other hand, except in our own state and in California, where the question has been sometimes doubted, the right of the prosecuting attorney to comment upon the failure of the defendant, when he takes the stand as a witness in his own behalf, to deny, or explain incriminating facts and statements, has been uniformly held allowable."

After citing numerous cases the court proceeded:

"The rule that no reference shall be made to the neglect, failure, or even refusal of a defendant to avail himself of his right to testify shall not be commented on, in the event he does not become a witness in his own behalf, is therefore, we find, universal; but, on the contrary, the rule that if he does go upon the witness stand he then stands in the precise attitude of of any other witness is, except in this state, and, as stated, in California. where the rule is subject to some doubt, also universal. Mr. Wharton, in his learned and able work on Criminal Evidence, lays down in the tenth edition thereof the rule that such comment is allowable."

And the court referred to the earlier rule in Missouri as expressed in State v. Musick, 101 Mo. 271, 14 S. W. 214, in which it was said:

"These statements made by the state's witnesses were not denied by defendant, and therefore stand admitted, as much so as if the defendant had admitted them in terms."

We think that the opinion in Reagan v. United States, 157 U. S. 301, 15 Sup. Ct. 610, 39 L. Ed. 709, should be taken as affirming, in substance, what was said of the rule so expressed in State v. Larkin. In that case Mr. Justice Brewer, for the court, referring to the act of March 16, 1878, said:

"On the other hand, if he avail himself of this privilege, his credibility may be impeached, his testimony may be assailed, and is to be weighed as that of any other witness. Assuming the position of a witness, he is entitled to all its rights and protections, and is subject to all its criticisms and burdens. It is unnecessary to consider whether, when offering himself as a witness as to one matter, he may either, at the will of the government or under the discretion of the court, be called upon to testify as to other matters. That question is not involved in this case, and we notice it simply to exclude it from the scope of our observation. The privileges and limitations to which we refer are those which inhere in the witness as a witness, and which affect the testimony voluntarily given. As to that, he may be fully cross-examined. It may be assailed by contradictory testimony. His credibility may be impeached, and by the same methods as are pursued in the case of any other witness. The jury properly consider his manner of testifying, the inherent probabilities of his story, the amount and character of the contradictory testimony, the nature and extent of his interest in the result of the trial, and the impeaching evidence in determining how much of credence he is entitled to."

In Brown v. Walker, 161 U. S. 591, 597, 16 Sup. Ct. 644, 647 (40 L. Ed. 819) the court said:

"Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and disclosed his criminal connections, he is not permitted to stop, but must go on and make a full disclosure."

In Fitzpatrick v. United States, 178 U. S. 304, 316, 20 Sup. Ct. 944, 949 (44 L. Ed. 1078) the court said:

"While the court would probably have no power of compelling an answer to any question, a refusal to answer a proper question put upon cross-examination has been held to be a proper subject of comment to the jury"—citing State v. Ober, 52 N. H. 459, 13 Am. Rep. 88.

In State v. Ober, so cited, the court said:

"Upon the whole, we are unable to reach any other conclusion than that the respondent's testimony, so far as it went (and not less the fact that it went no further), his refusal to submit to a full cross-examination, within proper limits, after waiving his constitutional privilege, and all his conduct and demeanor, were proper matters for comment by counsel and court, as well as for the consideration of the jury."

How the Circuit Court of Appeals for the First Circuit understood the decision in the Fitzpatrick Case is shown in Jacobs v. United States, 161 Fed. 694, 699, 88 C. C. A. 554, 559, where Judge Putnam said:

"He offers himself as a witness, and therefore puts himself in the position of any other witness, so far that he may be examined with reference to anything pertinent to the case and admissible in evidence therein."

Very numerous decisions of the state courts may be cited which support the ruling of the court below in giving the instruction which is assigned as error. Thus, in State v. Tatman, 59 Iowa, 471, 13 N. W. 632, the court said:

"The attention of the jury may properly be called to the fact that the defendant has not testified as to a certain part of the case."

In Comstock v. State, 14 Neb. 205, 15 N. W. 355, it was held that a failure of the defendant to contradict a fact within his personal knowledge is in the nature of an admission of such fact. In Heldt v. State, 20 Neb. 492, 30 N. W. 626, 57 Am. Rep. 835, the court held that the district attorney may comment on such omission. In State v. Ulsemer, 24 Wash. 657, 64 Pac. 800, it was held that comment might be made upon the defendant's failure to deny incriminating facts in the evidence. The court said:

"He assumes the character of a witness * * * the same as any other witness."

The same rule has been applied in Kansas (State v. Glave, 51 Kan. 330, 33 Pac. 8), and in Alabama (Cotton v. State, 87 Ala. 103, 6 South. 372). In Clarke v. State, 87 Ala. 71, 6 South. 368, the court said:

"Like any other witness he must submit to cross-examination, and his failure to explain any fact or circumstances in his knowledge tending to exculpate him, is a proper subject of comment by the prosecution."

In Lee v. State, 56 Ark. 4, 19 S. W. 16, it was held that the failure of one charged with crime to testify in his own behalf shall not create a presumption against him, and does not prevent the prosecuting attorney commenting on defendant's failure to deny certain testimony in

relation to facts of which he must have had knowledge. In Brashears v. State, 58 Md. 568, the court in a similar case said:

"His conduct on the witness stand, and his silence, when testifying, as to matters within his knowledge, were circumstances which the jury had a right to consider in deciding upon the credit due to the witness, in connection with the other facts proved in the case, and they were, therefore, necessarily circumstances upon which the state's attorney had a right to comment in addressing the jury."

In State of Nevada v. Harrington, 12 Nev. 125, 130, the court said:

"Our conclusions are that, if the defendant in a criminal action voluntarily testifies for himself, the same rights exist in favor of the state's attorney to comment upon his testimony, or his refusal to answer any proper question, or to draw all proper inferences from his failure to testify upon any material matter within his knowledge, as with other witnesses."

Many other cases may be cited to the same effect, and the text-books adopt the rule thus expressed as established by a uniform line of decisions. In Wharton's Criminal Evidence, § 681, it is said:

"But if the defendant, having full opportunity to do so, failed on the stand to controvert that which was testified against him, this may be regarded, when the matter is one within his personal knowledge, as an admission of the truth of such testimony."

And such, we think, is the meaning of the decisions of the Supreme Court of the United States, cited above, and epitomized in Sawyer v. United States, 202 U. S. 150, 165, 26 Sup. Ct. 575, 579 (50 L. Ed. 972, 6 Ann. Cas. 269), where it is said:

"It has been held in this court that a prisoner who takes the stand in his own behalf waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime."

We take this to mean that the waiver of the constitutional privilege of a defendant in a criminal case is a complete waiver, and places the defendant in the same attitude as that of a defendant in a civil action who testifies in his own behalf.

The plaintiff in error waived his privilege of silence when he took the witness stand and testified as to the subject-matter of the offense with which he was charged. He testified at length and in detail as to his relations with the two girls and his codefendant covering a considerable period of time, and ending abruptly at the railroad station at a late hour of the night on which the party took the train for Reno. There he stopped. He made no denial of the testimony that he purchased the train tickets and procured the drawing room on the Pullman car, or that the drawing room was actually occupied by the members of the party in the manner in which the girls testified that it was. Nor did he deny his participation in the discussion of the plan of securing a cottage or bungalow at Reno in which the party were to live during their stay at Reno. The jury, even in the absence of instruction from the court, would inevitably have taken his omission to testify as to those incidents to be an admission of the facts testified to by the two girls.

[2-4] Error is assigned to the denial of defendant's request for an instruction that the jury should determine from the evidence and circumstances whether Marsha Warrington and Lola Norris, or either of them, were accomplices of the defendants, and that, if it was found that they were, the testimony of an accomplice should be received with caution and weighed and scrutinized with great care by the jury, and that the jury should not regard the testimony of an accomplice, unless she is confirmed and corroborated in some material parts of her evidence. To this it is to be said:

First. A refusal to instruct as to the value of the testimony of an accomplice is not error for which a judgment should be reversed. In Holmgren v. United States, 217 U. S. 509, 523, 30 Sup. Ct. 588, 592 (54 L. Ed. 861, 19 Ann. Cas. 778), the court said:

"It is undoubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them."

Other courts also have said that such was the better practice, but, as the rule is stated in 2 Bishop, New Crim. Procedure, 1169, "they are not as of law required to give this advice."

Notwithstanding the views expressed by the Supreme Court in the Holmgren Case as to the better practice, that court and the federal courts generally have held that corroborating testimony is not necessary to support a conviction. This court so held in Lung v. United States, 218 Fed. 817, 134 C. C. A. 505. And it is believed that no court, state or federal, has held that it is reversible error to refuse to caution the jury to scrutinize with care the testimony of an accomplice. In Cheatham v. State, 67 Miss. 335, 7 South. 204, 19 Am. St. Rep. 310, the court said:

"The suspicion with which the testimony of accomplices is received by the courts, and their unwillingness to sustain convictions resting wholly upon the uncorroborated evidence of such persons, has led to the very general practice of advising juries to act with great prudence and suspicion upon such evidence, and to acquit unless there is corroboration in material particulars. But our researches have failed to discover a case in which a conviction has been set aside by reason of the court refusing so to instruct or advise."

The court, in that case, cited State v. Haney, 19 N. C. 390, in which, it was said, the Supreme Court of North Carolina had declared the true rule upon the subject, which was that:

"The practice of giving such instructions or advice to the jury rests in the discretion of the presiding judge, and his refusal so to do is not assignable as error." "No one," said the court, "can require the judge to give an instruction to the jury, except on the law of the case. The judge may caution them against reposing hasty confidence in the testimony of an accomplice. It is usual, justifiable, and, we add, it is proper, to do so, where he has cause to apprehend that the jury may feel themselves bound to find a verdict conforming to the positive testimony of the witness, without weighing the circumstances of suspicion and distrust under which his testimony is rendered."

See note to Commonwealth v. Price, 71 Am. Dec. 678, in which a large number of cases are cited to the same effect.

In the present case the court instructed the jury that the evidence must be such as to satisfy their minds beyond a reasonable doubt and

to a moral certainty, and said that they should take into consideration the character and conduct of each witness, his relation to the controversy and to the parties, his expressed or apparent bias or partiality, the reasonableness or unreasonableness of the statements he makes, and all other elements which tend to throw light upon his credibility.

Second. We are of the opinion that as to the counts of the indictments on which the defendants were found guilty neither Marsha Warrington nor Lola Norris was an accomplice, for, while there was testimony on which, if credited, Marsha Warrington might have been deemed an accomplice of the defendants in persuading, inducing, and enticing Lola Norris to go to Reno, under the last two counts of the indictments that question is eliminated from the case by the verdict of the jury in acquitting each of the defendants on those counts.

"The test by which to determine whether one is an accomplice is to ascertain whether he could be indicted for the offense of which the accused is being tried." 12 Cyc. 445.

"Where a penal statute is intended for the protection of a particular class of persons, one of that class does not become an accomplice by submitting to the injury." 1 McClain, Criminal Law, § 199.

Thus it is universally held that a woman on whom an abortion is committed is not an accomplice, although she assents to the act. But one may sustain such relation to an offense that, while not an accomplice in the commission of that offense, he may be indicted for a conspiracy to commit the offense. This was what was decided in United States v. Holte, 236 U. S. 140, 35 Sup. Ct. 271, 59 L. Ed. ——. There it was held that it was not impossible for a woman transported in violation of the act of June 25, 1910, to be guilty of crime in conspiring for the commission of that offense. The court said:

"A conspiracy to accomplish what an individual is free to do may be a crime."

And the ruling of the court was illustrated by a reference to the crime of abortion, as to which, said the court:

"A woman may conspire to procure an abortion upon herself when under the law she could not commit the substantive crime, and therefore it has been held she cannot be an accomplice."

The court recognized the parity between the offense committed in transporting, or causing to be transported, a woman under the act of June 25, 1910, and the crime of abortion, and the rule that, while the person as to whom either offense is committed cannot be an accomplice, she may be prosecuted as a co-conspirator to procure the commission of the offense.

[5] It is said that the trial court erred in compelling the defendant Diggs to testify to certain matters which were not the proper subject of cross-examination. In his direct testimony he had referred to conversations between the parties which took place just prior to the Reno trip, and in his direct examination he had said:

"I got the full information of all the trains and also the cost of transportation between different places from Sacramento to various positions. The next train leaving town was 10:45, the eastward train, and we all agreed to catch that train."

On his cross-examination, without objection, he had testified:

"I met Miss Warrington and Miss Norris frequently the first week preceding our trip to Reno."

And again he had said, also without objection:

"We left for Reno two weeks after meeting her on the levee."

Again he had said:

"I believe that was one week before we left for Reno on a Sunday night."

And again:

"That night we went to Reno."

After this testimony had been given, counsel for the government propounded this question:

"Q. In your testimony you have referred repeatedly to conversations and conferences that took place before the Reno trip. Now, what did you understand or mean by the Reno trip?"

The question was objected to as not cross-examination. The court overruled the objection and remarked:

"He is not asking him what occurred on that trip. He is simply identifying the trip."

The witness answered:

"It is perfectly evident what trip it was."

And in answer to the question:

"On that trip were you accompanied by Mr. Caminetti, Miss Norris, and Miss Warrington?"

—the question was objected to as not cross-examination, and the witness answered:

"They were along; yes."

We are unable to see upon what ground it can be held that the testimony so admitted constituted error for which the judgment should be reversed. After the witness had referred frequently to the "Reno trip," it was not improper to ask him to identify the trip, and that was all that was done.

[6] It is contended that there was misconduct of counsel for the prosecution, permitted and condoned by the trial judge, prejudicial to the defendant Diggs, in that counsel for the government was permitted to ask of the said defendant on his cross-examination whether, during the course of the trial, and during the cross-examination of Marsha Warrington, he had not repeatedly suggested to his counsel questions to be propounded to her. Marsha Warrington on her cross-examination had testified as to her intimate relations with Diggs, in answer to questions propounded by the latter's counsel. Following this, and while Diggs was on cross-examination, he was asked:

"Didn't you suggest that question to your counsel? A. Well, I suggested that to my counsel a long time before I came into the courtroom; * * * that suggestion may have been made by me during the cross-examination of Miss Warrington. I won't say that I did not make the suggestion."

In view of that testimony, there was clearly no error in the ruling of the court upon the question which is presented in the assignment of error. It follows that it is not ground for reversing the judgment in the Diggs case that counsel for the government remarked:

"Counsel for the defense, prompted by the defendant, put these questions to Marsha Warrington."

[7] Error is assigned to certain statements and animadversions made by the government counsel as to the facts before the jury, the guilt of the defendants, the sanctity of the home, and the importance of the cases under consideration. The remarks of counsel principally complained of in both cases are the following:

"The eyes of not only the people of the state of California are upon you, gentlemen of the jury, awaiting your verdict in this case, but the people of all these United States; 60,000,000 or 90,000,000 people are awaiting your verdict in this case."

Upon objection of counsel for the defendants, the court observed:

"That is merely a form of speech"

—and directed counsel to confine himself to the evidence.

Again counsel for the government, in addressing the jury, said:

"Gentlemen, if there is any depraved man in the world, if there is any man who has sunk to the uttermost depths of depravity, it is that man in form, because he is a man in form alone, who seduces an innocent girl and then exposes her shame to the world. If he had one redeeming trait of character in his composition, having blasted the life of that virgin, he ought to be willing to take 50 years in the penitentiary before he would come before a jury of his fellow citizens, and before the world, and say, Yes, I seduced that girl; before he would come before a jury of his fellow citizens and recount time after time when he had illicit intercourse with this girl. A decent man would die first."

In the Diggs case objection was made by his counsel, Mr. Devlin, as follows:

"If your honor please, I except to that, because no such language came from the defendant; it all came from Marsha Warrington.

"Mr. Roche: It came from Marsha Warrington upon your cross-examination for the first time.

"Mr. Devlin: We had a right to cross-examine her.

"The Court: Mr. Sullivan, confine yourself to the evidence; don't transgress it."

In the Caminetti case counsel for the government said:

"The government of these United States, gentlemen of the jury, whom we have the honor to represent here, your government, as well as my government, the government of all of us, demands that the laws enacted for the protection and preservation of its young and decent women be adequately and rigidly enforced. An acquittal in this case would be a miscarriage of justice, and it would be a blot upon the fair name and escutcheon of California."

In this connection it is to be observed that in charging the jury the court said:

"I should suggest to you, gentlemen, that the statements or declarations of counsel made at the bar are in no sense evidence for your consideration. You are to confine your consideration alone to the evidence that has been admitted before you from the witness stand or in the way of exhibits or other physical objects which may have been laid before you."

And the court admonished the jury that they must not permit them-
selves to be influenced in their verdict by the fact that the case had
attracted so much attention and given rise to so much controversy in
the public press, in the halls of Congress, and among the people. The
court said:

"Those facts are wholly extraneous to your inquiry or to mine, and we
have nothing whatsoever to do with them. They in no way affect the merits
of the case, and you should be careful to avoid permitting any feeling of bias
or prejudice flowing therefrom to find reflection in your verdict."

Counsel for the defendants were apparently satisfied with these in-
structions, and they made no request in either case that the jury be
instructed to disregard the remarks of counsel. It is the general rule
that improper remarks in argument by the prosecuting attorney, al-
though prejudicial, do not justify reversal, unless the court has been
requested to instruct the jury to disregard them, and has refused to
do so. 12 Cyc. 585. In People v. Shears, 133 Cal. 154, 65 Pac. 295,
it was held that, where the defendant did not invoke the action of the
court to instruct the jury that it was improper, and to disregard it,
but merely excepted to the remarks of the district attorney, the im-
propriety is not ground for reversal of the judgment, upon conviction
of manslaughter. A similar ruling was made in People v. Babcock,
160 Cal. 537, 117 Pac. 549.

In Dunlop v. United States, 165 U. S. 486, 498, 17 Sup. Ct. 375, 379
(41 L. Ed. 799) the court said:

"There is no doubt that, in the heat of argument, counsel do occasionally
make remarks that are not justified by the testimony, and which are, or may
be, prejudicial to the accused. In such cases, however, if the court interfere,
and counsel promptly withdraw the remark, the error will generally be
deemed to be cured. If every remark made by counsel outside of the testi-
mony were ground for a reversal, comparatively few verdicts would stand,
since in the ardor of advocacy, and in the excitement of trial, even the most
experienced counsel are occasionally carried away by this temptation."

In Chadwick v. United States, 141 Fed. 225, 245, 72 C. C. A. 343,
363, language was employed by the district attorney more inflamma-
tory and more subject to objection, we think, than the language used
by the counsel for the government in the case at bar. In that case
the defendant objected and excepted, and no ruling was made by the
court. Judge Lurton, for the Circuit Court of Appeals, in reviewing
the exception, held that there was no reversible error, and said:

"There is a degree of liberty allowable to counsel, whether for the govern-
ment or the accused, in respect to the line of argument they shall pursue
and the inferences to be drawn from the evidence, which a trial judge should
respect until the facts of the case are overstepped or arguments used which
plainly abuse the privilege. * * * But to entitle the accused to a re-
versal, when objection is made and the language not withdrawn, it must ap-
pear that the matter objected to was plainly unwarranted and so improper
as to be clearly injurious to the accused."

In Johnston v. United States, 154 Fed. 445, 83 C. C. A. 299, this
court in a similar case said:

"The use of language by counsel, calculated to prejudice a defendant and
not justified by the evidence, is improper and censurable, and should be dis-
countenanced by the court. In such a case, it is the duty of the trial court

to set aside the verdict, unless satisfied that the improper language was not instrumental in securing it. But invective based on the evidence and inferences legitimately to be derived therefrom are not inhibited, and it is usually within the discretion of the trial court to determine whether or not the limits of professional propriety have been exceeded. Ordinarily the exercise of that discretion will not be reviewed in an appellate court, unless the invective is so palpably improper that it may be seen to have been clearly injurious."

We discover nothing so offensive or inflammatory in the remarks of counsel for the government as to require us on that ground to reverse the judgments. The trial judge, in the exercise of the discretion vested in him, did not regard the language of counsel as of sufficient importance to call for further interference or action on his part than as indicated in the above excerpts from the record, and therein, we think, there was no abuse of discretion.

[8] It is contended that the court in its instructions gave to the words "concubine" and "mistress" too wide and inclusive a meaning, and it is argued that the defendants, by transporting the women for the purpose of making them their concubines and mistresses, were not guilty of the offense defined in the act, and that the words "prostitution or debauchery, or any other immoral practice," do not include concubinage, and that the immorality denounced by the White Slave Traffic Act is only commercialized vice. The federal decisions are against these contentions. Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 43 L. R. A. (N. S.) 906, 57 L. Ed. 523, Ann. Cas.1913E, 905; Athanasaw v. United States, 227 U. S. 326, 33 Sup. Ct. 285, 57 L. Ed. 528, Ann. Cas. 1913E, 911; United States v. Bitty, 208 U. S. 393, 28 Sup. Ct. 396, 52 L. Ed. 543; United States v. Flaspoller (D. C.) 205 Fed. 1006; Johnson v. United States, 215 Fed. 679, 131 C. C. A. 613.

[9] It is assigned as error that the court refused to instruct, as requested by the defendants, that in considering the testimony of Marsha Warrington, and the weight to be given thereto, they might consider her motive in testifying, "whether or not she has been or appears to be, acting under the influence of any person or persons, whether or not any promise of immunity has been offered to her, and any hope she may have for leniency in any criminal action brought against herself." It is sufficient in answer to this assignment to point to the fact that there is in the record no evidence tending in any way to show that there had been a promise of immunity to Marsha Warrington, or that she was acting under the influence of any person or persons.

[10] It is urged that there was no evidence on which to find that Caminetti took any part in transporting the girls from Sacramento to Reno, but that, on the other hand, the evidence was that the tickets were purchased by Diggs alone. The record does not sustain this contention. There are many items of the testimony which show that the journey to Reno was the result of the preconcerted action of both Diggs and Caminetti, and with a view to achieve a common purpose, which was, in fact, accomplished. Thus Lola Norris testified that, on the afternoon of the day on which they started for Reno, the four were together in a box at a restaurant, and that:

"When we agreed on Reno, just before Mr. Caminetti left, he gave me $20. I don't know whether he wanted me to buy my own, or buy my own and Miss Warrington's together."

Again she testified that on the same occasion Diggs said:

"Some one would have to manage the party, and the others would have to abide by his decisions. And so Mr. Caminetti said, 'I will make you the boss,' and so Mr. Diggs took charge of the party. Mr. Caminetti and Mr. Diggs were to share the expenses."

She testified that thereafter Caminetti left in search for money with which to pay for the trip, and that on his return—

"he said he had been having quite a time trying to locate the party who was to give him the money, but he finally succeeded in finding him, and he secured the money, and we all went down to the depot again. We reached the depot about 15 minutes before the train left, I think. Mr. Diggs went to the ticket office and bought the tickets."

She testified, also, that while Diggs was buying the tickets Caminetti—

"just stood there with us. * * * I heard no objection made by Caminetti to the suggestion of Mr. Diggs that he purchase the tickets."

There was testimony that Caminetti and Diggs together rented the bungalow in Reno which was occupied by the party, and that while there he ordered and paid for groceries to be sent to the bungalow. In view of these features of the evidence, and others not necessary to recount, the court below properly instructed the jury as follows:

"As to the question which has been argued by counsel whether the evidence is sufficient to show that the defendant transported, or aided or assisted in transporting, these girls to Reno, you will understand that it is not necessary, to sustain this charge, that the defendant be shown to have himself paid for the tickets or other expenses of that trip. If he contributed to the means of paying such expenses, or if it was understood between himself and Diggs that he was thereafter to contribute thereto by reimbursing Diggs, this would be sufficient on which to sustain the charge that the defendant aided and assisted in such transportation."

[11] It is contended that the instructions to the jury were erroneous, in that thereby the jury were led to believe that the defendants were merely charged with seducing the women named in the indictment, and that, if the jury so found, they might find the defendants guilty. This contention is not sustained by the record. It appears therefrom that the court read to the jury the indictment, in which it was charged that each defendant transported and caused to be transported the two girls named "for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of the said defendant," and in which the same allegation was made as to Lola Norris  The court also read the statute and explained the meaning of its terms, and, among other things, charged the jury that if they found that these girls were taken to Reno on the occasion in question, as testified to by them, and that while there the defendant Diggs and his companion, Caminetti, cohabited with them as the testimony tends to show, "then you may find that they were taken there with the immoral purpose and intent

charged." In the instructions the court defined the terms "concubine" and "mistress" and the term "debauchery" as used in the statute; and it is clear from the whole of the instructions that the jury must have fully understood the nature of the charges against each defendant.

Since writing the above our attention has been directed to the recent decision of the Circuit Court of Appeals for the First Circuit, in Myrick v. United States, 219 Fed. 1, in which the majority of that court, Judge Putnam dissenting, reversed the judgment of the District Court and followed the rule announced in Balliet v United States, 129 Fed. 689, 64 C. C. A. 201, above cited. In the majority opinion in that case reference is made to the fact "that the question has not been definitely decided by the Supreme Court." We still entertain the opinion, however, that the language of the statute and the utterances of the Supreme Court which we have cited are sufficiently broad and inclusive to justify the view which we have taken of the effect of the act of March 16, 1878. In this day of enlightened jurisprudence it is believed that the protection against self-incrimination conserved by the fifth amendment is to be classed with other bars which the rules of the common law placed against the admission of evidence of the truth, as to which, said Judge Dillon in State v Gigher, 23 Iowa, 318, "the tendency of modern legislation and modern decision is to remove these bars and to let in the light." But protection against self-incrimination is still afforded in the provision that the defendant may or may not testify for himself as he may elect. We think that when he elects to become a witness he waives his constitutional privilege against self-incrimination, and that the true rule is stated in Wigmore on Evidence, § 2276 (2):

"The case of an accused in a criminal trial, who voluntarily takes the stand, is different. Here his privilege has protected him from being asked even a single question, for the reason that no relevant fact that could be inquired about would not tend to incriminate him. On this very hypothesis, then, his voluntary offer of testimony upon any fact is a waiver as to all other relevant facts because of the necessary connection between all.".

And (2) (d):

"The subject of the direct examination, properly construed, is the whole fact of guilt or innocence, and hence the topic of cross-examination might always range over any relevant facts, except those merely affecting credibility."

There are numerous other assignments of error, which we have carefully considered, but in none of them do we find ground for reversing either of the judgments.

Finding no error, the judgments are affirmed.

WOLVERTON, District Judge (concurring). I am constrained, by reason of the importance of the cases under consideration, to set forth my views particularly touching the instructions of the trial court relative to the failure of the defendants, if such were the case, to deny or explain acts of an incriminating nature that the evidence of the pros-

ecution established against them, they having taken the witness stand in their own behalf. In order to a clear understanding of the view I entertain, it is essential that we get a comprehensive view of the situation.

First, as to the Diggs case. Diggs was indicted by six counts. By the first, he is charged with transporting Marsha Warrington from Sacramento, in California, to Reno, in Nevada, for the purpose of debauchery, and for an immoral purpose, namely, that she should become his concubine and mistress; by the second, that he transported Lola Norris from and between the same points, that she might become the mistress and concubine of F. Drew Caminetti; by the third, that he (Diggs) procured a ticket for Marsha Warrington from Sacramento to Reno, with the intent and purpose that she should become his concubine and mistress; by the fourth, that he procured a ticket for Lola Norris, with the intent and purpose that she should give herself up to debauchery, and for an immoral purpose, to wit, that she should become the concubine and mistress of one F. Drew Caminetti; by the fifth, that he (Diggs) persuaded, induced and enticed Marsha Warrington to go from Sacramento to Reno for the purpose of debauchery, and for an immoral purpose, to wit, that she should become his concubine and mistress; and by the sixth, that Diggs persuaded and enticed Lola Norris to go from Sacramento to Reno for the purpose of becoming the concubine and mistress of F. Drew Caminetti. Diggs was convicted on the first four counts, and acquitted on the last two. The elements of the offenses charged are few and simple, and comprise the transportation, the buying of the tickets, the persuasion and inducement, and the purpose with which these things were done. All were the subject of inquiry at the trial.

The story of Marsha Warrington as a witness runs from her first meeting with Diggs in September, 1912, to the time that the four were apprehended and placed under arrest in Reno, Nev. She tells of her acts and demeanor with relation to Diggs, and of his acts and demeanor toward her, of improper relations with him from time to time, of a trip to San Francisco with Diggs, Caminetti, and Miss Norris during the month of February, 1913, of Diggs' registering under a fictitious name with her as man and wife, of occupying the same room with him at the hotel during the night, of their going on to San Jose, where they were again registered as man and wife, and occupied the same room in the hotel for another night, of the party of the four who met at the house of Diggs in the absence of his wife in January before the Reno trip, and then in much detail the discussions between herself and Diggs, and the four of them, and what they did leading up to the final determination to go to Reno; also of what was done in procuring transportation, what was done on the way, and what was done in Reno. It was a connected story from the beginning to the end. In all material particulars she was corroborated by Lola Norris.

Maury I. Diggs, after the government had rested, took the stand as a witness in his own behalf. He narrated in great detail the history of his relations with Marsha Warrington, and the many troubles that came to him from their acts and conduct prior to the Reno trip, and also of the relationship existing between Caminetti and Lola Norris,

and of the relationship of the four, charging Marsha Warrington with having had improper relations with him at the time the four were met at Diggs' house in the absence of his wife, a thing that Marsha Warrington denied. Continuing, Diggs dwelt at length upon the discussions had, and what happened between him and Marsha Warrington, and among the four of them, relative to his and Caminetti's leaving Sacramento for a while, owing to the reports of scandal that had arisen and the trouble in which they were involved. He relates that the first conversation he had with Marsha Warrington with respect to his leaving the city was on the Southern Pacific levee. This was two weeks and one day before March 9th, the Reno trip having been entered upon on the 10th. Then he tells of other conversations had with her, and with Caminetti and Lola Norris, relative to his and Caminetti's leaving the city for a while to escape the odium that was threatening if they remained. One conversation he specifies as having taken place while they were on an automobile ride, when he suspected they were being followed; another during the last week, ending March 9th, at the Columbia Hotel, in Sacramento, where Diggs was in hiding, he having called Marsha Warrington up and advised her of his whereabouts; another he names as having taken place at the Peerless Restaurant. This was on Saturday. He says:

"Then there was another conversation Sunday afternoon. That was out at Twenty-Eighth and J street. I believe I had called Miss Warrington up and made an appointment to meet her out there at the Park. That was relative to my going away. I still maintained that I was going South to get away from all this trouble. Miss Warrington said, 'Well, I have thoroughly made up my mind I am going, too. I am going with you.' * * * The proposition was thoroughly settled right there, that we were going to get out of town. We had not talked at that time of exactly where we would go, or anything of the kind; but I was very much of the opinion that I wanted to go to Los Angeles, owing to the fact that I had a lot of friends there that had lived there, and thought for a week or so I could have a good time down there, and come back home, and everything would be all right. I did not intend to take the girls. I did not care whether they went with me or went alone. In fact, I wanted Miss Warrington to stay. * * * After leaving Miss Warrington and Miss Norris in the Park, Miss Warrington had prevailed upon Miss Norris that she should go with her, and the girls said that we would meet at the Saddle Rock Restaurant at 8 o'clock. So I early made up my mind that I was going to leave town, and I agreed to meet them there."

From there he went home to his wife. He continues with his story:

"After I got in my house I thoroughly made up my mind to go and see my father and ditch the appointment with the girls, and not see them any more, and take a chance on the whole business. I told my wife good-by. * * * Mr. Hamilton rode as far as Eighth and J, and got off the car, and I went to the depot with the full intention of going on that train and coming to Berkeley and seeing my father. I missed the train by 5 minutes, owing to the fact that I had stopped at the office to get the suit. The car did not get me there in time. I turned around and came back and went to the restaurant. The girls were not there. I went to the cigar store next door and shook dice for cigars, the 'twenty-six' game. In a few minutes, a little after 8 o'clock, I believe, the girls showed up. * * * In the meantime Mr. Caminetti showed up on the scene. He was pretty much under the influence of liquor. He says, 'Well, what is doing?' I said, 'Well, I am going, and the girls say they are going, too.' He said, 'Where are you going?' I said, 'I don't know; anything to get out of town for a while.' He said, 'Well, I haven't got any money; I will go down town and get some,' which he did."

220 F.—36

Here Diggs relates that he went out and made inquiry as to the time of departure of all trains leaving Sacramento that night. Then he continues:

"So the thing came up; the next train leaving town was 10:45, the eastbound train, and we all agreed to catch that train. I called Mr. Caminetti up on the telephone again. * * * He did not show up for that train. Miss Warrington and Miss Norris and I went over to the depot. When the train got ready to go, I thoroughly made up my mind between the restaurant and the depot that I did not care who went, or who was ready to go, or anything else; if the crowd was not ready to go, I was going alone; I was going to get out of town. Mr. Caminetti did not appear. Miss Norris, I believe, stayed in the little car house, the street car station at the end of the line, at the depot. Miss Warrington walked over to the Southern Pacific Station with me, and the train stopped. We were contemplating about taking it. Marsha said to me, 'Now,' she said, 'You go on and take the train; if your wife is wise to me, I am scared to death; I am afraid she will cause you harm or trouble, or have you arrested, and you better get out of here.' I was contemplating in my own mind whether to take the train or not. Then I believe I said to Marsha, 'No, I will not take that train.' I said, 'If there is going to be any staying here, I am no piker, and I will stay here and face this whole thing with the rest of you; I am not going to go away and leave you here.' Then we went back to the restaurant. Mr. Caminetti did not appear, so we went back to the restaurant. * * * We all talked over again the serious condition that we were in and where we would go. There was no specific place mentioned at the time during the conversation as to where we would go; no terminal point at all. We merely talked over different routes and different lines and different times of arrivals of different trains going out of Sacramento to the different places. There was no positive terminal settled upon at all. That is about all that occurred there. At this time Caminetti had not got back yet. In nearly every conversation we had, when we spoke of our conditions and the probable arrest of us—us boys, I mean— Marsha or Lola, either one, invariably would ask, 'What will they do to us? What will happen to us if these things come out?' From our meager knowledge of the law, we explained to them as near as we could what would happen if anybody chose to press them, and they thereupon would ask, 'Who will press us?' I cannot remember all the questions they asked, but Miss Warrington asked me what my wife could do to her if she knew she was keeping company with me; and I told her that, owing to the fact that she was not 21, I thought— I said I was not straight on the Juvenile Law, but I believed she could institute proceedings against her through the Juvenile Court if she wanted to. I also told her that if she had any money my wife could sue her for alienation of her husband's affections. That was told her upon her request as to what would happen to her."

Thus ended the examination in chief of Diggs, testifying in his own behalf.

The testimony of the government shows, and it is not disputed, that the four took the train later on the same night for Reno. On cross-examination Diggs says: "We left for Reno two weeks after meeting her on the levee." And again he says, referring to a ride about town: "That was one week before we left for Reno." Further on he was asked: "In your testimony you have referred repeatedly to conversations and events that took place before the Reno trip. Now, what did you understand to mean by the Reno trip?" To which he answered, over objections: "It is perfectly evident what trip it was." And so it was, without question.

Now, the purpose of the defense in offering the testimony of Diggs to the point where he terminated it was threefold: First, to show that there was no persuasion or inducement on his part, causing the girls to

go on the trip; second, to discredit the girls; and, third, to shade the purpose for which the girls were taken or went upon the trip. This comprehends practically the whole case, except the fact of the purchase of the tickets and the transportation from Sacramento to Reno. And yet these latter are so conjoined in time and circumstance with the former that there is no discernible line of cleavage whereby the testimony touching the one set of facts may be cut off from its relation to the other.

I am firmly persuaded that the defendant, having taken the stand and offered his testimony upon the merits of his case, and having entered into it in part, rendered himself amenable to cross-examination as to the whole, and, further, when he sought to show that the girls went upon the journey of their own free will and accord, without persuasion and inducement upon his part, then that his acts and demeanor at the time of leaving, including the purchase of tickets, and while upon the trip and at Reno, became subjects of perfectly legitimate inquiry to test the accuracy of his own rendition of how they all came to go upon the same journey. A defendant cannot tell a half story touching his defense, which is a half story from his standpoint of the merits of the case, then abruptly stop in his course and decline to answer further, and expect to reap the benefit for himself to be derived therefrom, without incurring the discredit that is, by the rules of evidence and legal inference, visited upon the ordinary witness pursuing a like course. Mr. Wigmore, in his work on Evidence (volume 4, § 2276, subd. 2), states the rule very succinctly which I think is applicable in the present case. After having discussed the rule applicable in the case of an ordinary witness, he says:

"The case of an accused in a criminal trial, who voluntarily takes the stand, is different. Here his privilege has protected him from being asked even a single question, for the reason that no relevant fact that could be inquired about would not tend to criminate him. On this very hypothesis, then, his voluntary offer of testimony upon any fact is a waiver as to all other relevant facts, because of the necessary connection between all. His situation is distinct from that of the ordinary witness, with reference to the point of time when a waiver can be predicated, because the ordinary witness is compelled to take the stand in the first instance, and his opportunity for choice does not come till later, when some part of the criminating fact is asked for, while the accused has the choice at the outset. From the point of view of the actual prescience of witness and accused, the result is the same. Each knows well enough that the inquiries will be upon topics relevant to the charge in issue; but that is immaterial. The question is: What does he know as to the connection between the first question and a possible subsequent incriminating question? Now, the accused knows that there must always be such a connection, and, if there is not, then his answer cannot be a waiver. The result is, then, that the accused, as to all facts whatever (except those which merely impeach his credit, and therefore are not related to the charge in issue), has signified his waiver by the initial act of taking the stand."

Further on he says (subdivision "d"):

"The subject of the direct examination, properly construed, is the whole fact of guilt or innocence, and hence the topic of cross-examination might always range over any relevant facts except those merely affecting credibility."

So it is said, in State v. Wentworth, 65 Me. 234, 243 (20 Am. Rep. 688):

"If he [defendant] discloses part, he must disclose the whole in relation to the subject-matter about which he has answered in part. * * * Answering truly in part with answers exonerative, he cannot stop midway, but must proceed, though his further answers may be self-incriminative. Answering falsely as to the subject-matter, he is not to be exempt from cross-examination because his answers to such cross-examination would tend to show the falsity of those given on direct examination. If it were so, a preference would be accorded to falsehood rather than to truth."

And again it is said, in State v. Ober, 52 N. H. 459, 13 Am. Rep. 88:

"Having testified concerning a part of the transaction, in which it was alleged that he was criminally concerned, without claiming his constitutional privilege, it was too late for him to halt at that point which suited his own convenience."

See, also, Connors v. People. 50 N. Y. 240; Stover v. People. 56 N. Y. 315; Heldt v. State, 20 Neb. 492, 30 N. W. 626, 57 Am. Rep. 835; Lee v. State, 56 Ark. 4, 19 S. W. 16; Clarke v. State, 78 Ala. 474, 56 Am. Rep. 45; State v. Tatman, 59 Iowa, 471, 13 N. W. 632; State v. Larkin, 250 Mo. 218, 157 S. W. 600, 46 L. R. A. (N. S.) 13; State v. Raftery, 252 Mo. 72, 158 S. W. 585.

The Supreme Court has enunciated the same principle, while perhaps not deciding the exact question here involved. In Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 948 (44 L. Ed. 1078), the court says:

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf, and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor, without laying himself open to a cross-examination upon those facts. The witness having sworn to an alibi, it was perfectly competent for the government to cross-examine him as to every fact which had a bearing upon his whereabouts upon the night of the murder, and as to what he did and the persons with whom he associated that night. Indeed, we know of no reason why an accused person, who takes the stand as a witness, should not be subject to cross-examination as other witnesses are."

In this case reference is made to State v. Lurch, 12 Or. 99, 6 Pac. 408, and State v. Saunders, 14 Or. 300, 12 Pac. 441. But these cases fall clearly within the exception noted by Mr. Wigmore. The Oregon statute seems to limit the right of cross-examination to "all facts to which he [defendant] has testified." Sess. Laws 1880, p. 28.

In Sawyer v. United States, 202 U. S. 150, 165, 26 Sup. Ct. 575, 579 (50 L. Ed. 972, 6 Ann. Cas. 269), the court seems to have interpreted the rule slightly more broadly than was announced in the Fitzpatrick Case. It says:

"It has been held in this court that a prisoner who takes the stand in his own behalf waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief, with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime."

And again, in Powers v. United States, 223 U. S. 303, 315, 32 Sup. Ct. 281, 284 (56 L. Ed. 448), the court says:

"Having taken the stand in his own behalf, and given the testimony above recited, tending to show that he was not guilty of the offense charged, he was required to submit to cross-examination, as any other witness in the case would be, concerning matter pertinent to the examination in chief."

These cases, it would seem, in principle, decide practically the very, point in issue here. When it is once ascertained that the inquiry touching what was done at the depot on the night and at the time the four left for Reno, and what took place on the journey, and what happened at Reno, was proper and legitimate subject-matter for the cross-examination of Diggs, it follows with absolute persuasion that the court's instruction complained of was not error for which a reversal should be had.

The case of Balliet v. United States, 129 Fed. 689, 64 C. C. A. 201, would seem to be opposed to this view, but we are not advised respecting the testimony offered in chief, and are without light as to the precise relation which the inferences sought to be drawn bear to the matter testified to. Sanborn, Circuit Judge, in his concurring opinion, has this to say on the subject:

"But in the federal courts the line of demarcation which limits a rightful cross-examination is clear and well-defined. It is the line between subjects relative to which the witness was examined upon the direct examination and those concerning which he was not required to testify."

It may be that the defendant might be called to testify to some collateral fact—that is, as to some matter distinct from the real merits of the case and yet having some pertinent bearing—and not be subject to cross-examination as to the merits; as, for instance, if a defendant in a murder case were called to testify merely whether or not he was related to the deceased. In such a case it would be a strange stretch of the rule to hold that he could be cross-examined as to whether he committed the murder. But where a defendant has taken the stand, and has once entered upon a disclosure or a recital of part of the details relating to the offense charged, the offense charged becomes the subject-matter of the inquiry in chief, and the defendant subjects himself to cross-examination touching the entire subject-matter. And this is my position in the present case. With all due respect for the court deciding the Balliet Case, I am unable to adopt its conclusion.

In the very recent case of Myrick v. United States, 219 Fed. 1, the court was of the opinion:

"That the defendant Cunningham, by taking the stand and testifying as to the commissions paid to agents, did not waive his constitutional right to be free from unfavorable comment on matters to which his testimony did not relate, and as to which he said nothing."

This case I do not regard as opposed to the view here entertained.

I have discussed in particular the Diggs case. But the facts of the Caminetti case, although Caminetti did not go so minutely into the previous relationship existing between him and Diggs with Lola Norris and Marsha Warrington, bring it within the same principle, and the same conclusion would follow, Caminetti's especial purpose in testifying was to show the particular motive which induced him to embark upon the expedition.

· Upon all other questions in the case, I concur with the views expressed by Judge GILBERT in the prevailing opinion.

ROSS, Circuit Judge (dissenting). These are companion cases, the respective plaintiffs in error being companions in the transactions out of which the cases arose. The record and arguments in each case are much alike, and therefore the cases may be properly and conveniently disposed of together.

The party defendant in the first case tried in the court below—Diggs—was at the times in question about 26 years old, residing with his wife and one child in the city of Sacramento, where, according to the evidence he was somewhat prominent as an architect and otherwise.

The defendant in the other case—Caminetti—was about two years younger, and had a wife and two children with whom he resided in the same city, and where he occupied an official position of some consequence, and was also a man of some prominence. The two were close friends. Two girls, named respectively Marsha Warrington and Lola Norris, were at the same time living in the same city—the first mentioned with her father and stepmother, and the second with her parents, all of whom were respectable people.

In both cases there was testimony given tending to show that several weeks before the commission of the acts which constitute the basis of the indictments a saloon keeper named Austin, who was an intimate friend of Diggs, and also a friend of Miss Warrington, introduced the two on a street in Sacramento. Miss Warrington was then about 20 years old and a stenographer; Lola Norris, about a year younger, was her intimate friend. The result was that these four persons almost immediately commenced going about together frequently, often to disreputable places, at different times Diggs taking the four in his machine on trips about the city and to outside places, where they sometimes spent the night; he registering under an assumed name with Marsha Warrington as his wife, and Caminetti under an assumed name with Lola Norris as his wife, in each instance where the night was spent away from home the girls deceiving their respective parents by false representations as to where they were going.

The two girls were the chief witnesses against the defendants on their trials. Marsha Warrington herself testified to her seduction by Diggs and that she had become pregnant by him prior to the trip to Reno, Nev., upon which trip the indictments are founded. Lola Norris testified that Caminetti had not accomplished his diabolical purpose prior to their arrival in Reno, although she admitted that she had spent the night with him on at least one of the trips out of Sacramento to near-by places, and had occupied the same bed with him in the drawing room of a Pullman car on the trip to Reno; Diggs and Miss Warrington occupying the other bed in the same drawing room.

There was evidence tending to show that prior to the Reno trip the conduct of these four persons had become more or less known in Sacramento and a subject of comment there, and that publicity as well as court proceedings became imminent before the four departed from Sacramento for Reno, Nev., from which latter place they were brought

back by officers of the law after having spent several days and nights in Reno in a cottage which the men had rented under assumed names, and where Diggs lived with Miss Warrington as husband and wife, and where Caminetti maintained the same pretended relationship with Miss Norris.

Subsequently the indictments in the present cases were presented and filed—that against Diggs containing six counts, and the one against Caminetti four counts.

In the Diggs case the first count is, in substance, that on the 15th day of January, 1913, at Sacramento, the defendant did willfully, knowingly, feloniously, and unlawfully transport and cause to be transported, and aid and assist in obtaining transportation for, Marsha Warrington from Sacramento, Cal., to Reno, Nev., over the line of the Southern Pacific Company, a railroad corporation engaged in carrying passengers from one state to the other, "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of the said defendant."

The second count contains like averments in respect to Lola Norris "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Lola Norris should be and become the concubine and the mistress of one F. Drew Caminetti."

The third count charges that the defendant on the 15th day of January, 1913, at Sacramento, did willfully, unlawfully, and feloniously, knowingly procure and obtain, and cause to be procured and obtained, and aid and assist in procuring and obtaining, a ticket issued by the Southern Pacific Company at its office in the city of Sacramento for passage between that city and Reno, in the state of Nevada, to be used by Marsha Warrington, in interstate commerce, in traveling from Sacramento to Reno over the line of the Southern Pacific Company, a common carrier engaged in the business of carrying passengers between the points named, whereby the said girl was then and there so transported, "with the intent and purpose on the part of the said defendant that said girl, Marsha Warrington, should give herself up to debauchery and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of the said defendant."

The fourth count contains substantially the same averments as the third, except as to the name of the girl; Lola Norris being therein named, instead of Marsha Warrington, and excepting the intent with which such transportation of Lola Norris is alleged to have been made, the same being, as alleged in the second count, "with the intent and purpose on the part of the said defendant that said girl, Lola Norris, should give herself up to debauchery and for an immoral purpose, to wit, that the aforesaid Lola Norris should be and become the concubine and the mistress of one F. Drew Caminetti."

The fifth count alleges that on the same day and year, at Sacramento, the defendant did willfully, unlawfully, and feloniously, knowingly persuade, induce, and entice, and cause to be persuaded, induced, and enticed, and aid and assist in persuading, inducing, and enticing, Marsha

Warrington to go from Sacramento, Cal., to Reno, Nev., in interstate commerce over the line of railroad of the Southern Pacific Company, "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Marsha Warrington, should be and become the concubine and the mistress of the said defendant."

The sixth count makes substantially the same allegations as the fifth, except in respect to the girl named; Lola Norris being therein named, instead of Marsha Warrington, and except in respect to the intent, which is therein charged to be "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Lola Norris, should be and become the concubine and the mistress of one F. Drew Caminetti."

Under that indictment Diggs was found guilty as charged in the first four counts, upon which conviction the judgment against him is based; the jury returning no verdict in respect to the last two counts of the indictment, and no further action by the court in respect thereto appearing to have been taken.

In the Caminetti case the first count charges, in substance, that on the 15th day of January, 1913, at Sacramento, Cal., the defendant did willfully, knowingly, and feloniously, unlawfully transport and cause to be transported, and aid and assist in obtaining transportation for, and in transporting in interstate commerce, from Sacramento to Reno, Nev., over the line of railroad of the Southern Pacific Company, a common carrier engaged in carrying passengers between the two cities named, a certain girl, to wit, one Lola Norris, "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Lola Norris should be and become the concubine and the mistress of the said defendant."

The second count contains substantially the same averments as the first, except that Marsha Warrington is therein named, instead of Lola Norris, and except as to the intent, which is therein charged to be "for the purpose of debauchery and for an immoral purpose, to wit, that the aforesaid Marsha Warrington should be and become the concubine and the mistress of one Maury I. Diggs."

The third count charges, in substance, that the defendant on the day and year already mentioned, at Sacramento, did willfully, unlawfully, and feloniously, knowingly, persuade, induce, and entice, and cause to be persuaded, induced, and enticed, and aid and assist in persuading, inducing, and enticing, Lola Norris to go from the city of Sacramento, Cal., to Reno, Nev., in interstate commerce over the line of railroad of the Southern Pacific Company, a common carrier of passengers between the points named, "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Lola Norris, should be and become the concubine and the mistress of the said defendant."

The fourth count makes substantially the same charges as the third count, except as to the girl, who is therein alleged to be Marsha Warrington, and in respect to the intent, which is therein alleged to be "for the purpose of debauchery and for an immoral purpose, to wit, that she, the said Marsha Warrington, should be and become the concubine and the mistress of one Maury I. Diggs."

Under that indictment Caminetti was found by the jury guilty as

charged in the first count, and not guilty upon each of the other counts, upon which verdict the judgment against him is based.

In each case the distinct and specific purpose alleged in the indictment in the alleged acts of the defendant, as respects Marsha Warrington, was that she "should be and become the concubine and the mistress of" Diggs, and, as respects Lola Norris, that she "should be and become the concubine and the mistress of" Caminetti.

However depraved and heinous the conduct of the two men was, yet, when brought before the court upon indictment, the same legal presumption of innocence of the offenses charged attended them that accompanies every other person legally charged with crime, and the same obligation rested upon the prosecution to establish their guilt by legal proof beyond a reasonable doubt that arises in the case of every other person legally accused of crime—the ultimate determination of the facts resting, as in every criminal case, with the jury, rightly instructed by the court as to the law governing the case.

In each of the present cases a large amount of evidence was introduced and many incriminating facts and circumstances testified to. Witnesses were sworn and testified on both sides. In the Diggs case that defendant was sworn on his own behalf and testified at length concerning his relations with Miss Warrington, and concerning the actions and relations of all four of the persons here under consideration, prior to their departure from Sacramento on the Reno trip; but in respect to their actions and relations on that trip, and while remaining in Reno, he neither testified nor was questioned, either on direct or cross-examination. In respect to all of those matters he chose to remain silent; and one of the principal questions in the Diggs case relates to the instruction given by the trial court to the jury respecting his silence in that regard.

On the part of the prosecution the actions and relations of the parties on the Reno trip and during the time they remained in that city was fully gone into, and much evidence was also given by the government tending to show that the two girls were persuaded and induced by the two men to go with them on that trip, although the testimony given by Diggs in his own behalf, if believed by the jury to be true, directly tended to show that there was no inducement or persuasion on the part of the men, but, on the contrary, that the girls went with them willingly, and, as to Miss Warrington, insistently.

Among the details of the trip and the stay of the four in Reno was the following testimony of the two young women introduced on behalf of the prosecution: That they left Sacramento for Reno the night of March 9, 1913, is undisputed. Among other things, Miss Warrington testified:

"After Mr. Diggs, Miss Norris, and myself reached the depot, the train came in, and I told Mr. Diggs to go on and take the train, and that I was perfectly willing to stay in Sacramento and would not go with him. He said, 'No;' that he wanted me to go."

Caminetti not having been in time for that train, Diggs reached him by telephone and arranged a further meeting of the party with Cami-

netti at the Saddle Rock restaurant, concerning which meeting Miss Warrington further testified:

"When Mr. Caminetti reached there, he said he had some money and that he would go on the next train. We then left the Saddle Rock and went to the depot, reaching it about 12 o'clock. Mr. Diggs said for us to wait and he would get the tickets; we waited, and he got the tickets at the ticket office in the depot. I waited with Mr. Caminetti and Miss Norris; then the train came and we got on. It was an ordinary Pullman car, and Mr. Diggs got a drawing room from the Pullman conductor and he paid for it. We waited until it was made up, then the four of us entered. Mr. Diggs, I think, ordered the porter to make up the drawing room. There were three beds—the upper and lower berths and a little side bed. We all went to bed right after we entered the room. Miss Norris and Mr. Caminetti had the upper berth, and Mr. Diggs and I had the lower berth. Miss Norris got in the upper berth two or three minutes after we entered the room. I think she got her clothes off up there, her shoes, her skirt, and her waist and her hat. Mr. Caminetti got in the berth the same time she did. I think he took his clothing off up there. I got in the lower berth first. Before getting into it I took off my skirt and waist and pumps. Mr. Diggs took off his shoes and coat, and I think he took off his trousers and his outer shirt. * * * I saw Mr. Diggs give the tickets to the conductor."

Miss Norris, also sworn on behalf of the prosecution, gave similar testimony to that of Miss Warrington just quoted, and in the course of her testimony said, among other things:

"We reached Reno about 8 or 9 o'clock next morning."

And again:

"I recall when the train reached Truckee. We arose about an hour and a half before the train reached Reno. Upon our arising in the morning, Mr. Diggs said that they would get a cottage when we got into Reno. All four of us were to live in the cottage."

Referring to the time of reaching Reno, Miss Warrington also testified:

"I remained in the berth with the defendant Diggs until about 8 o'clock the next morning, I think. Mr. Diggs got out first. Mr. Caminetti, I think, got out of the upper berth first. I recall reaching Reno that morning. It was before noon, I think; the first place we went was to a café to have our lunch. * * * Then Mr. Diggs and Mr. Caminetti went to the real estate firm, I think."

In respect to the meeting at the Saddle Rock restaurant Miss Norris also testified:

"At the Saddle Rock restaurant, just before leaving, Mr. Caminetti gave me some money and told me to buy my own ticket to Reno. Mr. Diggs saw him give it to me, and he said that he would buy all the tickets; that it would never do for us to separate, and for Miss Warrington and I to go together, and they go together, away from us. And he said— We had been talking about places to go, and they had suggested several places, and Mr. Diggs said it would not do for every one to have suggestions; that each one, of course, thought his was the best, and that some one would have to manage the affair; somebody would have to be the boss; 'Now who will it be;' and Mr. Caminetti said, ' Well, I name you to be the person to manage the trip;' and so he considered himself the boss."

The party left Sacramento shortly after midnight of March 9, 1913, by the Southern Pacific Railroad. On their arrival in Reno the next

morning they at first went to the Riverside Hotel, concerning which Miss Warrington testified:

"They said we should go to the hotel and wait for them, and they would try and rent a house for one month at least. I think they said they were going to stay in Nevada about six months. * * * They told us that when we reached the Riverside Hotel we should wait there until they returned. They returned about 5 o'clock. Then they registered, after which we went upstairs to the suite of three rooms, two bedrooms, with a sitting room between. We occupied these rooms just one night, and left about 9:30, I think, next morning. Mr. Caminetti and Miss Norris had one, and Mr. Diggs and I had the other room. We retired about 10:00 o'clock. We all discarded our wearing apparel. Mr. Diggs occupied the bed with me, and Miss Norris occupied the other bed with Mr. Caminetti."

And concerning which Miss Norris testified:

"Mr. Diggs and Mr. Caminetti went over to the clerk's desk in the office of the hotel and reserved three rooms, a suite of rooms. Mr. Diggs told us that he registered as Mr. Enright and wife, and Mr. Caminetti registered as Mr. Ross. * * * There were three rooms, two bedrooms and a sitting room. Mr. Caminetti and I occupied one, and Mr. Diggs and Miss Warrington the other. I discarded most of my wearing apparel that night."

On the day of the arrival of the party in Reno the men rented from a man named Mergen, acting for a firm of real estate agents there, a cottage, concerning which transaction Mergen testified on behalf of the prosecution:

"I recall negotiating with Mr. Enright on the 10th, of March, 1913, for the renting of that cottage. * * * The name Enright was given me by himself. I would recognize the man again if I saw him in this courtroom. Q. Will you kindly look around and see if he is here? A. He is right there, with his hand up to his face.

"Mr. Roche: You will concede, gentlemen, that that is the defendant.

"Mr. Devlin. Yes."

And in respect to the stay and actions of the parties in question while in Reno Miss Norris further testified:

"I knew that Mr. Caminetti went by the name of Ross at Reno, and that I was going by the name of Mrs. Ross, and that Mr. Diggs and Miss Warrington were going by the name of Enright and wife. * * * Mr. Diggs and Miss Warrington occupied the front bedroom, and Mr. Caminetti and I the back bedroom. Mr. Caminetti and I had sexual intercourse in that bungalow. He said he would marry me, and I believed him."

And Miss Warrington also testified:

"While at Reno I had sexual relations with Mr. Diggs."

Upon the conclusion of all of the evidence in the Diggs case, the court, after argument by the attorneys of the respective parties, instructed the jury, giving, among other instructions, this in respect to the defendant:

"The defendant has taken the stand in his own behalf, and, so far as his testimony tends to cover the transaction involved in the charges against him, it is somewhat at variance with that of the two girls, Miss Warrington and Miss Norris; that is, according to his story of their intimacy, he makes it appear that Miss Warrington was apparently pursuing him as much as he was pursuing her, if not more, and he claims that when he suggested the idea of leaving Sacramento alone she protested that she should not be left behind, but should go with him, and that it was she, and not the defendant,

who insisted that Miss Norris should accompany them. Now this conflict, so far as it exists, is for you to determine; that is, you will say whether the statements of these girls are true, or that of the defendant, to the extent that you find it material to determine in order to reach your verdict. The testimony of the defendant, however, does not cover the entire transaction as testified to by the two girls and the other witnesses for the prosecution. After testifying to the relations between himself and Caminetti and these girls down to the Sunday night on which the evidence of the government tends to show the trip to Reno was taken, he stops short and has given none of the details or incidents of that trip, nor any direct statement of the intent or purpose with which that trip was taken, contenting himself by merely referring to it as having been taken, and by testifying to his state of mind for some days previous to the taking of that trip. Now this was the defendant's privilege, and, being a defendant, he could not be required to say more if he did not desire to do so; nor could he be cross-examined as to matters not covered by his direct testimony. But in passing upon the evidence in the case for the purpose of finding the facts you have a right to take this omission of the defendant into consideration. A defendant is not required under the law to take the witness stand. He cannot be compelled to testify at all, and if he fails to do so no inference unfavorable to him may be drawn from that fact, nor is the prosecution permitted in that case to comment unfavorably upon the defendant's silence; but where a defendant elects to go upon the witness stand and testify, he then subjects himself to the same rule as that applying to any other witness, and if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence, since it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so."

It must be remembered that neither of the defendants to these cases was on trial for fornication or adultery. While both of those acts are made a crime and punishable as such by the laws of the state of California, neither is made a crime by any law of the United States. The statute of the United States upon which the present prosecutions are based is the act of June 25, 1910 (36 Stat. 825, c. 395), which the act itself expressly declares "shall be known and referred to as the 'White Slave Traffic Act,'" the second, third, and fourth sections of which are as follows:

"Sec. 2. That any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in any territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court.

"Sec. 3. That any person who shall knowingly persuade, induce, entice, or coerce, or cause to be persuaded, induced, enticed, or coerced, or aid or assist in persuading, inducing, enticing, or coercing any woman or girl to go from one place to another in interstate or foreign commerce, or in any territory or the District of Columbia, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and who shall thereby knowingly cause or aid or assist in causing such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or any territory or the District of Columbia, shall be deemed guilty of a felony and on conviction thereof shall be punished by a fine of not more than five thousand dollars, or by imprisonment for a term not exceeding five years, or by both such fine and imprisonment, in the discretion of the court.

"Sec. 4. That any person who shall knowingly persuade, induce, entice, or coerce any woman or girl under the age of eighteen years from any state or territory or the District of Columbia to any other state or territory or the District of Columbia, with the purpose and intent to induce or coerce her, or that she shall be induced or coerced to engage in prostitution or debauchery, or any other immoral practice, and shall in furtherance of such purpose knowingly induce or cause her to go and to be carried or transported as a passenger in interstate commerce upon the line or route of any common carrier or carriers, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine of not more than ten thousand dollars, or by imprisonment for a term not exceeding ten years, or by both such fine and imprisonment, in the discretion of the court."

In each indictment the charges related only to the trip of the parties in question from Sacramento, Cal., to Reno, Nev., and to the acts and circumstances connected with and growing out of that trip. Those acts and circumstances are in part detailed by the testimony of the witnesses Marsha Warrington and Lola Norris above quoted, in respect to which the defendant neither testified nor was questioned on either his direct or cross-examination. In respect to those matters he chose to avail himself of the privilege conferred upon him by article 5 of the amendments to the Constitution of the United States, which reads:

"No person * * * shall be compelled in any criminal case to be a witness against himself"

—and of the act of Congress of March 16, 1878 (20 Stat. 30, c. 37), which is as follows:

"That in the trial of all indictments, informations, complaints, and other proceedings against persons charged with the commission of crimes, offenses, and misdemeanors, in the United States court, territorial courts, and court-martial, and courts of inquiry, in any state or territory, including the District of Columbia, the person so charged shall, at his own request but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him."

To the extent that the defendant waived the immunity extended to him by the provisions of the Constitution and statute of the United States above quoted, he placed himself, as the court below properly told the jury, in the position of any other witness, and subjected his testimony to comment, by both counsel and court, to the same extent as may be properly and legally made by either respecting the testimony of any other witness. Authorities to that effect are very numerous, and

many of them are referred to by the respective counsel in the present cases. But such waiver does not, in my opinion, extend beyond the testimony given by the defendant, and the inferences and conclusions to be drawn therefrom, where he does not refuse to answer any proper question.

The counsel for the government have cited many authorities as to the proper limits to the cross-examination of a defendant in a criminal case who voluntarily goes on the stand as a witness, and as to the inferences to be drawn from his refusal to answer proper questions on cross-examination. But all such authorities are wholly inapplicable to the present cases for the reason that the direct examination of both defendants here was confined to matters occurring before the commencement of the Reno trip, and the only defendant who was cross-examined at all—Diggs—does not appear to have refused to answer any proper question. To hold that any inference or conclusion can be properly drawn from a failure of the defendant to explain or deny matters or circumstances concerning which he did not testify and concerning which he was not questioned, either on direct or cross-examination, would, in my opinion, manifestly be to make his silence in respect to such matters and circumstances evidence against him, contrary to the provisions of the Constitution and statute above quoted. And so the Circuit Court of Appeals for the Eighth Circuit in effect held in Balliet v. United States, 129 Fed. 689, 695, 64 C. C. A. 201, 207, where the court said:

"We have next to consider whether the jury were misdirected, and only one alleged error of this sort is called to our attention. At the conclusion of a somewhat lengthy charge, the trial judge made this statement, to which an exception was duly taken: 'It has been suggested that I have overlooked one thing. I may say you may consider, in determining the question, the fact that the defendant having gone upon the witness stand, if he has not fully explained, or has not explained matters which are material to the issues in this case, and which are naturally within his knowledge, you may consider that as a circumstance tending to show that the facts, if explained, etc., would bear out the contention of the government, and his failure to explain them or give a truthful explanation is against him.'

"We have not been able to conclude that this instruction states a correct rule of law, or that the giving of it was not a material error. As we interpret this instruction, it means that, inasmuch as the defendant had elected to testify in his own favor, if while on the stand he had not fully explained all matters and things material to the issues in the case which the jury might think were naturally within his knowledge, then the jury might conclude that the facts, etc., if he had indulged in an explanation concerning them, would have borne out the contention of the government (that is, shown that he was guilty), and that his failure to explain was against him (that is, would justify a conclusion of guilt). This rule of law would put the defendant in a criminal case in a peculiar attitude, for if he takes the stand as a witness he must perforce explain every fact and circumstance which has been put in evidence against him, as tending to establish guilt, which a jury may deem material, and such as he could explain, at the risk of having them conclude, because of his silence as respects such facts and circumstances, that they are true and that he is guilty. If a defendant in a criminal case desires to take the stand and contradict some particular fact or circumstance that has been testified to, he cannot safely do so for fear of raising a presumption of guilt by his failure to explain other facts and circumstances in evidence which the jury may happen to regard as material and may think the accused could explain. The federal statute (Act March 16, 1878, c. 37, 20 Stat. 30 [U. S. Comp. St. 1901, p. 660]) provides, in substance, that a person charged with an offense

'shall at his own request, but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him.' When the defendant in a criminal case, in compliance with this statute, waives his constitutional privilege by taking the witness stand, he occupies the attitude of any other witness, and may be cross-examined like an ordinary witness, and to the same extent. Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 44 L. Ed. 1078. The federal statute does not, like the statutes of some states (vide Rev. St. Mo. 1899, § 2637), expressly provide that the examination of the accused shall be limited to the matters testified to on his direct examination, but we apprehend that it should be so limited, because that is the general rule which obtains in the federal courts relative to the cross-examination of all witnesses except, when the rule is relaxed, as it sometimes is, on grounds of convenience or necessity. Houghton v. Jones, 1 Wall. 702, 706, 17 L. Ed. 503; Wills v. Russell, 100 U. S. 625, 25 L. Ed. 607; Montgomery v. Ætna Life Ins. Co., 38 C. C. A. 553, 97 Fed. 913; Goddard v. Crefield Mills, 21 C. C. A. 530, 75 Fed. 818; Safter v. United States, 31 C. C. A. 1, 87 Fed. 329. It is also doubtless true that, when a defendant in a criminal case takes advantage of the statute and testifies in his own favor, the government may comment on his testimony and draw inferences therefrom as freely as if he were an ordinary witness and not the accused. It is only where the accused fails to testify that the statute prohibits unfavorable comment and attempts to create a presumption against him because he has not done so. Conceding this much, we are nevertheless of opinion that the instruction in question went too far, in that it required the accused to explain every fact and circumstance which had been introduced against him, and gave to them additional probative force because he had not done so or attempted to do so. Furthermore, it left the jury at full liberty to determine what matters which had been given in evidence were 'material to the issues in the case,' without directions on that point, and equal liberty to determine what matters were 'naturally within his knowledge' and susceptible of explanation. The testimony in the case had taken a very wide range and covered a considerable period of time. While on the stand some facts and circumstances that had been introduced in evidence may have been overlooked by the accused or by his counsel, and he may not have been interrogated with respect thereto for that reason, or they may have been regarded as of no importance, or the circumstances may have been of a character which admitted of no further explanation, being in themselves such circumstances as the jury could ignore or draw such inferences therefrom as they thought proper. And yet the instruction was of a nature which permitted the jury to draw unfavorable inferences against the accused, because in the course of his examination he had not alluded to every fact and circumstance already in evidence, and given an explanation thereof consistent with his innocence. We are satisfied that the instruction cast an undue burden on the defendant, and that it was also misleading. Moreover, we are not able to say with certainty, as we must to uphold the verdict, that the defendant was not prejudiced by the instruction."

The instruction held erroneous in the case just cited, and the giving of which entitled the defendant to a new trial, was by no means so strong against the defendant there as is that against the defendant Diggs in which the jury was told:

"It is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so"

—in other words, that the law drew such an inference in respect to material testimony against him where he remained silent in regard to it. I think it clear that that instruction was erroneous and threw an illegal burden upon the defendant; it was omitted from the instructions given in the case of Caminetti, subsequently tried.

In the prevailing opinion in the present cases the court cites, as sustaining its holding that the trial judge was right in instructing the

jury in the Diggs case that it was "a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so," the decisions of the Supreme Court in the cases of Reagan v. United States, 157 U. S. 301, 15 Sup. Ct. 610, 39 L. Ed. 709, Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, Fitzpatrick v. United States, 178 U. S. 304, 20 Sup. Ct. 944, 44 L. Ed. 1078, and Sawyer v. United States, 202 U. S. 150, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269. How very far those cases are from holding anything of the sort may be very clearly shown by making a brief reference to each of them. Thus:

The defendant in the case of Reagan v. United States, 157 U. S. 301, 15 Sup. Ct. 610, 39 L. Ed. 709, was charged with the crime of smuggling, and took the stand as a witness in his own behalf. The Supreme Court, in considering the instruction of the trial court in respect to that matter, said:

"By the Act of March 16, 1878, c. 37, 20 Stat. 30, a defendant in a criminal case may, 'at his own request, but not otherwise, be a competent witness.' Under that statute it is a matter of choice whether he become a witness or not, and his failure to accept the privilege 'shall not create any presumption against him.' This forbids all comment in the presence of the jury upon his omission to testify. Wilson v. United States, 149 U. S. 60, 13 Sup. Ct. 765, 37 L. Ed. 650. On the other hand, if he avail himself of this privilege, his credibility may be impeached, his testimony may be assailed, and is to be weighed as that of any other witness. Assuming the position of a witness, he is entitled to all its rights and protections, and is subject to all its criticisms and burdens. It is unnecessary to consider whether, when offering himself as a witness as to one matter, he may, either at the will of the government or under the discretion of the court, be called upon to testify as to other matters. That question is not involved in this case, and we notice it simply to exclude it from the scope of our observations. The privileges and limitations to which we refer are those which inhere in the witness as a witness, and which affect the testimony voluntarily given. As to that he may be fully cross-examined."

It is thus seen that the Supreme Court there expressly declared that the question here involved was not involved in that case, and that it was mentioned only for the very purpose of excluding it from the scope of its observations in that case.

The case of Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819, came before the court on an appeal from an order of the Circuit Court made upon a return of a writ of habeas corpus remanding the petitioner to the custody of the marshal, he having refused to answer a certain question as a witness before the grand jury in relation to a charge then under investigation by that body against certain officers and agents of a certain railway company for an alleged violation of the Interstate Commerce Act; and the question before the Supreme Court was whether the Act of Congress of February 11, 1893, c. 83, 27 Stat. 443 (Comp. St. 1913, § 8577), which enacts that "no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, * * * on the ground or for the reason that the testimony or evidence, documentary or otherwise,

required of him, may tend to incriminate him or subject him to a penalty or forfeiture," sufficiently satisfies the constitutional provision declaring that no person shall be compelled in any criminal case to be a witness against himself. The few lines quoted from the opinion in that case by the court in the present cases give, in my opinion, a very inadequate idea of what the Supreme Court held in Brown v. Walker, and in no respect sustain, as I view it, the ruling of the court below upon the question under consideration in the present cases.

So in the case of Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 44 L. Ed. 1078, the question here involved did not arise; the question there being one as to the extent to which cross-examination was proper where the defendant takes the stand in his own behalf—the court saying at page 315 of 178 U. S., at page 948 of 20 Sup. Ct. (44 L. Ed. 1078):

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf, and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts. The witness having sworn to an alibi, it was perfectly competent for the government to cross-examine him as to every fact which had a bearing upon his whereabouts upon the night of the murder, and as to what he did and the persons with whom he associated that night. Indeed, we know of no reason why an accused person, who takes the stand as a witness, should not be subject to cross-examination as other witnesses are. Had another witness been placed upon the stand by the defense, and sworn that he was with the prisoner at Clancy's and Kennedy's that night, it would clearly have been competent to ask what the prisoner wore, and whether the witness saw Corbett the same night or the night before, and whether they were fellow occupants of the same room. While the court would probably have no power of compelling an answer to any question, a refusal to answer a proper question put upon cross-examination has been held to be a proper subject of comment to the jury. State v. Ober, 52 N. H. 459 [13 Am. Rep. 88]. And it is also held in a large number of cases that, when an accused person takes the stand in his own behalf, he is subject to impeachment like other witnesses. If the prosecution should go farther and compel the defendant, on cross-examination, to write his own name or that of another person, when he had not testified in reference thereto in his direct examination, the case of State v. Lurch, 12 Or. 99 [6 Pac. 408], is authority for saying that this would be error. It would be a clear case of the defendant being compelled to furnish original evidence against himself. State v. Saunders, 14 Or. 300 [12 Pac. 441], is also authority for the proposition that he cannot be compelled to answer as to any facts not relevant to his direct examination."

There is here cited by the Supreme Court, with its apparent approval, a decision of the Supreme Court of Oregon to the effect that a defendant to a criminal case *cannot be compelled* to *answer as to any facts not relevant to his direct examination.* And, in the case of Sawyer v. United States, 202 U. S. 150, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269, what the Supreme Court held was that where a defendant takes the stand in his own behalf he waives his constitutional privilege of silence and the prosecution has the right to cross-examine him *upon his evidence in chief* with the same latitude

220 F.—37

as though he were an ordinary witness as to circumstances connecting him with the crime; the court, at page 165 of 202 U. S., at page 579 of 26 Sup. Ct. (50 L. Ed. 972, 6 Ann. Cas. 269), saying:

"It has been held in this court that a prisoner who takes the stand in his own behalf waives his constitutional privilege of silence, and that the prosecution has the right to cross-examine him upon his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime. Fitzpatrick v. United States, 178 U. S. 304 [20 Sup. Ct. 944, 44 L. Ed. 1078]."

In each of the present cases there was a sharp conflict, as will be seen from the quotations already made, between the testimony of the two women and that of Diggs upon the question as to whether the women were persuaded, induced, or coerced into taking the Reno trip. That conflict is further shown by additional testimony of Diggs, and by the testimony of Caminetti. The latter was not cross-examined at all, and his direct testimony was short and confined to matters also antedating the trip to Reno, and mainly to reported threats of publicity of the relations existing between Diggs, himself, and the women, and threats of arrest and personal violence, and concluded with these statements:

"I remember having been at the Peerless restaurant on Saturday afternoon, March 8, 1913. I saw Maury I. Diggs there at that time. There were different people there at different times. Miss Norris and Miss Warrington were not there all the time. They were there during part of the time. I had a conversation with Maury I. Diggs in the Peerless restaurant with reference to something his father had said to him while in San Francisco. The Peerless restaurant is in the city of Sacramento on Ninth street between K and L. Miss Warrington was there when I got there, and later on, just after I got there, Miss Norris came in. Mr. Diggs said: 'I have just come up from San Francisco, and my father is coming up Monday to have you and Lola and Marsha arrested. He claims that you and Lola and Marsha are as much responsible for the position in which I am in as I am, and that he is going to put you three through everything I have gone through.' He said: 'I tried to keep him from coming up, but I could not, and he will be up here to-morrow morning.' That is about the substance of what he said. He went over it and enlarged upon it. I replied: 'Then I am gone.' I meant that when Mr. Diggs got there to have me arrested that I would not be there, that I was going to get out of town. First Mr. Diggs said that if I went it would be necessary for him to go, and when he said that Miss Warrington said: 'I am going, too; I can't stay here if you leave.' And Lola—Miss Norris—said that she could not go, although she hated to stay in Sacramento and face things she thought or knew were going to happen, but she could not leave. Thereupon Miss Warrington turned around and said: 'Lola, I am going, and you have got to go, too.' I believed the statements made by Mr. Diggs to me as having come from his father were true. I had already had a talk with him over the phone in which he said the same things, and by the tone of his voice I knew that he was extremely angry with me at that time, and from what Mr. Diggs said I gathered that his anger had grown. I told Miss Norris and Miss Warrington and Maury I. Diggs of the conversation I had had with Mr. Lesley, to which I have testified. Prior to the conversation at the Peerless restaurant I told them about what Mr. Lesley had said."

Additional testimony of Diggs is as follows:

"I said to Marsha: 'That is enough; the juvenile officers are after us; my father is here to carry out his intentions, and I am going to go. I am going to get out of this town for awhile. I am going to go away from here;

this is too hot for me.' Then Marsha said: 'Well, old boy, believe me, you're not going away and leave me here.' I said: 'Miss Warrington, you can do just as you please; but I am going to go away from here for awhile. I have too much to lose, and I have too good a family to bring trouble down on them, and I am going to go away.' She said: 'I am going too; you are not going away and leave me.' Thereupon Mr. Caminetti spoke up something about Miss Norris. Then she said: 'If Miss Norris doesn't want to go, I'll make her go; she has got to go away with me.' Miss Warrington said that about Miss Norris. * * * During the last week ending March 9th Miss Warrington and Miss Norris met me at the Columbia Hotel. They came up and seen me about 4 o'clock in the afternoon. I think that either Mr. Caminetti told them, or I told them, that I was there. I believe that I called Miss Warrington up. Miss Warrington came up there. It was in regard to our conditions. The specific arrangement was for all to come up there, whether it was on my suggestion or Mr. Caminetti's; I have forgotten which. I told her that I thoroughly and positively made up my mind to leave town. I said: 'I am going to Los Angeles for a week or two, and I have just got to go; that is all there is to it.' I was very much worried; in fact, I was scared to stick my nose out of that room. On that occasion I told her all about my business, all about my relations, and I told her that this thing was getting too much for me; that I had too much to lose, and had a good home, and a good wife, and too nice a child to take any chances. I said: 'Miss Warrington, we have to quit our going together; we have to cut it out; everybody is getting onto us.' She broke in and said: 'Yes, you bet your life they're getting onto us; a friend of mine, who is a newspaper reporter, told me we were going to be written up in the Sacramento Bee.' I said: 'Who was it?' She said: 'Alfred Putnam.' I said: 'What did he say to you?' She said that he said that one of the editors had got wise to our actions and had an article all written up, and that he was going to run it, and was going to publish it immediately, but through his influence, and through his respect for my father, owing to the fact that they were both Masons, had got the article squelched, and got it stopped. I said: 'Are you sure they had an article?' She said: 'Why, positively, he told me it was all written up and he saw it.' I said: 'Don't you think that is a little grand stand play on Putnam's part?' and she said: 'No, sir; that is the truth.' I said: 'By jinks; that is getting pretty serious.' She said: 'Yes, I guess you have had about all you want of the Sacramento Bee, haven't you?' And I said: 'Yes, I had; that I didn't want to get into any tangle with them; that I didn't want them to ever write me up.' Then the conversation drifted on back into the fear that was overtaking the whole crowd. I thoroughly declared myself that I was going. Marsha said: 'Well, if you're going, I am going, too; you're not going to leave me here with the bag to hold and face all this trouble.' I said: 'Miss Warrington, you can do just exactly as you please about it; I don't intend to ask you to go, or ask you to stay home; it is your business, and you can do as you please.' She said: 'Well, I am going.' Lola Norris said: 'I can't go. I am not going; my father is not feeling well, and it would break my mother's heart for me to go.' And Marsha said: 'Yes; and it will break my father's heart, too.' Somebody said something about her mother. She said: 'Well, I don't care about my mother; my mother and I don't get along anyhow.' Miss Warrington said she would like to go to spite her mother, her stepmother. Her aunt is her stepmother. She said her father had always been very good to her, and she liked her father, and didn't want to leave him. I said: 'That is up to you; you people can do as you please, but I am going to get out of here. That is final and positive. I am going. I don't care what the rest of you do—Mr. Caminetti, or any of you. I have too much to lose.' When Lola said it would break her mother's heart to go, Marsha said: 'Well, I can't help that; you've got to go with me; you've got to go along with me.' Lola, to my knowledge, did not say whether she was going or not. Then Mr. Caminetti spoke up, and he says these words very distinctly— He was sitting on the other side of the table. He says, 'Now, girls, I want to make myself understood right here;' he says, 'If Diggs is going, I am going;' and he says, 'If you people go with us, that is your business;' he says, 'Now, I don't want you girls to leave with

the idea that you're going to get any great or glorious or glittering future; I want to go on record right here as saying that I don't want you to go; I would rather have you stay home here; I don't want to be bothered with women in this business, if Diggs and I are going to get arrested, and are trying to get away from arrest, we don't want to be hampered with women. I want to go on record right now as not persuading you girls to go, or asking you to go; on the other hand, if you are going to go, we would rather have you go in some other direction.' Marsha sat up and said: 'We are not going to go in any other direction; if you and Diggs are going, we will go with you; you can't leave us; if you leave us here, and leave us to go in another direction, we will never see you again; that will be the end of you; we will never see you again.' "

While there was testimony on the part of the government tending to show that both Diggs and Caminetti persuaded and induced the girls to go with them from Sacramento to Reno, there was on the part of both defendants testimony tending to show that neither of them did so, but, on the contrary, that their going was voluntary. If voluntary, the girls were necessarily accomplices with the men in the alleged violation of the act of Congress upon which the indictments are based, and could, as was expressly held by the Supreme Court February 1, 1915, in the case of United States v. Clara Holte, 236 U. S. 140, 35 Sup. Ct. 271, 59 L. Ed. ——, have been indicted and prosecuted for having conspired with the men for a violation of the "White Slave Traffic Act."

Whether or not the testimony tending to show that the women were accomplices was true was, as a matter of course, like all other questions of fact, one for the exclusive determination of the jury under appropriate instructions. Based upon the view, however, that the women were not accomplices of the men, the court below refused to give any of the instructions requested by the defendants upon the subject of accomplices, some of which correctly defined what constitutes an accomplice, and the proper caution and care with which the testimony of accomplices should be weighed and scrutinized by the jury, to which action of the court exceptions were duly taken by the defendants. In holding, as I do, that they should have been given, it is but fair to the learned judge of the court below to say that at the time the present cases were tried the decision of the Supreme Court in the case of United States v. Clara Holte, supra, had not been rendered.

While many of the states have statutes expressly providing that no one can be convicted of a crime upon the testimony of an accomplice without some corroboration of his testimony, there is no such statute of the United States, and while, therefore, it is not essential in the federal courts, as it is in the courts of such states, to a conviction upon the testimony of an accomplice that such testimony be corroborated, it is proper and generally recognized as the duty of the courts in all such cases to explain to the jury the nature of such testimony, and to caution them to scrutinize and weigh it with great care. Such general rule is thus stated in Greenleaf on Evidence (16th Ed.) §§ 380 and 381:

"§ 380. The degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. It

has sometimes been said that they ought not to believe him, unless his testimony is corroborated by other evidence; and, without doubt, great caution in weighing such testimony is dictated by prudence and good reason. But there is no such rule of law; it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice, without any confirmation of his statement. But, on the other hand, judges, in their discretion, will advise a jury not to convict of felony upon the testimony of an accomplice alone and without corroboration; and it is now so generally the practice to give them such advice that its omission would be regarded as an omission of duty on the part of the judge. And considering the respect always paid by the jury to this advice from the bench, it may be regarded as the settled course of practice, not to convict a prisoner in any case of felony upon the sole and uncorroborated testimony of an accomplice. The judges do not, in such cases, withdraw the cause from the jury by positive direction to acquit, but only advise them not to give credit to the testimony.

"§ 381. But though it is thus the settled practice, in cases of felony, to require other evidence in corroboration of that of an accomplice, yet, in regard to the manner and extent of the corroboration to be required, learned judges are not perfectly agreed. Some have deemed it sufficient, if the witness is confirmed in any material part of the case; others have required confirmatory evidence as to the corpus delicti only; and others have thought it essential that there should be corroborating proof that the prisoner actually participated in the offense, and that, when several prisoners are to be tried, confirmation is to be required as to all of them before all can be safely convicted—the confirmation of the witness, as to the commission of the crime, being regarded as no confirmation at all, as it respects the prisoner: for, in describing the circumstances of the offense, he may have no inducement to speak falsely, but may have every motive to declare the truth, if he intends to be believed, when he afterwards fixes the crime upon the prisoner. If two or more accomplices are produced as witnesses, they are not deemed to corroborate each other; but the same rule is applied, and the same confirmation is required, as if there was but one."

The case of Bennett v. United States, 227 U. S. 333, 33 Sup. Ct. 333, 57 L. Ed. 531, was based upon the same act of Congress as the present cases, the White Slave Traffic Act of June 25, 1910; and it seems from the opinion of the court that, like the cases here, two women were involved in that alleged unlawful transaction, one Opal Clarke, and the other Ella Parks. The defendant there was indicted for having caused the illegal transportation of Opal Clarke, and in considering the objection to one of the instructions upon the question of corroborating the testimony of one of the women the Supreme Court said:

"The basis of this contention is that Opal Clarke was the accomplice of defendant as to Ella Parks, and that hence the court erred in its instructions to the jury in regard to the extent of the corroboration Opal Clarke's testimony had received. The instruction complained of submitted to the jury the fact, and warned against a conviction upon the uncorroborated testimony of an accomplice, and said: 'Necessarily, if you find that she was an accomplice with respect to these charges, or any of them, you will then necessarily have to inquire into the facts as to whether or not there is corroborating testimony. There is evidence tending to corroborate her testimony, and it is for you to consider its force and value and the weight to give to it.' The contention is that this was error, 'as the court instructed the jury that there was corroborating evidence, when the court should have charged the jury that it was for them to ascertain from the testimony whether or not there was corroborating testimony.' The objection is hypercritical. The court did not instruct the jury that there was corroborating testimony, but testimony of that tendency, and added that the force and weight of its corroborating power was for the jury to determine."

In Blashfield on Instructions to Juries, pp. 484, 485, it is said:

"Except in one state, it seems to be the well-settled and almost universal practice for the court to instruct that the testimony of accomplices should be viewed by the jury with great care and caution. It has been held, however, that, in the absence of a request, failure to give such instruction cannot be assigned as error. There is some diversity of opinion as to whether a refusal to give an instruction of this nature, when requested, will be ground for reversal. There are rulings both ways on this point"—citing a large number of cases.

In the case of United States v. Ybanez (C. C.) 53 Fed. 536, 540, the court, in speaking of the defendants there said:

"Some of them are, by their own statements, clearly accomplices, while at least two others claim that they were captured by Garza's men, and were compelled to join the expedition under the pressure of force and threats of violence. If any of the witnesses testifying in the case were constrained or compelled to go with, and remain in, the expedition, because of violence, or threats of violence, offered to them by men engaged in the enterprise; that is, if they did not join and remain with the expedition voluntarily, but were compelled to do so by men engaged therein, then they would not be regarded, in law, as accomplices, for an accomplice is a voluntary assistant in a crime. 'He is a person who knowingly and voluntarily, and with common intent with the principal offender, unites in the commission of an offense.' Bearing in mind this distinction between a person who is an accomplice and one who is not, you are further instructed that whether the testimony of an accomplice be true or false is a question which, like all controverted questions of fact, is submitted solely to you to determine for yourselves. It is not within the province of the court to pass upon controverted questions of fact, or upon questions affecting the credibility of witnesses. But it is the duty of the court to call your attention to certain rules which obtain in courts of justice in reference to these persons known in law as 'accomplices.' On this point you are instructed 'that a particeps criminis—that is, an accomplice —notwithstanding the turpitude of his conduct, is not on that account an incompetent witness.' It is the settled rule in this country that an accomplice in the commission of a crime is a competent witness, and the government has the right to use him as a witness. It is the duty of the court to admit his testimony, and that of the jury to consider it. The testimony of an accomplice is, however, always to be received with caution, and weighed and scrutinized with great care by the jury; and it is usual for courts to instruct juries—and you are so instructed in this case—not to regard the evidence of an accomplice unless he is confirmed and corroborated in some material parts of his evidence connecting the defendant with the crime, by unimpeachable testimony. But you are not to understand by this that he is to be believed only in such parts as are thus confirmed, which would be virtually to exclude him, inasmuch as the confirmatory evidence proves, of itself, those parts it applies to. If he is confirmed in material parts connecting the defendant on trial with the offenses charged in the indictment, he may be credited in others; and the jury will decide how far they will believe a witness, from the confirmation he receives by other evidence, from the nature, probability, and consistency of his story, from his manner of delivering it, and the ordinary circumstances which impress the mind with its truth. U. S. v. Kessler, Baldw. 22 [Fed. Cas. No. 15,528]; U. S. v. Reeves [C. C.] 38 Fed. 409, 410. With the rules above announced for your guidance, you will give to the testimony of such witnesses as have been shown to be accomplices such weight as you consider it entitled to receive."

In the case of United States v. Van Leuven (D. C.) 65 Fed. 78, 81, Shiras, District Judge, said:

"At the common law, as the same existed in England, in the progress and development of that law the conclusion was reached by the judges charged with the duty of presiding over trials of criminal cases that it was unwise

fcr a jury to convict a person upon the uncorroborated testimony of an accomplice, and therefore judges cautioned the juries in this particular, and charged them that it was unwise for the jury to convict upon the uncorroborated testimony of an accomplice. In the state of Iowa it has been enacted as a provision of statutory law that no person shall be convicted of a crime upon the uncorroborated testimony of an accomplice, but there must be corroborative testimony tending to connect the defendant with the commission of the offense. I have always deemed it my duty as a judge of a court of the United States, and trying cases arising in the state of Iowa, and where the defendant is a citizen of this state, to say to the jury that they cannot convict upon the uncorroborated testimony of an accomplice; and when a case stands before a jury on that kind of evidence alone I assume the duty of charging them to return a verdict of not guilty, but, if the testimony of an accomplice is accompanied by evidence tending to corroborate the same in its material statements, then it is the duty of the court to submit the whole to the jury, and it is for the jury to determine whether the corroborating evidence is of such a character and weight as justifies the jury in giving weight to the testimony of the accomplice."

The state of California has a statute similar to the statute of Iowa referred to in the last-cited case. But here we are not called upon to consider whether the federal courts in California should go to the extent indicated in the opinion in that case. I am, however, clearly of the opinion that the testimony in the present cases was such as to entitle the defendants to an instruction explaining to the jury what constituted an accomplice, and the care and caution with which the testimony of accomplices should be weighed and scrutinized, especially in view of the circumstances under which these trials took place, and of at least one circumstance occurring during the trial, which, however, need not be specifically referred to, since there is to be no other trial; for if it be true, as some of the testimony undoubtedly tends to show, that the women went voluntarily with the men in interstate commerce for the purposes stated in the indictments, they were manifestly accomplices with them in the violation of the White Slave Traffic Act, and might have been indicted, prosecuted, and punished as conspirators under the provisions of the United States Penal Code of March 4, 1909, c. 350, § 37, as was expressly decided by the Supreme Court in the very late case of United States v. Clara Holte, already cited.

In the case of Crawford v. United States, 212 U. S. 183, 204, 29 Sup. Ct. 260, 268 (53 L. Ed. 465, 15 Ann. Cas. 392) the Supreme Court, in speaking of the testimony of an accomplice—one Lorenz—said:

"But the evidence of a witness, situated as was Lorenz, is not to be taken as that of an ordinary witness, of good character, in a case whose testimony is generally and prima facie supposed to be correct. On the contrary, the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses. In many jurisdictions such a man is an incompetent witness unless he has been pardoned. The facts surrounding this case make it particularly important that the rule in regard to material errors should be most rigidly adhered to. If it be not clear that no harm could have resulted from the commission of this material error, the judgment should be reversed."

And in the very recent case of Lung v. United States, decided by this court January 4, 1915, 218 Fed. 817, 134 C. C. A. 505, we pointed out, as has been above shown, that while in the federal courts the tes-

timony of a confessed accomplice need not be corroborated to support a conviction, such testimony should be received with suspicion and with the greatest care and caution, and not taken as that of an ordinary witness of good character, generally and prima facie supposed to be true, and that, in the case then under consideration, the instructions of the trial court not being contained in the record, and there being no complaint in respect to them, the presumption was that the jury was so instructed.

For the reasons stated, I think that in each case the judgment should be reversed, and the case remanded for a new trial.

---

### BALAKLALA CONSOL. COPPER CO. v. REARDON.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915.)

No. 2420.

1. TRIAL ⊚⟿133—ERROR—CURE BY INSTRUCTIONS TO DISREGARD.

In an action for personal injuries, the admission of a question asked a juror on his voir dire as to whether he had any connection with an indemnity company or organization for the purpose of insuring against personal injuries, and the statement of counsel, in response to the court's inquiry as to the purpose of such examination, that there was indemnity insurance against that kind of an accident, and that the insurance company was defending through its own counsel, was cured by the court's remark that he would instruct the jury to pay no attention to the remark of counsel, unless it should appear that it was a pertinent fact, where no evidence was adduced to show that the juror was interested in any such company, and it therefore did not appear that it was a pertinent fact, as the court's remark was tantamount to a distinct instruction to pay no attention to the counsel's remark, unless it should appear to be pertinent, and, if defendant's counsel desired a further instruction at the close of the trial, it was his duty to request it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 316; Dec. Dig. ⊚⟿133.]

2. DEATH ⊚⟿72—ACTIONS FOR CAUSING—EVIDENCE—LOSS OR INJURY RESULTING FROM DEATH.

Under Civ. Code Cal. § 1970, providing that, when death results from injury to an employé, his personal representative shall have a right of action against the employer for the benefit of the widow, children, dependent parents, etc., in an action for the benefit of the parents, evidence that the parents were very poor, and that deceased had contributed to their support since he was big enough to work, was properly admitted; the pleadings having made an issue as to the parents' dependency.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 91; Dec. Dig. ⊚⟿72.]

3. DEATH ⊚⟿32—ACTIONS FOR CAUSING—PERSONS FOR WHOSE BENEFIT SUIT MAY BE BROUGHT.

Under Civ. Code Cal. § 1970, to support an action for the death of an employé for the benefit of his parents, there must be an actual dependency, and not a dependency resting on a presumption on account of relationship.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 47, 48; Dec. Dig. ⊚⟿32.]

---

⊚⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. MASTER AND SERVANT ⊂⇒286—ACTIONS FOR DEATH—QUESTIONS FOR JURY.**

In an action for the death of a miner, killed while drilling holes for blasting by the explosion of a missed shot, evidence *held* to make a question for the jury as to defendant's negligence with respect to the failure of a person employed for that purpose to inspect for the purpose of discovering missed shots.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ⊂⇒286.]

**5. MASTER AND SERVANT ⊂⇒107—LIABILITY FOR INJURIES—UNSAFE PLACE TO WORK.**

The rule that an employer is not bound to furnish a safe place, where the perils to the working place are caused by the progress of the work in which the employé is engaged, had no application to miners engaged in drilling holes preparatory to blasting, and injured by the explosion of a missed shot in a hole partly drilled by the preceding shift; there being no danger in the work if proper inspection was made, and the employer having undertaken to inspect each working place before assigning the men to work there.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. ⊂⇒107.]

**6. MASTER AND SERVANT ⊂⇒205—LIABILITY FOR INJURIES—CONTRIBUTORY NEGLIGENCE.**

Where a mine operator provided an inspector to search for and discover missed holes before each succeeding shift went to work at any place, a miner, engaged in drilling holes preparatory to blasting, and his helper, were entitled to assume that such inspector had done his duty, and to act upon that assumption.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 547–549; Dec. Dig. ⊂⇒205.]

**7. MASTER AND SERVANT ⊂⇒289—ACTIONS FOR INJURIES—QUESTIONS FOR JURY.**

In an action for the death of a miner, engaged in drilling preparatory to blasting, evidence *held* insufficient to make a question for the jury as to whether it was his duty to look for and discover, if possible, missed shots in places where he was at work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. ⊂⇒289.]

**8. MASTER AND SERVANT ⊂⇒291—ACTIONS FOR INJURIES—INSTRUCTIONS—CONFORMITY TO EVIDENCE.**

Where an action for the death of an employé, alleged to have been due to the negligence of an inspector, and an action for injuries to another employé, were tried together, and in the action for death there was no allegation that the inspector was incompetent, and the court, while covering many points common to both cases in its charge, distinguished the cases in every particular in which they differed, and expressly directed the jury's attention to the fact that in the action for injuries the complaint alleged that the inspector was incompetent, and that his incompetence contributed proximately to the injury, the refusal of an instruction that in the action for death there was no charge in the complaint that the accident was proximately caused by the inspector's incompetence, and that no recovery could be had therefor, was not error, though it might properly have been given.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1133, 1134, 1136–1146; Dec. Dig. ⊂⇒291.]

In Error to the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Action by J. E. Reardon, administrator of Frank Whitsett, deceased, against the Balaklala Consolidated Copper Company. Judgment for plaintiff, and defendant brings error. Affirmed.

For opinion below on demurrer and motion to strike, see 193 Fed. 189.

Frank Whitsett, the deceased, and his brother, Fred Whitsett, were employed to operate a Burleigh drill in the defendant's mine. The deceased was an experienced miner, and was known as a machine man. His brother was a machine man's helper, or chuck tender. The drill was operated by compressed air, and was used to drill holes in the rock or ore, preparatory to blasting. The brothers exchanged work from time to time, and alternately worked as drill man and chuck tender. At the time of the accident Fred was operating the drill, and the deceased was chuck tender. It was the practice to drill about a dozen holes in the face of the drift, four near the top, four in the middle, and four near the bottom. The bottom four were called "lifters." When the holes were finished, they were filled with dynamite, and there was a cap and fuse for each hole. As the men went off shift, the fuses were lighted, and the rock was blasted out. On the night of the accident, when the Whitsett brothers went to work in one of the drifts, the holes had all been drilled by the preceding shift, except three of the lifters, and one of those had been partly drilled. They began to work on the unfinished hole, and while they were drilling it the drill struck and exploded a missed shot, which killed the deceased and seriously injured his brother. Separate actions were brought by the administrator of Frank Whitsett and by Fred Whitsett. The cases were joined for trial before the same jury. The plaintiff obtained a verdict against the defendant in the sum of $3,500.

The complaint alleged failure and neglect of the defendant to exercise ordinary care in providing and maintaining a safe, suitable, and proper place for the deceased to perform his labor, and it alleged that the presence of the unexploded blast was unknown to the deceased, but could have been discovered and known by the defendant in the use and exercise of ordinary care and diligence. The answer denied that the defendant could have discovered or known of the missed shot. The main issue before the court below was whether or not the accident was proximately caused by negligence on the part of the defendant. The defendant insisted that there was no duty on its part to furnish the deceased with a safe place in which to work, and that the duty of looking for and detecting a missed shot rested on the deceased, and further contended that the missed shot was so concealed that it was impossible, by ordinary or practicable methods, to discover it.

C. H. Wilson, of San Francisco, Cal., for plaintiff in error.

William M. Cannon, of San Francisco, Cal., and C. S. Jackson, of Roseburg, Or., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] Error is assigned to a statement made by counsel for the plaintiff, in the presence of the jury, to the effect that the defendant had indemnity insurance against the accident, and that the insurance company was defending the action through its own counsel. On the examination of one of the talesmen, on his voir dire, by Mr. Cannon, counsel for the plaintiff, the following colloquy was had:

"Mr. Cannon: Q. Have you any connection, either as a stockholder or otherwise, with an indemnity company, or organization for the purpose of insuring people against personal injuries?

"Mr. Wilson: I object to that question as immaterial.

"Mr. Cannon: I do not think that it is immaterial. I would like to state why I asked the question.

"The Court: What is the reason?

"Mr. Cannon: The reason is—

"Mr. Wilson: I object to the reason being stated.

"The Court: I am asking for it.

"Mr. Cannon: In this case there is certain indemnity insurance against this kind of accident, and the insurance company is defending, through its own counsel, this action; therefore I have a right to inquire.

"Mr. Wilson: I object to the statement made by counsel, and assign it as error. It is an improper statement to make in this case. * * * We now move that the jury be discharged, on the ground that improper and foreign matter has come to the knowledge of the jury.

"The Court: The motion will be denied. I will instruct the jury to pay no attention to the remark of counsel, unless it should appear it is a pertinent fact.

"Mr. Cannon: Q. Have you any connection, either as a stockholder or otherwise, with any indemnity company such as I have described?

"Mr. Wilson: We insist upon our objection.

"The Court: I overrule the objection.

"Mr. Wilson: I will take an exception."

Error is assigned, not only to the statement of counsel, but to the ruling of the court in refusing to discharge the jury, and in admitting the testimony.

In Pennsylvania Co. v. Roy, 102 U. S. 451, 459, 26 L. Ed. 141, the court said:

"The charge from the court that the jury should not consider evidence which had been improperly admitted was equivalent to striking it out of the case. The exception to its admission fell when the error was subsequently corrected by instructions too clear and positive to be misunderstood by the jury. The presumption should not be indulged that the jury were too ignorant to comprehend, or were too unmindful of their duty to respect, instructions as to matters peculiarly within the province of the court to determine. It should rather be, so far as this court is concerned, that the jury were influenced in their verdict only by legal evidence. Any other rule would make it necessary in every trial, where an error in the admission of proof is committed, of which error the court becomes aware before the final submission of the case to the jury, to suspend the trial, discharge the jury, and commence anew. A rule of practice leading to such results cannot meet with approval."

In Throckmorton v. Holt, 180 U. S. 552, 567, 21 Sup. Ct. 474, 480 (45 L. Ed. 663), the court said:

"The general rule is that, if evidence which may have been taken in the course of a trial be withdrawn from the consideration of the jury by the direction of the presiding judge, such direction cures any error which may have been committed by its introduction."

In line with these cases is Turner v. American Security & Trust Co., 213 U. S. 257, 267, 29 Sup. Ct. 420, 53 L. Ed. 788.

The only modification of the rule is in cases where the court can see that such a strong impression has been made upon the minds of the jury by illegal and improper testimony that its subsequent withdrawal will not remove the effect caused by its admission. Portland Gold Min. Co. v. Flaherty, 111 Fed. 312, 49 C. C. A. 361, was a case in which, as here, counsel for the plaintiff stated to the jury that the case was being defended by an insurance company; but in view of the fact that the court immediately, upon the first suggestion of counsel, excluded from the jury any consideration of the statement, the Circuit Court of

Appeals held that there was no reversible error. See also, Weeks v. Scharer, 129 Fed. 333, 64 C. C. A. 11, Union Pac. R. Co. v. Thomas, 152 Fed. 365, 371, 81 C. C. A. 491, and Armour & Co. v. Kollmeyer, 161 Fed. 78, 83, 88 C. C. A. 242, 16 L. R. A. (N. S.) 1110.

The defendant contends that the trial court did not unequivocally withdraw from the jury the consideration of the statement so made by counsel, and that the court omitted to charge the jury, on the final submission of the case, to disregard that statement. But we regard the remark of the court as a distinct charge to the jury. It was tantamount to saying:

"I instruct the jury to pay no attention to the remark of counsel, unless it should appear it is a pertinent fact."

It did not thereafter appear that it was a pertinent fact, for no evidence was adduced to show that the juror was interested in any indemnity company. If counsel for the defendant desired further instruction at the conclusion of the trial, it was his duty to bring the matter to the attention of the court at that time, and request such an instruction. We cannot think that the matter so alluded to on the examination of the juror was of a nature so impressive that the jury could not divest their minds of it and render a verdict according to the instructions of the court and the evidence in the case. There is no indication of prejudice in the amount of the verdict which was rendered. It is not improbable that all intelligent jurors of the present day know, as a matter of common knowledge, that in the large majority of damage cases brought against mining and manufacturing corporations the real party in interest as defendant is an indemnity insurance company. There is little, if any, substantial ground for assuming that a juror of the class of men who are usually summoned in a federal court would permit such a fact to influence in any degree his verdict.

[2, 3] It is contended that the court erred in admitting evidence of the financial condition of the parents of the deceased; the evidence being that they were very poor, and that the deceased had contributed to their support since he was big enough to work for wages. Section 1970 of the Civil Code of California contains this provision:

"When death, whether instantaneous or otherwise, results from an injury to an employé received as aforesaid, the personal representative of such employé shall have a right of action therefor against such employer, and may recover damages in respect thereof, for and on behalf, and for the benefit of the widow, children, dependent parents, and dependent brothers and sisters, in order of precedence as herein stated, but no more than one action shall be brought for such recovery."

The complaint had alleged that James Whitsett, the father of the deceased, was wholly dependent upon the said Frank Whitsett for subsistence and support, and by reason of his death was left utterly helpless, and destitute. The answer denied this allegation on information and belief. The allegation was made a distinct issue, and we see no reason why the plaintiff should not be allowed to prove it as he did.

The defendant cites Green v. Southern Pacific Co., 122 Cal. 563, 55 Pac. 577, as decisive of the question. In that case it was held that, in an action brought by the widow and children of the deceased to

recover damages as his heirs at law for his death caused by the negligence of the defendant, the evidence of the poverty of one of the plaintiffs, a daughter of the deceased, who was living with him at his death, was not competent, and that its admission was prejudicial error, that it had no pertinent or competent bearing on the extent of the injury suffered by the plaintiffs, and that, whatever the daughter's condition in life, she was entitled under the law, in common with her coplaintiffs, to maintain the action solely as one of the next of kin and heirs at law of the deceased. In that case the evidence which was objected to had no relation to the issues. In the case at bar, it went to the very right of the plaintiff to recover.

But the defendant contends that the word "dependent," as used in section 1970 above quoted, means only one who is dependent for support and maintenance, that it does not necessarily mean a complete dependence, but may be a partial dependence, and that therefore it was error to permit evidence that the parents were very poor. We think that the word "dependent," as used in the statute, was intended to describe a condition of actual dependency, and not a dependency that rested on a presumption on account of relationship, for it is applied to persons to whom no such presumption obtains. It was therefore necessary for the plaintiff to prove, not a mere relation of dependency, but an actual dependency. South Side Trust Co. v. Wilmarth, 199 Fed. 418, 117 C. C. A. 650. We find no decision of any court of California holding that, under the provisions of section 1970 above quoted, evidence such as was admitted by the court below in this case is incompetent. We find no error, therefore, in its admission.

[4, 5] Error is assigned to the denial of the defendant's request for an instructed verdict in its favor. Prior to the argument to the jury, the defendant submitted to the court the following written request:

"You are instructed by the court that on the evidence and under the law you will return a verdict in this case for the defendant."

It does not appear that the request was argued before the court, or that the particular grounds of the motion were at any time specified. It has been held in the Seventh circuit that such a motion is insufficient to raise a question for review in the Circuit Court of Appeals. Adams v. Shirk, 104 Fed. 54, 43 C. C. A. 407. We are disposed to assume, however, that the court below passed upon the question which is now presented in this court—that is, whether or not there was sufficient evidence to go to the jury to show the defendant's negligence—and to hold that the motion was sufficient.

It appears from the testimony that the defendant had one employé, Yokum, who was known as a "missed hole" man, whose sole duty it was to examine the faces of the drifts before crews were set to work drilling therein, to discover and shoot missed holes. This man had made a casual inspection of the face of the drift, where the accident occurred; but, as the muck had not then been removed, he could not inspect the lowest row of holes. After the muck was removed, Yokum was present at the drift; but he made no further inspection of it. On that failure of Yokum to inspect the plaintiff bases its charge of negligence. But the defendant urges that there was evidence tending to

show that it was the duty of all employés working in the drifts to look out for missed holes, and that that duty rested upon the plaintiff's intestate, as well as upon Yokum. But there was testimony to the contrary. Several of the employés testified that they were never warned or given instruction by the defendant to look for missed holes.

Again, the defendant contends that it was not required to furnish the men engaged in drilling holes a safe place to work, for the reason that the working place was not of a permanent character, but was constantly shifting or being transformed, as the result of the employé's work, invoking the rule that the employer is not bound to furnish a safe place where the perils to the working place are caused by the progress of the work in which the employés are engaged. That rule has no application to the present case. The work was not work of construction or repair, in which the risks are caused by the progress of the work, and are assumed by the employé. It is a case in which the defendant directed its employés to work in places which had been prepared for their work as each gang was moved about the mine from drift to drift, and the defendant had undertaken to inspect each working place before assigning the men to work there. There was no danger in the work if proper inspection was made.

In Rocky Mountain Bell Tel. Co. v. Bassett, 178 Fed. 768, 102 C. C. A. 216, we said:

"The employer's duty was either to make the working place safe, or, if the danger was not obvious, to notify the employé of the hidden, unseen, and unappreciated danger, so that he might adopt means for his own safety."

And again we said:

"But where an employé is called from other work, and is set to work in an excavation, he has the right to assume that the master has investigated the conditions, and that the place is safe unless the danger is plain and obvious."

But it is said that there was no neglect of the master's duty in law in the present case for the reason that at times it was impossible to discover missed holes, and that neither the foreman who set the Whitsett brothers to work, nor the Whitsett brothers themselves, saw any indication of a missed hole at the place where the drill was set. We are not at all impressed with the credibility of the statement that the missed hole was not discoverable. Clearly it could have been found on proper inspection. It was a hole drilled in rock, and of a diameter sufficient to hold sticks of dynamite and a fuse. If Yokum had "barred" down all the loose rock on the face of the drift, as it was his duty to do, according to the testimony, he must necessarily have discovered the missed hole. Upon all the testimony we are convinced that the trial court committed no error in submitting the case to the jury.

The foregoing considerations dispose of the contention that the court erred in refusing to charge the jury, in substance, that no duty rests upon an employer to furnish a safe place to work, if the working place is not permanent, or has not previously been prepared by the master as a place for doing the work.

[6] Nor do we find error in the instruction, which the court gave, to the effect that if the jury found that the defendant provided an inspector called a "missed hole" man, whose duty it was to search for

and discover missed holes before each succeeding shift should go to work at any place, any driller or chuck tender was entitled to assume that such an inspector had done his duty in that regard, and to act upon that assumption.

[7] The defendant assigns error to the refusal of the court to charge that, if they found that it was the duty of Frank Whitsett to look for and discover, if possible, missed shots in places where he was engaged to work, his administrator cannot recover in this action, whether, upon the exercise of ordinary care Frank Whitsett could have found the missed shot, or it was so concealed that he could not, in the use of ordinary care, have found it. It is a sufficient answer to this assignment to point to the fact that there was no proof that it was Frank Whitsett's duty to look for missed shots. It is true that the foreman of the defendant's mine testified that it was the duty of all machine men to look for missed holes, in order to protect themselves. He did not testify, however, that any such rule was ever communicated to the plaintiff's intestate. On the contrary, the defendant's witness Meyers, the shift boss, when asked about the duty of machine men with reference to discovering missed holes said:

"I do not know that you would call it a duty. Of course, we did all we could about missed holes and things like that."

Meyers went on to say that the machine men were naturally on the lookout for missed holes, and some chuck tenders looked for missed holes and some did not.

"That is a thing that is so thoroughly understood among miners that there is no such thing as duty attached to it. Independently of instructions, most all the drill men and chuck tenders look for missed holes."

In the face of such testimony, the jury would not have been justified in finding that it was the duty of Frank Whitsett to look for and discover missed shots.

[8] It is assigned as error that the trial court refused to instruct the jury that, in the action brought by Reardon for the death of Frank Whitsett, "there is no charge in the complaint that the accident was proximately caused by the incompetence of Yokum," and that no recovery could be had in that case, or, if the jury found that the accident was proximately caused by the negligence of Yokum, the verdict must be for the defendant. While the first portion of the requested charge might properly have been given, it was not error to refuse it. It was coupled, however, with matter which clearly did not express the law, and, in any view, an instruction as to the incompetence of Yokum was not appropriate to the present case. Fred Whitsett in his complaint had alleged that Yokum was incompetent, but no such allegation was made in the case at bar. The court, in instructing the jury, covered many points that were common to both cases, but pains were taken to distinguish the two cases in every particular in which they differed. The court expressly directed the attention of the jury to the fact that in the case of Fred Whitsett the complaint alleged that the defendant had employed an incompetent man as a "missed hole" man, and that that fact contributed proximately to Fred Whitsett's injury.

We find no error. The judgment is affirmed.

UNITED STATES FIDELITY & GUARANTY CO. OF BALTIMORE,
MD., v. UNITED STATES et al.

(Circuit Court of Appeals, Fourth Circuit. November 28, 1914.)

No. 1308.

1. INTERNAL REVENUE ⊜⟶23—WAREHOUSE BONDS—LIABILITY OF SURETY.

The surety on a warehousing bond, given by the owner of a distillery
warehouse, conditioned for the payment of the internal revenue tax im-
posed on all spirits deposited in such warehouse before their removal
therefrom and within eight years from the date of their entry for de-
posit therein, was liable for the tax on spirits deposited in such ware-
house, though the government instituted proceedings whereby the dis-
tillery and the spirits therein were forfeited to it, and thereafter, while
such spirits were in possession of the government, they were stolen and
never recovered, as it was obviously the purpose of the government in
requiring such a bond to provide against any contingency that might
arise preventing it from collecting the tax, and the remedies of the gov-
ernment were not alternative, but cumulative.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 62–67;
Dec. Dig. ⊜⟶23.]

2. INTERNAL REVENUE ⊜⟶12, 26—TAXES ON SPIRITS—WHEN DUE.

The internal revenue tax on spirits becomes due as soon as the spirits
are produced, and the government has a first lien thereon until the tax
is paid.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 30–32,
74; Dec. Dig. ⊜⟶12, 26.]

In Error to the District Court of the United States for the East-
ern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Action by the United States against the United States Fidelity &
Guaranty Company of Baltimore, Md., and another. Judgment on a
directed verdict for the United States, and the defendant named
brings error. Affirmed.

Edward R. Baird, Jr., of Norfolk, Va. (Baird, Swink & Moreland,
of Norfolk, Va., on the brief), for plaintiff in error.

Hiram M. Smith, Asst. U. S. Atty., of Richmond, Va. (Richard H.
Mann, U. S. Atty., of Petersburg, Va., on the brief).

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This is an action instituted in the
United States District Court for the Eastern District of Virginia, at
Norfolk, in February, 1914, against Columbus F. Cheshire and the
United States Fidelity & Guaranty Company, upon a warehousing
bond in the penalty of $5,000, in which the former is principal and
the latter is surety. The plaintiff in error will be referred to as de-
fendant, and the defendant in error as plaintiff; such being the rela-
tive positions the parties occupied in the court below.

This case was heard upon a stipulation as to the facts. The court
instructed the jury to return a verdict in favor of the government for
$3,221.79, with interest from the 30th day of May, 1913, at the rate
of 6 per cent. per annum until paid; said amount being the full claim

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the government as presented in such action. Judgment was accord-- ingly entered by the court upon this verdict.

[1] The circumstances are as follows:

Columbus F. Cheshire was a distiller, owning distillery warehouse No. 3, near Portsmouth, Va. The warehousing bond given by him, upon which this suit was brought, was conditioned.

"To pay the full amount of tax, at the rate imposed by an act of Congress of August 28, 1894, on all spirits so deposited in said distillery warehouse before removal therefrom and within eight years from the date of entry of such spirits for deposit in said warehouse."

Because of alleged offenses against the government, proceedings were begun by it, before the institution of this suit, against Cheshire, in which was obtained a judgment forfeiting to the government the dis- tillery, the land whereon it was located, and 64 barrels of spirits, upon which taxes amounting to $3,221.79 were then unpaid. The agreed statement of facts contains the following:

"Fourth. On May 30, 1913, subsequent to the seizure and forfeiture of the distillery in these proceedings described, and while said distillery and whisky was in the possession of the United States government, to be sold by the marshal under the order of this court in said libel proceedings, the whisky in the warehouse was stolen therefrom before said sale, and has never been recovered or sold."

Upon the trial the court refused certain instructions asked for by the defendant, and at the request of the government charged the jury as follows:

"The jury are charged that the United States tax on spirits distilled at- taches to the same as soon as it comes into existence, and continues as a first lien thereon until the tax is paid or the whisky is sold by the United States; and defendants are not relieved from the payment of the tax there- on because the same was stolen before the sale thereof, while in the posses- sion of the government, notwithstanding it may have been declared forfeited to the government in the proceedings instituted for such forfeiture.

"The jury are accordingly directed to find a verdict for the government for the sum of $3,221.79, with interest thereon from the 30th day of May, 1913, at the rate of 6 per cent. per annum until paid."

In accordance with such charge, the jury rendered the following verdict:

"We, the jury, upon issue joined, find for the government for the sum of ($3,221.79) thirty-two hundred and twenty-one 79/100 dollars, with interest thereon from the 30th day of May, 1913, at the rate of six per centum per annum until paid. John W. Starke, Foreman. June 12th, 1914."

The surety excepted to the ruling of the court below, and the case comes here on writ of error.

The only question involved in this controversy is as to whether the court below erred in holding that under the facts of this case the surety was not relieved of its obligation to pay the taxes on the amount of spirits placed in the warehouse in pursuance of the execution of the bond in question. That portion of the obligation material to the issue is as follows:

"The principal shall  *  *  *  well and truly pay or cause to be paid *  *  * the full amount of tax on all spirits so deposited at said distillery

220 F.—38

warehouse before the removal therefrom and within eight years from the date of entry of such spirits for deposit in said warehouse."

It should be borne in mind that in the enforcement of the revenue laws it is the prime object of the government to safeguard its right to collect all the tax on spirits produced. Therefore, when spirits are entered for deposit in a warehouse, the government, in addition to requiring a bond for the payment of the taxes thereon, also retains possession of the warehouse, and the key to the same is kept at all times in the custody of a storekeeper and gauger.

[2] It has been uniformly held that the tax on spirits becomes due as soon as the same is produced, and that the government has a first lien on the same until the tax is paid. United States v. National Surety Co., 122 Fed. 904, 59 C. C. A. 130; United States v. Ulrici, 111 U. S. 38, 4 Sup. Ct. 288, 28 L. Ed. 344; Harkins v. Williard, 146 Fed. 707, 77 C. C. A. 129. However, it is contended by counsel for defendant that, inasmuch as the spirits in question were stolen after there had been a forfeiture of the same to the government by a decree of the District Court, the defendant, as surety on the warehouse bond, was thereby relieved from liability. When the defendant became surety on the warehouse bond, it entered into a contract with the government to the effect that the full amount of all taxes on spirits deposited at the distillery warehouse should be paid for before removal, and within eight years from the day when such spirits were entered for deposit.

By taking advantage of the statute, the distiller was afforded an opportunity to postpone the payment of tax on spirits produced. In other words, he secured an extension of eight years in which to make such payment. It is but natural that the government, in extending this grace to the distiller, should insist upon a provision in the warehouse bond that would absolutely remove all doubt as to the payment of the tax within the period mentioned. Common observation and experience teach us that during the period mentioned unforeseen contingencies are liable to arise which might render it impossible for the government to realize the tax by the sale of the spirits. Therefore it is obvious that it was the purpose of the government, in requiring the distiller to execute a bond of this character, to provide against any contingency that might arise which would prevent the government from collecting its tax. If this had been a distiller's bond, and the spirits had been stolen before the entry of decree of forfeiture, there would be no controversy here as to the liability of the surety; that question having been definitely settled in the cases of United States v. Mullins, 119 Fed. 335, 56 C. C. A. 238, United States v. Guest, 143 Fed. 456, 74 C. C. A. 590, and United States v. Sisk, 176 Fed. 885, 100 C. C. A. 355.

The case at bar is clearly analogous, and the fact that the spirits in this instance had been forfeited by a decree of the District Court before they were stolen could in no wise affect the status of the obligors; it being clearly provided in the bond in question that the tax on the spirits produced should be paid before the same were removed from the warehouse. This unconditional and continuing obligation was required by the government, in view of the many contingencies

which might arise, wherein it would be impossible for the government to realize the tax due by the sale of the spirits.

There is nothing in the bond to warrant the contention that the remedies of the government are alternative. Such rights are cumulative. Therefore the pursuit by one remedy could in no wise affect the right of the government, as in this instance, to resort to another for the purpose of collecting its tax. In the case of United States v. Witten, 143 U. S. 76, 12 Sup. Ct. 372, 36 L. Ed. 81, distilled spirits were stolen from a warehouse where the internal revenue officer had failed to provide sufficient locks on the doors. The court held that such action on the part of the government official could not be pleaded as a defense to an action to recover on the distiller's bond the taxes due on spirits before their removal from the warehouse. Among other things, the court in that case said:

"The only duty which the revenue officers owed in regard to the security of the warehouse and the safe-keeping of the spirits therein was to the government, and not to the defendants; and any negligence of those officers gave the defendants no rights against the government, and afforded them no excuse for not performing their obligation according to its term. This is too well settled by previous decisions of this court to require more extended discussion. Hart v. United States, 95 U. S. 316 [24 L. Ed. 479], and cases cited; Minturn v. United States, 106 U. S. 437 [1 Sup. Ct. 402, 27 L. Ed. 208]."

In view of what we have said, it follows that the judgment of the lower court should be affirmed.

Affirmed.

---

OTIS et al. v. PITTSBURGH-WESTMORELAND COAL CO.

(Circuit Court of Appeals, Third Circuit. February 6, 1915. On Petition for Rehearing, March 26, 1915.)

No. 1888.

1. TRIAL ⬥295—INSTRUCTIONS—CONSTRUCTION AS A WHOLE.
   In an action for the breach of a contract for the sale of bonds, where the principal issue was whether the plaintiffs accepted their option to purchase, a statement in the charge that it does not appear that there was any written acceptance, and that there was no letter referring to an acceptance in terms, was not erroneous, as requiring the acceptance to be in writing, where the court in connection therewith stated that the method of accepting the option was not specified, and in such a case it might be accepted in any manner by which the minds of the parties might meet, with the understanding that the acceptance had taken place.

   [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 703–717; Dec. Dig. ⬥295.]

2. APPEAL AND ERROR ⬥1064—HARMLESS ERROR—INSTRUCTIONS—IMMATERIAL ISSUE.
   Where the main issue between the parties was whether or not plaintiffs had taken certain bonds of the defendant under their option contract, and thereby accepted the option, or whether the bonds were purchased under a separate contract, error in an instruction as to whether the bonds were those held by defendant at the time the option contract was made

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

is harmless, since that would have no effect in determining whether they were delivered under the option or under a separate contract.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. ☞1064.]

On Petition for Rehearing.

3. TRIAL ☞242—INSTRUCTIONS—ISSUES—INCONSISTENT DEFENSES.

In an action for breach of contract to sell certain bonds to plaintiffs, where plaintiffs claimed that they had exercised their option to purchase the bonds by purchasing a part of them, and the defendants claimed that those bonds were sold under a separate contract and the option was never exercised, but if it was, the contract was terminated by plaintiffs' breach in failing to pay for those bonds according to the terms of the contract, a charge that the main question was whether the option was accepted, and if accepted, whether the failure to pay for the bonds in full was a material violation of its terms, was not objectionable as confusing before the jury two inconsistent grounds of defense.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 569–576; Dec. Dig. ☞242.]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action by Charles A. Otis and others, partners doing business under the name and style of Otis & Hough, now for use of Otis & Co., against the Pittsburgh-Westmoreland Coal Company. Judgment for the defendant, and plaintiffs bring error. Affirmed, and petition for rehearing dismissed.

See, also, 199 Fed. 86, 117 C. C. A. 598.

Arthur O. Fording, of Pittsburgh, Pa., for plaintiffs in error.
E. E. Robbins, of Greensburg, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The plaintiffs were bond brokers. The defendant was a coal operator. In a contract bearing date July 7, 1908, the defendant, in order to procure money needed in its business, made certain engagements for the sale of its bonds to the plaintiffs, and the plaintiffs undertook to resell and dispose of the same. Parts of the contract, and certain decided questions arising therefrom, that have relation to the matters now in controversy, appear in the opinion of this court reversing the judgment entered at the first trial of this case, and reported in 199 Fed. at page 86, 117 C. C. A. 598.

The contract makes two provisions for the delivery and sale of bonds. The first is an outright sale of $250,000 of bonds, to be delivered and paid for at the rate of $25,000 of bonds on the 1st day of each month following the date of the execution of the contract, with a stipulation that the plaintiffs might anticipate monthly deliveries by calling for and taking at one time any part or the whole of the bonds purchased, and thereupon be credited on their undertaking to the extent in which the transaction is anticipated. The second provision contemplates an option for the sale of $1,250,000 of bonds on commission, and contains similar requirements as to monthly and anticipated deliveries. This provision requires that the option, to be ef-

fective, must be accepted, and, if accepted, the contract completed thereby is terminated by the default of the plaintiffs in taking or paying for bonds in the amounts and at the periods agreed upon.

It is admitted that the parties performed all their undertakings with respect to the bonds purchased outright, but on April 8, 1909, before the tenth and last installment of purchased bonds had been delivered and paid for, the defendant delivered and the plaintiffs accepted for resale to a designated purchaser for a specified purpose, $100,000 of bonds, pursuant to negotiations theretofore had. These bonds were no part of those which were sold and purchased outright.

At the first trial of this case, the court excluded testimony offered by the plaintiffs to show that, by taking this $100,000 of bonds before the completion of the outright purchase, they had accepted or exercised the option contained in the contract, and held that the option to take the $1,250,000 option bonds could not be accepted or exercised until after the completion of the delivery and sale of the $250,000 purchased bonds. On writ of error, this court declined to give to the contract the restricted construction which its literal terms might warrant, and gave it a construction which the court found the parties themselves by their conduct had given it, and held that the plaintiffs obtained an option, which was established by the contract, that they could accept and exercise it before the termination of the period for the delivery of the bonds purchased outright, that the right to anticipate deliveries attached to the option bonds as well as to the purchased bonds, and that if anticipations were made, whether of one class or of the other, the requirement to take $25,000 of bonds monthly was suspended until such time as would have elapsed had the bonds been taken in regular monthly installments, instead of being taken in advance thereof.

When this court placed this construction upon the option clause of the contract, the question whether the sale of $100,000 of bonds of April 8, 1909, was an acceptance or was made in pursuance of an acceptance of the option by the plaintiffs, or was a transaction under another contract, became the central question in the controversy. The plaintiffs introduced testimony which had been excluded at the first trial, tending to prove that by the transaction of April 8th they had accepted the option granted them by the contract; and the defendants, on the other hand, introduced testimony tending to show that the transaction was the result of a separate negotiation, having for its object an altogether different matter from what was contemplated by the contract, that the transaction was entered into and completed under an agreement independent of and unrelated to the contract of July 7, 1908, and that therefore it was not an acceptance of the option.

This question was submitted to the jury, and to the manner of its submission the plaintiffs take exception. We are of opinion that the learned trial judge submitted the case upon a very clear statement of the law, and that while certain expressions in the charge, standing alone, might be open to the comment to which the plaintiffs have subjected them, nevertheless, when read in connection with their context, we find them unexceptionable.

[1] In his instructions upon the law, the learned judge properly stated to the jury that the "main question in the case is whether or not

the option was accepted by the plaintiffs," and in defining the burden which rested upon the plaintiffs to prove acceptance of the option upon which they were suing, he said, among other things, that "it does not appear that there was any written acceptance of the option, * * *" and elsewhere he stated that he did not recollect testimony of "any letter immediately following that transaction, or antedating it, in which reference is made in distinct terms to the fact that that [the $100,000 bond transaction] was an acceptance of the option." Stress is laid by the plaintiffs in error upon these two expressions, maintaining that in effect the jury was instructed that an acceptance of the option must have been by letter or by writing, and that the jury was thereby misled into the inference that, in the absence of testimony showing acceptance by letter or by other writing, the option was not accepted. As we read the part of the opinion from which the expressions excepted . to are taken, it is clear to us that nothing in the statement of the judge would have warranted the jury in thinking that the right of the plaintiffs to recover depended upon evidence of a written acceptance of the option. Though allusion was made to the absence of a written acceptance, the allusion was merely preliminary to the statement made, and in substance repeated, that "the method of accepting the option is not provided for in the agreement." Instead of misleading the jury into a belief that a writing was necessary to an acceptance, the words of the judge in effect cautioned the jury that such was not the case, for in the absence of a method of acceptance provided for by the contract the court distinctly instructed the jury that "an option, where there is no provision as to the manner of its acceptance, may be accepted in any manner by which, or in pursuance of which, or at a time when the minds of both parties have met with the understanding that the acceptance has taken place," continuing with an appropriate instruction respecting the legal inference of an acceptance, deduced from the acts of the parties.

[2] The plaintiffs further urge that the learned trial judge, in charging the jury that the burden of proof was upon them, erroneously required them to show not only that they had taken the $100,000 of bonds, but also to show affirmatively that the bonds so taken were bonds that the defendant had held when the contract was made in July preceding. The court said:

"Now, while the contract does include all the bonds that the defendant had subject to its disposal at that time, yet there is no evidence in the case that the defendant did not have other bonds on April 8th, which may have been other than some of these option bonds, and it was not necessary that the same bonds of the same number be always preserved intact to meet the requirements, provided that other bonds of like tenor and amount of the same issue were available."

It is not entirely clear just what the learned judge meant by this language. Its importance, however, is wholly lost in the consideration of the main issue, which was, not whether the bonds sold on April 8th were a part of the bonds reserved for delivery under the option, if accepted, but whether the bonds then sold were sold under the option or under an entirely different contract.

Testimony that the bonds sold in the transaction of April 8th were bonds reserved to be delivered under the option, if accepted, or testimony that they were other bonds, or absence of testimony upon the point, has no bearing upon the question whether the bonds were sold under a contract completed by the acceptance of the option, or under another contract, for, had the bonds been in fact a part of the bonds reserved for the option, there is nothing in the contract of July 7, 1908, nor in the relation of the parties, which would have prevented them modifying the old contract or entering into a new one concerning the same bonds. Evidence of the character of the bonds would not have proved the character of the contract under which they were sold. This is made clear by the main question submitted in the charge, upon which the jury must have acted, without being disturbed by the expression of the learned judge excepted to.

Default in paying for bonds terminated the contract. By the transaction of April 8, 1909, the bonds purchased by the plaintiffs were sold by them to a creditor of the defendant, and by the creditor were accepted in substitution of the defendant's obligation of indebtedness. The difference between the amount of the defendant's indebtedness and the purchase price of the bonds was paid by the purchaser to the plaintiffs, and the same remitted by the plaintiffs to the defendant, less the sum of $500. It was claimed by the plaintiffs that this sum was chargeable to the defendant as its part of the expense in effecting the sale. This was denied by the defendant, and the jury was asked to decide, if they found the option accepted, whether in withholding the payment of this sum the plaintiffs had defaulted in a payment for bonds delivered and purchased, and thereby under its provisions had terminated the contract. On this question there was considerable controversy, which the plaintiffs in error have reviewed before this court, but with which we think we have nothing to do.

After a careful consideration of all matters assigned as error, we are very clearly of the opinion that in the proceedings and judgment below error was not committed.

The judgment below is affirmed.

## On Petition for Rehearing.

PER CURIAM. [3] In the petition for a rehearing of this case the plaintiffs in error suggest that the court inadvertently erred in overlooking (and approving) two points made by the defendant which were inconsistent with each other, namely, that the one hundred bonds were not taken under the option because of its nonacceptance, and that in withholding five hundred dollars of the proceeds of the sale of the same bonds the plaintiffs failed to make payment under the terms of the option, thereby indicating that this court affirmed the judgment upon two equally inconsistent grounds: "(1) As to the acceptance, because the bonds were not taken under the written contract; (2) as to termination, because they were." The suggestion of such confusion warrants a brief consideration.

As the issues of this case developed, it was clear that the plaintiffs based their right to recover upon the acceptance of an option, the de-

livery and receipt of one hundred bonds thereunder, and their subsequent performance of its terms. The defense was based upon a contention that the option was not accepted, that the one hundred bonds were delivered and sold pursuant to an altogether different contract, but if accepted the option contract was nevertheless terminated by the plaintiffs' default in making full payment for the bonds delivered and sold. The defendant claimed, and the plaintiffs admitted, that five hundred dollars of the proceeds of the sale of the bonds had not been paid to the defendant. In its charge upon this point the District Court, without the suggestion of confusion, said:

"The main question in the case, gentlemen, is whether or not this option was accepted; then if accepted, whether or not the retention of the $500 was a material violation of its terms."

In approving the submission, this court said:

"The jury was asked to decide, if they found the option accepted, whether in withholding the payment of this sum ($500) the plaintiffs had defaulted in payment for bonds delivered and purchased and thereby under its provisions had terminated the contract."

The verdict was entirely consistent with a finding by the jury that the option had been accepted and that the contract had been terminated by the plaintiffs' failure to pay for the bonds delivered thereunder.

The other points presented in the petition for a rehearing fail to impress us that this case was improperly submitted or reviewed. The petition, therefore, is dismissed.

---

SMITH–BOOTH–USHER CO. v. DETROIT COPPER MINING CO. OF ARIZONA.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1915.)

No. 2472.

TRIAL ☞139—DIRECTION OF VERDICT—POWER OF COURT.

On a motion for directed verdict, the court may not weigh the evidence; and if the facts are disputed, or if there is substantial evidence both ways, even if there be a preponderance of evidence one way, it is for the jury to determine what facts are established.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. ☞139.]

In Error to the District Court of the United States for the District of Arizona; Wm. H. Sawtelle, Judge.

Action at law by the Smith-Booth-Usher Company against the Detroit Copper Mining Company of Arizona. Judgment for defendant, and plaintiff brings error. Reversed.

On December 5, 1912, the plaintiff, the Smith-Booth-Usher Company, entered into a contract with the defendant, the Detroit Copper Mining Company of Arizona, by the terms of which the plaintiff undertook to furnish to the defendant three 200 H. P. International Amet crude oil gas producers. The machinery was to be "as described in the Manufacturers' Bulletin, or of the latest improved design." It was to be shipped from Los Angeles to Morenci,

Ariz., where the defendant's plant is located. The defendant was to pay the plaintiff $10,000, with interest at 6 per cent. from the date of erection, upon the completion of the 90 days' trial provided for in the contract. in case the apparatus met the guaranty specified. The machinery was intended to produce gas from crude oil. It consisted of three distinct units, which were to furnish gas into a single main, together with "scrubbers, oil pump, and plans and specifications." In order to complete the gas producing plant, the defendant bound itself to furnish a 15,000 cubic feet gas holder and the necessary auxiliary machinery, including pipes and mains. In the latter part of February, 1913, the apparatus was shipped. At the request of the defendant, the plaintiff's erecting engineer, Vorhees, went to Morenci about March 8th, and superintended the erection of the machinery. It was completed about March 27, 1913. Cox, the plaintiff's sales engineer, went to Morenci April 2, 1913, and began the tests of the machinery in the 90 days' trial provided for in the contract. The tests were continued until May 7, 1913. There is evidence that with the consent of the defendant Cox then left Morenci, pending the decision of the defendant on his suggestion that it install a new gas washer for the machinery, and with the intention of returning and continuing the tests. On May 28th the defendant advised the plaintiff that it would go no further with the tests under the contract. The defendant refused to continue with the contract, and refused to pay for the machinery.

The plaintiff in its complaint alleged its performance of the written contract, and a breach of the same by the defendant in failing to supply the 15,000 cubic feet gas holder, and in refusing to proceed with the test. The defendant answered, denying that it failed or refused to furnish the 15,000 cubic feet gas holder, denying that the machinery met any of the guaranties specified in the agreement, admitting that on or about May 28th it had notified the plaintiff that it would go no further with the contract, but alleging that prior to that notice the plaintiff, after it had become fully apparent that the machinery could not be made to comply with the guaranties and conditions of the agreement, admitted that the same was not in compliance therewith, nor in conformity with the requirements of the agreement, and voluntarily abandoned further attempt to run or operate the same, and asked for a long extension of time in which to substitute other and different machinery, which request the defendant denied, and the defendant alleged that the gas produced by said machinery was so inferior in quality and grade, and so charged with soot and suspended matter, as to be not only entirely useless for the purposes for which it was intended, but so as to be highly injurious to the engines and gas-conducting pipes of the defendant.

Oscar C. Mueller and Alfred Wright, both of Los Angeles, Cal., and William M. Seabury, of Phœnix, Ariz. (John De R. Storey, of New York City, on the brief), for plaintiff in error.

Everett E. Ellinwood and John M. Ross, both of Bisbee, Ariz., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). At the close of the plaintiff's testimony, on the motion of the defendant that the jury be instructed to return a verdict in its favor, the court, in an extended instruction to the jury, reviewed and weighed the plaintiff's evidence, and concluded by saying:

"I have carefully examined the evidence in this case, and I find that it fails to show that the plaintiff has established that said apparatus did meet each and all of the guaranties specified in said agreement, and the defendant's motion to instruct the jury to return a verdict in its favor will be granted."

The circumstances under which a court may withdraw a case from the jury are stated by Mr. Justice Harlan, sitting with Judge Lurton

and Judge Sage in the Circuit Court of Appeals for the Sixth Circuit, in the leading case of Travelers' Ins. Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305, in which he said:

"The rule upon that subject has been defined in recent adjudications. The thought intended to be expressed in them is that the jury should be permitted to return a verdict according to its own view of the facts, unless upon a survey of the whole evidence, and giving effect to every inference to be fairly or reasonably drawn from it, the case is palpably for the party asking a peremptory instruction. A mere scintilla of evidence in favor of one party does not entitle him, of right, to go to the jury. Improvement Co. v. Munson, 14 Wall. 442, 448, [20 L. Ed. 867]. On the other hand, a case cannot properly be withdrawn from the consideration of the jury simply because, in the judgment of the court, there is a preponderance of evidence in favor of the party asking a peremptory instruction. If the facts are entirely undisputed or uncontradicted, or if, upon any issue dependent upon facts, there is no evidence whatever in favor of one party, or, what is the same thing, if the evidence is so slight as to justify the court in regarding the proof as substantially all one way, then the court may direct a verdict according to its view of the law arising upon such a case. If a verdict is rendered contrary to the evidence, the remedy of the losing party is a motion for a new trial. In disposing of that motion, the court, in the exercise of a sound legal discretion, may interpose and prevent the injustice that may be done by such a verdict. While the court may instruct the jury as to the law arising upon a given or hypothetical state of facts, it is for the jury, if the facts are disputed, or if there is substantial evidence both ways, even if there be a preponderance of evidence one way, to say what facts are established. And this is what was meant by the observation in some cases that the court should not withdraw from the jury a case depending upon the effect or weight of testimony, unless the evidence should be of such conclusive character as to compel the court to set aside a verdict returned in opposition to it. Insurance Co. v. Doster, 106 U. S. 30, 32, 1 Sup. Ct. 18 [27 L. Ed. 65]. The court may be of opinion that, according to the weight of the testimony, a verdict should be returned for the party asking a peremptory instruction. But it may not, for that reason alone, give such an instruction. It may not take the case from the jury, on issues of fact, unless the evidence is so distinctly all one way that a different view of it would shock the judicial mind."

In Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 Fed. 463, 477, 20 C. C. A. 596, 609, Judge Lurton said:

"We do not think, therefore, that it is a proper test of whether the court should direct a verdict that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions, he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether under the law a verdict might be found for the party having the onus."

Again, in Rochford v. Pennsylvania Co., 174 Fed. 81, 98 C. C. A. 105, Judge Lurton said:

"A motion for an instructed verdict. upon an insufficiency in law of the evidence, presupposes that the witnesses testifying to the facts adduced to make a case for the party against whom the motion is made are worthy of credit. It is as if the party making the motion had demurred to the evidence, and is equivalent to saying: 'We concede the truth of the facts which are

relied upon to make a case for the plaintiff, or a defense for the defendant; but they are insufficient in law to support a verdict, which must be founded upon such facts.'"

The right to a jury trial is guaranteed by the Constitution, and it is not to be denied except in a clear case. The foregoing decisions, and many others that might be cited, have definitely and distinctly established the rule that if there is any substantial evidence bearing upon the issue, to which the jury might properly give credit, the court is not authorized to instruct the jury to find a verdict in opposition thereto. Tested by these rules and on a careful consideration of the evidence in the case at bar, we are of the opinion that the cause should have been submitted to the jury.

One of the important provisions of the contract was that which gave the plaintiff the benefit of a 90 days' test. In the light of the testimony, it is clear that this provision secured to the plaintiff a substantial right, a right which was of the essence of the contract. The time which was devoted to the test was but 35 days. The defendant in its answer alleges a breach by the plaintiff of this provision of the contract. There was testimony, however, to the contrary. Cox, the testing engineer, testified that about May 6th Thompson, the defendant's general manager, stated to him that there was too much suspended matter in the gas, and that the gas must be cleaned better than it was being done at that time; that he answered Thompson by saying that by a system of sprays and sluicing the gas could be run through the pipe lines and through the holder without causing interruption of the service, but that, if he desired the gas cleaned better than it was being cleaned, there was an apparatus that had lately been tried at El Centro, whereby the gas could be cleaned absolutely; and that Thompson agreed to send an engineer to inspect that plant, and to be governed by the engineer's report, and would let the plaintiff know whether he was willing to grant an extension of time necessary to obtain that apparatus, and that it was upon that understanding that Cox left for Los Angeles on the following day, and he testified that he (Cox) held himself in readiness to return to Morenci to continue the test, as soon as he heard from Thompson. There is no evidence that Thompson ever did examine or cause to be examined the device at the El Centro plant, and it was not denied that a week later Thompson stated to Mr. Smith, the president of the plaintiff, at Los Angeles, that the defendant had made other arrangements, and had no longer any use for the plaintiff's apparatus. On May 27th Thompson wired the plaintiff that the defendant did not desire to continue with the contract. On May 28th Thompson wrote the plaintiff a letter, in which he set forth the real reasons why he wished to avoid the contract. He wrote:

"Our reasons for doing so are not so much because we doubt that you could finally make clean gas, but because the apparatus required for this and for handling the soot far exceeds anything we were led to expect when we negotiated for the plant."

The letter further explains that the plant so furnished, together with the washing apparatus, would occupy so much space that it would

be out of the question to install another gas plant, as was contemplated, on the defendant's premises.

The court below found failure of proof of the plaintiff's compliance with its contract principally in the fact that there was present in the gas produced by its machinery lamp black, which the court said clogged the defendant's gas pipes. But the evidence shows that the clogging was not in the gas pipes, but in the washers of the units; that the presence of lamp black was to be expected, and to be dealt with, and that the plaintiff, even if it had not already done so, expected, in the course of its tests so to control the same as to obviate the clogging. The contract stipulated that there should be "no suspended matter contained in the gas which will be injurious to the engines or gas-conducting pipes" of the defendant. This is all that the contract required as to the quality of the gas. It did not require that there should be no lamp black in it. Mr. Cox, who was admitted by the defendant to be a qualified expert, testified that the small amount of suspended matter in the gas would have no injurious effects on the defendant's engines or pipes, and although he admitted that the suspended matter might after a time cause the pipes to become clogged unless they were sluiced or cleaned, he testified that the cleaning could be done without closing down the plant, and it was in this connection that he testified that he proposed to Mr. Thompson to introduce the apparatus which would absolutely clean the gas, if the defendant desired it better cleaned, but at the same time he stated that the gas met the requirements of the contract.

One Ensign, an electrical mechanical engineer, testified that at Yuma the same kind of gas producers as those which the plaintiff had installed, used under similar conditions, produced gas which carried more lamp black, before it reached the holder, but that after four years of continuous use it produced less than three inches of lamp black in the bottom of the holder. In brief, there was evidence that the plaintiff had fully complied with its contract; that the gas producers produced a gas sufficiently free of matter in suspension as not to be injurious to the "engines or gas-conducting pipes" of the defendant; that after a test of 35 days, it was still ready and willing to make further tests and alterations in order to satisfy the defendant, and that the defendant refused to abide by the contract, principally for reasons which had nothing to do with the terms and provisions thereof. The case was clearly one for the jury.

The judgment is reversed, and the cause is remanded for a new trial.

UNITED STATES v. PETERSON et al.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915.)

No. 2414.

PUBLIC LANDS ⬤120 — CANCELLATION OF PATENTS — SUFFICIENCY OF EVIDENCE.

In a suit to cancel a patent to land which the patentee conveyed to defendant, on the ground that the patentee in filing on the land and obtaining a patent was acting for defendant, evidence *held* sufficient to sustain the burden of proof resting upon the government, and to entitle it to a decree canceling the patent.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ⬤120.

Cancellation of patent, see note to Hartman v. Warren, 22 C. C. A. 38.]

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit by the United States against Jennie Peterson (formerly Jennie Benedict) and others. From a decree dismissing the bill of complaint, the United States appeals. Reversed and remanded, with instructions.

Burton K. Wheeler, U. S. Atty., and Frank H. Woody, Jr., Asst. U. S. Atty., both of Butte, Mont., for the United States.

Cooper & Stephenson, of Great Falls, Mont., for appellees Albright.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge. The United States appeals from a decree dismissing its bill of complaint in a suit brought against the appellees to set aside and cancel, on the ground of fraud, a patent issued to Jennie Peterson for 160 acres of land in the state of Montana.

The testimony of Jennie Peterson was, in substance, as follows: She had been working in Montana for the defendant William H. Albright before she was of age, and had said that when she got old enough she would like to take up a ranch. Thereafter she returned to reside with her mother in Michigan. While there, in the spring of 1901, Albright wrote to her and said that he understood that she wanted to come West again, that she was old enough, and could file on a homestead, that he had a piece of land in view, and, if she decided to come West again, to let him know and he would send her a ticket. She answered his letter, and he sent her a ticket, which she used. She left Michigan July 5, 1901, and went to Great Falls. She had written to Albright, telling him about the time she would leave Michigan. He met her in Great Falls, and told her that the papers were ready in Prior's office. She thereupon filed on her homestead. She had not been on the land, and did not know where it was located. She did not direct Prior to prepare the papers, and had nothing to do with the preparation of the homestead filing, nor did she pay the filing fees, or know who paid them. She discussed with Albright what she was to receive for the land when she proved up on it. The

understanding was that she was to commute and prove up at the end of 14 months, and was to receive $640, "or the same as the rest of them would receive for their homestead right.". By "the rest of them" she meant Peter Carter, August Enger, Hermann, Oliver, "and a few more." Albright told her that she was to receive the same as the rest of them that took up homesteads. She understood that was for $640. Albright was to pay the expenses. He built her house for her. After making the entry, a part of the time she worked for Albright, and part of the time she lived on her homestead. In the early spring of 1902 she visited the ranch. She had nothing to do with the building of the cabin. While she lived on the ranch, Albright furnished her provisions, as it was a part of the agreement that he was to pay all expenses. She never paid out anything for expenses in the way of improvements. She could not state who did the labor, but thought Peter Parker and Gustav Hermann put up the cabin. She submitted final proof on August 11, 1905. Albright gave her money to pay the expenses of the witnesses. On making proof she answered the questions just as Albright told her to. He had furnished her with a copy of the questions. She did not pay the filing fees, or the fees on final proof. She commuted, and Albright gave her the money. After she got the filing receipt, she transferred it to Mrs. Albright, under Albright's direction. She received $650 for the land, $500 in a note of Albright, and $150 either in cash or by check. After making the entry on her homestead, she had had her homestead filing changed so to embrace some desert land which had been in the possession of one Lavelle, who relinquished the same at Albright's instance. She further testified that, on making final proof, Albright told her not to say anything about his arrangement with her. At that time she had no property except a horse. Albright told her they might ask her if she had any stock. He told her he would give her a bill of sale for two cows, which he did. After she came out of the land office, she handed the bill of sale back to Albright.

Peter Carter testified that he had been employed by Albright, that he filed on a homestead near Albright's quarry, and that he had an agreement to transfer the property to Albright prior to the time when he filed. He said:

"I was to file on the land, and he would pay the expense. When I acquired title, I was to transfer it to him."

And he testified that after he made his final proof, and received his final certificate, he sold it to Albright for $640.

Frank C. Whittaker testified that he had worked for Albright, and was working with him "as partner on things" for six or seven years, and was interested with him in some mining claims in 1901; that Albright and Mrs. Albright talked to him about getting Jennie Peterson to take up some land. "We three talked it over, and thought it would be a good thing to get her to come out and take up land for Mrs. Albright. Albright suggested that he would send her a ticket to come, and some money for expenses. Mrs. Albright thought it would be all right to have her come and keep books and take up some land," and he testified that before she came he and Albright staked and meas-

ured out the land for her claim, and put up three or four rock in place, so that they would know where it was, and set some sta res thereon. He testified that there was a difference made in her case from that of some other people who had taken up land and sold to Albright. "Before she got a patent, she was to get the same as the rest, $640—$440 clear, and he would furnish the money to commute with; that if she would stay on the land five years, and not commute, he would give her $750." He testified that Albright built the improvements on her place; that on one occasion Jennie Peterson went up to her homestead to stay several weeks, and Mrs. Albright told her to take provisions out of the kitchen, and that he (Whittaker) was sent up there once so that he could be a witness; that he saw her living on the land, and took her some provisions.

Charles Gustafson testified that he had a conversation with Albright, in which Albright told him that Jennie Peterson was coming "out there to take up land for him"; and he testified that Jennie Peterson told him in the fall of 1901 that she had taken up the land for Albright.

Mrs. Gustafson testified that Albright told her:

"We let that girl take up a homestead for us just to help her out, by working in the office and holding land there, so it gives her a show to make money in two places."

And the witness added:

"It was common talk with every one that the homesteads up there were for Mr. and Mrs. Albright."

Albright denied much of the testimony of the other witnesses. He denied that he sent Jennie Peterson a ticket, or that he met her at Great Falls, or took her to Prior's office. He testified that after she came out from Michigan he went over the land with her, and he described the method in which he arrived at the common corners of sections 35, 36, 25, and 26, "and then stepped back 440 steps, about a quarter of a mile, and made a point there, and we were on every 40. She told me she had to be on every 40." He said:

"I probably went to Great Falls with her when she made her filing. No doubt I did; but I didn't pay the filing fee, or the expense of building her cabin."

On cross-examination, he testified:

"I came to Great Falls with her when she made her homestead entry. I often had some business in Great Falls."

He testified that Hermann built a cabin on the homestead; that Hermann said to him, "I want to build Jennie's house;" and as corroborating his testimony, he pointed to his time book, which showed that Hermann was not working for him at the quarry from December 6 to December 27, 1901. He denied that he paid the expenses of final proof, or of the improvements, or of the cultivation of the land. He testified that he paid Jennie Peterson $800 for her claim, $150 in cash, $150 in check, and $500 by note. He testified that Jennie Peterson had told him she wanted some fencing done on her

claim, and asked him how much it would be, and when it was figured up it amounted to $110, so he said to her:

"'All right, you pay me, and I will get your fencing and put it up.' I constructed the fence on the Jennie Peterson claim, and she paid me for it."

Mrs. Albright testified:

"I don't think there was any agreement existing between her (Jennie Peterson) and Mr. Albright that she was holding the homestead for him."

The court below, while entertaining the opinion that the testimony served to arouse suspicion, and even preponderated in favor of the complainant, held that it fell short of the "high degree of proof" the government must produce to warrant cancellation of its executed contract, its patent and grant of title, and pointed to the fact that there were no circumstances to corroborate Mrs. Peterson, "that the ticket and letters, etc., rested on her testimony alone," and the court added:

"Albright's books are inconsistent with her testimony that he paid all her expenses on the land."

We find nothing incredible in the testimony of Jennie Peterson. Her testimony was given some 10 years after the date when she filed on her homestead, and it is not a suspicious circumstance that she had failed to preserve the letters which she testified Albright wrote her prior to her entry. As to his sending the ticket on which she came West, it is not pointed out how she possibly could have corroborated her testimony. What motive could she and the other witnesses have had to testify falsely against the Albrights? It does not appear, and Albright does not testify, that there was any misunderstanding or ill feeling between Jennie Peterson and himself until after she had stated the facts in regard to her homestead to one Bennett, shortly before the suit was begun. "There was no hard feelings between Mr. Albright and me until this case came up," said Jennie Peterson. But after the suit was begun, she testified, she had a conversation with Albright in which—

"Mr. Albright said I was in for it, and wanted to know what I was going to do about it. I said I was going to tell the truth; and he told me I might get 20 years in the penitentiary if I said I took it up for his benefit, because I swore I took it up for my own benefit. * * * He told me to do the right thing when I testified. I don't know what he meant by the right thing. He didn't explain. He said he would make me a present. He said I must testify that I didn't take it up for him, and he didn't make any bargain with anybody."

She went on to say that at that time he abused her shamefully, and added:

"The reason he talked that way was because his attorney discovered I put my name on this paper for Mr. Bennett. That was what the trouble started over."

According to Albright's testimony, he had had trouble with all the witnesses who testified against him, and Mrs. Peterson had tried to get blood money out of him, to hold him up for $1,000. He said:

"Jennie Peterson went around the kitchen, in the back way, and came to the hall, and says, 'Have you got anybody hid here?' I said, 'What do I want

to hide anybody for?' Then she said that, if I didn't give her $1,000, she, Frank Whittaker, and Charley Gustafson would swear me to the pen by a preponderance of the evidence."

He testified:

That Carter "fired a rock at him," and that Whittaker was "pretty crooked —dog-gone crooked"; that Whittaker drew a gun on him on April 27, 1910. "As I went to the table to get breakfast, he jumped from behind the door, and stuck the gun in my face. He said, 'Throw up your hands.' I flew upstairs. I didn't have a gun."

He furnished no explanation of the motive or provocation of these melodramatic acts of Peterson, Carter, and Whittaker, and the nature of the incidents described, and the manner in which they are narrated, carry the suggestion that their source is fictional.

We are unable to agree with the court below that Albright's books are inconsistent with Jennie Peterson's statement that he paid all her expenses on the land. The only books which Albright produced in evidence was his timebook. The daybook, which would have shown the nature of his transactions with Jennie Peterson, was not produced, nor was its absence accounted for, further than by Albright's statement: "I haven't got the daybook, and I don't know where it is." The timebook contained entries of the time of various employés of Albright, and charges of money entered against such employés from time to time. There is nothing but Albright's own testimony to show what those charges were for, whether for money paid for wages, or for groceries and goods supplied, or for services. One of the charges against Jennie Peterson is $110. Albright testified that that was for fences which he built on her homestead at her request. But the entry itself does not show that it may not have been for wages which she earned in his employment, as she was admittedly working for him as bookkeeper in his office during a large part of the time while she was residing upon her homestead. Albright pointed to entries of his timebook showing that Hermann was not working for him from December 6 to December 27, 1901, for the purpose of proving that Hermann was not in his employment while he was building the cabin on the Peterson claim. But in his answer to the bill of complaint Albright alleged that Jennie Peterson established her residence upon the lands aforesaid on or about the month of October, 1901, and in the homestead proof, made by Jennie Peterson in 1905, she deposed that the house was built in October, 1901. In short, the timebook adds neither strength nor corroboration to Albright's testimony.

Nor are we able to agree with the court below that the evidence is not of that high character which is required in order to set aside a patent for fraud. The latest expression of the views of the Supreme Court as to the nature of the evidence which is called for in that class of cases is found in Diamond Coal Co. v. United States, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936, in which the court said:

"The respect due to a patent, the presumption that all preceding steps required by law were duly observed, and the obvious necessity for stability in titles resting upon these official instruments, require that in suits to annul them the government shall bear the burden of proof, and shall sustain it by that class of evidence which commands respect and that amount of it which produces conviction."

220 F.—39

We think in the case at bar the government has met the burden of proof by a class of evidence which is entitled to respect and is convincing. The evidence wholly fails to establish the defense that Mrs. Albright was an innocent purchaser for value.

The decree is reversed, and the cause is remanded, with instructions to enter a decree for the appellant.

---

### LEITER et al. v. POINDEXTER.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915. Rehearing Denied March 18, 1915.)

No. 2335.

1. BILLS AND NOTES ☞150—NEGOTIABILITY—CHARACTER OF INSTRUMENT.

A contract entitled "Stockholder's Purchasing Contract," whereby the subscribers purchased a horse, following which agreement to purchase was a promise to pay $2,800 therefor in installments in the form of a promissory note, was upon its face what it purported to be, a purchasing contract, and not a negotiable promissory note.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 55, 374–379, 405, 406; Dec. Dig. ☞150.]

2. APPEAL AND ERROR ☞843—REVIEW—MATTERS NOT NECESSARY TO DECISION.

In an action by the transferee of a contract to purchase a horse, containing a promise to pay in the form of a promissory note, where the jury found for defendant on his contentions that the instrument did not contain the promise to pay when signed by him, and that the preliminary recitals of the contract, with the surrounding circumstances, put plaintiff on notice that the instrument was not a negotiable promissory note, but a contract of purchase, it was immaterial whether as a matter of law the instrument was a negotiable note or not, as the jury by its verdict found that it was not such an instrument in fact.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3331–3341; Dec. Dig. ☞843.]

In Error to the District Court of the United States for the Central Division of the District of Idaho; F. S. Dietrich, Judge.

Action by J. M. Leiter and another against Thomas S. Poindexter, brought by plaintiffs, as assignees of the A. C. Ruby Company, on a certain written instrument alleged to be a promissory note, executed by defendant and one Henry Stroh, in favor of the A. C. Ruby Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

Forney & Moore, of Moscow, Idaho, and Wilson & Neal, of Portland, Or., for plaintiffs in error.

C. J. Orland, of Moscow, Idaho, and J. T. Brown, of Colfax, Wash., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. On February 14, 1911, the defendant in error, Thomas S. Poindexter, together with one Henry Stroh, made,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

executed, and delivered to Samuel K. Watson, acting as agent for and on behalf of the A. C. Ruby Company, the following written instrument:

### "Stockholder's Purchasing Contract.

"Feb. 14, 1911.

"After a good and satisfactory examination of the Percheron stallion named Ithos, No. 53,347, owned by the A. C. Ruby Company of Portland, Or., and recognizing his value as a means of improving our horse stock, we, the undersigned subscribers, hereby purchase said stallion of the A. C. Ruby Company accordingly, and we hereby authorize the delivery of said horse to any one of the subscribers hereto.

"$2800.00.                            Portland, Oregon, Feb. 14, 1911.

"For value received, I promise to pay to the order of the A. C. Ruby Company the sum of twenty-eight hundred dollars, payable at the Merchants' National Bank, Portland, Oregon, in payments as follows:

"One thousand and $^{00}/_{100}$ dollars, Oct. 1, 1911.

"Nine hundred and $^{00}/_{100}$ dollars, Oct. 1, 1912.

"Nine hundred and $^{00}/_{100}$ dollars, Oct. 1, 1913—

with interest from date at the rate of eight per cent., payable semiannually, and if not so paid, the whole sum of both principal and interest become due and collectible at the option of the holder hereof, and in case suit or action is instituted to collect payment I agree to pay reasonable attorney's fees.

"Thos. S. Poindexter.
"Henry Stroh."

The plaintiffs in error were plaintiffs in the court below in an action commenced on December 16, 1911, on the foregoing instrument, alleging it to be a promissory note. It is further alleged that prior to the 14th day of August, 1911, A. C. Ruby Company mentioned in said instrument as payee, for a valuable consideration sold, assigned, and transferred the said note by indorsement to J. M. Leiter and Floyd J. Campbell, the plaintiffs in said action, and that the said plaintiffs were then the legal owners and holders of said note; that said note had not been paid, nor any part thereof, except the sum of $400 paid by the defendant, to apply one-third on each of the installments of principal provided for in said note. The defendant in his answer set up three defenses to the cause of action stated in the complaint:

[1] 1. A denial that the written instrument in suit was a negotiable promissory note. In this defense the issue was presented as a question of law, and was considered and determined by the court below in the negative. The offer of the plaintiffs to introduce evidence tending to show that they were bona fide holders of the instrument for value, and that they took it before maturity without notice of any defense thereto, was accordingly held by the court to be immaterial, and the evidence was excluded. The court also refused to instruct the jury that the instrument set out in the complaint was in law a negotiable promissory note. The case has been brought here by the plaintiffs upon that question alone. We concur in the ruling of the court below upon this question. We are of opinion that the instrument upon its face is what it purports to be, a "Stockholder's Purchasing Contract." But, as we view the case, the question was primarily one of fact. In the defendant's answer the two remaining defenses were questions of fact, the determination of either of which determined whether the instrument was in fact a negotiable promissory note.

[2] 2. In the second defense the defendant alleged that the instrument set out in the complaint was not signed by him in the form and with the conditions therein specified; that if the instrument set out in the complaint was in accordance with the original of which it was claimed and alleged to be a copy, and the defendant's signature was attached thereto, then the defendant alleged that such instrument had been altered and changed; that he at no time ever made, executed, signed, or delivered any such instrument to A. C. Ruby Company, or to any other person or persons; that he never signed any instrument whereby he agreed to pay A. C. Ruby Company $2,800; that he signed no instrument wherein he promised to pay said sum in installments of $1,000, $900, and $900, respectively, as mentioned in the complaint; that there was no promise to pay any sum of money at any time or date, and that as to all such matters the instrument had been altered and changed; that the defendant never at any time made, executed, or signed such instrument, and never agreed to make, execute, or sign such instrument, or any instrument for the payment of money in any amount to A. C. Ruby Company.

3. The third defense was the alleged failure of consideration upon the breach of a written warranty upon the part of the plaintiffs' assignor with respect to the character of the horse alleged to have been sold to the defendant. It appears that on February 14, 1911, the date of the instrument in suit, the A. C. Ruby Company executed and delivered to the defendant and another, mentioned as purchasers of the horse, and as part of the same transaction, a written guaranty concerning certain qualities of the horse mentioned in the "Stockholder's Purchasing Contract," and it was provided that in case the horse did not have these guaranteed qualities the A. C. Ruby Company would furnish another horse at the same price with the same guaranteed qualities. The defendant alleged in his answer that the horse did not have the qualities specified in the guaranty, and the horse was returned to A. C. Ruby Company without cost. In other words, the defendant alleged a breach of warranty on the part of A. C. Ruby Company, and a failure of consideration for the purchasing contract. This was no defense to the action upon the instrument as a promissory note in the hands of a purchaser for value, before maturity, without notice; but the plaintiffs raised no objection to the answer on that account, nor did they object to the testimony offered in support of this defense, nor did they object to the instructions of the court submitting this defense to the jury.

The jury returned a general verdict in favor of the defendant, and upon that verdict a judgment was entered in favor of the defendant. It is from that judgment that the present writ of error is prosecuted.

4. With respect to the second defense, the verdict was in effect a determination by the jury upon the question of fact that the plaintiff had no cause of action against the defendant upon the instrument as set out in the complaint. With respect to the third defense, the verdict was in effect a determination by the jury that the plaintiffs had no cause of action against the defendant upon the instrument as a purchasing contract. The evidence as it appears in the record was

sufficient to support a verdict upon either of these questions. In submitting the first question to the jury, the court said:

"It is unimportant to you whether this instrument is to be called a promissory note or simply a contract. In other words, it makes no difference whether in law it is to be deemed a promissory note or a contract. In either case, the defendant is bound if he signed it, and if the consideration therefor has not failed, as I shall explain to you in the course of my instructions. * * * There are in reality two primary questions, and this is the first question: I want to make it clear to you and as simple as possible. The first question is: Was this instrument (called 'Stockholder's Purchasing Contract'), in the form in which it now appears when Mr. Poindexter signed his name to it? He admits here upon the stand that this is his signature. However, his first defense is that when he signed his name there the instrument was practically blank. In other words, there was a printed form, but the written matter was not then entered, and that therefore it must have been filled out later by some other person, probably the holder. I say, this in his defense. The testimony, as you will observe, is conflicting upon that question. One or two of the witnesses say the instrument was a blank, and others say it was filled out in the form in which it now appears. There are some circumstances tending to corroborate the plaintiffs, and some the defendant; and it is for you, gentlemen, as best you may, to carefully canvass all the testimony and try to reach a conclusion upon which side the truth lies. If you find with the defendant, that this instrument was a blank, your verdict should be for the defendant, because he would not be bound by the action of any one in later filling in the amount of the note. If, upon the other hand, you find he did sign this in its present form, then he is, upon the face of the instrument, bound by it, and should be required to pay it, unless you find in his favor upon the other matter, which I am about to call to your attention."

In view of the general verdict upon this instruction, it must be held that the jury found as a fact that the defendant did not sign the instrument with its conditions of a promise to pay. This being so, it is clearly no longer material to determine whether the instrument, with the conditions in it, is or is not a negotiable promissory note.

5. The evidence supporting the third defense was also submitted to the jury with appropriate instructions, to which no objection was taken. It is not necessary to reproduce those instructions here, but they involved questions of fact concerning the guaranty, tending to show that the preliminary recitals in the "Stockholder's Purchasing Contract" in suit were sufficient, with the surrounding circumstances, to place the plaintiffs on notice that it was not a negotiable promissory note, but a contract of purchase; and the verdict of the jury must be held to have established that fact. This being so, we must say with respect to this defense, as we said with respect to the second defense, it is no longer material to determine as a matter of law whether the instrument set out in the complaint is or is not a negotiable promissory note. It has been found by a verdict of the jury that it was not such an instrument in fact.

The judgment of the court below is affirmed.

STOCKGROWERS' STATE BANK OF MOUNTAIN HOME et al. v. CORKER.

(Circuit Court of Appeals, Ninth Circuit. February 8, 1915.)

No. 2368.

1. BANKRUPTCY ⊗==166—PREFERENCES—NOTICE THAT PREFERENCE WILL BE EFFECTED.

Where at the time, within four months before bankruptcy, the F. Bank, to which the bankrupt was indebted, induced the S. Bank to make a loan secured by a chattel mortgage, with the proceeds of which the F. Bank was paid, the bankrupt was insolvent and had other outstanding debts of a large amount, the cashier of the F. Bank had directed the attention of the directors to unpaid drafts against the bankrupt, and he then considered the bankrupt's account unsatisfactory, because accrued interest was not forthcoming as demanded, the F. Bank had reasonable cause to believe that a preference would be effected.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ⊗==166.]

2. BANKRUPTCY ⊗==161—PREFERENCES—CHATTEL MORTGAGE.

A chattel mortgage on a stock of merchandise, given by a bankrupt within four months before bankruptcy, was not valid for the amount of a prior mortgage given more than two years before, where in the meantime the merchandise was being disposed of daily in the ordinary course of business, and replenished by other goods from time to time, without any provision being made for the application of the proceeds of sales to the mortgage indebtedness, and it did not appear that any of the goods originaly mortgaged remained in stock at the time of the subsequent mortgage, as it is the rule in Idaho that such a mortgage is void as against creditors and other interested parties, though good as between the mortgagor and mortgagee as to all property not disposed of.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. ⊗==161.]

Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Action by Charles E. Corker, trustee of Thomas Trathen, bankrupt, against the Stockgrowers' State Bank of Mountain Home and another. Judgment for plaintiff, and defendants appeal. Affirmed.

In the town of Mountain Home, Idaho, there were two furniture stores and two banks. One furniture store was conducted by the Thompson Furniture Company, and the other by one Trathen. Trathen owed the First National Bank on two notes, one for $1,700, and one for $500. The Thompson Furniture Company owed the Stockgrowers' State Bank an unsecured note for $3,400 and interest, together with overdrafts. Chattin, president of the First National Bank, was a director also in the Stockgrowers' Bank; Montgomery, assistant cashier of the First National Bank, was a director in the Stockgrowers' Bank; and Green was the attorney for both. Wolfe, another attorney, held assignments from certain creditors of Trathen, amounting to something over $800, and he was pressing these claims for collection. Trathen, in order to satisfy these demands, went to the First National Bank and applied for an additional loan. The matter was discussed with the officers and directors of the bank. The cashier of that bank considered the Trathen account unsatisfactory, because Trathen had been slow in paying interest. He investigated Trathen's assets, and advised his board of directors not to make the loan. The directors at first decided to make the loan, but thereafter, after interviewing Trathen, the additional loan was declined. Those members of the board of directors of the First National Bank who were favorable to making the loan to Trathen then went to the Stockgrowers' Bank and induced that

⊗==For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

bank to loan Trathen the money he needed to take up his debt to the First National Bank, as well as to pay Wolfe's clients. Trathen was notified that his application to the First National Bank had been denied, but that the Stockgrowers' Bank would furnish him the necessary money. He made no application to the Stockgrowers' Bank for a loan. On July 13, 1911, a note and chattel mortgage on Trathen's stock in the furniture store to the Stockgrowers' Bank were prepared by Green at the instance of that bank, and were executed by Trathen. About the same time the Stockgrowers' Bank called its loan to the Thompson Furniture Company, and that company paid the Stockgrowers' Bank through a loan secured from the First National. The outcome of the transaction was that the Stockgrowers' Bank paid the First National $2,294.35, and agreed to pay Wolfe $853.49, and it received from the First National Bank $3,606.69 on the debt owing from the Thompson Furniture Company. The Stockgrowers' Bank, having ascertained that the property on which it had taken its mortgage was not entirely satisfactory, refused to advance the money to pay Wolfe, and thereafter that bank began foreclosure proceedings, and on October 2, 1911, the sheriff sold to it the mortgaged property on the foreclosure for $2,465.18. On October 23, 1911, Trathen was adjudged a bankrupt, and thereafter the trustee in bankruptcy demanded of the Stockgrowers' Bank the possession of the goods obtained on the foreclosure. On August 8, 1913, the trustee brought the present suit against the two banks to recover, for the benefit of creditors of the bankrupt estate, the possession of the stock of furniture and notes and accounts of Trathen which had been mortgaged to the Stockgrowers' Bank. Upon the issues and the evidence, the court below held that the chattel mortgage and the foreclosure thereof created a fraudulent preference in favor of the First National Bank, and ordered the defendants to redeliver the property to the trustee within 20 days from the date of the decree, and in default thereof that judgment be entered against the defendants in the sum of $2,465.18, which was found to be the value of the property.

E. M. Wolfe, of Twin Falls, Idaho, and Wyman & Wyman, of Boise, Idaho, for appellants.

Harry S. Kessler, of Boise, Idaho, and W. C. Howie, of Mountain Home, Idaho, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] The appellants contend that the court below erred in decreeing that the mortgage to the Stockgrowers' Bank was a fraudulent preference. We find no ground for disturbing the conclusion of the court below that the bankrupt was insolvent at the time when the mortgage was made, that the effect of the mortgage was to enable the First National Bank, a creditor of the bankrupt, to obtain a greater percentage on its debt than any other creditor of the same class, and that at the time of taking the mortgage the defendants had reasonable cause to believe that the enforcement thereof would effect a preference within the meaning of the Bankruptcy Act. The record shows that, in addition to the debt which was at that time owing to the First National Bank and the claims which were represented by Wolfe, Trathen had outstanding debts of a large amount, and that the cashier of the First National Bank had directed the attention of his directors to the fact that there were unpaid drafts against Trathen, and that he testified that he considered the Trathen account unsatisfactory, because he had made demand for accrued interest, and it was not forthcoming. In Loveland on Bankruptcy, § 508, the law is thus stated:

"Constructive notice is sufficient, upon the ground that, when a party is about to perform an act by which he has reason to believe that the rights of a third party may be affected, an inquiry as to the facts is a moral duty and diligence, and an act of justice. Whatever fairly puts a party upon inquiry is sufficient notice where the means of knowledge are at hand, and if the party under such circumstances omits to inquire and proceeds to receive the transfer or conveyance, he does so at his peril, as he is chargeable of knowledge and of all the facts, which by a proper inquiry he might have ascertained."

Austin testified:

"I imagine I had investigated his assets, and knew practically what they consisted of. I presume I advised the board of directors as to what his property consisted of, though I cannot say positively."

[2] The principal contention of the appellants is that, notwithstanding the circumstances under which the mortgage was given to the Stockgrowers' Bank, it was good to the amount of $1,700; that being the amount for which, on April 12, 1909, Trathen had executed his mortgage on the same property to Evans and Owens to secure them as indorsers on his note for $1,700 to the bank, and which mortgage was transferred to the First National Bank a month prior to the execution of the mortgage to the Stockgrowers' Bank. But the mortgage to Evans and Owens covered Trathen's stock of merchandise as it was in April, 1909. During the 2 years and 3 months that elapsed between that date and the date of the mortgage to the Stockgrowers' Bank, the stock of merchandise was being disposed of daily, in the ordinary course of business, and was replenished by other goods from time to time. The appellants introduced no evidence whatever to show that any of the goods originally mortgaged to Evans and Owens remained in stock at the time of the execution of the mortgage to the Stockgrowers' Bank.

In Ryan v. Rogers, 14 Idaho, 309, 94 Pac. 427, it was held that where the mortgagor of a stock of merchandise, constituting his stock in trade, remains in possession of the chattels mortgaged, and with the knowledge and consent of the mortgagee continues to sell and dispose of the same without applying the proceeds of the sales to the reduction of the mortgage debt, the mortgage is thereby invalidated as against creditors and other interested third parties, although such a mortgage would be good as between the mortgagor and the mortgagee as to all property not so disposed of, and also held that if the mortgagee took possession of the mortgaged property prior to the assertion of right or acquisition of claim against the property by a creditor's attachment or execution, or other lien, the mortgagee will be protected to the extent of his claim. In the case at bar the mortgage made no provision for the application of the proceeds of the sales to the mortgage indebtedness, and possession of that merchandise was never at any time taken by the mortgagees or by the First National Bank. It follows that mortgage did not create a lien superior to the rights of the bankrupt's creditors. The recent decision of the Supreme Court of Idaho in Cauthorn v. Burley State Bank, 144 Pac. 1108, is not inconsistent with this construction of the law of the state.

Appellants suggest that, if we take the view that the First National Bank entered into an arrangement with the Stockgrowers' Bank

whereby the latter made the loan, but really for the other bank, the latter would not have changed its position throughout the transaction, since its new mortgage would be but a renewal of the old. But even in that view the last mortgage would still be affected by the infirmity of the first mortgage, since it could cover only the property originally mortgaged, and, as we have pointed out, there is no evidence to show that at the time when the last mortgage was taken any of the stock of merchandise included in the first mortgage remained in the possession of the mortgagor.

The decree is affirmed.

TACOMA RY. & POWER CO. v. REMMEN.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915.)

No. 2424.

1. STREET RAILROADS ⊚⟹117—ACTIONS FOR INJURIES—QUESTIONS FOR JURY.

In an action for injuries to a person struck by a street car, the testimony of two passengers and a person on the street that the motorman was looking back into the car as the car approached plaintiff made a question for the jury as to defendant's negligence.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 239–257; Dec. Dig. ⊚⟹117.]

2. STREET RAILROADS ⊚⟹98—LIABILITY FOR INJURIES—CONTRIBUTORY NEGLIGENCE.

The law imposes upon one attempting to cross a street car track the duty of vigilance and care.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 204–208; Dec. Dig. ⊚⟹98.]

3. STREET RAILROADS ⊚⟹117—ACTIONS FOR INJURIES—QUESTIONS FOR JURY.

In an action for injuries to a person struck by a north-bound car on a single-track street railway, where there was evidence that a car was approaching from the north, that plaintiff had seen a light leading him to believe that the north-bound car had turned onto a switch, and that he heard a whistle which he took to be a signal to it to stay on the switch for the south-bound car to pass, there was such a doubt as to his contributory negligence as justified the court in submitting that question to the jury, though he at no time looked towards the south for an approaching car.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 239–257; Dec. Dig. ⊚⟹117.]

4. STREET RAILROADS ⊚⟹98—LIABILITY FOR INJURIES—CONTRIBUTORY NEGLIGENCE.

A person crossing street car tracks had a right to assume that the street car company would exercise ordinary care in managing its road and operating its cars, and his failure to anticipate negligence on its part was not necessarily negligence.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 204–208; Dec. Dig. ⊚⟹98.]

5. TRIAL ⊚⟹252—ACTIONS FOR INJURIES—INSTRUCTIONS—CONFORMITY TO EVIDENCE.

In an action for injuries to a person struck by a north-bound car on a single-track street railway, where the evidence tended to show that he took no thought of a car coming from the south, but only of one approaching from the north, and that he assumed that two cars could not

be running at the same time in opposite directions, though he also testified that about the time he was on the track he saw a street car, and thought he could make it, and tried to jump, an instruction that if plaintiff thought he had time to cross the track before the car would reach him, and did not have sufficient time so to do, it was an error in judgment on his part, and he could not recover, was properly refused; there being nothing to indicate that he made any mistake in judgment as to his time to cross ahead of a north-bound car.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. ☞252.]

Ross, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Action by Elling Remmen against the Tacoma Railway & Power Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The Tacoma Railway & Power Company, the defendant in the court below, owned and operated a street railway on Yakima avenue in the city of Tacoma. Between Fifty-Sixth and Sixty-Fifth streets the road was a single track. At the juncture of the avenue with each of those streets there was a switch. The plaintiff was walking south on Yakima avenue, on the west side thereof, on an evening in December when it was quite dark. He testified that when he crossed Sixty-First street he saw a light ahead of him and saw it swing to the left, and that he judged it to be a north-bound car going onto the switch at Sixty-Fifth street; that he went a little farther, and a car came along and passed him, going south; that a little after that he heard a blast of a whistle to the south, and took it to be a signal given by the car which had passed him to the car which stood on the switch at Sixty-Fifth street to direct the latter to remain there, because another car was coming south behind the signaling car; that when he heard the whistle he had gone about 150 feet from Sixty-First street; that he proceeded southward on the sidewalk until he reached a point about 300 feet south of Sixty-First street, where the sidewalk abruptly ended, being obstructed by a fence and an inclosure which extended across the sidewalk and about 12 feet into the street; that within the inclosure there were trees which, together with the fence, obstructed his view of the track south of that point; that he started to walk across the street to the east side, then thought he heard a car coming from the north, and that he kept on walking and looking north to see if he could see the headlight of a car, and that he thought he saw one, and other lights, but that he did not see anything so close to him as to involve danger, and to use his own words: "So I straightened up again, and about that time I was on the street car track, and as I glanced ahead I saw a very short distance from me a street car, and I thought I could make it, and I tried to jump at the same time she struck me." The car which struck the plaintiff was coming from the south, and he testified that at no time from the time he went out into the street did he look to see whether a car was coming from that direction.

John A. Shackleford and F. D. Oaklay, both of Tacoma, Wash., for plaintiff in error.

J. F. Fitch, B. F. Jacobs, and J. M. Arntson, all of Tacoma, Wash., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above).    [1] Error is assigned to the denial of the motion of the defendant for a directed verdict in its favor, which motion was based upon the grounds,

first, that there was no proof of the defendant's negligence; and, second, that the plaintiff was guilty of contributory negligence. So far as the first ground of the motion is concerned, we find in the record ample evidence to go to the jury tending to show that the defendant was negligent. There was the testimony of two passengers upon the car which struck the plaintiff that at the time when the car was approaching the point where the plaintiff attempted to cross the track, a point well lighted up by an electric light near by, the motorman of the car which struck him was not looking ahead, but had turned and was looking into the car, and that he had continued so to look back into the car all the way from Sixty-Fourth street to the place of the accident, a distance of 650 feet. Similar evidence was given by a witness who stood on the street opposite the point where the accident occurred.

[2, 3] A more serious question is whether or not the plaintiff was in law guilty of contributory negligence. The law imposes upon one who attempts to cross a street car track the duty of vigilance and care; and in this case the plaintiff, upon his own admission, crossed the track at a point which was not a usual crossing place and looked only in one direction for an approaching car. His action in so doing, his omission to look at any time to the south, would doubtless constitute contributory negligence in law, were it not for the fact that the defendant, by its management of its cars, gave him reason to believe that a car could not be approaching from the south. His own testimony, and the testimony of one of his witnesses, indicates that at the time when he crossed the track a car going south had left the switch at Fifty-Sixth street and was coming south toward the point where the plaintiff was. We think there is ground for saying that he had the right to assume that the defendant would not be running another car north on the same single track toward a head-on collision with the car which he saw. That circumstance was sufficient, we think, to create a doubt upon the question of the plaintiff's contributory negligence, and to justify the court in submitting it to the jury. That there was a car coming south from Fifty-Sixth street is not contradicted by the defendant, nor does the defendant show that the plaintiff incorrectly interpreted the blast of the whistle which he heard.

[4] The plaintiff had the right to assume that the defendant would exercise ordinary care in managing its road and operating its cars. Kerr v. Boston Elevated Railway, 188 Mass. 434, 74 N. E. 669; Deitring v. St. Louis Transit Co., 109 Mo. App. 524, 85 S. W. 140; Frank J. Lennon Co. v. New York Ry. Co., 108 N. Y. Supp. 995. And his failure to anticipate negligence on the part of the defendant was not necessarily negligence on his part. New York Lubricating Oil Co. v. Pusey, 211 Fed. 622, 627, 129 C. C. A. 88; Strauchon v. Met. St. Ry. Co., 232 Mo. 587, 135 S. W. 14. And so, if the defendant threw the plaintiff off his guard or placed him in peril, the latter's conduct is not necessarily contributory negligence. In re Estate of Kern, 141 Iowa, 620, 118 N. W. 451; Tacoma Ry. & Power Co. v. Hays, 110 Fed. 496, 49 C. C. A. 115; Seattle Electric Co. v. Hovden, 190 Fed. 7, 111 C. C. A. 191.

[5] In view of the foregoing consideration, it was not error to deny the instruction, requested by the defendant, that if the plaintiff failed to look and listen, or take any reasonable precaution to ascertain whether a car was coming from the south, his failure to do so would be negligence, or the further requested instruction that, if the plaintiff thought he had time to cross the track before the car would reach him, and did not have sufficient time so to do, then it was an error in judgment on his part, and he could not recover. There was, as we have seen, no evidence to indicate that the plaintiff made a mistake in judgment as to his time to cross ahead of a car approaching from the south, or that he exercised any judgment as to danger from that direction. The evidence is that he took no thought of a car coming from the south, but only of the car which was approaching in the opposite direction, and that he assumed that the defendant could not be running two cars at the same time on a single track in opposite directions. Under all the circumstances, we think the court properly submitted to the jury the question of the plaintiff's contributory negligence.

We find no error. The judgment is affirmed.

ROSS, Circuit Judge (dissenting). I am unable to agree to the judgment in this case. In my opinion the plaintiff's own testimony shows such contributory negligence on his part as to preclude a recovery by him. I do not think it can be properly said (as is done in the opinion) that the defendant company by its management of its cars gave the plaintiff to believe that a car could not be approaching from the direction the car that inflicted the injury actually did come (the south), nor that the plaintiff had any right to assume that no car would be coming from that direction. Omitting immaterial matter, his testimony is as follows:

"On the 7th day of December, 1912, I left my home at about half past 1 o'clock and went downtown. I had 65 cents in money and paid 5 cents for car fare; bought a glass of beer, and then I bought 50 cents' worth of alcohol, and then another glass of beer, at about 5 o'clock p. m., with my last nickel. I then started to walk home, and was run down by a street car. * * * About the time I crossed Sixty-First street I seen a light that seemed like it was swinging on to the left—striking to the left. I judged it to be on the Alki switch. They call it Sixty-Fifth street switch on Yakima avenue. I thought the light was a car coming downtown, going in onto the switch. I was very close to the crossing, or on it, when I saw the light. I got a little further, and a car came along at a good speed and passed me going from town, the same direction I was going. I might have been almost in the center of that block. Not any more. Just a little after she passed me I was about in the center of the block. I heard a blast of the whistle, because I took notice of it. I thought that was a car that was coming behind, a tripper, as I knew by the time of the night it was, and thought it was a signal to the car that swung in first onto the switch for her to stop and wait until that tripper came up. When I heard the whistle I was halfway between the fence and Sixty-First street. * * * I started to walk across the street to the left, as I could not go further on the sidewalk, and there was an orchard and the fence in front of me. As I started to cross the street I thought I heard something. I was satisfied that I heard a car coming from the direction of town, going south. At that time I was off the end of the sidewalk, out in the street. I kept on walking, and looked around to see if I could see the head light of the car. I thought I seen the headlight, and also other lights; but I tried to get my eyes trained on it, fastened upon the headlight of the street car, and I did not see anything so close to me that I thought there was any

danger, and so I straightened up again and about that time I was on the street car track, and as I glanced ahead I saw a very short distance from me a street car, and I thought I could make it, and I tried to jump like this, and at the same time she struck me, and she rolled me over, and I landed on my arms underneath. I looked southward all the time I was walking on the sidewalk, and saw no street car up to the time I started to turn out across the street. There was a street light at the place I turned to go across, and a path at that point. * * * When I looked towards the north, thinking I heard a street car, I was between the sidewalk and the end of the fence; started off the sidewalk. I was walking across over to * * * aiming to get to that sidewalk over there on the other side. I do not remember anything further until two policemen picked me up in the car at the Interurban Depot. * * * It must be 4½ miles from where I left Fifteenth street to the place where I was injured. It is a block from Sixty-First street to the fence. As I got to Sixty-First street I thought I saw a swinging light on the switch. I did not see any car, but the light must have been from the car. I did not see a car at any time coming from the south, until she was as close as you are to me. My view was obstructed by the orchard and the fence. Q. Did you, at any time from the time you went out back of that fence out into the street, look to see whether a car was coming from that direction, or not? A. No, sir; I looked the other way, as I thought that I heard a car coming up the other way. Q. Where were you when you looked for the car coming the other way? A. I was leaving the sidewalk to go out into the street. Q. You were leaving this cement sidewalk? A. The end of the cement sidewalk; yes, sir. Then I looked down towards Tacoma and thought I saw a headlight. I tried to be sure of it, and kept on walking, and then turned around up the other way, as I thought that car was not close enough to hurt me anyhow, and then I got my eye on this other car. Q. When did you hear the blast of the whistle? A. Probably one-half way between Sixty-First street and the fence. Q. Where did that come from? A. It sounded from the south, Alki switch. Q. You heard the blast of a whistle halfway between Sixty-First street and the fence? A. Just about. Q. Then you knew the car was coming? A. I thought the car was going to stay there on account of another car coming up. Q. You knew what the blast of the whistle of a street car means? A. I thought it meant to stop. Q. Did you ever hear a street car give a whistle when it was going to stop? A. For another car behind it. Q. Why did you look towards the city when you heard the whistle at Alki switch? A. I thought there was a tripper behind the one coming on south. I thought the car was coming and was going to stay there on account of another car coming up. I thought the whistle meant to stop. I looked towards the city when I heard the whistle at Alki switch, because I thought there was a tripper behind the one coming on south. Q. You did not pay any attention at all to the whistle? A. I did, sir. Q. What did you do? A. I looked for the car coming. Q. Did you look in the opposite direction? A. I did, sir, because I thought this meant for the car coming from the opposite direction. Q. What kind of a whistle? A. Just one short blast. I think the edge of the fence is 12 feet from the street car track. Q. Where were you when you were hit by the street car? A. I must have been between the two tracks, and when the— I seen the car, and made a jump, and got just about to the east track there. When I first saw the street car that struck me, it was 10 feet away, and I was about the middle of the car track. I was struck right opposite this fence. The right side of my body was struck by the car. I could not say it was the side, or end, or what part of the car struck me. I did not know anything about the fender of the car. I did not see any headlight on the car. After I left Thirty-Eighth street it was raining a little drizzle."

When the witness spoke of "the two tracks," he probably meant the two *rails,* for it would seem from the record that there was but a single track at the place he crossed. But it distinctly appears from his testimony, as I understand it, that from the time he left the sidewalk and entered the street to cross the track he did not look south until

the car coming from that direction was almost upon him, when he took the chances of crossing ahead of it—the witness saying:

"I did not see anything so close to me that I thought there was any danger, and so I straightened up again, and about that time I was on the street car track, and as I glanced ahead I saw a very short distance from me a street car, and I thought I could make it, and I tried to jump like this, and at the same time she struck me, and she rolled me over, and I landed on my arms underneath."

---

## RAILWAY MAIL ASS'N v. HARRINGTON.

(Circuit Court of Appeals, Second Circuit.   January 12, 1915.)

### No. 121.

1. INSURANCE ☞668—ACTION ON ACCIDENT POLICY—QUESTIONS FOR JURY.
Conflicting evidence considered, in an action on an accident policy to recover for the death of the insured, and *held* to justify the submission of the case to the jury.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. ☞668.]

2. INSURANCE ☞659—ACTION ON ACCIDENT POLICY—EVIDENCE OF CAUSE OF DEATH.
A railway mail clerk, on leaving his car at the end of a run, gave indications of a severe pain in the abdomen. A few days later he became incapacitated, was taken to a hospital, and operated upon, but died from peritonitis. There was a yellow spot of some size of recent origin on the skin over the appendix, and the autopsy developed that there were adhesions beneath such spot. In an action on an accident policy to recover for his death, it was shown that he was a young man and had previously been in good health. There was medical testimony that the appendix was split, and not perforated, which indicated that the injury was caused by violent external means, causing appendicitis, naturally followed by the peritonitis. Deceased was alone in his car during the run. *Held* that, in the absence of admissible direct evidence, it was competent for plaintiff to show, as justifying an inference as to the manner of injury, that there was an iron rack in the car, the corner of which was at about the same height above the floor as the discolored spot would be when deceased was standing at the rack, and that the road over which his route ran was very rough.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1691–1693; Dec. Dig. ☞659.]

3. INSURANCE ☞659—ACTION ON ACCIDENT POLICY—EVIDENCE.
In an action on an accident policy to recover for the death of the insured, the exclusion of a certain part of the attending physician's statement, filed with the notice of death, which was offered in evidence by defendant, without including other questions and answers contained therein, *held* not error.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1691–1693; Dec. Dig. ☞659.]

In Error to the District Court of the United States for the Western District of New York.

This cause comes here upon writ of error to review a judgment of the District Court, Western District of New York, in favor of defendant in error, who was plaintiff below.   The action was brought to recover upon an accident insurance policy issued to plaintiff's husband,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

providing for the payment to her of $4,000 if he should receive bodily injuries through external, violent, and accidental means, and death should result from said injuries alone within 120 days.

F. A. Robbins, of Rochester, N. Y., for plaintiff in error.

J. W. Hollis, of Hornell, N. Y., and H. A. Heminway, of Corning, N. Y., for the defendant in error.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. [1] The assignment of error to which the argument for defendant was mainly directed is the sending of the cause to the jury against his objection.

There was uncontradicted testimony that the deceased on July 26, 1911, upon returning to the hotel at Tupper Lake where he resided from the mail car in which he worked, made an exclamation of pain, and placed his hand on his abdomen; immediately thereafter, contrary to his usual custom, he went to bed; that he continued to discharge his duties on the mail car until August 1st, acting as if ill or in pain; that on the evening of that day he went to bed, remained there until August 11th, when he was removed to a hospital, where he was operated upon, and died August 13th of general peritonitis. The theory of plaintiff was that Harrington met his death as a result of septic peritonitis, following traumatic appendicitis, caused by external violence.

There was testimony that prior to July 26th he was a healthy, vigorous man, 27 years of age; that subsequent to July 26th a yellowish spot was seen on his abdomen about the size of a half dollar; that as late as May 30th his abdomen was free from any mark or scar; that the mail car in which he worked contained an iron rack, the corner of which was about the same level above the floor that this spot on deceased's abdomen would be if he were standing by the rack; that the roadbed was unusually rough, and that the car sometimes rocked so that letters were thrown out of the boxes; that at the autopsy there were found under the spot, which was located at McBurney's point directly over the vermiform appendix, adhesions, which in the opinion of some of the medical witnesses indicated that the spot had been caused by some external violent means, such as a blow; that the appendix was found to be split, not perforated, which also in the opinion of some of the medical witnesses indicated that the wound to the appendix had been caused by external violence; that this rupture of the appendix produced appendicitis, naturally followed by peritonitis, of which Harrington died. Some of the medical witnesses also testified that the appearance of the spot indicated that it was of recent origin.

As to some of these propositions there is conflicting testimony—for example, some of the medical witnesses state that the appendix was perforated, not split; some of them were of the opinion that the appearance of the spot indicated that it was the scar of an old wound. But if the jury accepted the statements enumerated above, and their verdict shows that they did, they were warranted in drawing the conclusion that, in the language of the policy, deceased's bodily injuries were received "through external, violent, and accidental means," that the accident resulted "in producing visible external marks of injury

or violence suffered by the body" of deceased, and that death resulted, within the time specified in the contract, "wholly from the injury."

Defendant relies on our decision in National Association of Railway Clerks v. Scott, 155 Fed. 92, 83 C. C. A. 652, which was an action on a similar policy, in which plaintiff recovered a verdict, which this court set aside on the ground that plaintiff had not sustained the burden of proving that death was caused by external, violent, and accidental means, that deceased had suffered an injury, and that such injury alone caused death. The facts in that case are so different from the facts in this case that the decision is not applicable. In the Scott Case deceased had been for years in ill health, suffering from albuminuria, congestion of the liver, palpitation of the heart, and nephritis. The death certificate gave as the chief cause of death nephritis, and as contributing cause valvular heart trouble. The only evidence of a blow was a bruise on the shin. There was no contention that a blow received there would produce any of these troubles; no such causal connection was suggested as there is testified to here between a blow immediately above the appendix and a rupture of the latter. The theory in the Scott Case was that because of the bruise on the shin it might be inferred that at the time it was received he had had a heavy fall, causing general shock, from which, again, it might be inferred that the other ailments ensued.

We found, therefore, that there was a fatal hiatus between the fact that death occurred and the conclusion that it was caused alone by external injury. In the case at bar, if the jury believed the witnesses on whom plaintiff relies, they might fairly find a direct connection between the blow that produced the spot and the rupture of appendix, which caused the disease that proved fatal to this man, theretofore in good health.

The jury was fully and carefully instructed. No exception to these instructions which calls for special comment was reserved. The only two covering any part of the charge are substantially to the submission of the cause to the jury. As stated in the brief of plaintiff in error, these exceptions raised in substance the same question that was raised by motions for nonsuit and for direction of verdict.

[2] Error is assigned to the admission of testimony as to the interior arrangement of the mail car, and the roughness of the road—circumstances from which plaintiff argued that the jury might infer that the blow came from Harrington's being thrown against the corner of the rack. There was no direct testimony to any such accident. There is nothing to indicate that on the regular run of this car there was any one in it except the single clerk in charge. If so, no direct testimony was obtainable. Death kept Harrington off the witness stand. Statements which he may have made to others, after he left the car, as to anything which had occurred to him during the day's run, would be too remote for admission on the theory of res gestæ. A similar situation arises when a man is found dead at a place where a railroad train has just passed, there being no eyewitness of his death. Circumstantial evidence, if convincing, may establish the proposition that he died because the train struck him. Harrington's first indication that he was suffering pain was given immediately after he left his car on July 26th,

and it seems to us that it was not error to show the condition of things in the car, and its irregular movements on the rough roadbed, as circumstances to be considered by the jury in deciding whether on that day he received an injury through external, violent, and accidental means.

[3] Error is also assigned to the court's refusal to admit in evidence part of a document offered by defendant. The constitution and by-laws of defendant were made a part of the policy. They were put in evidence, but a portion only is printed in the record. No doubt they provided, as all such documents do, for formal written notice and signed statements as a condition precedent to the allowance of any claim. When the attending physician was on the stand, as witness for the plaintiff, counsel for plaintiff called for the physician's statement, made on a blank form of defendant, which had been filed with plaintiff's claim, and had the witness identify it as the blank he had filled up and signed. Thereupon it was marked "No. 3 for identification." Presumably plaintiff's counsel wished to be prepared with available evidence in case some technical objection were raised as to sufficiency of the papers accompanying the claim.

Upon cross-examination the witness again identified the statement and his signature thereto. Thereupon the defendant offered in evidence a portion of the document, "omitting the question and answer, 'What is the precise nature of the injury, its extent, and your diagnosis?'" The answer to this question given in the document reads: "Struck the projecting corner of the iron mail rack while at work in his car. The blow struck squarely in the region of the vermiform appendix. Traumatic appendicitis." The question immediately preceding reads: "What visible signs did you find of an injury caused by external, violent, and accidental means?" The answer to it reads: "Swelling over region of vermiform appendix." Defendant wanted to get this last answer in evidence, in order to argue from it that the witness' prior testimony as to the presence of the yellow spot should be discredited. But he did not want the answer to the other question, because it gave what the physician had been told was the "history of the case," on which, as well as what he sees, a physician usually bases his diagnosis.

On the margin of Exhibit 3 for identification, above its title, the physician had also written a memorandum purporting to give the names and addresses of persons whom the deceased had told about his injury. This was not responsive to any question in the printed form; it was in no way connected with the "physician's statement"; it was a gratuitous deliverance of the physician The circumstance that it was written on the margin of the paper which contained the "statement" did not make it a part thereof, any more than it would have been, had it been inscribed on a scrap of paper and pinned to the statement. Had the offer of Exhibit 3 in evidence with this addendum elided been rejected, it would have been error; but no such offer was made. Defendant insisted on eliding the whole of one question and answer, and rejection of the offer by the court was put on the ground that it was not fair to put in the one answer without the other.

220 F.—40

Exhibit 3 was not evidence on any issue raised in the cause. It evidenced the fact that on a certain date a "physician's statement" in the form required by the contract had been prepared and signed; but no question was raised as to noncompliance with technical requirements of this sort. It also showed that on the same date the physician had made certain statements—a wholly immaterial circumstance. The only object of the offer was to base an argument on these statements as to the persuasiveness of the physician's testimony on the trial. The testimony tended to show that if the only basis of diagnosis were a swelling at the place indicated, plus other internal symptoms, a correct diagnosis would have been "appendicitis" merely, arising from natural causes, not "traumatic appendicitis," induced by some violent external means. On the trial the witness testified that the disease was "traumatic appendicitis." If the question and answer which defendant wished put in were admitted, and the other question and answer excluded, a plausible argument might be made that this suggestion of "traumatic appendicitis" was an afterthought of the physician, brought forth for the purposes of the trial; that in his signed "statement," made five days after Harrington's death, he had incorporated nothing to indicate either that he then believed the disease to be "traumatic appendicitis" or had any grounds for such belief. To admit the mutilated statement would have been unfair to the witness, because the entire statement did show that at the time he signed it he had diagnosed the case as one of "traumatic appendicitis," basing his diagnosis on the swelling which he saw and the history of the case which he had had from some one—the patient or some one else—indicating the receipt of a recent blow at the exact place over the appendix where the swelling was located. These would be indicia quite sufficient to induce a careful physician to make such a diagnosis.

Under these circumstances we are satisfied that it was not error to refuse the offer in evidence of Exhibit 3 with the particular question and answer stricken out.

Judgment affirmed.

---

### LA CROSSE PLOW CO. v. VAN BRUNT.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

#### No. 2111.

PATENTS ⬅️328—SUIT FOR INFRINGEMENT—ACCOUNTING FOR PROFITS.

On an accounting for profits of infringement of the Van Brunt patent, No. 659,881, for improvement in grain drills, by the use of the scraper for cleaning the furrow opener, covered by claim 5, where the evidence supported the findings of the special master and trial court that defendant had so kept its books and conducted its business as to render it impossible to ascertain what portion of the profits from the sale of drills having the infringing device was due to that feature, and that in a certain portion of the territory covered by defendant's sales, owing to the sticky character of the soil, the use of the infringing scraper was the only thing that made the machines marketable, it was not error to award com-

plainant all of the profits made on the infringing machines sold in such territory.

[Ed. Note.—Accounting by infringer for profits, see notes to Brickill v. Mayor, etc., of City of New York, 50 C. C. A. 8; Clark v. Johnson, 120 C. C. A. 389.]

Appeal from the District Court of the United States for the Western District of Wisconsin; Arthur L. Sanborn, Judge.

Suit in equity by Willard A. Van Brunt against the La Crosse Plow Company. From a final decree (208 Fed. 281), defendant appeals. Affirmed.

The matters before the court on this appeal involve the accounting based upon the decree of the District Court entered in pursuance of the opinion and order of this court in Van Brunt v. La Crosse Plow Co., 168 Fed. 927, 94 C. C. A. 331, wherein the court found patent No. 659,880, for improvement in grain drills, issued October 16, 1900, to be valid and infringed. The particular feature of the grain drill in question found by this court to constitute infringement is that part of the so-called furrow-opening portion of the drill termed the scraper, whereby the convex face of the disk is kept clean and the tendency of dirt and trash to accumulate and interfere with the operation of the drill is counteracted. The scraper is the device of claim 5 of said patent.

The cause was referred to a special master to take and report the accounting. He reported that, notwithstanding the fact that appellant had produced in evidence several other seeding machines which it claimed were proper standards of comparison, from which appellant claims it appeared that it had realized no profit from the use of the infringing scraper, the record disclosed no proper standard of comparison; that a profit of $17,396.17 had been received by appellant from the sale of seeders employing the infringing scraper; that owing to the sticky character of the soil in the Northwest territory, the use of the infringing scraper was the feature that made appellant's seeding machines marketable in that locality; and that about 60 per cent. of appellant's sales of seeders using the infringing scraper was made in that region, and that the said profit of $17,396.17 was attributable to the presence of the scraper in suit. The master further found that appellant had, by its method of keeping its books and its manner of conducting its said business, so commingled the proceeds from its sales of seeders as to make it practically impossible for appellee to ascertain what portion of said profits was realized from the sale of the infringing scraper as distinguished from the rest of the seeder; that appellant had not attempted to make any apportionment of the profits, and that unless it were possible to arrive at some apportionment from the evidence appellant would, under the rule laid down in the Garretson Case, 111 U. S. 121, 4 Sup. Ct. 291, 28 L. Ed. 371, be liable for the whole amount of the profits realized from the sale of the complete machine; that the furrow opener is a separable part of the seeder; that the parts of the seeding machine sold by appellant other than the scraper belonged to it; that an approximate apportionment of said profits between the scraper and the other parts of the machine might equitably be made upon the basis of the ratio of the relative cost of the two parts, which he ascertained to be that of two to one in favor of appellant, or $6,607.76 to appellee and $10,788.41 to appellant, which adjustment the master favorably suggested to the District Court, with the proviso that, if the court did not approve of that method of apportionment, then appellant should be decreed to pay to appellee the whole sum of $17,396.17 as aforesaid. The District Court approved the master's findings of fact, but disapproved his apportionment of the profits and the method thereof.

From the master's report, and the evidence in support thereof, the court found that other devices were successful in localities where the drilling for planting was comparatively dry, but that the infringing furrow opener captured the Northwest sticky territory, in which region appellant disposed of about 60 per cent. of its infringing product, while the remaining 40 per cent. was sold for use in localities having less sticky soils. From these premises the District Court proceeded to enter a decree holding appellant for the total

profits received by it in the Northwestern territory, or three-fifths of the total profit from the sale of seeders bearing the infringing furrow openers in all localities, being the sum of $10,437.70, together with interest from the date of the master's report, and costs.

Seventy errors are assigned by appellant, which may be summed up as follows, viz.:

(1) Appellee had not given appellant notice that the device in suit was patented according to law.

(2) That notwithstanding several available standards of comparison were in evidence showing no profits thereover, the court decreed profits and held the standards offered were not proper standards.

(3) The court failed to require appellee to prove what part of the profits arose from the scraper.

(4) The court held that, owing to the failure to keep and show books, it was impossible to determine what proportion of profits was due to the use of the infringing device.

(5) The court erred in holding that appellee is entitled to recover the entire profits in the Northwest territory, in view of the Court of Appeals' exclusion of claims 1, 2, 3, and 4, and the withdrawal of claim 9, of the patent in suit.

(6) The court held that the infringing device was deemed necessary to success in the Northwest territory.

(7) In granting substantial profits, the court was indulging in speculation.

(8) The court overruled appellant's motion to require appellee to apportion the profits, and in holding that the burden of apportionment was on appellant, since appellee made no attempt to apportion profits.

(9) The court awarded the sum of $10,437.70 to appellee as profits.

Other facts appear in the opinion.

Fred Gerlach and George P. Fisher, both of Chicago, Ill., for appellant.

Border Bowman, of Springfield, Ohio, for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). The ultimate question here involved is: With what sum should appellant be charged, if any, as profits growing out of the sale of seeding machines using the infringing scraper? Having ascertained that appellant realized a profit of $17,396.17 from machines so equipped, as to which finding no error is assigned, it was the duty of the trial court to determine, if possible, from the evidence, what part of that profit, if any, arose from the use of the infringing furrow opener.

Where, as in the present case, the proceeds of the sales of seeders was so hopelessly confused as to make such discovery impossible from appellant's books and business methods and other facts in evidence, appellee was relieved from making any apportionment of profits, and it became obligatory upon the appellant to take up that burden. Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co., 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653. This appellant undertook to do by offering in evidence certain other furrow opening devices, in order to show that, by the use thereof, appellant derived no profits "over what it would have had in using other means then open to the public, and adequate to enable it to obtain an equally beneficial result"—following the rule laid down in Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664, Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609, and Columbia Wire Co. v. Kokomo, 194 Fed. 108, 114 C. C. A. 186.

We do not deem it necessary to enumerate the various devices produced in evidence by appellant as so-called standards of comparison. Suffice it to say, no one of them disclosed the infringing scraper in suit. Some of them were not open to appellant; others were too broad or too wide or too thick to meet the requirements of seeding in the Northwest territory; some were double disk furrow openers, some single; some had the single disk with cast scraper; and some were in the form of shoe drills or furrow openers. After going carefully into all these, the master found that none of them compared favorably with the infringing scraper, or could be used as a standard of comparison therewith, and concluded with the finding that in the Northwest territory, with its sticky soil, the seeders equipped with the infringing scraper practically supplanted every other seeding machine, and that, in order to get an entrance into the sticky soil territory, it was essential that appellee's device be employed. It is strongly corroborative of this evidence that appellant and, as the evidence shows, many others have copied it, either as infringers or licensees. We find the conclusion of the master well supported by the evidence.

Appellant introduced evidence to show that subsequent to the infringing period it used a noninfringing single disk furrow opener with a broad scraper, which the master found was successful in the Northwest territory for a short time and then suspended. That the infringed scraper lives, and that the broad scraper died, would seem to negative the claim that the latter was adapted to the sticky territory's requirements, even if the former were competent. Thus we are led to the conclusion that it was the infringing scraper that commanded the planting trade in the Northwest, and that without it the seeding trade of appellant would not have resulted profitably to it. We further conclude that, in view of the fact that appellant made it impossible for appellee or the court to apportion the profits as between the infringing scraper and the other parts of said seeding machine, appellee, under the decisions, is entitled to all the profit realized by appellant from the sales of seeding machines carrying said infringing scraper in said Northwest territory. There seems to be no exception to the finding of the District Court and the master that 60 per cent. of appellant's infringing sales were had in said Northwest territory. This method of apportioning the profits seems fair to us. We are therefore of the opinion that the decree of the District Court, in awarding to appellee profits to the amount of $10,437.70 against appellant, was right upon the evidence.

We do not deem the objection of want of notice well taken. The filing of the bill and service of process was notice, and the accounting period was then begun. American Caramel Co. v. Thomas Mills & Bros., 162 Fed. 147, 89 C. C. A. 171 (3d Cir., C. C. A.).

The decree of the District Court is affirmed.

UNITED STATES v. GREAT NORTHERN RY. CO.

(Circuit Court of Appeals, Seventh Circuit.  January 5, 1915.)

No. 2060.

1. PLEADING &⟶420—ERRORS—WAIVER—RULING AS TO AMENDMENT.

Plaintiff waived its exception to the ruling that an amendment of the complaint was necessary by subsequently making the amendment.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1408–1412; Dec. Dig. &⟶420.]

2. MASTER AND SERVANT &⟶17—HOURS OF SERVICE—ACTIONS FOR PENALTIES —PLEADING.

Under the Hours of Service Act (Act March 4, 1907, c. 2939, 34 Stat. 1416 [Comp. St. 1913, § 8678]) § 2, prohibiting carriers from requiring or permitting trainmen to remain on duty for more than 16 consecutive hours, and section 3 (section 8679) providing that the provisions of that act shall not apply in any case of casualty, unavoidable accident, or act of God, nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of the employé at the time he left a terminal, and which could not have been foreseen, in an action for penalties for violations, the government is not bound in its complaint to negative all possible legal excuses within the proviso of section 3, since, where a statute put an exception or limitation into the definition of a duty, a plaintiff counting on a breach of that duty must by his pleadings and proof negative the exception or limitation; but where a statute gives a general definition of a duty, and subsequently provides that a violator shall not be liable under certain circumstances, plaintiff need only plead and prove the violation of the duty as defined, leaving it to defendant to plead and prove the circumstances saving defendant from liability.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. &⟶17.]

3. MASTER AND SERVANT &⟶17—HOURS OF SERVICE—ACTIONS FOR PENAL-TIES—NATURE OF REMEDY—"CIVIL ACTION."

Actions for violations of the Hours of Service Act are "civil actions."

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. &⟶17.

For other definitions, see Words and Phrases, First and Second Series, Civil Action.]

4. MASTER AND SERVANT &⟶13—HOURS OF SERVICE—STATUTORY PROVISIONS.

The Hours of Service Act should be liberally construed to accomplish the intended cure.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. &⟶13.]

5. MASTER AND SERVANT &⟶17—HOURS OF SERVICE—ACTIONS FOR PENALTIES— SUFFICIENCY OF EVIDENCE.

In actions for penalties under the Hours of Service Act, if affirmative defenses are pleaded, the proof should bring the case clearly within the letter as well as within the spirit of the proviso of section 3.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. &⟶17.]

6. MASTER AND SERVANT &⟶13—HOURS OF SERVICE—STATUTORY PROVISIONS— "ACT OF GOD"—"UNAVOIDABLE ACCIDENT"—"CASUALTY."

Within the Hours of Service Act, an "act of God" consists of violence of nature in which no human agency participates by act or omission, an "unavoidable accident" is one occurring while the railroad company and its employés are in the exercise of due care, while a "casualty," differing from the others and not so broad as to deprive them of meaning and

&⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

use, is an occurrence or happening due entirely to an outside human agency; and if, when a train leaves a terminal, the railroad company, through its inspectors, knows or by the exercise of due care might foresee a cause that would be likely to produce an accident and consequent delay, the delay is not excusable; and hence it was error for the court, in an action for penalties, to charge on the theory that a casualty meant any occurrence or happening, whether unavoidable or avoidable by the exercise of due care, and that all delays, except those knowingly and willfully caused by the railroad, were therefore excusable, and to charge that the question of inspection had no bearing on the case.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

For other definitions, see Words and Phrases, First and Second Series, Act of God; Casualty; Unavoidable Accident.]

7. MASTER AND SERVANT ☞17—HOURS OF SERVICE—ACTIONS FOR PENALTIES—EVIDENCE.

In an action for penalties under the Hours of Service Act, defended on the ground of unavoidable accidents, consisting of the bursting of air hose and the pulling out of drawbars, the government was entitled to prove, as tending to show a negligent habit of the officers and agents of the railroad company, that, during several months preceding the accidents in question, instances of like trouble were of daily occurrence, though the purpose and effect of such evidence should have been limited by an instruction if requested.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. ☞17.

Hours of service of employés, see note to United States v. Houston Belt & Terminal Ry. Co., 125 C. C. A. 485.]

In Error to the District Court of the United States for the Western District of Wisconsin; A. L. Sanborn, Judge.

Action for statutory penalties by the United States against the Great Northern Railway Company. Judgment for defendant, and the United States brings error. Reversed.

This action was brought to recover penalties for ten alleged violations of the Hours of Service Act. 34 Stat. L. 1415.

So far as trainmen are concerned, Congress enacted in section 2 that no common carrier should require or permit any such employé to be or remain on duty for a longer period than 16 consecutive hours, and declared in section 3 that a violator of section 2 should be liable to a penalty of not more than $500, with a proviso as follows: "That the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal and which could not have been foreseen."

Two train crews of five men each were involved. As the delay in both instances came from substantially identical causes, an outline of the story of one train will suffice.

Defendant is extensively engaged in transporting iron ore from mines near Kelly Lake, Minn., to docks at Allouez, near Superior, Wis., a distance of 100 miles. Rails, cars, and engines are of the heaviest types. From mines to docks the grade is slightly downhill. On the right-hand track of the two mains the loads are brought down, and on the other the empties are returned. So heavy is the traffic that from 100 to 125 loads are taken in one train; and the trains, following each other less than an hour apart day and night, and progressing at an average speed of little over 6 miles an hour, usually consume nearly the whole of the 16 permitted hours in making the run. On June 18, 1912, the crew of train 1981 began service at 7:45 p. m. and remained on duty for more than 20 consecutive hours. When this train

had covered about 70 miles, the seventh train ahead of it pulled out some drawbars and broke into five pieces. The cripple and the six intermediate trains were put in on sidings and the crews were relieved. But no siding ahead was available for train 1981; it could not back up, either on account of its weight or obstructing other down trains; it could not cross over to the other main track without blocking the stream of returning empties; and the men in charge were required or permitted to proceed on the main track to destination.

Delay in the other instance was caused by the bursting of air hose.

Plaintiff's complaint, as originally filed, did not negative the conditions of the proviso. On defendant's motion the court held that such an amendment was necessary. Plaintiff excepted to the ruling, but later made the amendment.

Plaintiff offered, but was not permitted, to prove that between April 1 and June 18, 1912, from 2 to 7, with an average of at least 3, break in twos on defendant's line were caused each day by the pulling out of drawbars or the bursting of hose.

Plaintiff excepted to the following instructions: "Was the breaking of the drawbar in the one case, and the breaking of the hose in the other, a casualty or an accident? Did it happen by chance, unexpectedly? You do not have to find it was unavoidable. Therefore you do not have to find that the company inspected. If the first exception, casualty, were left out, and it said the company shall be excused on account of unavoidable accident, then you might have to find they had done everything they could reasonably to prevent the thing that occurred. * * * The question of inspection is not one bearing on the case. * * * If you find that it was an accident and it caused the delay, even though it was avoidable, the company could not be bound."

Plaintiff tendered, and the court refused to give, the following instruction: "That the burden is upon the defendant to bring itself clearly within the proviso; that is, that the delay was the result of a casualty, unavoidable accident, or act of God, or of a cause which was not known to the carrier at the time the crew left the terminal, and which could not have been foreseen. It cannot be presumed, in the absence of any proof, that the company's equipment was in good condition, and the mere statement that the delay was the result of a pulled out drawbar in one instance and a bursted air hose in another is not, standing alone, sufficient to excuse the defendant."

John A. Aylward, of Madison, Wis., and Roscoe F. Walter, of Washington, D. C., for the United States.

J. A. Murphy, of Superior, Wis., for defendant in error.

Before BAKER, SEAMAN, and MACK, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1] By subsequently amending its complaint plaintiff waived its exception to the ruling that required the amendment; and if the record were otherwise free from error, we should not take up this question of pleading. But since a new trial must be ordered on account of errors duly preserved for review, we deem it proper to put plaintiff in position to move the trial court to strike out the amendment.

[2] The principle (for the rule is not a mere artificiality) is this: If a statute puts an exception or limitation into the definition of duty, then a plaintiff, counting on a breach of the duty, must plead and prove the negative of the exception or limitation. Example: A statute requires a railroad to maintain fences along its right of way except at highway crossings and within the limits of cities and towns. Plaintiff, damaged by reason of a break in the fence, must plead and prove, in

order to establish a failure in duty, that the break in the fence existed outside of highway crossings and the limits of cities and towns. If, however, a statute gives a general definition of duty and then subsequently provides that a violator shall not be liable under such and such circumstances, plaintiff need plead and prove no more than the violation of the duty as defined, and defendant must plead and prove the circumstances that save him from liability. Example: A railroad fencing statute in the same words as above, which then adds that the statute shall not apply in any case of casualty or unavoidable accident or act of God unless the railroad has failed to use diligence in making repairs after actual or constructive notice of the break. Under such a statute, plaintiff must plead and prove, as before, the negative of the limitation in the definition, but not the negative of all possible legal excuses; if any such exists, it must be pleaded and proven as a defense against the consequences of the violation of the defined duty. As the proviso in the hours of service statute is not an exception or limitation in the definition of duty, but only subsequently affords certain exemptions from liability for violations of the defined duty, the court erred in requiring plaintiff to amend its complaint by negativing all possible legal excuses for the violations that were duly set forth. Teel v. Fonda, 4 Johns. (N. Y.) 304; Hart v. Cleis, 8 Johns. (N. Y.) 41; Smith v. U. S., Fed. Cas. No. 13,122; McGear v. Woodruff, 33 N. J. Law, 213, and cases cited; Chicago, B. & Q. Rld. v. Carter, 20 Ill. 391.

[3-5] To protect the lives of employés and of the traveling public against accidents due to loss of efficiency from overwork was the purpose of limiting the hours of continuous service. Actions for violations are civil; and the statute, in view of its purpose, should be liberally construed to accomplish the intended cure. If affirmative defenses are pleaded, the proof should bring the case clearly within the letter as well as within the spirit of the proviso. U. S. v. Ill. Centr. Rld. (D. C.) 180 Fed. 630; U. S. v. Kansas City So. Rld. (D. C.) 189 Fed. 471; U. S. v. Denver & R. G. Rld. (D. C.) 197 Fed. 629; U. S. v. Kansas City So. Rld., 202 Fed. 828, 121 C. C. A. 136; U. S. v. Great Northern Rld. (D. C.) 206 Fed. 838; U. S. v. Mo. Pac. Rld. (D. C.) 206 Fed. 847; Great Northern Rld. v. U. S., 211 Fed. 309, 127 C. C. A. 595; U. S. v. Atchison, T. & S. F. Rld. (D. C.) 212 Fed. 1000.

[6] A consideration of the proviso will furnish a basis for determining the other assignments of error. If the view that was acted upon by the court throughout the trial is correct, namely, that "casualty" means any occurrence or happening, whether unavoidable or avoidable by the exercise of due care on the part of the railroad, and therefore excuses all delays except those knowingly and willfully caused by the railroad, then it seems clear to us that Congress stands convicted of having followed up "casualty" with a series of meaningless and purposeless expressions. But, if the result can fairly be reached, courts must ascribe a meaning and a purpose to every part of a statute. Looking at the proviso as a whole, and with the intent of leaving, if possible, vitality in all its parts, we conceive that Congress said to the railroads: You need not pay penalties for violations in the following instances: Act of God. You are excusable for delay caused by violence of nature

in which no human agency participates by act or omission. For example, a washout due to an unprecedented flood that was not and could not reasonably have been anticipated. Unavoidable accident. You are excusable if, at the time and place of the accident that caused the delay, you, through your employés, were in the exercise of due care. For example, a switchtender falls dead at an open switch and a collision immediately follows without any one's fault. Last clause of the proviso, explanatory of unavoidable accident. But you are not excusable if, at the time a train leaves a terminal, you, through your inspectors, either knew or by the exercise of due care might have foreseen a cause that would be likely to produce an accident and consequent delay. For · example, incompetent trainmen or defective or inefficient drawbars or air hose, particularly if you had notice of a succession of accidents due to those causes. Casualty (which must differ from the other defenses and must not be so broad as to deprive them of meaning and use). You are excusable for delay from an occurrence or happening due entirely to an outside human agency. For example, your train is overturned by a train of another railroad at a crossing by reason of the other road's trainmen's disobedience of the interlock signals. And finally, if you cannot establish one of these defenses by a fair preponderance of the evidence, you must pay the penalty for keeping your employés on duty an excessive time.

Error was therefore committed in giving, and in refusing to give, the instructions quoted in the statement of the case.

[7] Excuse for the delays in this case as shown by the evidence could only come under the head of unavoidable accident. Against defendant's claim of excuse plaintiff was entitled to prove, as it offered, that during several months preceding the accidents in question instances of like trouble were of daily occurrence. A defendant of course is not to be convicted of a particular violation by showing that at other times he committed other violations. And defendant in this case would be entitled to an instruction limiting the purpose and effect of this evidence. But it was clearly admissible "as tending to show a negligent habit of the officers and agents of the railroad company." Grand Trunk Rld. v. Richardson, 91 U. S. 454, 470 (23 L. Ed. 356); District of Columbia v. Armes, 107 U. S. 519, 2 Sup. Ct. 840, 27 L. Ed. 618; Cleveland, etc., Rld. v. Newell, 104 Ind. 264, 3 N. E. 836, 54 Am. Rep. 312; Rockford Gas Co. v. Ernst, 68 Ill. App. 300; 29 Cyc. 611, 612. Phillips v. Town of Willow, 70 Wis. 6, 34 N. W. 731, 5 Am. St. Rep. 114, relied on by defendant as holding to the contrary, is distinguishable because the court notes that the evidence of the prior accident was offered, not to show notice of defect, but to prove that the stone (the claimed defect) was in the traveled part of the highway.

On the evidence in the record the case was one to be submitted to the jury under proper instructions.

The judgment is reversed for further proceedings not inconsistent with this opinion.

DELANO et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit.  January 5, 1915.)

No. 2148.

MASTER AND SERVANT ☞13—HOURS OF SERVICE ACT—CONSTRUCTION.

    A railroad company is not relieved from liability for violation of Hours of Service Act March 4, 1907, c. 2939, § 2, 34 Stat. 1416 (Comp. St. 1913, § 8678), by requiring a train dispatcher in a night and day office to remain on duty for more than 9 hours in each 24-hour period, by the fact that during a part of such time he is employed otherwise than as train dispatcher.

    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

    Hours of service of employés, see note to United States v. Houston Belt & G. Ry. Co., 125 C. C. A. 485.]

In Error to the District Court of the United States for the Southern Division of the Southern District of Illinois; J. Otis Humphrey, Judge.

  Action by the United States against Frederick A. Delano, William K. Bixby, and Edward B. Pryor, receivers of the Wabash Railroad Company, to recover penalties.  Judgment for the United States, and defendants bring error.  Affirmed.

    J. L. Minnis and N. S. Brown, both of St. Louis, Mo., and R. H. McAnulty, Walter McC. Allen, and Otis Scott Humphrey, all of Springfield, Ill., for plaintiffs in error.

    Edward C. Knotts, of Carlinville, Ill., for the United States.

    Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

    BAKER, Circuit Judge.  Plaintiffs in error, defendants below, were adjudged to have violated the Hours of Service Act.  34 Stat. L. 1415.

    Plaintiff declared that defendants were engaged in operating a railroad in interstate commerce, and that they required a telegrapher, who was employed by them in a day and night station to receive and deliver orders affecting train movements, to be on duty 11 hours and 30 minutes during each 24-hour period.

    In a special plea defendants admitted all the averments of the declaration except the one respecting the service of the operator.  Concerning that, they alleged that he performed the duties of a train dispatcher during the first six hours of his service and that during the remaining five hours and a half he was set at other duties that did not pertain to or affect the movements of trains.

    A demurrer to the plea was sustained; defendants declined to plead further; and judgment followed.

    Section 1 enacts that:

    "The term 'employees' as used in this act shall be held to mean persons actually engaged in or connected with the movement of any train."

    By exclusion or omission ticket sellers and inspectors or repairers of telegraph lines and apparatus are not within the statute.  If our

train dispatchers, defendants inquire, may lawfully be employed, after we relieve them from train dispatching, by the Majestic Theater to sell tickets or by the Western Union to inspect and repair telegraph lines and apparatus, why may not we also lawfully employ them in like capacities?

An answer requires an examination of section 2, which is as follows:

"Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employé subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employé of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had, at least ten consecutive hours off duty; and no such employé who has been on duty sixteen hours in the aggregate in any twenty-four hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty: . Provided, that no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices, places, and stations continuously operated night and day."

To protect the lives of employés and of the traveling public against accidents due to loss of efficiency from overwork was the purpose of limiting the hours of service. Actions for violations are civil; and the statute, in view of its purpose, should be liberally construed to accomplish the intended cure. U. S. v. Great N. Ry. Co. (at this session) 220 Fed. 630, 136 C. C. A. 238, and cases cited.

Defendants admit that the employé involved in this case was engaged and used by them as a train dispatcher. Therefore he was within the class defined in section 1. But in protecting him under section 2 Congress stated no class of duties in which he might be overworked by defendants and so rendered inefficient as a train dispatcher. To justify defendants' claim, the statute should read that:

"No train dispatcher shall be required or permitted to be on duty as a train dispatcher for a longer period than nine hours in any twenty-four-hour period, but after he has been relieved as a train dispatcher the carrier may require him to serve as a ticket seller, provided he be given eight consecutive hours off duty."

That, however, is not the way the statute was written. An adoption of defendants' revision would be not only contrary to recognized canons of statutory construction, but also destructive of the intended cure of a recognized evil. It is a matter of common knowledge (attested by the carriers' petitions to the Interstate Commerce Commission immediately after the passage of the act for time in which to secure additional shifts of train dispatchers) that prior to the act carriers were having 24-hours work divided between two shifts, and that at most of the stations the train dispatchers acted also as ticket sellers or in other capacities. If 12 hours of mixed work as train dispatcher and ticket seller is forbidden, it would be simply an evasion to require 6 consecutive hours of duty as a train dispatcher to be followed by 6 consecutive hours of duty as a ticket seller. The evil to be

cured did not come from the employés' selling tickets or doing work for other people when off duty, but from the power of the carriers, customarily exercised, to require their employés who were concerned with train movements to do extra and overtime work.

Our conclusion is supported, we believe, by the decisions in Baltimore & Ohio R. Co. v. Interstate Commerce Commission, 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. 878; Missouri, K. & T. R. Co. v. United States, 231 U. S. 112, 34 Sup. Ct. 26, 58 L. Ed. 144; United States v. Great N. R. Co. (D. C.) 206 Fed. 838; San Pedro, L. A. & S. L. R. Co. v. United States, 213 Fed. 326, 130 C. C. A. 28. And it accords with the contemporaneous construction put upon the act by the administrative officers (In re Georgia Southern & F. R. Co., 13 Interst. Com. Com'n R. 134; In re Various Carriers, 13 Interst. Com. Com'n R. 142; Instructions to Carriers for Reporting Hours of Service, March 16, 1908), whose interpretation is entitled to great weight and should not be overturned without clear and cogent reasons (United States v. Moore, 95 U. S. 763, 24 L. Ed. 588; Heath v. Wallace, 138 U. S. 582, 11 Sup. Ct. 380, 34 L. Ed. 1063; United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 370, 17 Sup. Ct. 540, 41 L. Ed. 1007).

The judgment is affirmed.

---

BALL v. IMPROVED PROPERTY HOLDING CO. OF NEW YORK.

EQUITABLE TRUST CO. OF NEW YORK v. IMPROVED PROPERTY HOLDING CO. OF NEW YORK et al.

In re HOWLAND.

(Circuit Court of Appeals, Second Circuit.   January 12, 1915.)

No. 120.

1. RECEIVERS ⊕=162—INCOME—DISPOSITION—MORTGAGES—PRIORITIES.

When a receiver of a corporation's property was appointed, a mortgage on a part of the property was in default, but unsecured creditors believed, if a foreclosure could be delayed, that a settlement and reorganization could be arranged, and the business carried on successfully. By agreement of the complainant, defendant, the receivers, and committees for all classes of bondholders, an order was accordingly made setting aside 10 per cent. of the gross rents and income of the property for expenses, and providing for operating and maintenance charges and expenses, and for the use of the remainder to pay ground rent and charges matured and unpaid prior to the appointment of the receivers. *Held*, that this operated to set apart the rents of the mortgaged property for the payment of the mortgage, and hence a separate receiver subsequently appointed for the mortgaged property was entitled to the rents from such property due prior to the receivership in preference to a receiver for the general creditors.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 277; Dec. Dig. ⊕=162.]

2. APPEAL AND ERROR ⊕=1008—REVIEW—QUESTIONS OF FACT.

Where the District Judge, who heard a petition by a receiver for the general creditors of the property of a corporation to compel receivers of property covered by a mortgage to turn over to him certain rents, was familiar with all the prior proceedings, his statement that the disposition

of such rents was with the consent of the petitioning receiver's predecessors in office, must be accepted.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3955–3960, 3962–3969; Dec. Dig. ☞1008.]

3. RECEIVERS ☞67—RIGHT TO PROPERTY—PRIORITIES.

A petition by the receiver for the general creditors of the property of a corporation to compel the receivers of the property covered by a mortgage to turn over to him certain rents was properly denied, where the money had already been spent and accounted for under the court's direction.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 117–122; Dec. Dig. ☞67.]

Appeal from the District Court of the United States for the Southern District of New York.

On appeal from an order of the District Court for the Southern District of New York denying the application of Silas W. Howland, as receiver for the general creditors of the property of the Improved Property Holding Company of New York which is not covered by the mortgages of the said company, to compel the receivers of the property of the said company which is covered by its mortgage of June 1, 1906, to turn over to him certain assets which are in his possession.

William M. Chadbourne and Walter Ralston Nelles, both of New York City, for receiver.

Henry H. Pierce, Garrard Glenn, and Edward H. Green, all of New York City, for committee of Series A bondholders.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

PER CURIAM. [1] The present controversy relates to the disposition of a sum approximating $8,000, which is made up of various items due to the mortgagor—the Improved Property Holding Company—for rent from its tenants prior to May 21, 1912, when the order appointing Burlingham and O'Donohue temporary receivers was made. By this order they were "authorized to collect the rents, income, tolls, and profits of the said premises and property." This order was continued May 31, 1912, and Robert E. Dowling, an additional receiver, was appointed. They were again appointed receivers of "all the property of said defendant, real, and personal and mixed, of whatsoever kind and description, * * * including * * * rents, issues, profits, and income accruing and to accrue. * * *" It provided further:

"That the said receivers be and they hereby are authorized to run, manage, and operate the said buildings and properties, to collect the rents, income, and profits of the said buildings and properties, acting in all things subject to the supervision of this court."

The first question therefore is: To whom do these sums due for rent prior to the receivership belong? If they were covered by the mortgage of the so-called A properties, they obviously belong to the A receivers; if not so covered, they would, with equal certainty, belong to the Property Holding Company and its receiver. There was a controversy between the A receivers and the general receiver as to

the ownership of these rents. When the Ball suit was instituted in May, 1912, the A mortgage was in default, and a foreclosure action could have been commenced at any time. But the unsecured creditors believed, if such an action could be delayed, that a settlement and a reorganization could be arranged, and the company's business carried on successfully in the future. It was hardly to be supposed, however, that the A bondholders would agree to such a delay, unless some consideration was offered them for their forbearance.

That a modus vivendi was agreed upon is evidenced by the order of June 17, 1912, by which the receivers, after setting aside 10 per cent. of the gross rents and income of the property for expenses and providing for operating and maintenance charges and expenses, were to use the remainder of the fund to pay ground rent and charges matured and unpaid prior to the appointment of the receivers. This order was consented to by the complainant, defendant, the receivers, and the committees for all classes of bondholders, and it is not easy to see why it did not operate to set apart the rents of the A properties for the payment of the A mortgage. It seems to us entirely clear that the sum in question was turned over to the receiver of the properties as a part of the agreement that more time should be given in which to effect a reorganization, that it was an entirely fair and reasonable thing to do, and cannot now be repudiated by those who received the benefit.

[2] Judge Hough, who heard the petition of Mr. Howland in the District Court, was familiar with all the prior proceedings and we must accept his statement that the actual disposition of the past-due rents was made with the consent of the receivers who preceded Mr. Howland in office. In short, we cannot resist the conclusion that the situation was well known to all the creditors, and that with full knowledge of the fact and with the hope that a settlement could be arranged they consented that the A bondholders should not by delay lose the benefit of the rents.

[3] Another exceedingly practical reason why the money which the petitioner seeks to reach cannot be paid is that it has already been spent and accounted for under the direction of the court.

The order is affirmed, with costs.

---

### In re NG WAH CHUNG.

### NG WAH CHUNG v. PRENTIS, Immigrant Inspector.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

No. 2102.

ALIENS ⟨⟩32—DEPORTATION OF CHINESE—REGULARITY OF PROCEEDINGS.

Evidence considered, in a habeas corpus proceeding by a Chinese person ordered deported, and *held* insufficient to sustain the charge that he was not given a fair hearing before the immigration inspector.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. ⟨⟩32.

What Chinese persons are excluded from the United States, see note to Wong You v. United States, 104 C. C. A. 538.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; George A. Carpenter, Judge.

Habeas corpus proceeding by Ng Wah Chung against Percy L. Prentis, Immigration Inspector in charge at Chicago. Petition dismissed, and petitioner appeals. Affirmed.

Wm. R. Medaris, of Chicago, Ill., for appellant.

John E. Byrne, of Chicago, Ill., for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge. Appellant, a person of Chinese descent, appeals from an order discharging a writ of habeas corpus and remanding him to the custody of the immigrant inspector.

The basis of the petition for the writ was that petitioner was arrested and tried on a warrant charging that he was an alien likely to become a public charge, while the deportation warrant found that charge to be true and also another, namely, that petitioner was unlawfully in this country because of having entered without inspection, regarding which latter charge petitioner was given no notice before trial and no opportunity to defend.

Deportation would be sustained, if petitioner had a fair hearing upon the charge in the warrant of arrest. Appellant challenges the fairness of the hearing on that issue; but we refrain from entering upon that branch of the case, because we find from the record that petitioner and his counsel had notice that the hearing before the immigration officer would include both charges.

The petition and the answer joined issue on this question of notice, and the evidence presented to the court was all embodied in a written stipulation.

It was stipulated, among other things, that:

"A formal hearing under the rules of the Department of Labor was accorded petitioner, at which the following proceedings were had:

"Mr. Eby: Mr. Kan, advise the alien of the nature of the charges against him.

"Mr. Medaris: Let me see the warrant. (Whereupon Mr. Eby exhibited formal warrant containing one charge, as above set forth.)

"Mr. Kan spoke to petitioner in the Chinese language, and Mr. Kan says he advised petitioner he was being given a hearing on the charge of being unlawfully within the United States, because a person likely to become a public charge, and because he entered without inspection."

Mr. Eby was the examining inspector, Mr. Kan the official interpreter, and Mr. Medaris the counsel of petitioner. There was no stipulation of fact, and no testimony to the effect, that petitioner did not understand that the witnesses about to be examined would testify concerning both charges. At the habeas corpus trial the court could make no other finding than that petitioner had notice. Formal pleadings at hearings of aliens before examining inspectors are neither required nor contemplated. Rule 22 of the Department of Labor, promulgated under authority of the statute, provided:

"If during the hearing new facts are proved, which constitute a reason, in addition to those stated in the warrant of arrest, why the alien is in

the country in violation of the law, the alien's attention should be directed to such facts and reason, and he should be given an opportunity to show why he should not be deported therefor."

Hence, if the only question concerning the fairness of the hearing was whether petitioner had notice of the additional charge, this case would be at an end. But petitioner was also entitled to "an opportunity to show why he should not be deported therefor." The stipulation sets out the testimony of petitioner and Mr. Kan. This testimony shows that, against his then claim of having been born in the United States, he admitted, when arrested, that he was born in China; that petitioner at the hearing admitted, on being confronted with the papers, that he stated when he landed at Vancouver, B. C., and there paid a $500 head tax, that he was born in China; that he went through Canada to Windsor; that from there he traveled to Chicago concealed in a freight car (the route commonly known as the "underground"); that he was not inspected, and evaded inspection by the United States immigrant officers; and that when he emerged from the freight car at Chicago he was arrested. The stipulation admits that petitioner was represented by counsel, and that petitioner and his counsel chose to rest the case upon the testimony of the above-named witnesses. There was no stipulation of fact, and no testimony to the effect, that petitioner had other testimony to offer. So the case is reduced to the contention that petitioner did not have a fair hearing because his counsel, who was present at the hearing, did not understand that both charges were to be investigated. At the habeas corpus trial the burden of establishing this contention, in view of the notice to petitioner and the opportunity given him to meet both charges, was upon petitioner. It is claimed that the contention is established by the facts that counsel asked for and was given the warrant of arrest, which contained but the one charge, and that he limited his cross-examinations to the one charge. But the request to see the warrant of arrest was made in connection with the inspector's direction to the interpreter: "Advise the alien of the nature of the charges against him." There was no stipulation of fact, and no testimony to the effect, that counsel failed to understand that the inspector directed the interpreter to advise petitioner concerning a plurality of charges; that counsel did not observe the interpreter, in obedience, to the inspector's direction, making a statement in Chinese to petitioner; that counsel during the hearing did not confer with his client; that counsel did not understand the Chinese language; or that counsel was ignorant of rule 22 and the nonnecessity of pleadings at a hearing before the inspector. On the other hand, the stipulation shows that the evidence respecting the additional charge was introduced without objection that it was beyond the scope of the inquiry, and that, during the examination of Mr. Kan, counsel facilitated the introduction of his client's signed confession by admitting that the stenographer, if present and sworn, would testify that he correctly reported and transcribed petitioner's statements, and that Government Exhibit B was such transcript. So far from sustaining the contention, the record would rather support the inference that counsel was fully aware of the fact that both charges were being covered by the hearing,

and that he chose to rely upon the untenable technical objection that no fair hearing could be had of a charge that was not stated in writing in the warrant of arrest. The case is therefore ruled by the decision in Siniscalchi v. Thomas, 195 Fed. 701, 115 C. C. A. 501, and cases there cited.

The order is affirmed.

---

## FLANDERS MOTOR CO. v. REED.

(Circuit Court of Appeals, First Circuit. February 17, 1915.)

### No. 1053.

**1. APPEAL AND ERROR ☞900—REVIEW—AGREED STATEMENTS OF FACTS.**

That a proceeding to reclaim from the possession of a trustee in bankruptcy property claimed to have been sold to the bankrupt conditionally was submitted on agreed statements of fact did not restrict the power of the court to draw inferences of fact, as the law and the facts were reviewable as fully as in ordinary equity appeals.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3667–3669; Dec. Dig. ☞900.]

**2. BANKRUPTCY ☞140—OWNERSHIP OF PROPERTY—CONDITIONAL SALES.**

By a contract between an automobile manufacturer and a dealer, the manufacturer agreed to sell automobiles to the dealer at specified discounts from list prices for resale in certain territory. The contract also provided that on orders for automobile parts the dealer should be allowed a specified discount from list prices, and that title to each automobile and all parts should not pass to the dealer until paid for. There was no provision requiring the dealer to keep such parts distinct from other goods, or to keep the proceeds in case of sale separate, and the dealer sold and delivered parts, for which payment had not been made, as if they were his own, in the ordinary course of his business, and without keeping the proceeds separate from other moneys. The manufacturer knew and recognized what was being done in this respect without objection. *Held,* that there was no bona fide reservation of title, but only a pretended reservation, as a safeguard in case of need, but not otherwise to govern the rights of the parties or the course of dealings; and hence the manufacturer was not entitled to retake parts in the possession of the dealer when he became bankrupt from his trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ☞140.]

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Proceeding by the Flanders Motor Company against George W. Reed, trustee. From an order (In re Harrington, 212 Fed. 542), affirming an order of the referee in bankruptcy, dismissing a petition to reclaim property from the possession of the trustee, the Motor Company appeals. Affirmed.

Percy W. Carver, of Boston, Mass. (Carver & Carver, of Boston, Mass., on the brief), for appellant.

George W. Reed, of Boston, Mass., for appellee.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

DODGE, Circuit Judge. [1] The questions here arising were submitted first to the referee and afterward to the District Court on an

---

"agreed statement of facts," supplemented by a statement of "further agreed facts" and by certain documents made part of the facts agreed by reference in the statements thereof. We find no reason to believe that, in these proceedings, such a submission restricts the power of the court to draw inferences of fact, because we are judges alike of the law and the facts as fully as in ordinary equity appeals.

[2] The petitioner sought to reclaim certain automobile parts claimed to be its property, though in the bankrupts' possession at the time of the bankruptcy. The District Court affirmed the referee's order dismissing the petition. 212 Fed. 542. The parts in question had been furnished to the bankrupts by the Metzger Motor Car Company, of Detroit, in pursuance of a written agreement dated June 28, 1911 (Exhibit D). Though the bankrupts had not kept the parts so furnished separate from their other goods, the trustee was able to separate them after the bankruptcy, and had done so. The petitioner had succeeded to all the Metzger Company's rights.

By Exhibit D the Metzger Company gave the bankrupts the right to sell "Everitt" automobiles within a certain territory, and agreed to sell "Everitt" cars to them, at specified discounts from specified list prices, f. o. b. at Detroit. Another clause of Exhibit D provided that "on orders for parts" the bankrupts should "be allowed 30 per cent. discount from the last list prices" established by the Metzger Company.

Clause 9 of Exhibit D provided that the title to each and every automobile, and to all automobile parts furnished, should not pass to the bankrupts until the same were paid for in full in cash.

There is nothing in the record to show whether or not any cars were actually furnished under the agreement, or, if any, how many were furnished, or what course of dealing was followed regarding them.

According to the first agreed statement of facts, a "great many parts applicable for use in said 'Everitt' cars were furnished"; and the questions here involved relate only to the parts thus furnished. Payment for them in full never having been made, the petitioner asserts that title to them never passed.

The case, as the opinion below states, is to be determined according to the law of Massachusetts, which does not make recording necessary to the validity of an agreement for conditional sale. If the provision for reservation of title in clause 9 expresses an agreement made in good faith, intended by both parties to be actually observed according to its terms in their dealings regarding the parts in question, and in fact so observed by them until the bankruptcy, the petitioner is entitled to the parts as against the bankrupts' trustee.

We do not find in the 14 other clauses of Exhibit D, containing numerous other stipulations between the parties as to their contemplated dealings with the goods to be furnished, any provisions adapted to secure such dealings with the parts furnished or their proceeds, while in the bankrupts' hands, as it would be natural to expect, had retention of title by the vendor been what the parties really intended by their agreement, taken as a whole. Thus, as the opinion below points out, there were no provisions either that the proceeds should be the vendor's in case of sales made by the bankrupts or that the

parts should be kept distinct in any way from the bankrupts' other goods until sold, or that the parts remaining unsold at the end of the year for which the agreement was to continue should be returned to the vendor. In all these respects the agreement in Ludvigh v. American Woolen Co., 231 U. S. 522, 34 Sup. Ct. 161, 58 L. Ed. 345, upon which the petitioner relies, differed from the agreement here.

As to the course of dealing followed with regard to the parts or their proceeds, the bankrupts sold and delivered the parts on hand as if they were their own, in the ordinary course of their business, and without keeping the proceeds, of such sales in any way distinct from their other moneys. The parts so sold, of course, became parts of the machines to repair which they were bought from the bankrupts. The petitioner, knowing that the parts furnished, and the proceeds thereof, were being thus dealt with by the bankrupts, recognized what was being done without objection. This seems to us evident, as it did to the District Court, from the petitioner's letter to the bankrupts of October 31, 1912.

Referring again to Ludvigh v. American Woolen Co., above cited, not only did the agreement under which goods were furnished to the bankrupt in that case differ in the above respects from the agreement here; but a very different course of dealing between the parties appears to have been followed with respect to the goods furnished or their proceeds. The proceeds from sales of the goods made by the bankrupt were regularly turned over to the consignor, checks given the bankrupt in payment for such goods were regularly indorsed by the consignor as well as by the bankrupt, and the consignor, through a representative of its own in the bankrupt's place of business, had kept its own account of such sales.

The District Court held the trustee in that case entitled to the goods, notwithstanding the attempted reservation of title (176 Fed. 155); the Court of Appeals reaching the contrary result (188 Fed. 30, 110 C. C. A. 180), and the decision of the Court of Appeals being affirmed by the Supreme Court. In the opinion of the Court of Appeals it was said (188 Fed. 30, 33, 110 C. C. A. 180, 183):

"Contracts of sale under which title is to remain in the vendor, although the vendee may consume the goods, or sell them and apply the proceeds to his own use, are fraudulent as to creditors, because the stipulation that title is to remain in the vendor is entirely inconsistent with the purpose of the contract"

—citing the decision of the same court in Re Garcewich, 115 Fed. 87, 53 C. C. A. 510. In the case at bar there were no provisions to prevent the vendee from thus consuming the goods, or selling them and applying the proceeds to his own use, and Re Garcewich therefore applies.

In view of the agreement, and of all that appeared regarding the dealings of the parties under it, with reference to these parts and their proceeds, we think it was rightly held that the mere presence in the agreement of the terms expressed in paragraph 9 did not go far enough, as against the indications to the contrary, to establish a bona fide understanding between the parties that the goods should, for all purposes, be the petitioner's until the bankrupts had fully paid for

them. We think the conclusion of the District Court sufficiently supported, that both the consignor and the bankrupts are to be regarded as having intended paragraph 9 to be a safeguard in case of need, but not otherwise to govern their rights or the course of dealing between them.

The judgment of the District Court is affirmed, and the appellee recovers his costs of appeal.

## In re RECTOR'S.

### In re WARD.

(Circuit Court of Appeals, Second Circuit. January 12, 1915.)

### No. 109.

1. SALES ⬤⟿477—CONDITIONAL SALES—RENEWAL OF NOTES—EVIDENCE.

Where it was obvious that it was the intention of the parties that a note given by a conditional vendee to the vendor should be in renewal of one of the purchase-money notes, this fact was sufficiently proved, though aside from a letter there was no explicit evidence that it was so given, and the parties apparently assumed, without considering it necessary to explicitly agree, that it should be a renewal.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1411–1417; Dec. Dig. ⬤⟿477.]

2. SALES ⬤⟿459—CONDITIONAL SALES—PAROL MODIFICATION OF CONTRACT.

A provision in a contract for the conditional sale of personal property against modifications of the contract, except in writing, did not prevent the parties from agreeing that the title should remain in the seller until a note given in renewal of one of the purchase-money notes was paid, as the parties could agree to disregard such provision.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1337–1347; Dec. Dig. ⬤⟿459.]

3. SALES ⬤⟿477—CONDITIONAL SALES—WAIVER OF SECURITY—SALE OF PURCHASE-MONEY NOTES.

Where, though a conditional seller of personal property sold the purchase-money notes, they were not sold without recourse, and the seller remained liable as indorser and had taken them up, the sale of the notes was not an election to consider them as final payment and a waiver of the reservation of title.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1411–1417; Dec. Dig. ⬤⟿477.]

4. SALES ⬤⟿477—CONDITIONAL SALES—WAIVER OF SECURITY—SURRENDER OF NOTES.

Under Personal Property Law N. Y. (Consol. Laws, c. 41) § 65, providing that whenever articles are sold upon the condition that the title shall remain in the vendor until payment of the purchase price, and they are retaken by the vendor, they shall be retained for 30 days, during which period the vendee may comply with the terms of the contract, and thereupon receive the property, and that after the expiration of such period the vendor may cause them to be sold at public auction, and unless so sold within 30 days after the expiration of such period the vendee may recover the payments on such articles, the refusal of a seller to surrender the purchase-money notes on demand was not a waiver of his right to retake the property, even assuming that the notes could not be enforced in addition to retaking the property.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1411–1417; Dec. Dig. ⬤⟿477.]

5. BANKRUPTCY ⊙⇒267—CONDITIONAL SALES—SALE OF PROPERTY BY TRUSTEE —SURRENDER OF NOTES.

If a surrender of the notes was necessary, it was sufficient for the seller, in a bankruptcy proceeding against a lessee or purchaser of the property from the conditional vendee, to offer to surrender the notes on the hearing upon a master's report and before final decree.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 371, 380; Dec. Dig. ⊙⇒267.

What constitutes a contract of conditional sale, see note to Dunlop v. Mercer, 86 C. C. A. 448.]

6. SALES ⊙⇒473—CONDITIONAL SALES—RIGHTS OF THIRD PARTIES.

Where a contract for the sale of property had annexed thereto as an exhibit a form of bill of sale providing that title should remain in the seller, bills of sale subsequently executed, reserving title to the seller, were valid as against one who leased or purchased the property from the conditional vendee with knowledge of the agreement, though the bills of sale were not executed until after the delivery of the property; the statute at the time protecting only purchasers without notice from the seller's title reserved in a bill of conditional sale.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1377–1390; Dec. Dig. ⊙⇒473.]

7. BANKRUPTCY ⊙⇒267—SALE BY TRUSTEE—CLAIMS BY THIRD PERSONS.

Where property sold with a reservation of title to the seller was sold or leased by the conditional vendee to a party which subsequently became bankrupt, though the strictly proper course was for the vendor to retake the property and sell it under Personal Property Law N. Y. § 65, returning the surplus, where the property had been sold in the bankruptcy proceeding, the question whether the vendor had a lien was wholly academic.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 371, 380; Dec. Dig. ⊙⇒267.]

Petition to Revise and Appeal from Order of the District Court of the United States for the Southern District of New York.

The opinion of Learned Hand, District Judge, is as follows:

[1] The trustee raises five points, which I shall take up seriatim. The first point is that the fifth note was paid and the ninth note was a loan. This rests upon the fact that the fifth note was paid before the ninth was given, and that, therefore, the ninth could not be in renewal of it. There is not the slightest question about the intention of the parties, Stoddard's letter of August 24, 1912, is only one bit of evidence which happens to be explicit. No other evidence is necessary, because the intention is so obvious from the situation of the parties and from the oral testimony of the various interviews that occurred. It is inconceivable that the new note should not have been expected to have all the security of the old, or that the seller should have advanced new money at the very moment that he found the debtor embarrassed. It is perhaps true that outside of Stoddard's letter there is not any explicit recognition of this feature, but people do not feel it necessary in talk to expatiate upon what is the obvious purport of the whole interview. Nothing is commoner in such matters than to find the whole interview taken up with the discussion of details which presuppose, but do not expressly embody, the fundamental assumption upon which the whole proceeds. Stoddard's letter, he swears, was made in execution of the arrangements theretofore made, and all the testimony corroborates, without contradiction, the interpretation which the petition puts upon the transaction.

[2] I have not been able to find out with certainty whether the trustee contends that, if the parties did so intend, there was any legal obstacle in the way of their intention. If so, I must overrule it, for there is no reason whatever which prevented them from agreeing that the title should remain

in Stern until the ninth note was paid quite as easily as all the rest. That was the upshot of the agreement. The provision against modifications of the contract, except in writing, cannot, of course, bind the parties, if they subsequently agree to disregard it, though it may prove a strong bit of evidence, if they disagree as to whether they did subsequently modify it. Here there is no conflict of evidence. It seems hardly necessary to go over the question of consideration, if we once see that the money lent in August was in pursuance of a prior arrangement.

[3] The second point is that the sale of the notes was an election to consider them as final payment. The notes were not sold without recourse, as was presumed in Hawks v. Hinchcliff, 17 Barb. 492. They were indorsed over. It makes not the slightest difference whether we call it a sale or a discount for the purposes of this case. The point raised, perhaps, justifies an analysis of the whole situation. The notes were given and the property was delivered, but with a condition that title should not pass until all the notes were paid, and if not paid the property might be retaken. Two notes were not paid, and the conditional seller, who was indorser, has taken them up. It is now urged that, though he remained liable as indorser, and though he has taken up the notes, his sale waived the security in his favor arising from the condition in the title, and left him without protection. By what process of reasoning this result is reached I confess I cannot conceive. It attributes an intention to the parties quite absurd and destructive of the very purpose of the whole undertaking. The condition in the title certainly continued so long as was necessary for the protection of the conditional seller, and enabled him to retake until he was free of the notes.

[4, 5] The third point is that the notes should have been surrendered, and that the refusal to do so is an election to waive the right to reclaim. No doubt equity might, unassisted, have provided that the retaken title should be held in fact only as a security for the unpaid balance. This it might have done in consonance with its general relief against forfeitures, but the statute in New York has stepped in and done the same thing. Personal Property Law, § 65. The corollary of this would seem to allow the seller to sue for the balance in case the property did not bring the full amount, which would convert the transaction into a chattel mortgage and nothing more. The contrary was, however, held in Earle v. Robinson, 91 Hun, 363, 36 N. Y. Supp. 178, affirmed on opinion below in 157 N. Y. 683, 51 N. E. 1090.

That question is, however, somewhat different from whether the notes must be surrendered as a condition of retaking. Granting that they may not be enforced, it may be that they need not be surrendered. The decision in Brewer v. Ford, 54 Hun, 116, 7 N. Y. Supp. 244, and 59 Hun, 17, 12 N. Y. Supp. 619; Id., 126 N. Y. 643, 27 N. E. 852, can be explained only on the theory that the seller need not surrender the notes, and it is so explained by Justice Van Brunt in Earle v. Robinson, supra, in an opinion which was accepted by the Court of Appeals. It must be taken that a suit may be brought to retake property held under conditional sale without surrender. Yet, even were it not so, I think that it is sufficient that the seller in the case at bar, which was begun by a receiver and is still in this court upon a master's report, offers now to surrender the notes. It is certainly his right to reserve his option until he is put to an election, and to elect before final decree.

[6] The fourth point is that the delivery was made on or before December 28, 1910, and that no bills of sale were executed until after that time. There was a contract of April 15, 1910, with a form of bill of sale annexed as an exhibit which in the most explicit way provided that the title of all the property delivered should remain in the seller. Rector's, the bankrupt, took its lease with full knowledge of this agreement, and was as much bound by it as the buyer, the Hotel Rector Company, whether the lease of the latter was a lease proper or a purchase. At that time the statute protected only purchasers without notice from the seller's title reserved in the bill of conditional sale. Just how the trustee seeks to avoid the contract of April 15, 1910, because it was not observed to the letter, I cannot understand. Apparently his contention rests upon the fact that the delivery of

the chattels took place before the bills of sale were executed. It seems hardly necessary to discuss that position.

[7] The last point is that in this proceeding the petitioner should not assert a lien. I agree that in this proceeding the strictly proper course was to retake the property and to sell it under section 65 of the Personal Property Law, giving back the surplus. It really makes small difference whether you call the right a lien or not, for it certainly has exactly the same effect in the end as a lien. The property has in fact been sold, and the whole question is academic.

The petitioner may take a decree for the amount of the notes, with interest to date, together with its disbursements and a docket fee, upon surrender of the notes. If there is any surplus, it will go to the estate. I direct the trustee not to take an appeal from the decree to be entered, without submitting the matter to a meeting of creditors called for that purpose, and thereafter getting the consent of this court.

J. F. McNaboe, of New York City, for petitioner.
A. H. Townley, of New York City, for respondent.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. Order affirmed on opinion of the District Judge.

---

## THE A. G. BROWER.

### (Circuit Court of Appeals, Second Circuit. January 12, 1915.)

### No. 116.

1. ADMIRALTY ⬥118—APPELLATE PROCEEDINGS—FINDINGS OF FACT.

An appeal in admiralty operates as a new trial, whether the case was tried by the judge alone or with a jury, and findings of fact are not binding on the appellate court, although they will be given due consideration, and will not be disregarded, unless the court is well satisfied that they are contrary to the weight of evidence.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794; Dec. Dig. ⬥118.]

2. SHIPPING ⬥86—LIABILITY OF VESSEL—INJURY TO STEVEDORE.

Evidence held to sustain a finding that an injury to a stevedore helping to discharge a cargo of grain, by falling over a mooring cable stretched a foot above the deck, while walking along the pier side of the deck after dark on his way to the hatch where he was working, was chargeable to the fault of the vessel in failing to mark the cable by a light, as shown to have been customary.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 343, 353–360; Dec. Dig. ⬥86.]

Appeal from the District Court of the United States for the Western District of New York.

This cause comes here on appeal to review a decree of the District Court, Western District of New York, sitting in admiralty, for $500 in favor of libelant. He was a grain shoveler in the employ of the Lake Carriers Association, which was engaged in discharging the vessel's cargo, and sustained personal injuries by tripping over the vessel's after mooring cable, while passing along the deck on the port (dock) side.

There were three mooring cables leading from winches on the vessel to the dock. These wire cables were about a foot above the deck. Libelant came

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on board about 7 a. m. by a ladder—which was shifted from place to place as occasion required. At that time the ladder was placed just aft of the forward cable and from it he walked between hatches 3 and 4 across the deck to the scuttle which led to holds 1 and 2, where he was set to work. At noon he went off the boat for lunch, going from and returning to this scuttle by the same ladder, still located in the same place. A little after 7 p. m.—it was dark then (October 17th)—he left the boat to get a sandwich and a glass of beer. At that time the vessel had been moved along so that the leg of the elevator which was discharging her, was in hatch 6, leading into hold 3. He had been at work just before he left cleaning the leg of the elevator and went ashore, not by the ladder, but by a "door" which let down from the elevator to vessel, a way sometimes used by the shovelers. Upon his return he knew he was to go to work through the after scuttle, located between hatches 7 and 8, and leading to holds 3 and 4. . Returning, he found the ladder placed at the dock side of the ship between hatches 9 and 10—hatch 10 was 2½ feet forward of the boiler house. He mounted the ladder, proceeded forward along the port (dock) side of the deck, and tripped over the mooring cable leading from the after winch, which was located between hatches 8 and 9. He testified that he did not see the cable, because it was dark, and did not know the after winch was located so far forward.

F. W. Ely, of Buffalo, N. Y., for appellant.

Irving W. Cole, of Buffalo, N. Y., for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. [1] The cause was tried with a jury under the statute providing for such procedure in causes arising on the Lakes. The practice in such cases is discussed in our opinion in Sweeting v. S. S. Western States, 159 Fed. 354, 86 C. C. A. 354. Appeal in admiralty operates as a new trial whether it was tried below by the judge alone, or with a jury.

The jury's findings as to the facts are not conclusive here, as they would be on a writ of error, where the issues had been submitted to them under a charge to which no sound exceptions had been reserved. Nevertheless the findings of the trial court, whether by judge or jury, on the questions of fact, being the conclusions reached by the tribunal which heard and saw the witnesses, are given due consideration and will not be disregarded, unless the appellate court is well satisfied that they are contrary to the weight of evidence.

[2] Examination of the testimony leads us to the conclusion reached in the District Court. This cable was an obstruction to the passageway on the port side of the vessel—a necessary obstruction, no doubt. By daylight, when its presence could be observed, the passageway was not thereby rendered unsafe. After nightfall the condition was this. On the elevator tower there was a cluster of electric lights, with a reflector behind them so arranged as to throw the light straight out from the tower; some of these lights were out of commission (bulbs broken or filaments burnt out); the reflector was rusty. Eighty or more feet aft of these tower lights was a 32-candle electric lamp, with reflector, on the port side of the boiler house, and a similar one on the starboard side. The electric lighting current of the ship was turned on, but there is a conflict of testimony as to whether the particular port lamp was burning at the time; witnesses who passed close to it, and one witness who at the time of the accident was looking aft,

did not notice that it was burning. Whether it was burning or not, we are satisfied that neither it nor the tower lights sufficiently illuminated that part of the passage, which this cable crossed, to disclose the presence of the cable to a person walking along the passageway. Two or three others besides the plaintiff tripped over it that same night.

There is evidence that when men are at work on the ship, and one of these cables is not sufficiently illuminated to be readily observed, it is usual to hang a lantern on such cable to advise those using the passageway of its presence. We think the situation on the night in question called for some such precaution. No doubt there was a safe passage fore and aft on the starboard side, no better lit than the port side. But except for the cable the port side afforded as safe a passageway as the starboard, and it might be expected that it would be used by any one working there who was not advised, or had no reason to expect, there was a cable in that part of the passageway he was using. The midship cable at that time was forward of the scuttle which led to holds 3 and 4. The ladder provided for their access to the ship was at that time located aft; between these two points this after cable ran above the deck from the after winch to the dock. There is testimony that this after winch was considerably further forward of the stern than is usual, and it might well be expected that any one coming up the ladder, and seeing no lantern between the ladder and the scuttle he was bound to, would suppose that the ladder had been placed forward of the after cable expressly to afford access to the vessel at a place whence one could go with safety to the scuttle.

Nor do we think libelant was negligent. He said that was the only boat he ever saw with the after winch so far forward of the boiler house, and that he supposed the ladder in the evening had been placed forward of the after cable, just as, when he came on board in the morning and the ladder was further forward, it was placed aft of the forward cable.

Decree affirmed, with interest and costs.

---

### S. R. FEIL CO. v. JOHN E. ROBBINS CO.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

No. 2089.

1. TRADE-MARKS AND TRADE-NAMES ⬥3—INFRINGEMENT—COMPOUND WORD.

Where a trade-mark consists of a hyphenated word, one part of which is descriptive, and not subject to exclusive appropriation, while the other is purely arbitrary, the appropriation by another of the descriptive part only is not an infringement.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names. Cent. Dig. §§ 4–7; Dec. Dig. ⬥3.]

2. TRADE-MARKS AND TRADE-NAMES ⬥57—INFRINGEMENT.

One is not required to so distinguish his goods that careless buyers will know by whom they are made and sold.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 65; Dec. Dig. ⬥57.]

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

3. TRADE-MARKS AND TRADE-NAMES ⊜⇒59—INFRINGEMENT—SAL- VET.

The trade-mark "Sal-Vet" *held* not infringed by the word "SalTone."

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 68–72; Dec. Dig. ⊜⇒59.]

4. TRADE-MARKS AND TRADE-NAMES ⊜⇒93—UNFAIR COMPETITION.

That defendant, which made and sold a veterinary remedy similar to one sold by complainant, paraphrased complainant's advertising literature, including its cuts and pictures, and also in response to decoy letters ordering complainant's remedy sent its own, *held* insufficient to establish unfair competition in a legal sense; defendant having distinguished its product by its dress and name of maker, so that any purchaser using any care would not be deceived.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. ⊜⇒93.

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

5. WORDS AND PHRASES—"SAL."

The word "sal" means salt, and is used commonly as a prefix to scientific terms, in which connection it signifies that some form of salt is the substantial element of the preparation.

Appeal from the District Court of the United States for the District of Indiana; Albert B. Anderson, Judge.

Suit in equity by the S. R. Feil Company against the John E. Robbins Company. Decree for defendant, and complainant appeals. Affirmed.

Henry M. Dowling, of Indianapolis, Ind., and Homer C. Underwood, of Ft. Wayne, Ind., for appellant.

Ferdinand Winter, of Indianapolis, Ind., and Mr. Craig, for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge. The bill in this case first charges the appellee, hereinafter termed defendant, with infringement of the registered trade-mark "Sal-Vet," hyphenated, belonging to appellant, hereinafter called complainant, by the use of the registered trade-mark "SalTone," not hyphenated, and then, secondly, charges unfair competition. On final hearing the District Court dismissed the bill for want of equity.

[5] It will be noted that complainant's trade-mark consists of two distinct terms—Sal, and Vet. From the evidence it appears that complainant's trade-mark was well established when defendant began to employ the term "SalTone"; that one of the principal ingredients of both remedies is salt; that the dictionary definition of the word "sal" is "salt," and that the word "sal" is principally used in connection with scientific subjects, as chemistry. It is the common prefix for names of various preparations, such as the well known sal volatile, sal soda, and sal ammoniac, in which connection it is always understood to mean that some form of salt is a substantial element of the preparation. It is one of those descriptive words which the courts have held could not be appropriated as a trade-mark. Thus, in Standard Paint Company v. Trinidad Asphalt Company, 220 U. S. 453, 31 Sup. Ct. 457, 55 L. Ed. 536, with reference to the word "rubberoid," the court says:

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"No sign or form of words can be appropriated as a valid trade-mark, which from the nature of the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right, for the same purpose. * * * Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection."

In the opinion rendered by the Circuit Court of Appeals for the Eighth Circuit in said cause—163 Fed., pp. 979 and 980, 90 C. C. A. 195—the authorities upon this subject are exhaustively cited.

[1-3] There is no such word as "Vet" in the dictionaries, nor does the evidence disclose any, except as used by complainant. It is alleged by defendant to be an abbreviation of the word "veterinary," but such definition is a mere assumption from the fact that it is a veterinary remedy. If it be assumed that the use of the common word "sal," in hyphenated association with the arbitrary term "Vet," may constitute a proper trade-mark, as was held in Wolfe v. Barnett, 24 La. Ann. 97, 13 Am. Rep. 111, Clinton Metalic Paint Co. v. N. Y. Metalic Paint Co., 23 Misc. Rep. 66, 50 N. Y. Supp. 437, Solis Cigar Co. v. Pozo, 16 Colo. 388, 26 Pac. 556, 25 Am. St. Rep. 279, and Paul on Trade-Marks (1903) § 40, yet where only the common and nonexclusive feature is used, there is no infringement. 38 Cyc. p. 755, and cases cited. In the present case defendant has appropriated only the term "Sal," which he and every one else was at liberty to use. As between the arbitrary term "Vet" and the word "Tone," there can be no reasonable claim to resemblance. No ordinary purchaser would take the one for the other, even in combination with the word "Sal." One is not required to so distinguish his goods that careless buyers will know by whom they are made and sold. Wrisley Co. v. Iowa Soap Co., 122 Fed. 796, 59 C. C. A. 54; Johnson v. Parr, Russ, Eq. Cases (Nova Scotia) 98. In this view of the law as applied to the facts of this case, it is of no consequence that consumers of complainant's product recognized the goods bearing the term "Sal-Vet" as the goods of complainant. Nor is it necessary to determine whether the term "Sal-Vet" had acquired a secondary meaning as representing complainant's product. Defendant has not used that term, and consequently has not infringed it.

[4] With reference to the charge of unfair competition, it appears from the record that defendant practically paraphrased complainant's circulars and other advertising, including its cuts and pictorial matter, and that it followed complainant in the use of blank order forms or coupons. It is also in evidence that, when complainant caused five decoy letters to be sent asking defendant for "Sal-Vet," defendant filled the orders with "SalTone," and that a number of people—eight in all—bought "SalTone" when they supposed they were getting "Sal-Vet." Defendant even followed complainant in using cuts in which the animals were shown to be so eager for the preparation that they besieged and partook from a barrel in which it was shipped.

In the paraphrasing of complainant's advertising literature and the approximation of its pictorial matter, defendant's actions were unethical rather than fraudulent. It is not shown that defendant ever sought, in its regular trade, to sell its product for that of complainant, but has insisted that "SalTone" was much the same and just as good as "Sal-

Vet." The marketing of the two remedies ran side by side for several years in a friendly manner. Salesmen were advised by defendant to do no "knocking," and not to seek to sell to those merchants dealing in "Sal-Vet." The diseases sought to be cured were the same, as were the animals. The evidence discloses that the two mixtures accomplished the same result. Naturally the advertising would be more or less similar both in language and pictures. There was no bad faith in using the order forms or coupons, since these are shown to be in common use in the mail order business. With the exception of the five decoy orders sent by parties under complainant's direction, and filled by sending "SalTone," it does not appear that defendant's object was to secure complainant's trade unfairly. Both seem to have been liberal advertisers in the same journals, which the record shows were such media as were likely to reach the owners of stock.

The evidence discloses somewhat overzealous business competition rather than unfair competition or fraud. There is shown no imposition upon nor complaint by the public with regard to the five decoy orders. It appears that no one was defrauded or deceived. The goods shipped to fill the same, while of similar packages to those of complainant, in shape, were plainly marked "SalTone," and carried in · distinct form and colors the notice that they were made by the defendant, as did all defendant's other goods on the market. While the action of defendant in filling these orders was reprehensible as a business transaction, it did not amount to such a degree of unfairness or fraud as would justify penalization by the granting of the relief asked for by the bill. Throughout the record it appears that defendant always used its own name as proprietor, and the trade-mark of its product, "SalTone," and that the packages did not so closely resemble each other as to be misleading to one with any discriminating sense. The confusion, if it amounts to that, was brought about by the carelessness of purchasers, who appear to have been more anxious to procure a specific for the cure of animal diseases than to buy any particular preparation.

The facts do not bring the case within the rule obtaining in cases of unfair or fraudulent competition.

The decree of the District Court is affirmed.

---

## WILLIAMSON v. OSENTON.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1915.)

### No. 1167.

1. APPEAL AND ERROR ☞1004—REVIEW—EXCESSIVENESS OF DAMAGES.

While there is no more salutary judicial power than that of relieving against excessive verdicts, and while the exercise of this power with moderation and firmness is important, under Const. U. S. Amend. 7, providing that no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law, the refusal of the District Court to grant a new trial for excessive-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ness of the verdict in a wife's action for the alienation of her husband's affections is not reviewable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3944–3947; Dec. Dig. ☞1004.]

2. HUSBAND AND WIFE ☞335—ALIENATION OF AFFECTIONS—INSTRUCTIONS.
    In a wife's action for the alienation of her husband's affections, defendant had no reason to complain of an instruction that such an accusation against a woman should be proved by evidence convincing to the minds and consciences of the jury.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1126; Dec. Dig. ☞335.]

3. HUSBAND AND WIFE ☞335—ALIENATION OF AFFECTIONS—INSTRUCTIONS.
    In a wife's action for alienation of her husband's affections, defendant had no reason to complain of instructions that if defendant enticed plaintiff's husband into sexual intercourse with her, by allurement held out, not purposely, but under the influence of passion, actual damages only could be recovered, but that, if the sexual association imputed to defendant and plaintiff's husband was sought by defendant with design to induce the husband to withdraw his affections from his wife and bestow them on defendant, plaintiff would be entitled to recover punitive damages.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1126; Dec. Dig. ☞335.]

4. HUSBAND AND WIFE ☞334—ALIENATION OF AFFECTIONS—DEFENSES.
    In a wife's action for alienation of her husband's affections, the estrangement of the husband from his wife could be taken into consideration in mitigation of the damages only, and was not a bar to the recovery of either compensatory or punitive damages.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1125; Dec. Dig. ☞334.]

5. APPEAL AND ERROR ☞1067—HARMLESS ERROR—REFUSAL OF INSTRUCTIONS.
    In an action for alienating the affections of plaintiff's husband, where defendant and the husband denied all sexual intercourse, while the evidence for plaintiff, if true, showed beyond doubt deliberate and active initiative and co-operation of both parties in the infliction of the wrong on plaintiff, the error, if any, in refusing to charge that if the enticement was on the part of the husband, and not on the part of defendant, there could be no recovery, was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Dec. Dig. ☞1067.]

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Action by Katherine Osenton against Margaret H. Williamson. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 211 Fed. 1023, 127 C. C. A. 667.

W. E. Chilton and A. M. Belcher, both of Charleston, W. Va. (Chilton, MacCorkle & Chilton, of Charleston, W. Va., S. W. Walker, of Martinsburg, W. Va., and Arthur English, of New York City, on the briefs), for plaintiff in error.

Connor Hall and R. G. Linn, both of Charleston, W. Va. (C. Beverley Broun, of Charleston, W. Va., on the briefs), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WOODS, Circuit Judge. In this action for the alienation of the affections of her husband, C. W. Osenton, Katherine Osenton recovered against Margaret H. Williamson a verdict of $35,000. A motion for a new trial was refused. Careful examination of the law of the case leads to the conclusion that all the rulings of the District Court were sound.

[1] In such an action for damages this court cannot review the action of the District Court in refusing to grant a new trial for excess in the verdict. The provision of the seventh amendment of the Constitution that "no fact once tried by a jury shall be otherwise reexaminable in any court of the United States, than according to the rules of the common law," was held in Parsons v. Bedford, 3 Pet. 433, 7 L. Ed. 732, to deny to a federal appellate court that power. N. Y. C. & H. R. R. Co. v. Fraloff, 100 U. S. 24, 25 L. Ed. 531; Blitz v. United States, 153 U. S. 308, 14 Sup. Ct. 924, 38 L. Ed. 725. There is no more salutary judicial power than that of relieving against excessive verdicts. With the changes which modern life has brought, the importance of the exercise of the power with moderation and firmness becomes more and more important, especially when it is considered that the refusal of the trial court to give relief cannot be reviewed. Large as this verdict is, the motion to reduce by granting a new trial nisi was in the discretion of the District Court and beyond the consideration of this court.

[2-4] It would unnecessarily incumber the record to consider in detail the assignments of error in the instructions to the jury. The charge was to the effect (1) that an accusation like this against a woman should be proved by evidence convincing to the minds and consciences of the jury; (2) that if the jury believed from the evidence the defendant had enticed the husband into sexual intercourse with her by allurement held out, not purposely, but under the influence of passion, then the plaintiff could recover only actual damages; (3) that if, on the other hand, they believed that the sexual association imputed to the defendant and Osenton by some of the witnesses, in her own house and on journeys together, was sought by the defendant with the design to induce the husband to withdraw his affections from his wife, and bestow them on defendant, then the plaintiff would be entitled to recover punitive damages; (4) that if the jury found the plaintiff was entitled to damages, and credited the evidence of estrangement of Osenton from his wife, this should be taken into consideration in mitigation of the damages to be awarded.

The defendant has no reason to complain of the first three of these propositions. In Tinker v. Colwell, 193 U. S. 473, 24 Sup. Ct. 505, 48 L. Ed. 754, the Supreme Court referring to a judgment for damages in favor of a husband for criminal conversation with his wife uses this language:

"The injury for which it was recovered is one of the grossest which can be inflicted upon the husband, and the person who perpetrates it knows it is an offense of the most aggravated character; that it is a wrong for which no adequate compensation can be made, and hence personal and particular malice towards the husband as an individual need not be shown, for the law implies that there must be malice in the very act itself, and we think Con-

gress did not intend to permit such an injury to be released by a discharge in bankruptcy."

We decline to make any distinction between the character of the wrong of alienating the affections of the wife from the husband by alluring with habitual criminal intercourse and that of alienating the affections of the husband from the wife by like means. The bearing of the evidence as to estrangement was properly limited in the charge to the subject of mitigation of damages. Estrangement is obviously not a bar to the recovery of either compensatory or punitive damages.

[5] The charge was a strong and comprehensive statement of all the law of the case. But if it be assumed, as defendant's counsel earnestly contended, that their requests more specifically laying down the proposition that if the enticement was on the part of Osenton, and not on the part of Mrs. Williamson, then there could be no recovery, should have been given, the error would be entirely immaterial. Looking at the case in a practical way, it is clear that the real and sole issue was that of the credibility of the witnesses. Osenton and the defendant denied all sexual intercourse, saying that their association began and continued in the relation of attorney and client and was altogether innocent, and defendant's witnesses testified in support of their statements. Witnesses for the plaintiff testified, on the other hand, to the defendant's keeping a special room for Osenton at her home adjoining her own room, and to the most brazen intercourse between them on his visits, which were very frequent; to several trips taken by Osenton and the defendant together in flaunting defiance of his marital obligations and the feelings of the plaintiff; and to vulgar indulgence by the defendant of her passion for Osenton on their trips. The jury accepted this testimony on plaintiff's behalf as true, and it showed, beyond doubt, deliberate and active initiative and co-operation of both parties in the infliction of this grievous wrong on the plaintiff. If the jury had believed the testimony of Osenton and the defendant and their witnesses, then they could not have found any verdict for the plaintiff under the charge; on the other hand, the jury's acceptance of the testimony on behalf of the plaintiff required at their hands a verdict for both compensatory and punitive damages. The sole issue being this broad one of fact, even if there had been error in not giving the specific instructions requested, it would be immaterial.

Affirmed.

BAKER v. BISHOP–BABCOCK–BECKER CO. et al.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1915.)

No. 1303.

1. BANKRUPTCY ⊚⇒415—APPLICATION FOR DISCHARGE—REFERENCE TO REFEREE OR SPECIAL MASTER—REVIEW.

On a bankrupt's application for a discharge, the findings of a referee or special master on conflicting testimony should not be disturbed, unless it appears that he has made a plain mistake, especially in cases involving the concealment of assets, where the motive and intent of the bankrupt becomes material.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 698–708, 719, 723. 724, 726, 728; Dec. Dig. ⊚⇒415.

Appeal and review in Bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

2. BANKRUPTCY ⊚⇒408—GROUNDS FOR REFUSAL OF DISCHARGE—CONCEALMENT OF PROPERTY.

Where a bankrupt's omission from his schedules of furniture which cost $50 or $60, and sold for $15, was not with any fraudulent intent, it was not ground for denying a discharge; the key to the room containing the furniture having been turned over to the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759. 762, 763; Dec. Dig. ⊚⇒408.]

Appeal from the District Court of the United States for the Southern District of West Virginia, at Bluefield, in bankruptcy; Benjamin F. Keller, Judge.

In the matter of B. F. Baker, bankrupt. From an order sustaining objections by the Bishop-Babcock-Becker Company and others to the bankrupt's application for a discharge, and denying a discharge, the bankrupt appeals. Reversed.

Joseph M. Sanders and Lucius J. Holland, both of Bluefield, W. Va. (Sanders & Crockett, of Bluefield, W. Va., on the brief), for appellant.

D. E. French, of Bluefield, W. Va., and R. E. Scott, of Richmond, Va. (Russell S. Ritz and French & Easley, all of Bluefield, W. Va., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and WADDILL, District Judge.

WADDILL, District Judge. This is an appeal from an order of the United States District Court for the Southern District of West Virginia, denying a discharge to the bankrupt, the appellant. The facts are briefly that in October, 1911, the bankrupt and L. A. Jaffee formed a copartnership for the purpose of conducting a news and cigar stand at the Altamont Hotel, Bluefield, and also a news, cigar, and soda fountain stand in the L. Kaufman Building, Bluefield; the latter business being known as the "Idle Hour." The copartnership continued a few months only, and in February, 1912, Baker bought out his partner's interest, and continued business in his own name until the 8th of April, 1912, when he filed a voluntary petition in bankruptcy. The case was regularly proceeded with, W. C. Pollock selected as trustee, and

on the 11th of March, 1913, the bankrupt made his application for discharge.

On the return day of the notice to show cause against the granting of the same, certain creditors, the appellees herein, noted their appearances, and filed specifications of objection to the granting of the discharge, whereupon, pursuant to the rules of practice of the district (section 1, rule 44, of Rules of Practice of the District Court), the matters arising upon said specifications were referred to H. B. Lee, Esq., referee in bankruptcy, as special master, to report upon the same. Six specifications of objection were filed, only one of which is necessary to be set out herein, namely, the first, that the bankrupt—

"within four months prior to his adjudication in bankruptcy, and while a bankrupt, he knowingly and fraudulently concealed from the trustee certain property, consisting of bedroom furniture, located immediately overhead in the second floor of the building where he conducted one of his places of business, which property the said bankrupt used for his private purposes in private apartments occupied by him, which property belonged to his estate in bankruptcy, and is worth probably the sum of $75, with intent to hinder, delay, and defraud his creditors."

The referee and special master duly made and filed his report, certifying that only the testimony of the bankrupt and that of the trustee of his estate had been adduced before him, which he caused to be taken down stenographically and returned with his report, and he found and certified to the court that there was no testimony whatever to support two of the specifications of objection, and only testimony as to the first charge herein set forth, stated in three different specifications, and another regarding a certain diamond ring set forth in another specification, and that there was not sufficient evidence to sustain the objection to the discharge as to either of the four specifications concerning which some testimony was introduced, and he recommended accordingly that the bankrupt be granted his discharge. To this action of the referee and special master, the appellees excepted, and asked that the District Court review and revise the same. The case was thereupon duly presented to the District Court, and that court on the 21st of May, 1914, entered its order in the following language:

"Ordered, that the report of the said special master be and it hereby is in respect of the first specification of objection, overruled, and set aside; that the said first specification of objection of the Bishop-Babcock-Becker Company, a corporation, a creditor and party in interest herein, be and the same is hereby sustained; that the application for discharge of the said B. F. Baker, a bankrupt, be and the same hereby is denied."

From the action of the District Court this appeal was taken by the bankrupt. But two questions are presented for the consideration of this court upon the record, namely, whether or not the lower court erred in setting aside the action of the referee and special master in reference to the first specification of objection, and in holding that the evidence sustained the objection to the discharge, and in refusing the same.

[1, 2] Just what weight should be given to the finding of a referee or special master upon an application for a discharge, has been the

subject of some difference of opinion among the courts; but we think it may fairly be stated that the consensus is that where a referee and special master's action is based upon conflicting testimony, and he heard and saw the witnesses, that his findings ought to be accepted, and not disturbed, unless it appears that he has made a plain mistake; and this is particularly true in cases involving the concealment of assets, where the motive and intent of the bankrupt becomes material. In this class of cases much weight is necessarily due to the conclusions of the tribunal which had the opportunity of seeing and observing the manner and deportment of the witnesses whose acts were called in question, or of those who may have been cognizant of the transaction. In re Lafleche (D. C. Vermont) 109 Fed. 307; Ohio Valley Bank v. Mack, 163 Fed. 155, and cases cited, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184; In re Wheeler, 165 Fed. 188, 91 C. C. A. 222 (C. C. A. 7th Circuit); Epstein v. Steinfeld, 210 Fed. 236, 127 C. C. A. 24 (C. C. A. 3d Circuit). In this case we have the findings of fact by the referee and special master, and have carefully and critically examined the testimony; and our conclusion is that he was correct in his finding, and that the evidence is entirely insufficient to justify a refusal of the discharge.

The objection thereto related especially to the alleged failure to list certain bedroom furniture used by the bankrupt and his clerk in a room over the store in which he did business, and while it is averred that his misconduct in this regard was fraudulent, and with intent to conceal property from his creditors, we do not think the testimony taken as a whole, or any reasonable inference that can be drawn therefrom, justifies that conclusion. On the contrary, the circumstances support a different conclusion; that is, that the small amount of household effects, that cost only some $50 or $60 and sold for $15, was not purposely and with fraudulent intent left out of the schedules. The bankrupt's explanation is that he thought it would be included in the furniture in the place of business itself, and that he gave to his trustee his key to the room in which it was, and called his attention to the same. The trustee admits receiving the key, but does not recall having had his attention called especially to the property; but it is quite evident from the entire case that what the bankrupt did was not with any fraudulent intent, and the mere omission of the articles from his schedule is not in itself sufficient to justify the denial of the discharge. In re Slingluff (D. C.) 105 Fed. 502. Moreover, the property was partly owned by the clerk of the bankrupt, who used the same, which might in part explain its omission, aside from the improbability of the bankrupt's attempting in giving his assets, scheduled at a considerable amount, to knowingly and purposely commit a fraud which would disentitle him to a discharge about so small a matter as that involved in the exception.

It follows from what has been said that the action of the lower court should be reversed, at the cost of the appellees.

Reversed.